# EXHIBIT 3

**Query    Reports    Utilities    Help    Log Out**

ACCO,(KESx),DISCOVERY,MANADR,RELATED-G

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
### CIVIL DOCKET FOR CASE #: 8:22-cv-01664-DOC-KES

| | |
|---|---|
| Mitchell Cohen et al v. Kia America, Inc. et al | Date Filed: 09/09/2022 |
| Assigned to: Judge David O. Carter | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Karen E. Scott | Nature of Suit: 355 Motor Vehicle Prod. |
| Related Case: 8:22-cv-01440-DOC-KES | Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Mitchell Cohen**
*individually and on behalf of all others
similarly situated*

represented by **Jennifer A Lenze**
Lenze Lawyers PLC
1300 Highland Avenue Suite 207
Manhattan Beach, CA 90266
310-322-8800
Fax: 310-322-8811
Email: jlenze@lenzelawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Fegan**
Fegan Scott LLP
150 South Wacker Drive, 24th Floor
Chicago, IL 60606
312-741-1019
Fax: 312-264-0100
Email: beth@feganscott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan D. Lindenfeld**
Fegan Scott LLC
140 Broadway, 46th Floor
New York, NY 10005
332-216-2101
Fax: 312-264-0100
Email: jonathan@feganscott.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

represented by

**Pauline Ragsdale**
*individually and on behalf of all others similarly situated*

Jennifer A Lenze
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Elizabeth A. Fegan
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Jonathan D. Lindenfeld
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Herbert Taylor**
*individually and on behalf of all others similarly situated*

represented by **Jennifer A Lenze**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Fegan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan D. Lindenfeld**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kia America, Inc.**

**Defendant**

**Kia Corporation**

**Defendant**

**Hyundai Motor America**

**Defendant**

**Hyundai Motor Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| | | |
|---|---|---|
| 09/09/2022 | 1 | COMPLAINT Receipt No: ACACDC-33954720 - Fee: $402, filed by Plaintiff MITCHELL COHEN. (Attorney Jennifer A Lenze added to party MITCHELL COHEN(pty:pla))(Lenze, Jennifer) (Entered: 09/09/2022) |
| 09/09/2022 | 2 | CIVIL COVER SHEET filed by Plaintiff MITCHELL COHEN. (Lenze, Jennifer) (Entered: 09/09/2022) |
| 09/09/2022 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff MITCHELL COHEN. (Attachments: # 1 Summons Motor Company, # 2 Summons Kia America, Inc.)(Lenze, Jennifer) (Entered: 09/09/2022) |
| 09/13/2022 | 4 | NOTICE OF ASSIGNMENT to District Judge Cormac J. Carney and Magistrate Judge Douglas F. McCormick. (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 6 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendants Hyundai Motor America, Hyundai Motor Company, Kia America, Inc. (Attachments: # 1 Summons for Hyundai Motor Company, # 2 Kia America, Inc) (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 8 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Elizabeth A Fegan on behalf on Plaintiffs. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 9 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Jonathan D Lindenfeld on behalf on Plaintiffs. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 09/13/2022) |
| 09/13/2022 | 10 | |

|  |  | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening) 1 . The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. (ghap) (Entered: 09/13/2022) |
|---|---|---|
| 09/13/2022 | 11 | NOTICE of Interested Parties filed by Plaintiff Mitchell Cohen, Pauline Ragsdale, Herbert Taylor, (Lenze, Jennifer) (Entered: 09/13/2022) |
| 09/13/2022 | 12 | NOTICE of Related Case(s) filed by Plaintiff Mitchell Cohen, Pauline Ragsdale, Herbert Taylor. Related Case(s): 8:22-cv-01440; 8:22-cv-01548 (Lenze, Jennifer) (Entered: 09/13/2022) |
| 09/15/2022 | 13 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 21-01-Related Case- filed. Related Case No: 8:22-cv-01440-DOC-(KESx). Case transferred from Judge Cormac J. Carney and Magistrate Judge Douglas F. McCormick to Judge David O. Carter and Magistrate Judge Karen E. Scott for all further proceedings. The case number will now reflect the initials of the transferee Judge 8:22-cv-01664-DOC-(KESx). Signed by Judge David O. Carter (dve) (Entered: 09/15/2022) |
| 09/16/2022 | 14 | APPLICATION of Non-Resident Attorney Jonathan D. Lindenfeld to Appear Pro Hac Vice on behalf of Plaintiffs Mitchell Cohen, Pauline Ragsdale, Herbert Taylor (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-33995358) filed by Plaintiff Mitchell Cohen, Pauline Ragsdale, Herbert Taylor. (Lenze, Jennifer) (Entered: 09/16/2022) |
| 09/16/2022 | 15 | APPLICATION of Non-Resident Attorney Elizabeth A. Fegan to Appear Pro Hac Vice on behalf of Plaintiffs Mitchell Cohen, Pauline Ragsdale, Herbert Taylor (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-33995630) filed by Plaintiff Mitchell Cohen, Pauline Ragsdale, Herbert Taylor. (Lenze, Jennifer) (Entered: 09/16/2022) |
| 09/16/2022 | 16 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Elizabeth A. Fegan to Appear Pro Hac Vice on behalf of Plaintiffs Mitchell Cohen, Pauline Ragsdale, Herbert Taylor (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-33995630) 15 , APPLICATION of Non-Resident Attorney Jonathan D. Lindenfeld to Appear Pro Hac Vice on behalf of Plaintiffs Mitchell Cohen, Pauline Ragsdale, Herbert Taylor (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-33995358) 14 . The following error(s) was/were found: Local Rule 83-2.1.3.3(b) Proposed order not attached. (lt) (Entered: 09/16/2022) |
| 09/19/2022 | 17 | ORDER by Judge David O. Carter: Granting 15 Non-Resident Attorney Elizabeth A. Fegan APPLICATION to Appear Pro Hac Vice on behalf of Plaintiffs, designating Jennifer A. Lenze as local counsel. (twdb) (Entered: 09/19/2022) |
| 09/19/2022 | 18 | ORDER by Judge David O. Carter: Granting 14 Non-Resident Attorney Jonathan D. Lindenfeld APPLICATION to Appear Pro Hac Vice on behalf of |

| | | Plaintiffs, designating Jennifer A. Lenze as local counsel. (twdb) (Entered: 09/19/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/06/2022 07:07:07 | | | |
| **PACER Login:** | jb0014 | **Client Code:** | 71273-10008 |
| **Description:** | Docket Report | **Search Criteria:** | 8:22-cv-01664-DOC-KES End date: 10/6/2022 |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

Jennifer A. Lenze, CA Bar # 246858
LENZE LAWYERS, PLC.
999 Corporate Drive, Suite 100
Ladera Ranch, CA 92694
Telephone: (310) 322-8800
Facsimile: (310) 322-8811
jlenze@lenzelawyers.com

ELIZABETH A. FEGAN (*pro hac vice* forthcoming)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: 312.741.1019
Facsimile: 312.264.0100
beth@feganscott.com

JONATHAN D. LINDENFELD (*pro hac vice* forthcoming)
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Telephone: 332.216.2101
Facsimile: 917.725.9346
jonathan@feganscott.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL COHEN, PAULINE RAGSDALE, and HERBERT TAYLOR, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>KIA AMERICA, INC., KIA CORPORATION, HYUNDAI MOTOR AMERICA, and, HYUNDAI MOTOR COMPANY,<br><br>          Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

i

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   JURISDICTION ............................................................................. 5

III.  PARTIES ............................................................................................... 5

   A.   Plaintiffs ......................................................................................... 5

   B.   Defendants .................................................................................... 10

IV.  SUBSTANTIVE ALLEGATIONS ............................................. 14

   A.   Hyundai and Kia become one of the most popular automakers in the United States by promoting the safety and reliability of their vehicles ............................ 14

   B.   Auto thefts pose a serious safety risk ................................................. 21

   C.   Engine immobilizers are an inexpensive and proven means to dramatically reduce auto theft ................................................. 26

   D.   As a result of the Defect, Class Vehicles are stolen at an astronomical rate ........ 33

   E.   Defendants knowingly manufactured and sold millions of Class Vehicles that are easily stolen in less than ninety seconds. ...................................... 41

   F.   HMA and KA falsely claim to offer the best warranty program in the nation, yet fail to offer a remedy for the Defect. ............................................ 55

   G.   Fraudulent Omission/Concealment Allegations ................................. 57

V.   TOLLING OF STATUTES OF LIMITATIONS ............................ 60

   A.   Discovery Rule ............................................................................ 60

   B.   Fraudulent Concealment ............................................................. 61

   C.   Estoppel .................................................................................... 62

VI.  CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS ............ 63

VII. CLASS ALLEGATIONS ............................................................... 71

VIII. CAUSES OF ACTION .................................................................. 75

   VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *ET SEQ.* ...................................... 75

   VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 ................................................. 79

VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500, *ET SEQ*................................................................81

BREACH OF IMPLIED WARRANTY, BASED ON CALIFORNIA LAW ............83

VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT FLA. STAT. § 501.201 *ET SEQ*. ...................................86

BREACH OF IMPLIED WARRANTY, FLA. STAT. § 672.314................................88

VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. §§ 325D.43, *ET SEQ* ..................................91

VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.69, SUBD. 1 *ET SEQ*. AND MINN. STAT. §§ 8.31, *ET SEQ*. .................93

BREACH OF IMPLIED WARRANTY, MINN. STAT. § 336.2-314 ........................95

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,  GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212 ...................................................................98

IX.   REQUEST FOR RELIEF ........................................................................................102

X.    DEMAND FOR JURY TRIAL ..............................................................................103

CLASS ACTION COMPLAINT

Plaintiffs Mitchell Cohen, Pauline Ragsdale, and Herbert Taylor (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated, complain of Defendants Kia America, Inc., formerly known as KIA Motors America, Inc. ("KA"), KIA Corporation, formerly known as KIA Motors Corporation ("KC," and with KA, "Kia"), Hyundai Motor Company ("HMC"), and Hyundai Motor America ("HMA," and with HMC, "Hyundai") (Kia and Hyundai are collectively referred to as "Defendants"), based upon their personal knowledge as to facts specific to them and based upon the investigation of counsel in all other respects, as follows:

## I.   INTRODUCTION

1.   Over fifty years ago, the U.S. Department of Transportation ("DOT") recognized that "stolen cars constitute a major hazard to life and limb … [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968). In recognition of the safety risk caused by auto thefts, Federal Motor Vehicle Safety Standards ("FMVSS" or "Safety Standards") were promulgated.

2.   One of the most fundamental Safety Standards is No. 144, which requires manufacturers to install in each of their vehicles "a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self–mobility, of the vehicle, or both." 49 C.F.R. § 571.114 S5.1.1.

3.   Today, and at all times relevant to this Complaint, the National Highway Traffic Safety Administration ("NHTSA") works with manufacturers to ensure the installation of "anti-theft devices, like immobilizer systems, as standard equipment on

their vehicles."[1]

4.    An engine immobilizer is an anti-theft device that can prevent vehicles from starting unless a verified code is received by a transponder module that controls the engine. *See* 81 Fed. Reg. 66,833 (Sept. 29, 2016). This anti-theft device thus prevents the vehicle from being "hot wired" or started by any means other than an authorized key. Engine immobilizers have been described as "simple and low-cost anti-theft device[s]."[2] The cost to a manufacturer—such as Defendants—to install an immobilizer is approximately $50 per vehicle.

5.    Engine immobilizers have been found to be highly effective at preventing auto thefts. Indeed, Defendants have acknowledged in filings with the National Highway Traffic Safety Administration ("NHTSA"), which predate the sale of the first Class Vehicle, that the installation of immobilizers results in "a clear reduction in vehicle thefts," ranging from 50% to 80% between pre- and post-introduction of immobilizer devices as standard equipment. 75 Fed. Reg. 1,447, 1448 (Jan. 11, 2010).

6.    Yet, despite their acknowledgment of the effectiveness of immobilizers of reducing auto thefts (and thus, minimizing the risk of personal injuries), and the relatively negligible cost to install the component, Defendants have knowingly sold millions of Class Vehicles[3] that do not contain this industry standard safety component and have

---

[1] https://www.nhtsa.gov/road-safety/vehicle-theft-prevention (last accessed Aug. 30, 2022).

[2] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 14, 2013). CentER Discussion Paper Series No. 2013-004, TILEC Discussion Paper No. 2013-001, Available at SSRN: https://ssrn.com/abstract=2202165.

[3] The "Class Vehicles" mean all 2011-2022 Kia vehicles or 2015-2022 Hyundai vehicles which do not contain an engine immobilizer. On information and belief, this

other design flaws that place millions of people at risk.

7. Design flaws in the Class Vehicles allow thieves to steal a Class Vehicle in less than ninety seconds. The series of design flaws in the Class Vehicles includes: (i) the windows do not contain alarms and can easily be knocked off their frames; (ii) the steering columns do not contain adequately secure casings, allowing easy access to the ignition; (iii) the ignition lock cylinders can be easily removed with minimal force, and in so doing, leaves the ignition switch intact; (iv) the exposed ignition switch can be started with any set of pliers, or the current generation of thieves' tool of choice, a USB connector; and (v) the Class Vehicles do not contain engine immobilizers (collectively, the "Defect").

8. The number of Class Vehicle thefts has been steadily growing across the United States since 2013 (*see infra* ¶¶ 158-169), but in 2020, the number of Class Vehicle thefts skyrocketed. After a group of teenagers in Milwaukee, Wisconsin calledthe "Kia Boyz" discovered how the Defect made the theft of the Class Vehicles simple, the theft rate for Kia vehicles in the city increased by almost 3,200% year-over-year in the first six months of 2021, and thefts for Hyundai vehicles were up more than 1,700% over the same period.[4] While Defendants account for less than 10% of the U.S. auto market, 66% of all vehicles stolen in the city during this period were manufactured and sold by Defendants.[5]

---

includes all Hyundai and Kia models, except for the most expensive trim packages, and following models: Kia Niro; Kia Stinger; Hyundai Azera; Hyundai Equus; Hyundai G80; Hyundai Genesis; and Hyundai Ioniq.

[4] https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/ (last accessed Aug. 26, 2022).

[5] https://www.wsj.com/articles/too-easy-to-steal-in-milwaukee-car-theft-kia-hyundai-city-council-11642720288 (last accessed Aug. 26, 2022).

9. Since then, thefts of Class Vehicles have skyrocketed nationwide. For example, St. Paul, Minnesota reported a 1,300% increase in Kia thefts and nearly 600% in Hyundai thefts over the same period.[6] St. Petersburg, Florida Police reported that 41% of vehicles stolen in approximately the first six months of 2022 were Hyundai and Kia vehicles.[7]

10. Over the last few months, Defendants have acknowledged the existence of the Defect, yet they have failed to issue a safety defect recall, provide warranty coverage, or otherwise attempt to remedy the Defect in the Class Vehicles.

11. Had Plaintiffs and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

12. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants caused Plaintiffs and the members of the Class damages, including, but not limited to, loss of value, loss of use of the vehicles, and repair costs.

13. Accordingly, Plaintiffs bring this action to redress Defendants' misconduct. Plaintiffs seek equitable relief in the form of an adequate remedy for the Defect and an appropriate curative notice regarding the existence the Defect, recovery of damages, a

[6] https://www.fox9.com/news/minneapolis-woman-had-kias-targeted-three-times-in-six-months (last accessed Aug. 26, 2022).

[7] https://www.abcactionnews.com/news/region-pinellas/st-pete-police-warn-about-troubling-car-theft-trend-targeting-kia-hyundai-cars (last accessed Aug. 26, 2022).

repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle and damage caused by the Defect.

## II. JURISDICTION

14. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

15. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business and because HMA and KA are headquartered in this district. HMA and KA advertised in this district and Defendants received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Defendants also have research and development offices in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

16. This Court has personal jurisdiction over Defendants by virtue of their transactions and business conducted in this judicial district, and because HMA and KA are headquartered in California. Defendants have transacted and done business, and violated statutory and common law, in the State of California and in this judicial district.

## III. PARTIES

### A. Plaintiffs

17. Plaintiff Mitchell Cohen is a resident of Jupiter, Florida. Mr. Cohen

purchased a new 2012 Kia Sorento LX from Bev Smith Kia, located at 5655 US-1, Fort Pierce, Florida, in or around September 2011. The 2012 Kia Sorento LX is installed with a traditional "insert-and-turn" key ignition system and Kia does not offer an immobilizer in this trim package (as a standard feature or as an add on).[8]

18. Bev Smith Kia is part of Kia's network of authorized dealers across the United States, and is promoted on KA's website, which includes an updated list of the dealership's inventory.[9]

19. Mr. Cohen purchased his Class Vehicle because he believed that the vehicle was safe, reliable, and of the highest quality. When shopping for his Class Vehicle, Mr. Cohen researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing his Class Vehicle, Mr. Cohen heard, viewed, and/or read Kia marketing materials and advertisements including brochures, commercials, and internet advertisements, which were disseminated from California, that touted the quality, reliability and safety of Kia vehicles.

20. At no point before Mr. Cohen purchased his vehicle did Kia disclose that his vehicle suffered from the Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

21. Mr. Cohen did not receive the benefit of his bargain. Mr. Cohen purchased a

---

[8] https://www.auto-brochures.com/makes/Kia/Sorento/Kia_US%20Sorento_2012.pdf (last accessed Aug. 26, 2022).

[9] https://www.kia.com/us/en/find-a-dealer/result?zipCode=34982 (last accessed Aug. 24, 2022).

CLASS ACTION COMPLAINT

vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Mr. Cohen's Class Vehicle.

22.   Had Defendants disclosed the Defect, Mr. Cohen would not have purchased his Class Vehicle, or would have paid less to do so.

23. Mr. Cohen purchased his vehicle and it included the manufacturer's warranty. At all times, Mr. Cohen maintained his vehicle in accordance with Kia's guidance.

24.   Mr. Cohen would purchase a Hyundai or Kia vehicle in the future if Defendants' representations about the vehicle, including its quality, safety, and durability, were accurate.

25.   Plaintiff Pauline Ragsdale is a resident of Northwood, Iowa. Ms. Ragsdale purchased a new 2020 Kia Sportage LX from Kia of Mankato, located at 160 St Andrews Dr, Mankato, Minnesota, in June 2020.  The 2020 Kia Sportage LX is installed with a traditional "insert-and-turn" key ignition system and Kia does not offer an immobilizer in this trim package (as a standard feature or as an add on).[10]

26.   Kia of Mankato is part of Kia's network of authorized dealers across the United States, and is promoted on KA's website, which includes an updated list of the dealership's inventory.[11]

27.   Ms. Ragsdale purchased her Class Vehicle because she believed that the

[10] https://www.kiamedia.com/us/en/models/sportage/2020/features (last accessed Aug. 24, 2022).
[11] https://www.kia.com/us/en/find-a-dealer/result?zipCode=56001 (last accessed Aug. 24, 2022).

vehicle was safe, reliable, and of the highest quality. When shopping for her Class Vehicle, Ms. Ragsdale researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing his Class Vehicle, Ms. Ragsdale heard, viewed, and/or read Kia marketing materials and advertisements including brochures, commercials, and internet advertisements, which were disseminated from California, that touted the quality, reliability and safety of Kia vehicles.

28.   At no point before Ms. Ragsdale purchased her vehicle did Kia disclose that her vehicle suffered from the Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

29.   Ms. Ragsdale did not receive the benefit of her bargain. Ms. Ragsdale purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Ms. Ragsdale's Class Vehicle.

30.   Had Defendants disclosed the Defect, Ms. Ragsdale would not have purchased her Class Vehicle, or would have paid less to do so.

31.   Ms. Ragsdale purchased her vehicle new and it included the manufacturer's warranty. Ms. Ragsdale still owns her vehicle, which is used for personal, family and/or household uses. At all times, Ms. Ragsdale maintained her vehicle in accordance with Kia's guidance.

32.   Ms. Ragsdale would purchase a Hyundai or Kia vehicle in the future if Defendants' representations about the vehicle, including its quality, safety, and

8

durability, were accurate.

33. Plaintiff Herbert Taylor is a resident of Decatur, Georgia. Mr. Taylor purchased a new 2016 Hyundai Sonata from Rick Case Hyundai, located at 3180 Satellite Blvd., Duluth, Georgia, on March 30, 2016. Mr. Taylor's 2016 Hyundai Sonata is installed with a traditional "insert-and-turn" key ignition system and Hyundai did not offer an immobilizer for his vehicle.

34. Rick Case Hyundai is part of Hyundai's network of authorized dealers across the United States, and is promoted on HMA's website, which includes an updated list of the dealership's inventory.[12]

35. Mr. Taylor purchased his Class Vehicle because he believed that the vehicle was safe, reliable, and of the highest quality. When shopping for his Class Vehicle, Mr. Taylor researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing his Class Vehicle, Mr. Taylor heard, viewed, and/or read Hyundai marketing materials and advertisements including brochures, commercials, and internet advertisements, which were disseminated from California, that touted the quality, reliability and safety of Hyundai vehicles.

36. At no point before Mr. Taylor purchased his vehicle did Hyundai disclose that his vehicle suffered from the Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

37. Mr. Taylor did not receive the benefit of his bargain. Mr. Taylor purchased

---

[12] https://www.hyundaiusa.com/us/en/dealer-locator (last accessed Sept. 1, 2022).

a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Mr. Taylor's Class Vehicle.

38.    Had Defendants disclosed the Defect, Mr. Taylor would not have purchased his Class Vehicle, or would have paid less to do so.

39. Mr. Taylor purchased his vehicle and it included the manufacturer's warranty. At all times, Mr. Taylor maintained his vehicle in accordance with Hyundai's guidance.

40.    Mr. Taylor would purchase a Hyundai or Kia vehicle in the future if Defendants' representations about the vehicle, including its quality, safety, and durability, were accurate.

## B.    Defendants

41.    Defendant HMA is a California corporation with its principal place of business in Fountain Valley, California. HMA also maintains a 4,300-acre testing facility in Irwindale, California, and an engineering facility in Detroit, Michigan.  HMA is a subsidiary of HMC and is actively engaged in manufacturing, assembling, marketing, and distributing Hyundai vehicles sold in California and the rest of the United States.

42.    HMA's C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Hyundai vehicles are located at the company's Fountain Valley headquarters. As detailed *infra*, the decisions regarding the marketing and sale of the Class Vehicles, the development and issuance of safety recalls, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by HMA at its

California headquarters.

43. In documents filed with NHTSA related to safety recalls for the Class Vehicles, HMA is listed as the manufacturer of the recalled vehicles.[13] Additionally, in HMA's recall notices to owners, it instructs Class Vehicle owners to visit the "nearest Hyundai dealer" to have the repair completed.[14]

44. Defendant HMC is a South Korean corporation with its headquarters located in Seoul, South Korea. HMC is the parent corporation of HMA and owns a 33.88% stake in KC.

45. HMC promotes on its own website "all Hyundai models" sold by HMA in the United States.[15]

46. HMC states that it "help[s] [its] overseas subsidiaries, sales corporations, and newly established enterprises in particular to establish the direction of their customer service strategies."[16] HMC further claims to have "established an ICT-based convergence education system in order to bolster the competency of its employees in customer contact channels such as vehicle sales and product CS, and has also conducted knowledge-enhancing training on vehicles (electric vehicles, luxury vehicles) and customer consultation (CRM, CS) skills improvement training in an effort to nurture

---

[13] *E.g.*, https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V543-3047.PDF (last accessed Aug. 26, 2022).

[14] https://static.nhtsa.gov/odi/rcl/2020/RCONL-20V543-0565.pdf (last accessed Aug. 26, 2022).

[15] https://www.hyundai.com/worldwide/en/vehicles (last accessed Aug. 26, 2022).

[16] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf. (last accessed Aug. 24, 2022).

experts in vehicle sales, customer interaction, and customer service."

47. On information and belief, HMC and HMA control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

48. For example, HMC developed a "dealership facility program-known as the 'Global Dealership Space Identity,'" which was implemented by HMA across the United States.[17] With the assistance of a third party, HMA created "a Global Design Space Identity (GDSI) Facility Standards Manual that outlined all of the new requirements for interior and exterior elements that US dealerships would need." HMA also "developed the GDSI Facility Design Services Program—a multi-faceted … program including individual surveys of every dealership, site-specific recommendations, and the installation of all new brand elements." As part of the GDSI Facility Design Services Program, HMA provides "every dealer with a complete design intent document" and each dealership works with the third-party retained by HMA "from start to finish— ending each project with an on-site GDSI Facility Compliance Review to make sure every installation was successful[.]"

---

[17] https://www.agi.net/our-work/a-subsidiary-of-hyundai-motor-company-of-korea-distributes-cars-and-sport-utility-vehicles-throughout-the-united-states (last accessed Aug. 24, 2022).

49.    Defendant KA is a California corporation with its principal place of business in Irvine, California. KA is a subsidiary of KC and is actively engaged in manufacturing, assembling, marketing, and distributing Kia vehicles sold in the United States.

50.    In documents filed with NHTSA related to safety recalls for the Class Vehicles, HMA is listed as the manufacturer of the recalled vehicles.[18] Additionally, in KA's recall notices to owners, it instructs Class Vehicle owners to have the repair completed at the "nearest Kia dealer," which can be located through the link to KA's website listed on the notice.[19]

51.    KA's C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Kia vehicles are located at the company's Irvine headquarters. As detailed *infra*, the decisions regarding the marketing and sale of the Class Vehicles, the development and issuance of safety recalls, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by KA at its California headquarters.

52.    Defendant KC is a South Korean corporation with its headquarters located in Seoul, South Korea. KC is the parent corporation of KA.

53.    On its own website, KC promotes Kia branded vehicles sold by KA in the United States.[20]

54.    On information and belief, KA and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer

---

[18] *E.g.*, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V331-5686.PDF (last accessed Aug. 26, 2022).

[19] https://static.nhtsa.gov/odi/rcl/2021/RCONL-21V331-7827.pdf  (last accessed Aug. 26, 2022).

[20] *E.g.*, https://worldwide.kia.com/na/sportage (last accessed Aug. 24, 2022).

a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

## IV. SUBSTANTIVE ALLEGATIONS[21]

### A. Hyundai and Kia become one of the most popular automakers in the United States by promoting the safety and reliability of their vehicles.

55.  HMC was established in South Korea in 1967 and started selling vehicles in the United States in 1986 through its subsidiary HMA. Since that time, HMC has become one of the largest automakers in the United States and around the world.

56.  KC was founded in 1944 manufacturing bicycles and motorcycles and is Korea's oldest manufacturer of motor vehicles. KA was formed in 1992 when KC first imported its vehicles into the United States.

57.  In 1999, HMC announced that it had acquired a controlling interest in KC, and that KC would obtain an ownership interest in approximately twenty-two (22) HMC subsidiaries. In subsequent years, HMC divested a portion of its interest and currently controls approximately 34% of KC.

58.  Through its network of more than 800 dealerships nationwide, HMA sells and services its vehicles, including the Hyundai Elantra (Hyundai's best-selling model), Hyundai Santa Fe, Hyundai Tucson, and Hyundai Accent. Likewise, KA sells and services a complete line of vehicles in the U.S. through its own network of over 700 dealers.

---

[21] Emphasis added throughout unless stated otherwise.

59. Collectively, Defendants are the world's fourth-largest automaker. Defendants reported global sales of 6.6 million vehicles in 2022, down from 7.19 million vehicles in 2019.[22]

60. Within the United States alone, HMA sold an average of 625,264 vehicles per year since 2006, approximately 4.13% of the total U.S. market:[23]

| Year | Vehicles Sold | Market Share (%) |
|---|---|---|
| 2006 | 455,520 | 2.75 |
| 2007 | 467,009 | 2.89 |
| 2008 | 401,742 | 3.03 |
| 2009 | 435,064 | 4.17 |
| 2010 | 538,228 | 4.64 |
| 2011 | 645,691 | 5.05 |
| 2012 | 703,007 | 4.85 |
| 2013 | 720,783 | 4.63 |
| 2014 | 725,718 | 4.39 |
| 2015 | 761,710 | 4.36 |
| 2016 | 768,057 | 4.38 |
| 2017 | 664,943 | 3.86 |
| 2018 | 667,634 | 3.85 |
| 2019 | 688,771 | 4.03 |
| 2020 | 622,269 | 4.26 |
| 2021 | 738,081 | 4.91 |

61. Over the same time period, KA sold an average of 500,351 vehicles per year, or approximately 3.3% of the U.S. market:[24]

| Year | Vehicles Sold | Market Share (%) |
|---|---|---|
| 2006 | 294,302 | 1.78 |

---

[22] https://www.wardsauto.com/industry-news/numbers-tell-story-who-s-best-car-company-world (last accessed August 24, 2022); https://www.reuters.com/article/us-hyundai-motor-sales/hyundai-kia-salesdrop-to-seven-year-low-on-china-weakness-forecast-better-2020-idUSKBN1Z10AC (last accessed Aug. 24, 2022).

[23] https://carsalesbase.com/us-hyundai/ (last accessed Aug. 24, 2022).

[24] https://carsalesbase.com/us-kia/ (last accessed Aug. 25, 2022).

15

| | | |
|---|---|---|
| **2007** | 305,473 | 1.89 |
| **2008** | 273,397 | 2.06 |
| **2009** | 300,063 | 2.88 |
| **2010** | 366,268 | 3.16 |
| **2011** | 485,492 | 3.8 |
| **2012** | 557,599 | 3.85 |
| **2013** | 535,179 | 3.43 |
| **2014** | 580,234 | 3.51 |
| **2015** | 625,818 | 3.58 |
| **2016** | 647,598 | 3.69 |
| **2017** | 589,668 | 3.42 |
| **2018** | 589,673 | 3.4 |
| **2019** | 615,338 | 3.6 |
| **2020** | 586,105 | 4.01 |
| **2021** | 701,416 | 4.66 |

62.     Additionally, a recent report by McKinsey & Company found that over twice as many second-owner used vehicles are sold in the United States each year compared to new vehicles.[25]

63.     Defendants have been able to transform themselves into such large players in the U.S. auto-market based on its assurances to consumers of care and quality. For example, HMC touts itself as being "committed to becoming a lifetime partner in automobiles and beyond[.]"[26]

64.     On HMC's webpage devoted to promoting its vehicles sold around the world, including those sold by HMA, HMC touts the safety of its vehicles.[27] HMC states that it "is focusing on technology that can be applied to as many passenger cars as possible[,]"

[25] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-new-platforms-accelerating-sales-in-a-digitally-disrupted-market# (last accessed Aug. 24, 2022).

[26] https://www.hyundai.com/worldwide/en/company/news/news-room/news/hyundai-motor-reports-december-2019-global-sales-0000016366 (last accessed Aug. 24, 2022).

[27] *E.g.*, https://www.hyundai.com/worldwide/en/suv/tucson-2021/safety (last accessed (last accessed Aug. 24, 2022).

CLASS ACTION COMPLAINT

"[w]hile having [a] constant effort on car safety, Hyundai drives the adoption of new technologies."[28] HMC further advertises that "[f]rom the moment you step into a Hyundai Motor's vehicle, safety surrounds you from all corners at every second, even in places you never imagined."[29]

65.    HMC further touts its continued improvement of quality and safety measures and how it conducts extensive post-sale monitoring of its vehicles:[30]

> **[W]e continue upgrading overall quality and safety systems not only by promoting preemptive quality and safety measures from the vehicle development stage, but also by preventing any significant problems afterward through early detection, early improvement and early after-sales actions**. In particular, we will establish a sustainable safety management system designed to maximize customer satisfaction and strengthen trust by developing quality and safety training programs, operating quality and safety reporting centers, analyzing safety information, and establishing safety test sites.

66.    In HMA's public statements, it poses a question: "What if [a car company] cracked the entire industry wide open, peered more deeply into it, spread out all its parts, and questioned their every detail? ... At Hyundai, we ask ourselves the important questions every day. And, every day, we seek the best answers. It's what makes us grow as a car company. It's what makes us Hyundai."[31]

67.    In HMA's 2019 Hyundai Tucson brochure, the company states that its

---

[28] https://www.hyundai.com/worldwide/en/company/innovation/safety/inside (last accessed Aug. 24, 2022).

[29] https://www.hyundai.com/worldwide/en/company/innovation/safety/research (last accessed Aug. 24, 2022).

[30] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed Aug. 24, 2022).

[31] https://www.hyundainews.com/en-us/about-us (last accessed Aug. 24, 2022).

"commitment to Hyundai owners doesn't end with the transfer of keys" and that the vehicle includes "more standard safety features" and that it is "flush with … advanced safety technologies."[32] In particular, HMA claims that "[u]nlike many competitors, Tucson doesn't require you to move up to costlier trim levels to enjoy" certain safety features.

68. The 2017 Tucson brochure states that the vehicle contains "[a]n arsenal of advanced safety features" that are "class-leading."[33]

69. Likewise, KA advertises that it "believe[s] in the outstanding quality and durability of every new Kia that rolls off the assembly line" and that "[f]rom design to technology, materials to safety features, Kia continues to innovate[.]"[34]

70. KA claims that "Kia engineers are passionate about producing vehicles that are exceptionally well designed and reliable. Their dedication to quality and attention to detail give Kia the confidence to back every model with an industry-leading warranty program."[35]

71. KA's promotional material similarly touts its dedication to safety.

72. In KA's brochure for the 2020 Kia Sorento, KA states that "[a]t Kia, the priority is always on improving all aspects of safety. Advanced sensor systems, strategically placed airbags, and breakthroughs in materials and design that have led to strong body construction are just a few of the ways we never stop working to increase

---

[32] https://secure.viewer.zmags.com/publication/2f65b9a9#/2f65b9a9/16 (last accessed Aug. 26, 2022).

[33] http://viewer.zmags.com/publication/006d43a3?cs:o=%272017_Certifed_Tucson_Brochure%27#/006d43a3/1 (last accessed Aug. 26, 2022).

[34] https://www.kia.com/us/en/why-kia (last accessed Aug. 26, 2022).

[35] https://manualzz.com/doc/7136122/kia-2015-sorento-brochure---dealer-e (last accessed Aug. 26, 2022).

your protection."[36] KA adds "IT HELPS DETECT, COORDINATE, AND REACT to give you more peace of mind."

73. In the 2011 Kia Sportage brochure, KA states that the vehicle offers "advanced features" including "[a]dvances safety systems" that "are comprehensive and advanced, all as standard equipment."[37] In KA's brochure for the 2016 Kia Sorento, KA claims that the vehicle contains "[a] long list of technologically advanced features … [that] inspire confidence and enhance everyday convenience."[38] The marketing brochure dedicates an entire page to "Advanced safety systems—because life is full of curves[.] Sorento features advanced safety systems designed to help give … you peace of mind every time you drive."

74. In KA's brochure for the 2015 Kia Sorento, the company similarly claimed that the vehicle is "equipped with advanced safety features" and "systems that help give you peace of mind every time you drive[.]"[39] KA also states in the 2014 Sorento brochure that the vehicle "is also equipped with advanced active and passive safety features designed to ensure your peace of mind[.]"[40]

75. Today, over half the cars HMC sells in the United States are designed and

---

[36] https://www.auto-brochures.com/makes/Kia/Sportage/Kia_US%20Sportage_2020.pdf (last accessed Aug. 24, 2022).

[37] https://www.auto-brochures.com/makes/Kia/Sportage/Kia_US%20Sportage_2011.pdf (last accessed Aug. 24, 2022).

[38] https://www.auto-brochures.com/makes/Kia/Sorento/Kia_US%20Sorento_2016.pdf (last accessed Aug. 26, 2022).

[39] https://manualzz.com/doc/7136122/kia-2015-sorento-brochure---dealer-e (last accessed Aug. 26, 2022).

[40] https://cdn.dealereprocess.org/cdn/brochures/kia/2014-sorento.pdf (last accessed Aug. 26, 2022).

manufactured domestically at HMA's facilities, including at its "design, research, and testing grounds in California" near its corporate headquarters.[41] In total, HMC and HMA employ approximately 5,000 people at these facilities, and an additional 20,000 employees at U.S. dealerships.

76.    Hyundai and Kia branded vehicles share many of the same products and the same group of engineers work on Hyundai and Kia vehicles at Hyundai-KA Technical Center, Inc. ("HATCI").[42]

77.    Hyundai and Kia vehicles may also be rebranded or "rebadged" versions of the other brand's vehicles. For example, the Hyundai Entourage "is identical to the [Kia] Sedona, except for cosmetics and the packaging of a few features."[43] The engines are the same in these vehicles, the climate controls are placed in the same locations, even the number of cupholders (14) are identical.

78.    Because Hyundai and Kia vehicles are often rebadged vehicles, they frequently use identical and interchangeable parts. That is why when HMA announces a recall of its vehicles, an identical Kia recall is typically announced shortly thereafter, or vice versa. For example, in 2013, Hyundai and Kia recalled 1.7 million vehicles across thirteen models which shared the same defective brake light switches.[44] The *Los Angeles Times* noted that the "massive recall of 1.7 million vehicles … was a sign of what can go

---

[41] https://www.hyundainews.com/en-us/about-us (last accessed Aug. 26, 2022).

[42] https://www.forbes.com/sites/jimhenry/2013/05/31/balancing-act-hyundai-and-kia-share-products-under-the-skin-but-must-avoid-blurring-identities/?sh=210585421c7a (last accessed Aug. 26, 2022); https://www.hyundainews.com/en-us/releases/398 (last accessed July 14, 2021).

[43] https://www.nytimes.com/2006/11/12/automobiles/autoreviews/12AUTO.html (last accessed Aug. 26, 2022).

[44] https://www.latimes.com/business/la-xpm-2013-apr-03-la-fi-hy-hyundai-kia-motors-recall-20130403-story.html (last accessed Aug. 26, 2022).

wrong when parts are shared by" Hyundai and Kia.

**B.    Auto thefts pose a serious safety risk.**

79.    It has long been recognized that auto thefts pose a serious safety risk to vehicle owners and bystanders.  In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C.S. § 30101 *et seq*., which was enacted "to reduce traffic accidents and deaths and injuries resulting from traffic accidents" and "to prescribe motor vehicle safety standards." In 1968, the DOT promulgated a new Safety Standard No. 114 titled "Theft Protection; Passenger Cars," pursuant to the Safety Act. *See* 33 Fed. Reg. 6,471 (Apr. 27, 1968).

80.    The proposed Theft Protection rule, FMVSS No. 14 was implemented after it was "demonstrated that ***stolen cars constitute a major hazard to life and limb on the highways.***" 33 Fed. Reg. 6,471. As part of its evaluation of the proposed rule, the DOT found that "[t]he evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id*. Among the evidence used in support of this conclusion was a 1968 study conducted by the Department of Justice ("DOJ").

81.    The DOJ found that a substantially significant number of stolen vehicles would result in personal injury accidents:

> [T]here were an estimated 94,000 stolen cars involved in accidents in 1966, and more than 18,000 of these accidents resulted in injury to one or more people. On a proportionate basis, 18.2 percent of the stolen cars became involved in accidents, and 19.6 percent of the stolen-car accidents resulted in personal injury. The same study predicted that automobile thefts in 1967 total about 650,000; about 100,000 of these stolen cars could be expected to become involved in highway accidents. ***Comparing these figures with statistics for vehicles which are not stolen, the approximate rate for stolen cars would be some 200 times the normal accident rate for other vehicles***.

33 Fed. Reg. 6,471 (Apr. 27, 1968).

82. The DOJ survey found that "*[t]he number of car thieves who start cars with* so-called 'master keys' and *devices which bypass the lock is … large enough to produce a significant safety hazard*." 33 Fed. Reg. 6,471. Accordingly, FMVSS No. 14 was explicitly designed to "defeat" this method for stealing a vehicle and requires "[a] large number of locking-system combinations and a steering or self-mobility lock." *Id*.

83. The DOJ further explained that "the large majority of car thieves are amateurs, almost half of whom are engaged in so-called 'joy-riding'" and that "most" of the thieves are juveniles. 33 Fed. Reg. 6,471.

84. Given the dramatic increase in the accident rate caused by stolen vehicles, the DOT determined that "*a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety*. It would not only reduce the number of injuries and deaths among those who steal cars, it would also protect the many innocent members of the public who are killed and injured by stolen cars each year." 33 Fed. Reg. 6,471 (Apr. 27, 1968). Further, the DOT "concluded that a standard that would reduce the incidence of unauthorized use of cars meets the need for motor vehicle safety" and rejected the contention that the Theft Protection rules are "not related to improving motor vehicle safety." *Id*.

85. The first iteration of FMVSS No. 114 Theft Protection; Passenger Cars stated in relevant part:

S1. *Purpose and scope*. This standard specifies requirements for theft protection to reduce the incidence of accidents resulting from unauthorized use.

S2. *Application*. This standard applies to passenger cars.

S4. *Requirements*.

***S4.1 Each passenger car shall have a key-locking system that, whenever the key is removed, will prevent-***

> ***(a) Normal activation of the car's engine or other main source of motive power; and***

> ***(b) Either steering or self-mobility of the car, or both.***

S4.2 The prime means for deactivating the car's engine or other main source of motive power shall not activate the deterrent required by S4.1(b).

S4.3 The number of different combinations of the key locking systems required by S4.1 of each manufacturer shall be at least 1,000, or a number equal to the number of passenger cars manufactured by such manufacturer, whichever is less.

S4.4 A warning to the driver shall be activated when the key required by S4.1 has been left in the locking system and the driver's door is opened.

*Id.* at 6,472. The standard became effective on January 1, 1970. *See id.*[45]

86.    In the half century since the DOT recognized the safety risks posed by auto thefts, the agency has continued to monitor the safety risks posed by auto thefts and modernize its rules designed to prevent auto thefts.

87.    In 1984, Congress enacted the Motor Vehicle Theft Law Enforcement Act (the "Theft Act"), 49 U.S.C. 33101 *et seq*., which directs NHTSA to establish theft prevention standards for passenger vehicles. *See* 81 Fed. Reg. 66,833, 66,834 (Sept. 29, 2016). Pursuant to the Theft Act, NHTSA implemented 49 C.F.R. Part 541, which requires manufacturers of designated high theft passenger car lines to inscribe or affix the Vehicle Identification Number (VIN) onto the engine, the transmission, and major body parts. Each vehicle in a high-theft line must have its major parts and major replacement parts-marked unless the vehicle line is granted an exemption from the parts marking requirements ("PMR"). A manufacturer may petition for a PMR exemption when it plans to install a standard equipment antitheft device on the entire line. *See* 49

---

[45] FMVSS No. 114 is codified in 49 C.F.R. § 571.114.

C.F.R. §§ 543.1 *et seq*. The agency must determine that the antitheft device to be installed on the line is likely to be as effective in reducing and deterring motor vehicle theft as parts-marking.

88.    In 1992, Congress enacted the Anti Car Theft Act (Pub. L. No. 102-519, codified at 49 U.S.C. chapter 331), which expanded the PMR to include multipurpose passenger vehicles and certain light duty trucks. On April 6, 2004, the Federal Motor Vehicle Theft Prevention Standard was extended to include all passenger cars, multipurpose passenger vehicles with a gross vehicle weight rating (GVWR) of 6,000 pounds or less, all light-duty trucks (LDTs) determined to be high-theft (with a gross vehicle weight rating of 6,000 pounds or less), and all low-theft LDTs with major parts that are interchangeable with a majority of the covered major parts of those passenger motor vehicle lines subject to the theft prevention standard. 69 Fed. Reg. 17,960 (Apr. 6, 2004).

89.    In 2006, NHTSA iterated that its "safety standard on theft protection [FMVSS No. 114] specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles." *See* 71 Fed. Reg. 17,752 (Apr. 7, 2006). NHTSA goes on to make clear that "the standard sought to ensure that the vehicle could not be easily operated without the key.…" *Id*.

90.    FMVSS No. 114 is currently codified as 49 C.F.R. 571.114, and provides:

**S1. Scope**. This standard specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles.

**S2. Purpose**. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.

**S3. Application**. This standard applies to all passenger cars, and to trucks and

multipurpose passenger vehicles with a GVWR of 4,536 kilograms (10,000 pounds) or less. However, it does not apply to walk- in van-type vehicles. Additionally, paragraph S5.3 of this standard applies to all motor vehicles, except trailers and motorcycles, with a GVWR of 4,536 kilograms (10,000 pounds) or less.

**S4. Definition**s.
Combination means a variation of the key that permits the starting system of a particular vehicle to be operated.
Key means a physical device or an electronic code which, when inserted into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor.
Starting system means the vehicle system used in conjunction with the key to activate the engine or motor.

S5 **Requirements**. Each vehicle subject to this standard must meet the requirements of S5.1, S5.2, and S5.3. Open-body type vehicles are not required to comply with S5.1.3.
S5.1 **Theft protection**.
    S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
        (a) The normal activation of the vehicle's engine or motor; and
        (b) Either steering, or forward self-mobility, of the vehicle, or both.

91. NHTSA is also required to periodically obtain and publish accurate and reliable theft data. 49 U.S.C. 33104(b)(4) (Designation of high theft vehicle lines and parts). The National Crime Information Center ("NCIC") of the Federal Bureau of Investigation ("FBI") provides this data to NHTSA. The NCIC is a governmental system that receives vehicle theft data from approximately 23,000 criminal justice agencies and other law enforcement authorities throughout the United States. This national data includes the reported thefts of self-insured and uninsured vehicles, not all of which are reported to other data sources.

92. In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares

CLASS ACTION COMPLAINT

information with, automotive manufacturers and their authorized representatives, including HMA and KA.

**C.      Engine immobilizers are an inexpensive and proven means to dramatically reduce auto theft.**

93.      Over the last fifty years since FMVSS No. 114 was issued, manufacturers have developed a bevy of safety features, many of which would have been inconceivable to drivers in 1968, and others which are directly contemplated by the initial promulgation of the Safety Standard. Falling into the latter category are engine immobilizers, which have become standard across the globe.

94.      An immobilizer is an anti-theft device that can prevent vehicles from starting unless a verified code is received by a transponder module that controls the engine. *See* 81 Fed. Reg. 66,833 (Sept. 29, 2016). This theft-prevention device thus prevents the vehicle from being "hot wired" or started by any means other than an authorized key. Engine immobilizers have been described as "simple and low-cost anti-theft device[s]."[46]

95.      Since 1986, there have been three popular engine immobilizing antitheft devices: resistor-pellet, transponder-based, and magnetic rotation device systems.

96.      In 1986, General Motors ("GM") introduced the vehicle antitheft system ("VATS") or Pass-Key I system on its Corvette models. It was the first system to be an integrated part of the vehicle electronics and ushered in the engine immobilizer concept. The system availability expanded through the various GM product lines since 1986, and by 1994, over 66% of GM domestically produced vehicles were Pass-Key equipped. In 1992, GM introduced the Pass-Key II.

---

[46] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 14, 2013). CentER Discussion Paper Series No. 2013-004, TILEC Discussion Paper No. 2013-001, Available at SSRN: https://ssrn.com/abstract=2202165.

97.    The Pass-Key VATS worked as follows: When a properly cut ignition key is inserted into the ignition lock keyway and rotated, the resistor pellet embedded in the key shank touches the contacts located in the outer ignition lock keyway, transmitting a signal to the Pass-Key decoder module located in the instrument panel in the passenger compartment. The signal's electrical resistance is measured by the decoder module by comparing its value to the fixed resistance value in the module. If the resistance value is correct for that specific vehicle, the starter-enable relay is energized and a discrete signal is sent to the vehicle's electronic control module to enable engine functions and allow fuel injector pulses to begin. If an invalid key is rotated, the resistance value is read as incorrect and the decoder module will shut down for two to four minutes, preventing the engine from starting during this time interval.

98.    Next came transponder-based electronic immobilizer systems, which were first introduced by Ford in 1996 and named SecureLock.

99.    With a transponder-based immobilizer, when the ignition key is turned to the start position, the transponder located in the key head transmits a code to the powertrain's electronic control module ("ECM"). Each transponder is programed by the manufacturer with a unique code. The engine functions are enabled only if the transponder code matches the code previously programmed into the ECM. Ford explained that the "device is activated when the driver/operator turns off the engine by using the properly coded ignition key." 64 Fed. Reg. 7,949 (Feb. 17, 1999) (describing SecuriLock).

100.    Shortly after Ford introduced a transponder-based immobilizer, other manufacturers followed its lead. GM began installing its transponder-based system called the Pass-Key III in 1997. DaimlerChrysler has been installing its Sentry Key Immobilizer System ("SKIS") in its vehicles as standard equipment since 1999. Nissan has its own

27

transponder-based system since 2001, which has been installed as standard equipment in its vehicles as well. *See* 66 Fed. Reg. 53,830 (Oct. 24, 2001) (Nissan's PMR petition); 74 Fed Reg 28,768 (June 17, 2009) (describing Nissan's immobilizer device).

101. The third type of immobilizer utilizes a magnetic rotation device. In 1996, GM began phasing out its use of its Pass-Key systems, replacing them with its magnetic-rotation system device called "PassLock I." The following year, it began installing its PassLock II, a magnetic-rotation system device. The magnetic rotation system uses a coded magnet embedded in the ignition lock cylinder (as opposed to the key shank as in Pass-Key systems), and an electronic sensor mounted on the column assembly housing surrounding the ignition lock. When the ignition lock core is rotated within the housing using the correctly cut key, the magnet passes over the housing-mounted sensor, generating a signal that is sent to the decoder module, which measures the voltage. If the value of the sensor's voltage matches the value stored in the memory of the decoder, the decoder sends an encoded signal to the power control module ("PCM") to start the flow of fuel and enable engine functions. If an invalid key is used, an improper voltage value is measured, which sends a signal to the PCM to prevent the flow of fuel for ten minutes.

102. Over the last three decades, these immobilizers have been proven to be highly efficacious and to dramatically reduce the auto theft rates.

103. A study conducted in Europe after immobilizers were mandated found that the overall rate of auto theftauto thefts fell by 46% between 1995 and 2008.[47] The same study also found that the additional manufacturing costs related to installing an engine

---

[47] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 31, 2013). CESifo Working Paper Series No. 4092, Available at SSRN: https://ssrn.com/abstract=2214895.

immobilizer was as little as approximately $50 per vehicle and the benefits in terms of prevented thefts are many times higher than the costs of installing the device.

104. Given how effective and relatively inexpensive engine immobilizers are, most automotive regulators around globe require the installation of the device in new vehicles sold.

105. In November 1995, the European Union ("EU") adopted Directive 74/61/EEC, which made installation of an electronic engine immobilizer mandatory in all new passenger cars sold within the EU as of October 1998. Australia has required immobilizers in vehicles sold since 2001 and Canada has required the component since 2007. In parts of Australia and Canada, the legislation also extended to the existing car fleet.[48]

106. Although not explicitly required in order to comply with FMVSS No. 114, NHTSA has repeatedly demonstrated its support for the installation of immobilizers and has stated that the device complies with FMVSS No. 114. In 2006, NHTSA noted that FMVSS No. 114 was promulgated due to the agency's "concern about car thieves who could bypass the ignition lock." 71 Fed. Reg. 17,752, 17,753. NHTSA went on to explain how a manufacturer's engine immobilizer satisfied FMVSS No. 114:

> We note that in promulgating FMVSS No. 114, the agency expressed concern about car thieves who could bypass the ignition lock. In response to this concern, the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed (see 33 FR 4471, April 27, 1968).
>
> The engine control module immobilizer described in your letter satisfies the requirements of S4.2(b) because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system. When the engine control module is locked, the

---

[48] *Id.*

vehicle is not capable of forward self-mobility because it is incapable of moving forward under its own power.

*Id.*

107.  Although NHTSA has determined that engine immobilizers satisfy FMVSS No. 114 and are entitled to PMR exemptions due to their efficacy, its regulations do not explicitly call for their installations. That is because "[NHTSA] cannot mandate specific technologies that motor vehicle manufacturers are to use to deter theft." *See* 71 Fed. Reg. 17,752, 17,753. NHTSA noted that 49 U.S.C. 30102(9) of the Safety Act allows it to promulgate performance safety standards for motor vehicles, but it does not allow it to "specify the design of vehicles." *Id.*  NHTSA also noted that in addition to the installation of immobilizers, manufacturers have sought to comply with FMVSS No. 114 by installing hardened collars that shield the upper and lower casing of the steering column, which "deter theft by increasing significantly the time required to disable the locking mechanism for the ignition, steering wheel and automatic transmission gear selector." *Id.*

108.  Since the introduction of engine immobilizers, the rate of auto thefts has fallen dramatically. Below is a table published by NHTSA in 2017, detailing the theft rate in the United States from 1993 through 2014:

CLASS ACTION COMPLAINT



Figure 1: Theft Rate Data Trend (MY/CY 1993-2014)

82 Fed. Reg. 28,246, 28247 (June 21, 2017).

109. In a 2013 NHTSA report regarding the drop in the vehicle theft rate from 1993 through 2011, NHTSA noted that it "***believes that the theft rate reduction is a result of several factors, including*** vehicle parts marking; ***the increased use of standard antitheft devices and other advances in electronic technology (i.e., immobilizers) and theft prevention methods***; increased and improved prosecution efforts by law enforcement organizations; and, increased public awareness which may have contributed to the overall reduction in vehicle thefts." 78 Fed. Reg. 41,016, 41,017 (July 9, 2013).

110. The following table identifies each make and model that has received a PMR exemption for installing an immobilizer and/or other antitheft measure consistent with FMVSS, as of August 23, 2022:

| Manufacturer | Subject lines |
|---|---|
| BMW | MINI, MINI Countryman (MPV), X1 (MPV), X1, X2 (MPV), X3 (MPV), X4 (MPV), X5 (MPV), Z4, 2 Series,[1] 3 Series, 4 Series, 5 Series, 6 Series, 7 Series, 8 Series. |
| CHRYSLER | 200, 300, Dodge Charger, Dodge Challenger, Dodge Dart, Dodge Journey, Fiat 500, Fiat 124 Spider, Jeep Cherokee, Jeep Compass, Jeep Grand Cherokee (MPV), Jeep Gladiator,[1] Jeep Patriot, Jeep Wrangler/ Wrangler JK,[2] Jeep Wrangler JL (new), Town and Country MPV. |
| FORD MOTOR CO | C-Max, EcoSport, Edge, Escape, Explorer, Fiesta, Focus, Fusion, Lincoln Corsair,[1] Lincoln MKC, Lincoln MKX, Lincoln Nautilus, Mustang. |
| GENERAL MOTORS | Buick LaCrosse/Regal, Buick Encore,[1] Buick Verano, Cadillac ATS, Cadillac CTS, Cadillac SRX, Cadillac XTS, Cadillac XT4, Chevrolet Bolt, Chevrolet Camaro, Chevrolet Corvette, Chevrolet Cruze, Chevrolet Equinox, Chevrolet Impala/Monte Carlo, Chevrolet Malibu, Chevrolet Sonic, Chevrolet Spark, Chevrolet Volt, GMC Terrain. |
| HONDA | Accord, Acura TLX,[1] Acura MDX, Civic, CR–V, Passport, Pilot. |
| HYUNDAI | Azera, Equus, Genesis G70,[1] Genesis G80,[3] IONIQ. |
| JAGUAR | F-Type, XE, XF, XJ, Land Rover Discovery Sport, Land Rover E-Pace,[1] Land Rover F-Pace, Land Rover Range Rover Evoque, Land Rover Velar. |
| KIA | Niro, Stinger. |
| MASERATI | Ghibli, Levante (SUV), Quattroporte. |
| MAZDA | 2, 3, 5, 6, CX–3, CX–5, CX–9, MX–5 Miata. |
| MERCEDES–BENZ | smart Line Chassis, smart USA fortwo, SL-Line Chassis (SL-Class), (the models within this line are): SL400/ SL450, SL550, SL 63/AMG, SL 65/AMG, SLK-Line Chassis (SLK-Class/SLC-Class), (the models within this line are): SLK 250, SLK 300, SLK 350, SLK 55 AMG, SLC 300 AMG, SLC 43, S-Line Chassis (S/CL/ S-Coupe Class/S-Class Cabriolet/Mercedes Maybach), (the models within this line are): S400 Hybrid, S550, S600, S63 AMG, S65 AMG, Mercedes-Maybach S560, Mercedes-Maybach S650, CL550, CL600, CL63 AMG, CL65 AMG, NGCC Chassis Line (CLA/GLA/B-Class/A-Class), (the models within this line are): A220, B250e, CLA250, CLA45 AMG, GLA250, GLA45 AMG, C-Line Chassis (C-Class/CLK/GLK-Class/ GLC-Class), (the models within this line are): C63 AMG, C240, C250, C300, C350, CLK 350, CLK 550, CLK 63AMG, GLK250, GLK350, E-Line Chassis (E-Class/CLS Class), (the models within this line are): E55, E63 AMG, E320 BLUETEC, E350 BLUETEC, E320/E320DT CDi, E350/E500/E550, E400 HYBRID, CLS400, CLS500/550, CLS55 AMG, CLS63 AMG. |
| MITSUBISHI | Eclipse Cross, iMiEV, Lancer, Outlander, Outlander Sport, Mirage. |
| NISSAN | Altima, Juke, Leaf, Maxima, Murano, NV200 Taxi, Pathfinder, Quest, Rogue, Kicks, Sentra, Infiniti Q70, Infiniti Q50/60, Infiniti QX50, Infiniti QX60, Versa.[1] |
| PORSCHE | 911, Boxster/Cayman, Macan, Panamera, Taycan.[1] |
| SUBARU | Ascent, Forester, Impreza, Legacy, Outback, WRX, XV Crosstrek/Crosstrek.[4] |
| TESLA | Model 3, Model S, Model X, Model Y.[1] |
| TOYOTA | Avalon, Camry, Corolla, C–HR,[1] Highlander, Lexus ES, Lexus GS, Lexus LS, Lexus NX, Lexus RX, Prius, RAV4, Sienna. |
| VOLKSWAGEN | Atlas, Beetle, Eos, Jetta, Passat, Tiguan, Golf/Golf Sport wagen/eGolf/Alltrack, Audi A3, Audi A4, Audi A4Allroad MPV, Audi A6, Audi A8, Audi Q3, Audi Q5, Audi TT. |
| VOLVO | S60. |

[1] Granted an exemption from the parts-marking requirements beginning with MY 2020.
[2] Jeep Wrangler (2009–2019) nameplate changed to Jeep Wrangler JK, JK discontinued after MY 2018.
[3] Hyundai discontinued use of its parts-marking exemption for the Genesis vehicle line beginning with the 2010 model year, line was reintroduced as the Genesis G80.
[4] Subaru XV Crosstrek nameplate changed to Crosstrek beginning with MY 2016.

87 Fed. Reg. 51,616 (Aug. 23, 2022).

111. As the table above reveals, nearly all of the best-selling cars in America (except for Hyundai and Kia vehicles) have received PMR exemptions, including Toyota Rav4, Honda CR-V, Toyota Camry, Nissan Rogue, Toyota Highlander, and the Honda Civic.[49] On information and belief, each of these vehicles received a PMR exemption based on the installation of an engine immobilizer.

112. Moreover, many of these vehicles are comparably priced to Hyundai and Kia

[49] https://www.caranddriver.com/news/g36005989/best-selling-cars-2021/ (last accessed Aug. 26, 2022).

32

vehicles and directly compete for Plaintiffs' and the Class's purchases. For instance, the MSRP for a 2021 Hyundai Elantra ranges from $19,650 to $28,100, and the MSRP for a 2021 Honda Civic, which includes an engine immobilizer, ranges from $21,050 to $28,100.[50]

**D.    As a result of the Defect, Class Vehicles are stolen at an astronomical rate.**

113.  As the DOT and DOJ found in 1968, amateur thieves stealing cars to go joy-riding make up a significant portion of all auto thefts in America. Moreover, these thieves are able to steal cars using simple means, such as hotwiring and removing the ignition lock. That is why simple measures such as the installation of an immobilizer is so effective at preventing the majority of auto thefts.

114.  In the Fall of 2020, a group of teenagers from Milwaukee discovered the Defect and began wreaking havoc across their city—and soon the entire United States. In particular, these teenagers discovered that there are no alarms attached to the windows in the Class Vehicles and the windows can easily be knocked off their frame. Once they stealthily entered the vehicles, the thieves found that the steering column did not contain adequate casing and could easily be pulled off. Next, the thieves discovered that the ignition lock cylinder is easily removed with a screwdriver and minimal force, thereby exposing the ignition switch, which remains intact. And in a truly modern take on car theft, these thieves found that the ignition switch fits perfectly into the end of a USB cable, which has become ubiquitous in vehicles today, and can start with a simple twist. While the USB cable end is frequently used, any set of pliers works just as well. Once the ignition switch is turned and the vehicle starts, the steering lock is disengaged.

---

[50] https://www.edmunds.com/hyundai/elantra/2021/ (last accessed Aug. 26, 2022).

**CLASS ACTION COMPLAINT**

115. The simple steps detailed above can be completed by a complete novice thief in less than ninety seconds.[51]

116. Contrary to Defendants' statements concerning how they employ the latest technology and safety features in their vehicles (*see supra* ¶¶ 64-74), the automotive news website *The Drive* noted that the Defect allows thieves to "simply force the ignition cylinder as if they were using a screwdriver to perform the same trick on a car from the 1980s."[52]

117. In a February 3, 2021 *Milwaukee Journal-Sentinel* article, one repair shop owner noted that "[w]e are seeing a rash of Kias, Hyundais, and Hondas, but mostly Kias. Some late-model Kias from 2016 to 2020 are easy to steal, and young people have figured that out[.]"[53] The business owner commented that "thieves know they can break the back window without setting off an alarm, unlock the door, quickly peel back the steering column, and either use a screwdriver or a USB port to crank the car and go." Another body shop owner in Waukesha, Wisconsin noted that he is seeing multiple Kia and Hyundai vehicles brought into his shop for repairs every week.[54] This mechanic too commented that "[t]he thieves … are quite consistent" in the manner in which they steal and damage the vehicle. Further, due to the quantity and frequency in which Class Vehicles are stolen, the parts necessary to repair the vehicles are "are all on backorder so it's might take a few weeks" to complete a repair job that otherwise would take a couple

---

[51] *See* https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts (last accessed Aug. 26, 2022).

[52] https://www.thedrive.com/news/how-thieves-are-stealing-hyundais-and-kias-with-just-a-usb-cable (last accessed Aug. 26, 2022)

[53] https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/ (last accessed Aug. 26, 2022)

[54] https://www.wisn.com/article/critics-question-design-of-kia-hyundai-vehicles-in-massive-theft-spike/36828234 (last accessed Aug. 26, 2022).

of days.

118.  Below is a diagram of a steering column, including the ignition cylinder and ignition switch:



119.  As the pictures below demonstrate, the steering column in the Class Vehicles are easily torn apart and allow thieves to take advantage of the Defect:



*Picture of an ignition switch exposed after the steering column is exposed and ignition cylinder was forcefully removed.*



*Picture of ignition switch tip after ignition cylinder is removed.*



*Picture of USB cable attached to ignition starter and used as makeshift key.*

120. The thieves are easily able to identify the Class Vehicles because each Hyundai and Kia vehicle sold with a traditional "insert-and-turn" key ignition systems, as opposed to "push-to-start" ignition, contains the Defect. Notably, as explained below, the vast majority of Hyundai and Kia vehicles are sold with a traditional "insert-and-turn" key ignition system, making Class Vehicles very easy to identify. Criminals know that Defendants install immobilizers in each "push-to-start" as a "Comfort, Convenience & Technology" feature.[55]

121. This group from Milwaukee called themselves the "Kia Boyz" and began to post videos of their dangerous joy-rides on social media platforms, including TikTok.

122. When these thieves stole these cars, they often caused thousands of dollars in damage to the vehicle, before abandoning them. If a Class Vehicle owner is lucky enough to recover their vehicle, the first thing that must be done is repair the window and steering column, which can exceed $3,000.[56] But that is not the only expense a Class Vehicle owner incurs after their vehicle is stolen. Because the vehicles are typically stolen by amateurs going on reckless joy-rides, damage expenses frequently exceed $10,000.

123. Yet even after paying $10,000 to repair their vehicles, the vehicles are no more protected from the Defect than they were prior to being stolen. Indeed, repair shops note that they frequently have the same vehicles brought into their shops due to the

---

[55] *See, e.g.,* https://www.kiamedia.com/us/en/models/sportage/2020/features (last accessed Aug. 26, 2022).

[56] *See* https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/ (last accessed Aug. 26, 2022).

37

Defect within months of repair jobs.

124.  And because Class Vehicles are being stolen at such an alarming rate, HMA and KA authorized dealers and independent repair shops have had difficulty acquiring the parts needed to repair them, as there is a national backorder of up to eight weeks in some cases.[57]

125.  One Class Vehicle owner reported that her vehicle was stolen three times in 2022 alone: "We would joke that lightning would not strike three times, but I just feel super unlucky … It actually spent like more than 30 days in repairs because 56, the shop that I went to, had so many stolen KIAs that they couldn't get parts in time to fix mine."[58]

126.  As word spread of the Defect, reports of Class Vehicle thefts skyrocketed.

127.  In just the first six months of 2021, Hyundai thefts were up more than 1,700% year-over-year in Milwaukee, while Kia thefts increased by almost 3,200%.[59]  Moreover, while Hyundai and Kia vehicles make up a relatively small percentage of vehicles sold and found in Milwaukee in the first six months of 2021, 66% of all vehicles stolen in the city were manufactured and sold by Defendants.[60]

128.  In July 2022, St. Louis reported 669 stolen Hyundai and vehicles for the first six as of June 30, 2022, compared to 137 vehicles over same period in 2021, an increase of 388%. In the month of July alone, the city reported 78 Hyundai and 68 Kia vehicles as stolen.

---

[57] https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/ (last accessed Aug. 26, 2022).

[58] https://www.fox35orlando.com/news/kia-hyundai-car-thefts-florida-police-seeing-increase-in-vehicle-thefts-of-older-models (last accessed Aug. 26, 2022).

[59] https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/ (last accessed Aug. 26, 2022).

[60] https://www.wsj.com/articles/too-easy-to-steal-in-milwaukee-car-theft-kia-hyundai-city-council-11642720288 (last accessed Aug. 26, 2022).

129. St. Paul, Minnesota reported that as of June 30, 2022, there were 256 thefts involving Kia vehicles, as compared to 18 thefts in the first six months of 2021, a staggering 1,300% increase.[61] And Hyundai thefts increased from 31 reports to 212 over the same period, an increase of nearly 600%.

130. St. Petersburg, Florida Police reported that 41% of vehicles stolen in approximately the first six months of 2022 were Hyundai and Kia vehicles.[62] A detective in the police department explained the dramatic percentage of Class Vehicles stolen: "What the thieves are doing is they're defeating the steering column, and they're able to override the ignition mechanism, allowing them to steal the vehicle much more easily and without a key or a key fob[.]"[63] The detective added that the widespread knowledge of the Defect has "trickled its way down south, and it seems that it's like wildfire. It's burning through all the states now[.]"

131. In Columbus, Ohio, a total of 4,013 vehicles had been reported stolen to Columbus police, of which over 38% were either Kia or Hyundai vehicles.[64] In comparison, in 2021, before knowledge of the Defect became widespread in Columbus, Hyundai and Kia vehicles accounted for approximately 10% of stolen vehicle in the city.

132. In Cook County, Illinois, 642 Kia and Hyundai vehicles were reported stolen from July 1, 2022, to August 10, 2022, as compared to 74 Kia and Hyundai vehicles

---

[61] https://www.fox9.com/news/minneapolis-woman-had-kias-targeted-three-times-in-six-months (last accessed Aug. 26, 2022).

[62] https://www.abcactionnews.com/news/region-pinellas/st-pete-police-warn-about-troubling-car-theft-trend-targeting-kia-hyundai-cars (last accessed Aug. 26, 2022).

[63] *Id.*

[64] https://www.dispatch.com/story/news/2022/07/11/kia-and-hyundai-cars-being-stolen-higher-rates-columbus/7813529001/ (last accessed Aug. 26, 2022).

stolen over the same period in 2021, an increase of 767%.[65]

133.  Seattle reported a year-over-year increase of 720% in Kia thefts for July 2022.[66] Omaha, Nebraska reported a year-over-year increase of 80% in Class Vehicle thefts in 2022.[67] In Denver, approximately 33% of all stolen vehicles are Hyundai or Kia branded.[68]

134.  The safety risk created by the Defect could not be more serious. In fact, there have already been reports of fatalities involving Class Vehicles taken for joy rides, including the death of a 70-year-old bystander.[69] In another incident, a 16-year-old boy was killed after the Class Vehicle he stole was involved in a head-on crash following a police chase.[70] Of his two 12-year-old passengers, one was in critical condition when taken to a hospital; the other suffered two broken legs.

135.  A police commander in Columbus, Ohio noted that, in addition to bystanders, police officers "are being put at risk to chase these cars down and stop this from

---

[65] https://www.cbsnews.com/chicago/news/thefts-of-kias-and-hyundais-are-skyrocketing-up-767-this-summer-in-cook-county/ (last accessed Aug. 26, 2022).

[66] https://spdblotter.seattle.gov/2022/08/15/warning-to-kia-drivers-recent-spike-in-thefts-may-be-tied-to-tiktok-videos/ (last accessed Aug. 26, 2022).

[67] https://omaha.com/news/local/crime-and-courts/omaha-police-link-increase-of-kia-hyundai-thefts-to-social-media-trend/article_1390835a-0eb3-11ed-94f0-47493c6cff0e.html#:~:text=Omaha%20police%20have%20seen%20an%20increase%20in%20the,young%20thieves%20driving%20stolen%20vehicles%2C%20police%20said%20Thursday. (last accessed Aug. 26, 2022).

[68] https://www.imfromdenver.com/why-are-denver-thieves-going-after-hyundais-and-kias/ (last accessed Aug. 26, 2022).

[69] https://www.fox9.com/news/minneapolis-woman-had-kias-targeted-three-times-in-six-months (last accessed Aug. 26, 2022).

[70] https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640 (last accessed Aug. 26, 2022).

happening[.]"[71]

**E.  Defendants knowingly manufactured and sold millions of Class Vehicles that are easily stolen in less than ninety seconds.**

136.  After considerable public outcry and scrutiny, in 2022, Defendants acknowledged that their vehicles contain the Defect, and therefore, are easily stolen. But as detailed below, Defendants have known of the Defect long before they sold the first Class Vehicle.

137.  On information and belief, each Defendant was aware of the Defect and the safety risk it posed to Class Vehicle owners (as well as bystanders), through the following sources, including, but not limited to: (1) each Defendant's pre-sale testing and part sales; (2) each Defendant's own records of customer complaints; (3) dealership repair records; (4) warranty and post-warranty claims; (5) HMA's U.S. Technical Committee responsible for safety recalls; and (6) each Defendant's post sale monitoring of Class Vehicles for safety defects.

138.  HMC states that it conducts "preemptive quality and safety measures from the vehicle development stage" and is able to "prevent[] any significant problems afterward through early detection, early improvement and early after-sales actions."[72] HMC further states that it "constantly monitors customer complaints and voluntarily recalls all the relevant vehicles to protect customers as soon as manufacturing defects assessed as highly likely to cause accidents are identified."

---

[71] https://www.dispatch.com/story/news/2022/07/11/kia-and-hyundai-cars-being-stolen-higher-rates-columbus/7813529001/ (last accessed Aug. 26, 2022).

[72] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed August 24, 2022).

139. HMC, HMA, KA, and KC are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct pre-sale tests to verify the parts are free from defects and align with their specifications.

140. KC conducts expansive presale testing on its vehicles to make sure they "endure over a long time without fault."[73] KC states that it conducts "performance and durability tests" on "all Kia vehicles sold in the U.S" at the California Proving Ground.[74]

141. HMC and HMA similarly conduct extensive safety testing on their vehicles. Like Kia, HMA touts that its cars are tested in order to ensure that the cars are roadworthy.[75]

142. HMA claims that its staff "hand check nuts, bolts, cables, wiring and power components before any Hyundai leaves the plant. Then every vehicle is road tested to eliminate squeaks and rattles that can't be detected on the factory floor."[76] Further, HMA states that it has "250 robots, equipped with optical sensors far more sensitive than the human eye, [that] inspect[] every vehicle for quality welds and proper fit. This ensures tight seams and seals, as well as perfect alignment."

143. HMC touts its robust Product Quality Management systems, "based on its "quality philosophy of 'producing defect-free vehicles that will never break down'

---

[73] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed Aug. 29, 2022).

[74] KC 2017 Annual Report, p.58, *available at* https://worldwide.kia.com/int/company/ir/archive/annual-report (last accessed Aug. 26, 2022).

[75] https://www.auto-brochures.com/makes/Hyundai/Entourage/Hyundai_US%20Entourage_2008.pdf (last accessed Aug. 26, 2022).

[76] https://www.auto-brochures.com/makes/Hyundai/Entourage/Hyundai_US%20Entourage_2008.pdf (last accessed Aug. 26, 2022).

backed by cutting-edge safety technologies:"[77]

**Establishing Quality Management System** Hyundai seeks to create "customer safety" values by securing leading quality standards in the global market and strengthening quality management through technical preventive quality activities, among other initiatives. We have established a company-wide integrated quality management system to satisfy customers' diverse quality and safety requirements, …..

**Quality Management Standards and Techniques** Hyundai has introduced and applied quality management techniques to strengthen its market competitiveness on the basis of "defect-free quality". Our quality management techniques, aimed at providing customers with vehicles of the very highest quality in all fields, such as R&D, production, sales, and services, are supported by the best experts in each field (Man); optimal equipment (Machine); the best parts (Material); the best method (Method); thorough verification (Measurement); and commitment to defect free quality (Moral). ….. We also make continuous efforts to upgrade quality management standards and criteria based on the data collected and analyzed in quality risk management processes, such as quality checks, case studies, and improvements.

**Preemptive Management of Quality Risks** From the early design stage of new vehicle development, Hyundai preemptively inspects and manages parts suppliers as well as its own production process quality. Based on product drawings, we conduct a comprehensive review of parts in terms of functions, structures, reliability, and durability, while carefully analyzing our own processes and those of suppliers before issuing the final approval, thereby eliminating quality risks throughout production processes in advance. In addition to our own verification of test vehicles, Hyundai relies on the test drive opinions of customers and professional quality organizations to identify major issues and carry out improvement activities in parallel. ***Moreover, Hyundai holds quality inspection meetings on regular basis, and in particular, on the verge of new car models' mass production, reports the***

---

[77]

https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed Aug. 26, 2022).

*quality risk assessment results and taken measures to the highest level of management.*

**Quality Risk Assessment – Identification and Improvement** Hyundai has established a control tower devoted to the management of vehicle quality risks in the production process. *Whenever a quality risk is detected from information acquired through statistical process control, periodic inspections, and shipment pass rates, the control tower takes the lead in conducting joint investigations and taking the necessary countermeasures.* Also, in order to prevent quality risks from occurring in the vehicle production process, we take thorough preventive measures, such as process management by suppliers, assessment of quality prevention activities, validation of quality inspection equipment, and reliability testing of parts.

**Quality Mindset Campaign** Hyundai is carrying out the "Quality Mindset Campaign" with the purpose of spreading a quality culture throughout its entire car development, production *and sales processes*, while its employees internalize the quality first mindset. *The campaign serves as an opportunity for the company to listen directly to voice of customers (VOCs)* on quality issues through various initiatives including "Customers' Quality Diagnosis and Employees' Input", "Meetings between Customers and Employees", and "On-site Meetings between Customers and Production Quality Officers." Based on the VOC, Hyundai is conducting the New Vehicle Quality Assurance Program, among others, as a way to deliver products of perfect quality to its customers. We will continue to promote various quality improvement activities by promoting close communication with customers and their active participation.

**Strengthening Quality Verification Capabilities** Hyundai provides annual training on the roles and major tasks involved in securing its pre-manufacturing quality, manufacturing quality, and *market quality as a way to strengthen the verification capability of its overall quality value chain*. To maximize the effectiveness of verification through enhanced verification capacity, each course includes not only basic theoretical education but also practical and experience-oriented education if necessary. In addition, we offer expert courses on quality verification in collaboration with external educational institutions to verify new technologies following the transition to electrification and to strengthen the verification of quality issues from the customer's point of view.

**Quality Assurance and Management** Hyundai strives to enhance its quality

assurance and management for the safety and protection of customers ***after product sales*** as well as quality management from vehicle development to production, thereby ensuring safety of customers and happiness of their families. In addition, we take quality improvement measures aimed at boosting customer satisfaction by identifying customers' specific complaints, while continuously reinforcing maintainability by evaluating the consistency of maintenance services and improving diagnosis methods, among others.

144. As part of a 2014 Consent Decree entered into by HMA and HATCI with NHTSA, HMA "commit[ed] and agree[ed] to … [make] corporate organizational and process improvements" including the creation of a U.S. Technical Committee to review and make decisions regarding potential safety recalls. The head of the U.S. Technical Committee was also granted "direct access to the board of directors and the Chief Executive Officer ('CEO') of [HMA]."[78]

145. Defendants were also made aware of the Defect and had knowledge of its potential dangers based on its specific knowledge concerning the theft rate for their vehicles, as well as their specific knowledge concerning engine immobilizers.

146. As an initial matter, HMC and KC sell the very same Class Vehicles overseas, with one major difference: vehicles sold in Europe (since 1998), Australia (since 2001) and Canada (since 2007) have engine immobilizers.

147. For example, in the 2020 Kia Sportage Owners Manual for Canada, Kia notes that the "vehicle is equipped with an electronic engine immobilizer system to reduce the risk of unauthorized vehicle use."[79]

148. Second, Defendants have touted the benefits of immobilizers when seeking

---

[78] https://www.nhtsa.gov/sites/nhtsa.gov/files/2021-11/TQ14-002-Hyundai-Consent-Order-8-7-2014-tag.pdf (last accessed Aug. 26, 2022)

[79] *See, e.g.,* https://www.destinationkia.com/blogs/1016/wp-content/uploads/2019/07/2020-Kia-Sportage-Owners-Manual.pdf (last accessed Aug. 29, 2022).

PMR exemptions for their high-end vehicles.

149. On March 2, 2007, HATCI, acting on behalf of HMA, petitioned NHTSA for a PMR exemption for the Hyundai Azera vehicle line beginning with model year (MY) 2008. *See* 72 Fed. Reg. 39,661 (July 19, 2007). In that petition, Hyundai stated that it "will install its passive antitheft device as standard equipment on the vehicle line. Features of the antitheft device will include a passive immobilizer consisting of an EMS (engine control unit), SMARTRA (immobilizer unit), an antenna coil and transponder ignition keys." This form of immobilizer was transponder based, which was first introduced in 1996, and already standard in Defendants' competitors' vehicles. *See supra* ¶¶ 99-100. The petition specifically notes that Hyundai "believes that the GM Pass-Key and Ford Securilock devices contain components that are functionally and operationally similar to its device," which have been shown in theft data from the National Crime Information Center to produce "a clear reduction in vehicle thefts after the introduction of the GM and Ford devices." *Id.*

150. On October 22, 2007, HATCI, on behalf of Hyundai, submitted a petition for PMR exemption for its luxury Hyundai Genesis vehicle line beginning with MY 2009. 73 Fed. Reg. 4,304 (Jan. 24, 2008). That same day, HATCI submitted a PMR exemption petition on behalf of KMC for its luxury Kia Amanti vehicle line beginning with MY 2009. 75 Fed. Reg. 1,447 (Jan. 11, 2010).

151. Like the Azera petition, HATCI stated that Defendants would install a passive immobilizer consisting of an EMS (engine control unit), SMARTRA 3 (immobilizer unit), an antenna coil and transponder ignition keys standard in the vehicle lines. *Id.* In both petitions, HATCI again touted the success of immobilizers in GM and Ford vehicles in reducing auto thefts. *Id.*

CLASS ACTION COMPLAINT

152. In a petition filed by Hyundai in 2009 for its VI vehicle line, beginning with MY 2011, Hyundai stated it will "install its passive Smart-key Immobilizer device and alarm system (audible and visual) on the VI vehicle line as standard equipment." 75 Fed. Reg. 6,253 (Feb. 8. 2010). In support of its petition, Hyundai relied on an "April 2006 report by JP Research, Inc., which concluded that antitheft devices were consistently much more effective in reducing thefts when compared to parts marking."

153. In particular, the cited JP Research report found that vehicle lines containing antitheft devices "were 70% more effective than parts marking in deterring theft." Hyundai's petition also relied on theft data from other manufacturer's vehicle lines (Lincoln Town Car, Chrysler Town and Country, Mazda MX–5 Miata and Mazda 3) that have been exempted from the theft prevention standard. Hyundai noted that "[t]heft rates for the Lincoln Town Car, Chrysler Town and Country, Mazda MX–5 Miata and Mazda 3 all are below the median theft rate of 3.5826." Further, Hyundai touted the success of its immobilizers in its Azera model, stating:

> Hyundai also compared the theft rates for its Azera model which has been installed with an antitheft device as standard equipment since (MY 2006) and was granted an exemption from the theft prevention standard in MY 2008 to the overall theft rate reported by NHTSA for model years (MYs') 2006 and 2007. The theft rate for the MY 2006 Hyundai Azera was 0.7758 which was comparatively lower than the overall theft rate of 2.08 for MY 2006. The theft rate for the MY 2007 Azera was 1.8003, also comparatively lower than the overall theft rate of 1.86 for MY 2007. ***Conclusively, Hyundai stated that it believes the data indicate that installation of antitheft devices are effective in reducing thefts***.

154. On September 8, 2016, and January 22, 2017, HATCI, on behalf of HMA and KA, respectively, submitted PMR exemption petitions for two hybrid electric vehicle lines, the MY 2017 Hyundai Ioniq and the MY 2018 Kia Niro. *See* 82 Fed. Reg. 22,051,

22,048  (May 11, 2017) 82 Fed. Reg. 22,048 (May 11, 2017). As part of these petitions, HATCI again touted the JP Research Report's conclusion that antitheft devices "were 70% more effective than parts marking in deterring theft."

155. Defendants thus were keenly aware of the disparate risk created by their decision not to install immobilizers in the Class Vehicles.

156. In addition to the research cited in Defendants' PMR petitions, publicly available information concerning vehicle thefts in the United States over the last decade notified Defendants as to the extent of the issue created by the Defect.

157. Every year since 2007, the National Insurance Crime Bureau ("NICB") publishes its "Hot Wheels" report that identifies the most stolen vehicles in the United States.[80] The report examines vehicle theft data submitted by law enforcement to the NCIC and determines the vehicle make, model and model year most reported stolen each year. In fact, the NCIC data relied on by the NICB was utilized by Defendants when seeking PMR exemptions. *See* 72 Fed. Reg. 39,661.

158.  Hyundai and Kia Class Vehicles first made the cut in a Hot Wheels report in 2013, when the 2013 Hyundai Elantra was listed as the sixth most stolen new car in 2013.[81] The 2013 Elantra did not, however, make the list of top-10 best selling vehicles that year.[82] Accordingly, the 2013 Elantra was stolen at a disproportionate rate.

159.   The NICB noted in the 2013 report that a reduction in vehicle thefts requires, *inter alia*, "Immobilizing Device: Generally speaking, if your vehicle can't be started, it

---

[80] *See* https://www.nicb.org/news/blog/hot-wheels-americas-10-most-stolen-vehicles (last accessed Aug. 26, 2022).

[81] https://www.nicb.org/sites/files/2017-10/2013-Hot-Wheels-Report.pdf (last accessed Aug. 29, 2022).

[82] https://www.edmunds.com/car-reviews/top-10/top-10-best-selling-vehicles-for-2013.html (last accessed Aug. 29, 2022).

can't be stolen. 'Kill' switches, fuel cut-offs and smart keys are among the devices that are extremely effective."

160. As detailed above (*see supra* ¶¶ 60-61), beginning around 2010, Hyundai and Kia started to increase the number of vehicles sold in the U.S.—built upon their marketing campaigns concerning the safety and reliability of their vehicles.

161. Coinciding with the growth in sales of Hyundai and Kia vehicles and the prevalence of Class Vehicles on U.S. streets, more and more of Defendants' vehicles began to appear in the Hot Wheels reports.

162. The 2015 Hot Wheels report named the 2015 Hyundai Sonata as the seventh most stolen new vehicle that year, the 2013 Hyundai Sonata was identified as the tenth most stolen vehicle in Maryland, and the 2015 Hyundai Elantra made the list as the third most stolen vehicle in Vermont.[83]

163. The 2016 Hot Wheels report named the 2016 Hyundai Hyundai Sonata the sixth most stolen new car in the United States, followed by the 2016 Hyundai Elantra in eighth place.[84] Additionally, the 2011 Sonata was the eighth most stolen vehicle in Delaware, the 2016 Hyundai Sonata was the eighth most stolen vehicle in Florida, the 2013 Hyundai Sonata was the seventh most stolen vehicle in Maryland, and the 2014 Hyundai Sonata was the ninth most stolen vehicle in Rhode Island.

164. The 2017 Hot Wheels report identified the 2017 Hyundai Elantra as the fourth most stolen new car in the United States and the 2017 Hyundai Sonata as the tenth

---

[83] https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf (last accessed Aug. 29, 2022)

[84] https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf (last accessed Aug. 29, 2022).

CLASS ACTION COMPLAINT

most stolen new car.[85] Defendants fared no better in the state report: the 2011 Sonata was the ninth most stolen vehicle in Connecticut; the 2013 Sonata and 2016 Elantra were fourth and sixth, respectively, on Delaware's most stolen cars list; the 2016 Sonata checked in at No. 6 on Washington D.C.'s most stolen cars list; the 2016 Sonata and 2017 Elantra were eighth and tenth, respectively, on Florida's most stolen cars list; the 2013 Elantra was the eighth most stolen car in Maine; the 2013 Sonata was the seventh most stolen car in Maryland; the 2017 Hyundai Sonata was the eighth most stolen car in New York; the 2013 Hyundai Sonata was the ninth most stolen car in North Carolina; and the 2013 Hyundai Sonata was the eighth most stolen car in Virginia.

165. Defendants were also frequently named in the 2018 Hot Wheels report, including: the 2018 Hyundai Elantra as the sixth most stolen new vehicle in the country; the 2011 Hyundai Sonata and 2015 Hyundai Elantra were seventh and ninth, respectively, on Washington D.C.'s most stolen cars list; the 2013 Hyundai Sonata and 2017 Hyundai Elantra were eighth and tenth on Florida's list; the 2013 Hyundai Sonata and the 2017 Hyundai Accent were sixth and ninth, respectively, on Maine's list; the 2013 Hyundai Sonata and 2018 Hyundai Elantra were ninth and tenth, respectively, on Maryland's list; the 2018 Hyundai Elantra was the tenth most stolen car in Nevada; the 2017 Hyundai Sonata was the third most stolen car in New Mexico; the 2011 Hyundai Sonata was the eighth most stolen car in North Carolina; the 2017 Hyundai Sonata was the seventh most stolen car in Rhode Island; the 2013 Hyundai Sonata was the tenth most stolen car in Virginia; and the 2015 Kia was the sixth most stolen car in New Mexico.[86]

---

[85] https://www.nicb.org/sites/files/2019-06/HotWheelsReleaseFINAL18WEB.pdf (last accessed Aug. 29, 2022).

[86] https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf (last accessed Aug. 29, 2022).

166. In the 2019 Hot Wheels report, Defendants earned the following distinctions: the 2011 Hyundai Sonata was named the eighth most stolen vehicle in Connecticut; the 2013 Hyundai Sonata was named fifth most stolen vehicle in Delaware; the 2015 Hyundai Sonata was named tenth most stolen vehicle in the District of Columbia; the 2013 Hyundai Sonata was named eighth most stolen vehicle in Florida, followed by the 2017 Hyundai Elantra in ninth place in the state; the 2017 Hyundai Elantra was named eighth most stolen vehicle in Maryland, followed by the 2013 Hyundai Sonata in ninth place in the state; the 2014 Hyundai Elantra was named the eighth most stolen vehicle in New Hampshire; the 2015 Hyundai Sonata was named third most stolen vehicle in New Mexico, followed by 2015 Kia Optima in fifth, and the 2013 Hyundai Elantra in eighth; the 2011 Hyundai Sonata was identified as the tenth most stolen vehicle in North Carolina; and the 20018 Hyundai Elantra was the sixth most stolen vehicle in Wyoming.[87]

167. The 2020 Hot Wheels report begins to reveal the explosion in public knowledge of the Defect.[88] In particular, the report identifies the following Class Vehicles:  the 2017/2016 Hyundai Sonata and the 2015 Kia Optima as the eighth and tenth, respectively, as the most stolen vehicles in Colorado; the 2015 Hyundai Sonata was the ninth most stolen vehicle in Connecticut; the 2012 Hyundai Sonata was the tenth most stolen vehicle in Delaware; the 2011 Hyundai Sonata was the sixth most stolen vehicle in Washington D.C., while the 2018 Hyundai Elantra was the eighth most stolen vehicle in the District; the 2011 Hyundai Sonata was the ninth most stolen vehicle in

---

[87] https://www.nicb.org/sites/files/2020-10/2019_State_Top10Report_01wTT.pdf (last accessed Aug. 29, 2022).

[88] https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles (last accessed Aug. 29, 2022).

Florida; the 2013 Hyundai Sonata and 2017 Hyundai Elantra were seventh and ninth, respectively, for Maryland; the 2019 Hyundai Elantra was the tenth most stolen car in Massachusetts; the 2019 Kia Forte was the ninth most stolen car in New Hampshire; the 2013 Hyundai Elantra, 2015 Hyundai Sonata, and 2015 Kia Optima were the third, fifth, and seventh, respectively, most stolen cars in New Mexico; the 2019 Hyundai Elantra was the ninth most stolen car in Pennsylvania; the 2013 Hyundai Accent was third, the 2019 Kia Rio was fourth, the 2019 Kia Soul was fifth, the 2017 Hyundai Tucson was seventh, and the 2017 Hyundai Elantra was the eighth most stolen cars in Puerto Rico; the 2019 Hyundai Elantra was the seventh most stolen vehicle in Rhode Island; the 2013 Hyundai Elantra and 2013 Hyundai Sonata were the eighth and tenth, respectively, most stolen vehicles in Virginia; and the 2011 Hyundai Sonata was the seventh most stolen vehicle in Wisconsin.

168. As expected, Defendants made a dominant showing on the 2021 Hot Wheels report: the 2017 Hyundai Sonata was fifth in Colorado, followed by the 2015 Kia Optima in sixth and the 2017 Kia Sportage in ninth; the 2015 Kia Optima was the tenth most stolen vehicle in California; the 2020 Hyundai Elantra was tenth on Connecticut's list; the 2013 Hyundai Sonata was sixth for Delaware, followed by the 2013 Hyundai Elantra; the 2018 Hyundai Elantra and 2011 Hyundai Sonata were seventh and eighth, respectively, for the District of Columbia; the 2017 Hyundai Elantra and 2015 Hyundai Sonata were eighth and tenth, respectively, for Maryland; the 2015 Hyundai Sonata, 2018 Hyundai Elantra, and 2015 Kia Optima were named fourth, sixth, and seventh, respectively, for New Mexico; the 2013 Hyundai Sonata was ninth for North Carolina; the 2020 Hyundai Elantra and 2011 Hyundai Sonata were eighth and tenth, respectively, in Pennsylvania; the 2017 Hyundai Tucson was third in Puerto Rico, followed by the

52

2018 Kia Soul in fourth, the 2019 Hyundai Accent in sixth, the 2019 Kia Rio in seventh, 2020 Kia Sedona in eighth, and the 2019 Kia Forte in tenth; the 2013/2011 Hyundai Sonata was tenth for Rhode Island; the 2013 Hyundai Elantra was tenth in West Virginia; and the 2021/2016 Kia Forte was tenth in Vermont.[89]

169. Finally, the 2021 Hot Wheels report for Wisconsin provides a dark picture for Class Vehicle owners and does not bode well for the rest of the nation in 2022. In Wisconsin, Hyundai and Kia vehicles took the first seven spots for the most stolen vehicles in the state, far exceeding its competitors:

| Wisconsin | 1 | Hyundai Elantra | 2017 | 1,006 |
| Wisconsin | 2 | Hyundai Sonata | 2015 | 898 |
| Wisconsin | 3 | Kia Motors Corporation Optima | 2019 | 627 |
| Wisconsin | 4 | Kia Motors Corporation Forte | 2019 | 569 |
| Wisconsin | 5 | Kia Motors Corporation Sportage | 2020 | 512 |
| Wisconsin | 6 | Hyundai Tucson | 2018 | 374 |
| Wisconsin | 7 | Kia Motors Corporation Soul | 2020 | 367 |
| Wisconsin | 8 | Honda Civic | 2000 | 347 |
| Wisconsin | 9 | Chevrolet Pick-Up (Full Size) | 2007 | 266 |
| Wisconsin | 10 | Honda Accord | 1997 | 263 |

170. On information and belief, Defendants monitored the Hot Wheel reports, as well as the underlying NCIC data, and thus were actively or constructively aware of this rise in the thefts of the Class Vehicles.

171. On information and belief, KA's and HMA's customer relations divisions regularly receive and respond directly to customer calls concerning, *inter alia*, product defects. Through these sources, Defendants were made aware of the Defect and had knowledge of its potential danger.

172. On information and belief, HMA and KA's customer relations departments,

---

[89] https://www.nicb.org/news/news-releases/chevrolet-and-ford-full-size-pick-ups-most-stolen-vehicles-second-year-row (last accessed Aug. 29, 2022); https://www.nicb.org/sites/files/2022-07/Hot%20Wheels_Top%2010%20By%20State.pdf (last accessed Aug. 29, 2022).

which interact with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, have received numerous reports of the Defect, including the design flaws related to the windows, steering column casing, ignition cylinder and switch, and lack of engine immobilizer in Class Vehicles. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

173. Defendants' warranty departments similarly review and analyze warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

174. The rise in thefts would also be shown in Defendants' customer complaints—both directly and as relayed through their dealers—and replacement part orders for repairs.

175. Upon information and belief, each Defendant knew or should have known about the Defect because of the high number of replacement parts likely ordered from Defendants. All HMA and KA service centers are required to order replacement parts,

including windows, steering columns, ignition cylinders and switches, and engine immobilizers directly from HMA, HMC, KA, or KC. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. HMA, HMC, KA, and KC routinely monitor part sales reports and are responsible for shipping parts requested by dealerships and technicians. Thus, HMA, HMC, KA, and KC have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of auto-parts necessary to fix damage caused by vehicle thefts of the Class Vehicles was known to HMA, HMC, KA, and KC, and should have alerted them to the scope and severity of the Defect.

176. On information and belief, the customer relations and warranty divisions of HMA, HMC, KA, and KC interact with one another and discuss potential issues in Hyundai and Kia vehicles which share components and designs.

177. On information and belief, the engineering offices, safety offices, and safety investigators of HMA, HMC, KA, and KC interact with one another and discuss potential issues in Hyundai and Kia vehicles which share components and designs.

**F.  HMA and KA falsely claim to offer the best warranty program in the nation, yet fail to offer a remedy for the Defect.**

178. HMA and KA advertise their warranty program as "industry-lead[ing]"[90] and "America's Best Warranty."[91]

179. KA's warranty begins with the representation that "[t]he latest engineering

---

[90] https://owners.kia.com/us/en/service-page/warranty.html (last accessed Aug. 29, 2022).
[91] https://www.hyundaiusa.com/us/en/assurance/america-best-warranty (last accessed Aug. 29, 2022).

techniques have been incorporated into the design and production of your Kia Vehicle."[92]
HMA states that in addition to "giving [owners] added peace of mind, [its] warranty
supports [HMA's] commitment to provide vehicles of high quality, dependability and
reliability."[93]

180. But in reality, HMA's and KA's warranty programs bring little comfort to
Class Vehicle owners, and, as explained above, Defendants were keenly aware that their
vehicles do not incorporate the "latest engineering techniques" and design. Despite
HMA's and KA's promises, they have consistently evaded their warranty obligations by
failing to inform consumers that their vehicles are defective and by refusing to cover
damages caused by the Defect.

181. In many instances, consumers have incurred and will continue to incur
expenses for the repair and replacement of various vehicle parts as a result of damages
caused by the Defect.

182. Furthermore, a number of Class Members who presented their Class
Vehicles to HMA and KA dealerships because of issues related to the Defect were denied
warranty repairs and, instead, were informed that nothing was wrong with their vehicles.

183. On information and belief, HMA and KA also disclaimed any coverage for
damages to Class Vehicles after they were easily stolen due to the defect due to purported
exclusions in their written warranties for incidents of collision and theft.

184. After news of the Defect became common knowledge and an epidemic of

---

[92]
https://www.kia.com/us/content/dam/kia/us/en/images/warranty/manual/general-
warranty-and-consumer-info/2020_warranty.pdf (last accessed Aug. 29, 2022).
    [93] https://www.hyundaiusa.com/us/en/assurance/america-best-warranty (last
accessed Aug. 29, 2022).

vehicle thefts began to take hold over the country, Defendants announced that going forward, they would install immobilizers in all of their vehicles. This change would affect certain 2022 model vehicles and all Hyundai and Kia vehicles from 2023 onward.

185. What this announcement does not do is provide any relief to the millions of Class Vehicle owners whose vehicles remain just as susceptible to theft as before Defendants made this acknowledgment. Class Vehicle owners are, therefore, left with few good options. Even more concerning, due to widespread knowledge of the Defect, major insurance companies, including Progressive, have decided that they no longer will cover damages related to theft of Class Vehicles.[94]

186. Hyundai and Kia recently announced that they have developed a security kit that purportedly targets the method of entry thieves are using to access these vehicles and disables the starter if the alarm is triggered.[95] But Defendants will not install this device free of charge, as they are required to do under their warranties and applicable laws and regulations. Instead, Defendants will be charging Class Members for this device, which will not even be available until October at the earliest.

## G. Fraudulent Omission/Concealment Allegations

187. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals employed by Defendants responsible for making false and misleading statements regarding the Class Vehicles. Defendants necessarily are in possession of all of this information. Plaintiffs'

---

[94] https://boingboing.net/2022/08/16/progressive-insurance-halts-underwriting-some-kia-hyundai-cars-in-denver-co-and-other-states.html (last accessed Aug. 29, 2022).

[95] Hyundai has a new way to prevent its cars from getting stolen | Fox News (last accessed Aug. 29, 2022).

claims arise out of Defendants' fraudulent omission/concealment of the Defect, despite their representations about the quality, reliability, and safety of the Class Vehicles.

188. Plaintiffs allege that at all relevant times, including specifically at the time they and Class Members purchased their Class Vehicles, Defendants knew, or were reckless in not knowing, of the Defect; Defendants had a duty to disclose the Defect based upon their exclusive knowledge; and Defendants never disclosed the Defect to Plaintiffs or the public at any time or place in any manner prior to the Recalls.

189. Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

190. *Who*: each Defendant (HMA, HMC, KA, and KC) actively concealed and omitted the Defect from Plaintiffs and Class Members while simultaneously touting the quality, safety, and dependability of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decisions.

191. *What*: that the Class Vehicles contain the Defect, as alleged herein. Defendants concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

192. *When*: Defendants concealed and omitted material information regarding the Defect at all times while making representations about the quality, safety, and dependability of the Class Vehicles on an ongoing basis, and continuing to this day. Defendants still have not disclosed the truth about the full scope of the Defect in the Class Vehicles. And when consumers brought their vehicles to HMA and KA dealerships or called Defendants' respective customer service and warranty departments

complaining of the Defect, Defendants denied an adequate repair for the Defect and warranty coverage.

193. **Where**: Defendants concealed and omitted material information regarding the true nature of the Defect in every communication they had with Plaintiffs and Class Members and made representations about the quality, reliability, and safety of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Defect in the Class Vehicles prior to the Recalls. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites. There are channels through which Defendants could have disclosed the Defect, including, but not limited to: (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class Members through means such as state vehicle registry lists and e-mail notifications.

194. **How**: Defendants concealed and omitted the Defect from Plaintiffs and Class Members and made representations about the quality, safety, and dependability of the Class Vehicles. Each Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class Members at all times, even though they each knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendants promised in their marketing materials that Class Vehicles have qualities that they do not have.

195. **Why**: Defendants actively concealed and omitted material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, and durability of the Class

Vehicles. Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## V. TOLLING OF STATUTES OF LIMITATIONS

196.  Any applicable statute(s) of limitations have been tolled by HMA's, HMC's, KA's, and KC's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true nature of the Defect because Defendants concealed it. Plaintiffs' claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

**A. Discovery Rule**

197.  The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Defect.

198.  As alleged above, Class Members had no way of knowing about the Defect in their Class Vehicles. HMA, HMC, KA, and KC concealed their knowledge of the Defect while KA and HMA continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles. To this day, Defendants failed to disclose the full extent of the Defect and the risks faced by Class Vehicle drivers.

199.  Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that HMA, HMC, KA, and KC were concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

200. Class Members did not know facts that would have caused a reasonable person to suspect that there was a Defect affecting their vehicle and an ordinary person

would be unable to appreciate that the vehicle was defective. Even if a Class Vehicle owner or lessee learns that their vehicle or another's Class Vehicle was stolen, as an ordinary consumer, without sophisticated knowledge of mechanical systems and antitheft devices, would not and could not suspect that the Class Vehicle that was stolen was, in fact, attributable to a pervasive Defect because HMA, HMC, KA, and KC withheld this information and pointed to their express warranties, which purport to disclaim liability for these damages.

201. For ordinary consumers, the existence and partial extent of the Defect only came to light after media outlets began to cover a story of local teenagers in Milwaukee that have caused the theft rate to skyrocket.

202. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

## B. Fraudulent Concealment

203. As the manufacturers, distributors, sellers, and/or warrantors of the Class Vehicles, HMA, HMC, KA, and KC were under a continuous duty to disclose to Class Members the existence of the Defect found in the Class Vehicles.

204. Defendants were and remain under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect found in the Class Vehicles will allow juveniles to steal the vehicle in less than two minutes, that they will require costly repairs, pose safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles.

205. HMA, HMC, KA, and KC recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the Defect.

206. Due to each Defendant's concealment throughout the time period relevant to

this action, all applicable statutes of limitation have been tolled.

207. Instead of publicly disclosing the Defect in the Class Vehicles, Defendants kept owners and lessees in the dark about the Defect present in their vehicles. To this day, Defendants have knowingly or recklessly failed to disclose the full extent of the Defect and have failed to offer adequate remedies for the Defect.

208. Class Members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

209. Until the Defect was exposed to the public known through a series of media coverage as the epidemic exploded in 2021, Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of such a connection. In particular, Class Members did not possess the aggregate data concerning vehicle thefts, which was beginning to cluster in specific areas around the United States, or the technical data related to the design of the Class Vehicles, which has ultimately led to this crisis.

210. This ignorance of the existence of the Defect present in the Class Vehicles is common across each Plaintiff and Class Member.

## C. Estoppel

211. HMA, HMC, KA, and KC were, and are, under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. HMA, HMC, KA, and KC failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the quality and reliability of the Vehicles. Plaintiffs and Class Members reasonably relied upon each Defendant's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, each Defendant is estopped from relying on any statutes of limitation in

defense of this action.

## VI. CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS

212. California law applies to Plaintiffs' nationwide claims because Plaintiffs' injuries emanate from HMA's and KA's actions in California. Each pertinent decision related to the decision to conceal the Defect from Class Members, including the marketing, commercial distribution, and Defect investigation for the Class Vehicles in the United States, was made from HMA's and KA's California headquarters by their respective executives and employees located in California.

213. On information and belief, HMC and KC conducted an investigation into the Defect and potential remedies in California and their subsidiaries' California headquarters.

214. Defendant HMA is headquartered in Fountain Valley, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Hyundai Class Vehicles.

215. On HMA's website, the company promotes a quote by Brandon Ramirez, Sr., Group Manager of Product Public Relations (who is based in Fountain Valley),[96] which states that "[e]very aspect of a car model, from the initial concept all the way until it launches and even planning the next generation, happens right here in the U.S."[97]

216. HMA maintains its C-Suite, and its engineering, marketing, customer relations, and warranty departments at its Fountain Valley offices.

---

[96] https://www.linkedin.com/in/brandon-ramirez-b891265 (last accessed Aug. 29, 2022).

[97] https://www.hyundaiusa.com/us/en/why-hyundai/made-in-america?adobe_mc=MCMID%3D306036122547715901117361901999371395 33%7CMCORGID%3DC3BCE0154FA24300A4C98A1%2540AdobeOrg%7CTS%3D1626118865 (last accessed Aug. 29, 2022).

217. José Muñoz serves as the Global Chief Operating Officer of HMC and the President and CEO of HMA.[98] "Based in Hyundai's U.S. headquarters in Fountain Valley, California," Mr. Muñoz oversees the entire American market.

218. Brian K. Latouf served as the Global Chief Safety Officer of HMA from December 2019 through July 2022, when he was appointed to the same role for HMC.[99] Based in California, Mr. Latouf is responsible for all safety regulation matters, including the strategic legal direction and oversight of all safety investigations and recalls in the U.S., Canada and Mexico.

219. Wayne Gates serves as Director of Product Analysis Group at HMA.[100] Based in Fountain Valley, California, Mr. Gates oversees, among other things, safety, compliance, and regulatory issues involving Hyundai vehicles, and liaisons with NHTSA regarding Hyundai recalls.[101]

220. Omar Rivera serves as HMA's Executive Director of Quality and Service Engineering.[102] Based in Fountain Valley, California, Mr. Rivera and his team are responsible for model line engineering and engineering analysis, among other

---

[98] https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed Aug. 29, 2022).

[99] https://www.hyundainews.com/en-us/bios/brian-latouf (last accessed Aug. 29, 2022); https://www.linkedin.com/in/brian-latouf-b6a8b7b4/ (last accessed Aug. 29, 2022); https://www.prnewswire.com/news-releases/hyundai-motor-appoints-brian-latouf-to-lead-new-global-safety-office-301589377.html (last accessed Aug. 29, 2022).

[100] https://www.linkedin.com/in/wayne-gates-b8a85b7/ (last accessed Aug. 29, 2022).

[101] *Id*.; https://static.nhtsa.gov/odi/rcl/2020/RCAK-20V543-1854.pdf (last accessed Aug. 29, 2022).

[102] https://www.hyundainews.com/en-us/bios/omar-rivera (last accessed Aug. 29, 2022).

responsibilities.[103]

221. Paul Imhoff serves as Director of Customer Experience at HMA.[104] Based in California, Mr. Imhoff is responsible for the "customer experience for Hyundai in the U.S."[105] and "[o]versees all aspects of the customer experience, from retail processes and after sales improvements to call centers and customer feedback surveys ." Prior to his current role, Mr. Imhoff served as HMA's Director of Marketing Communications, where he was responsible for brand strategy, national and regional advertising, experiential marketing, auto shows, branded content, social media and multicultural marketing.

222. Danial Kim serves as the Senior Group Manager of North America Safety Office at HMA at the company's offices in California, and previously served as a Senior Manager of Engineering & Design Analysis.[106] Mr. Kim serves as Hyundai's "[l]iaison responsible for corporate compliance with NHTSA enforcement of potential safety-related product defects." Mr. Kim also "facilitate[es] product safety recall/campaign decisions in accordance with federal regulation and guidelines, manage[s] [ ] TREAD compliance program including EWR reporting, collaboration with ODI in joint product safety investigations, recall filing and completion reporting, coordinating with overseas R&D, manufacturing, and service in identifying and closing potential safety defects."

---

[103] *Id*.; https://www.linkedin.com/in/omar-rivera-a917363/(last accessed Aug. 29, 2022).

[104] https://www.hyundainews.com/en-us/bios/paul-imhoff (last accessed Aug. 29, 2022).

[105] *Id*.; https://www.linkedin.com/in/pimhoff/ (last accessed Aug. 29, 2022).

[106] https://www.linkedin.com/in/daniel-kim-60013228/ (last accessed Aug. 29, 2022).

223.  Cole Stutz serves as the Director of Safety Field Investigations at HMA.[107] Based in Fountain Valley, California, Mr. Stutz liaisons with NHTSA regarding safety recalls, among other things.[108]

224. Scott Stewart serves as the Senior Group Manager of Safety Field Investigations at HMA and is based at the company's offices in California.[109]

225.  Barry Ratzlaff serves as the Chief Customer Officer of HMA.[110] In this role, he is responsible for Hyundai's customer experience strategy, retail process, sales and service training, product quality and service engineering. Mr. Ratzlaff is a 30-year automotive veteran with roles in manufacturing, quality and product development. Mr. Ratzlaff is based in Fountain Valley, California.

226.  Angela Zepeda serves as the Chief Marketing Officer for HMA.[111] Based in Fountain Valley, California, Ms. Zepeda "is responsible for all of Hyundai's marketing and advertising activities in the U.S., including the strategic direction, brand development, national and regional advertising, experiential marketing, digital and social media, brand partnerships, and lead generation, among other responsibilities."[112]

---

[107] https://www.linkedin.com/in/cole-stutz-2b7796103/ (last accessed Aug. 29, 2022).

[108] *Id.*; https://static.nhtsa.gov/odi/rcl/2021/RCAK-21V303-6447.pdf (last accessed Aug. 29, 2022).

[109] https://www.linkedin.com/in/scott-stewart-10048094/ (last accessed Aug. 29, 2022).

[110] https://www.hyundainews.com/en-us/bios/barry-ratzlaff (last accessed Aug. 29, 2022); https://www.linkedin.com/in/barry-ratzlaff-54b40811/ (last accessed Aug. 29, 2022).

[111] https://www.hyundainews.com/en-us/bios/angela-zepeda (last accessed Aug. 29, 2022).

[112] *Id.*; https://www.linkedin.com/in/angela-zepeda-8bb8293/ (last accessed Aug. 29, 2022).

227.  Randy Parker serves as Chief Executive Officer for HMA.[113] Prior to his promotion in July 2022, Mr. Parker served as Senior Vice President of National Sales at HMA. Mr. Parker is was based in Fountain Valley, California, where he was "responsible for all aspects of sales and distribution of Hyundai vehicles in the U.S., including sales strategies, fleet and certified pre-owned operations, dealer relations, market representation, and other related activities with the mission to grow Hyundai sales and market share."[114] Mr. Parker "also overs[aw] Hyundai's seven regions that work directly with Hyundai retailers on sales and service."

228.  Fred DePerez serves as the Vice President of Product Line Management and Sales Planning for HMA.[115] Based in Fountain Valley, California, Mr. DePerez oversees Product Line Management, Sales Planning, and Retail Operations.[116]

229.  Robert Grafton serves as an Executive Director of Dealer Development & Strategy for HMA.[117] Based in Fountain Valley, California, Mr. Grafton is "responsible for managing and implementing the Hyundai dealer network strategy by optimizing retail representation and improving dealer relations."[118]

230.  David VandeLinde is the Vice President of After-Sales for HMA and based

---

[113]  https://www.prnewswire.com/news-releases/randy-parker-named-chief-executive-officer-of-hyundai-motor-america-301595523.html (last accessed Aug. 29, 2022).

[114] *Id.*; https://www.linkedin.com/in/randy-parker-24806232/ (last accessed Aug. 29, 2022); https://web.archive.org/web/20210202225203/https://www.hyundainews.com/en-us/bios/randy-parker (Aug. 29, 2022).

[115] https://www.hyundainews.com/en-us/bios/fred-deperez (last accessed Aug. 29, 2022).

[116] *Id.*; https://www.linkedin.com/in/freddeperez/ (last accessed Aug. 29, 2022).

[117] https://www.hyundainews.com/en-us/bios/robert-grafton (last accessed Aug. 29, 2022).

[118] *Id.*; https://www.linkedin.com/in/robertgrafton/ (last accessed Aug. 29, 2022).

in Fountain Valley, California.[119]  In this role, Mr. VandeLinde is responsible for leading dealer service programs and operations, parts and accessory sales, and owner marketing. Prior to his current role, Mr. VandeLinde served as the director of Dealer Service Process where he oversaw Hyundai's retail service process, parts planning, parts and service field ops, and parts and service training. Mr. VandeLinde led a team of over fifty team members who were responsible for in Service Analytics and Technician Retention. Mr. VandeLinde was also central to HMA "establishing and operationalizing a platform for gathering and publishing dealer best practices, developing and publishing the first ever Hyundai Service Process Manual (the Car Care Process Guide), and revolutionizing Hyundai's approach to field training to be more experiential."

231. Kate Fabian serves as the director of Marketing Communications for HMA.[120] Based in Fountain Valley, California, Ms. Fabian "is responsible for brand strategy and planning, multicultural marketing, media strategy, national and regional dealer advertising, experiential marketing, branded content and social media."[121]

232. Ricky Lao serves as HMA's Director of Product Planning.[122] Based in Fountain Valley, California, Mr. Lao and his team are "responsible for leading the product planning process from concept phase through product launch, and subsequent lifecycle management, for all current and future cars and SUVs representing the Hyundai

---

[119] https://www.hyundainews.com/en-us/bios/david-vandelinde (last accessed Aug. 29, 2022); https://www.linkedin.com/in/dave-vandelinde-6b2b2078/ (last accessed Aug. 29, 2022).

[120] https://www.hyundainews.com/en-us/bios/kate-fabian-- (last accessed Aug. 29, 2022).

[121] *Id.*; https://www.linkedin.com/in/kate-fabian-b1150412/ (last accessed Aug. 29, 2022).

[122] https://www.hyundainews.com/en-us/bios/ricky-lao (last accessed Aug. 29, 2022); https://www.linkedin.com/in/ricky-lao-189303/ (last accessed Aug. 29, 2022).

North American market."

233. Additionally, HMA's "Customer Care Center," which handles customer complaints and warranty inquiries for Hyundai Class Vehicle owners and lessees, is located in Fountain Valley.[123]

234. On information and belief, HMA's website, including the "Consumer Assistance Center" webpage,[124] is managed by Hyundai's marketing and customer service departments located in Fountain Valley.

235. In addition to HMA's engineering and safety investigation teams responsible for post-sale investigations located at its Fountain Valley headquarters, HMA conducts pre-sale durability testing in California, including at its "California Proving Ground" and the "Hyundai Design and Technical Center" located in Irvine.[125] The Hyundai Design and Technical Center is HMA's "90,000-square-foot state-of-the-art facility" and "is home to Hyundai automobile designers, engineers, model-makers and technicians[.]"

236. Defendant KA is headquartered in Irvine, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Kia vehicles, including the Kia Class Vehicles.

237. KA's C-Suite, and employees responsible for KA's distribution of Class Vehicles, decision to conceal the Defect, Kia's public statements to the U.S. market concerning Class Vehicles, as well as the Recalls, are also based in California.

238. SeungKyu (Sean) Yoon is the President and CEO of KA and is responsible

---

[123]https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2021_Owners_Handbook_Warranty.pdf (Aug. 29, 2022).

[124] https://owners.hyundaiusa.com/us/en/contact-us.html (last accessed Aug. 29, 2022).

[125] *See* https://www.hyundainews.com/en-us/releases/1250; https://www.hyundainews.com/en-us/releases/1251 (last accessed Aug. 29, 2022).

for its strategy and operations in the U.S., including its manufacturing.[126] Mr. Yoon is based at KA's headquarters in Irvine, California.

239. Russell Wager serves as KA's Vice President of Marketing and oversees all of the company's marketing communications including the marketing operations, customer journey, and public relations areas.[127] Mr. Wager is based at KA's headquarters in Irvine, California.

240. J.S. (Jurassic) Park serves as KA's Chief Safety Officer and Vice President of Regulatory Compliance.[128] Based at KA's headquarters in Irvine, California, Mr. Park participates in all safety-recall decision-making for the U.S. market and acts as the company's liaison with NHTSA regarding Kia recalls, among other things.

241. KA's Regulatory Compliance managers and employees are also located at its headquarters in Irvine, California.[129] The Regulatory Compliance office works with KC and its affiliates (including HATCI) to, *inter alia*, monitor safety regulatory issues and advise on statements made to consumers, including on Monroney labels.

---

[126] https://www.kiamedia.com/us/en/media/pressreleases/13858/seungkyu-sean-yoon-1 (last accessed Aug. 29, 2022); https://www.linkedin.com/in/seungkyu-sean-yoon-3251b1a9/ (last accessed Aug. 29, 2022); https://www.automotiveworld.com/news-releases/kia-america-debuts-in-us-new-name-replaces-kia-motors-america-as-part-of-kia-corporation-global-brand-strategy/ (last accessed Aug. 29, 2022).

[127] https://www.kiamedia.com/us/en/media/pressreleases/17221/russell-wager (last accessed Aug. 29, 2022); https://www.linkedin.com/in/russell-wager/ (last accessed Aug. 29, 2022).

[128] https://static.oemdtc.com/Recall/21V447/RCAK-21V447-9829.pdf (last accessed Aug. 29, 2022); https://static.nhtsa.gov/odi/rcl/2020/RCAK-20V518-6959.pdf (last accessed Aug. 29, 2022).

[129] *See* https://www.linkedin.com/jobs/view/regulatory-compliance-manager-at-kia-motors-america-2432082551/?refId=db5aad21-355f-41fe-b515-f22f69d9a0e5&trackingId=61TH90nuMf9kICG1U9DG2A%3D%3D (last accessed Aug. 29, 2022).

242. Additionally, KA's "Customer Assistance Center" and Consumer Affairs Department, which handles customer complaints and warranty inquiries for Kia Class Vehicle owners and lessees, is located in Irvine, California.[130]

243. On information and belief, KA's website, including the "Consumer Assistance Center" webpage,[131] is managed by KA's marketing and customer service departments located in Irvine, California.

244. In addition to KA's engineering and safety investigation teams responsible for post-sale investigations located at its Irvine headquarters, KA conducts pre-sale durability testing in California, including at its "California Proving Ground" and the Hyundai-Kia Design and Technical Center located in Irvine.[132] The "$30 million state-of-the-art" Design and Technical Center "houses more than 100 auto designers, engineers, model makers and technicians."

245. Finally, while HMC and KC participated in the investigations of the Defect in Hyundai and Kia vehicles, the ultimate decisions concerning whether to recall the Class Vehicles were made by HMA and KA executives at their respective California headquarters.

## VII. CLASS ALLEGATIONS

246. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

---

[130]https://www.kia.com/us/content/dam/kia/us/en/images/warranty/manual/general-warranty-and-consumer-info/2020_warranty.pdf (last accessed Aug. 29, 2022).

[131] https://ksupport.kiausa.com/ConsumerAffairs (last accessed Aug. 29, 2022).

[132] https://www.hyundainews.com/en-us/releases/1270 (last accessed Aug. 29, 2022).

247. Plaintiffs seek to represent a class ("Nationwide Class") under the laws of the State of California defined as:

> All persons or entities that purchased or leased a Class Vehicle in the United States.

248. In addition, and in the alternative to the Nationwide Class, Plaintiffs seek to represent the following State Classes:

**Florida Class:** (represented by Plaintiff Cohen)
All persons or entities that purchased or leased a Class Vehicle in the State of Florida.

**Minnesota Class:** (represented by Plaintiff Ragsdale)
All persons or entities that purchased or leased a Class Vehicle in the State of Minnesota.

**Georgia Class:** (represented by Plaintiff Taylor)
All persons or entities that purchased or leased a Class Vehicle in the State of Georgia.

249. The Nationwide Class and the State Classes are collectively referred to herein as the Classes.

250. Excluded from the Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Classes definitions based on discovery and further investigation.

251. <u>Numerosity</u>: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least five million Class

Vehicles have been sold and leased in the United States.

252. <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.  Whether Defendants engaged in the conduct alleged herein;

b.  Whether Plaintiffs' claims emanate from HMA's and KA's conduct in California;

c.  Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.  Whether the Class Vehicles were sold with a safety defect;

e.  Whether Defendants knew of the Defect but failed to disclose the problem and its consequences to their customers;

f.  Whether a reasonable consumer would consider the Defect or its consequences to be material;

g.  When Defendants discovered the Defect in the Class Vehicles, and what, if anything, they did in response;

h.  Whether Defendants should be required to disclose the existence of the Defect;

i.  Whether Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein;

j.  Whether Plaintiffs and Class Members overpaid for their Class Vehicles; and

k.  Whether Plaintiffs and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

253. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Class Vehicles with the same Defect as did each member of the

Classes. Furthermore, Plaintiffs and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

254. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

255. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Classes. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

256. Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIII.CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *ET SEQ*. ("CLRA")**
(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

257. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

258. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

259. HMA, HMC, KA, and KC are each a "person" as that term is defined in California Civil Code § 1761(c).

260. Plaintiffs and the Class Members are "consumer[s]" as that term is defined in California Civil Code §1761(d).

261. HMA, HMC, KA, and KC engaged in unfair and deceptive acts in violation of the CLRA, Cal. Civ. Code § 1750, *et seq*., by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

    a. (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

    b. (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or

that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

c. (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

d. (a)(9) Advertising goods and services with the intent not to sell them as advertised; and

e. (a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

262. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

263. HMA, HMC, KA, and KC knew that the Class Vehicles were defectively designed and were not suitable for their intended use.

264. HMA, HMC, KA, and KC were each under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles because:

a. Defendants were in a superior position to know the true state of facts about the safety Defect and associated costs in the Class Vehicles;

b. Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous Defect until it was disclosed by Defendants, or revealed through in public media reports; because Plaintiffs do not have access to aggregate data concerning car thefts and replacement components available to Defendants;

c. Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety Defect and the associated repair costs that it causes until it was disclosed by Defendants, or revealed through in the public media; and

CLASS ACTION COMPLAINT

    d   Defendants actively concealed the safety Defect and the associated repair costs by knowingly failing to recall Class Vehicles and denying warranty claims arising from the Defect.

265. Further, pursuant to FMVSS No. 114, Defendants were required to outfit their vehicles with safety measures to curb specific cases of auto theft through technology designed to prevent thieves from starting the vehicle without authorized keys. HMA, HMC, KA, and KC have been aware of the benefits of immobilizer technology for more than a decade. Indeed, since no later than 2007, in various Petitions for exemption from the PMR—albeit, only for a discrete subset of their luxury model lines—Defendants extoled the benefits of immobilizer technology as a way to substantially reduce or eliminate easy cases of auto theft.

266. However, despite the utility and ubiquity of engine immobilizers—as evidenced by the litany of automotive manufacturers that have equipped immobilizers as a standard feature and obtained an exemption from the PMR because of it (*see supra* ¶ 110)—Defendants failed to incorporate this technology as a standard feature into virtually every other vehicle line except for its high–end models, including the vehicles owned by Plaintiffs and the Class Members, and even in the face of appreciable increases in the rate of thefts for the Class Vehicles.

267. Defendants were actually or constructively aware of the Defect present in the Class Vehicle that was making them such an easy target for thieves; knowledge of which they learned from a variety of sources, including, on information and belief: (i) NCIC crime data; (ii) their interaction with, and study of, what other manufacturers were doing to reduce auto theft; (iii) their interaction with NHTSA and law enforcement; (iv) reports from various media outlets; (v) their interaction, through one or more affiliates (e.g., their

respective financing arms), with the insurance companies of the victims of these auto thefts; and (vi) the increase in component parts that they, through one or more affiliates, were supplying to authorized dealers and autobody shops around the country that were tasked with fixing stolen vehicles once they were recovered.

268. Despite the wealth of data demonstrating this growing safety risk, however, Defendants did nothing to ameliorate this problem. They never informed the current owners, including Plaintiffs and the Class, of the safety risk their vehicles posed; they continued to sell and lease the Class Vehicles without ever informing prospective customers of the heightened safety risk posed by purchasing a standard keyed ignition vehicle without an immobilizer; and until their 2022 model year vehicles, they never modified the design of these vehicles to account for this Defect, such as by making immobilizer technology standard across all vehicle lines.

269. Quite the opposite, actually: HMA and KA—through a variety of marketing campaigns disseminated in various media (on their website, in vehicle brochures, on television, and through various press releases, to name a few)—consistently touted the safety, reliability, and durability of their vehicles that Kia and Hyundai owners would come to enjoy in the years following their purchase or lease.

270. In failing to disclose the Defect and the associated safety risks and repair costs that result from it, HMA, HMC, KA, and KC have knowingly and intentionally concealed material facts and breached their duty to disclose.

271. The facts concealed or not disclosed by HMA, HMC, KA, and KC to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Class

Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

272. On or about August 26, 2022, Plaintiffs, through undersigned counsel, provided Defendants with notices of their violations of the CLRA.

273. Plaintiffs and Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

274. Plaintiffs and the Class Members seek all remedies available under the CLRA, including equitable relief, damages, punitive damages, and attorneys' fees.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 ("UCL")
(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

275. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

276. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

277. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

278. HMA, HMC, KA, and KC have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a superior position to know the true

CLASS ACTION COMPLAINT

facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

279. The Defect constitutes a safety issue that triggered each Defendant's duty to disclose the safety issue to consumers. As explained above, for over fifty years, NHTSA has recognized that auto thefts pose "a major hazard to life and limb … [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968).

280. These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

281. A business practice is unlawful under the UCL if it is forbidden by any law. Defendants' acts, conduct, and practices were unlawful, in that they constituted, among others, violations of the CLRA, FAL, Song-Beverly Act, and/or implied warranties.

282. The injuries suffered by Plaintiffs and the Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

283. HMA, HMC, KA, and KC knew or should have known that their conduct violated the UCL.

284. Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and

revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

### THIRD CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500, *ET SEQ.* ("FAL")**
(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

285. Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

286. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMA, HMC, KA, and KC.

287. California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

288. HMA, HMC, KA, and KC caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

289. HMA, HMC, KA, and KC have violated section 17500 because the

misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

290. Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of HMA's, HMC's, KA's, and KC's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of HMA, HMC, KA, and KC with respect to the safety and reliability of the Class Vehicles. HMA's, HMC's, KA's, and KC's representations were untrue because the Class Vehicles are distributed with a safety Defect. Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

291. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of HMA's, HMC's, KA's, and KC's businesses. HMA's and KA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

292. Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin HMA, HMC, KA, and KC from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money HMA, HMC, KA, and KC acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY, BASED ON CALIFORNIA LAW
(Individually and on behalf of the Nationwide Class)
(As to all Defendants)

293. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

294. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against HMA, HMC, KA, and KC

295. At all relevant times hereto, HMA, HMC, KA, and KC were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. HMA, HMC, KA, and KC knew or should have known of the specific use for which the Class Vehicles were purchased.

296. HMA, HMC, KA, and KC provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles pose a substantial safety hazard because the Defect renders them highly susceptible and predisposed to theft by experienced and amateur thieves, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

297. The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Defect.

298. HMA, HMC, KA, and KC impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed,

and/or sold by HMA, HMC, KA, and KC were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation.

299. Defendants market and advertise the sale of the Class Vehicles in various media outlets across the United States, including to the Plaintiffs and the Class.

300. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Defect which renders them highly susceptible and predisposed to theft and makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

301. Plaintiffs and the other Class Members have had sufficient direct dealings with either HMA, HMC, KA, and KC or their agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between HMA and HMC or KA and KC on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between HMA and HMC or KA and KC and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from KA and HMA is to immediately re-sell them to the end-users like Plaintiffs and the Class Members.

302. Additionally, privity is excused here because Plaintiffs and each of the other Class Members relied on statements made by HMA, HMC, KA, and KC themselves in choosing to purchase or lease a Class Vehicle.

303. HMA, HMC, KA, and KC advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet their needs; obtain information about the value of trade-in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

304. HMA, HMC, KA, and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

305. Additionally, the Magnuson–Moss Warranty Act ("MMWA") specifies that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify … any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer

85

Product…"). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

306. HMA's, HMC's, KA's, and KC's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

307. Plaintiffs and the other Class Members are entitled to damages and other legal and equitable relief, including, an adequate remedy for the Defect, or at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

308. Plaintiffs and the other Class Members are entitled to costs and attorneys' fees.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT FLA. STAT. § 501.201 *ET SEQ.* ("FDUTPA")**
(Individually and on behalf of the Florida Class)
(As to all Defendants)

309. Plaintiff Cohen incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

310. Plaintiff Cohen brings this claim on behalf of himself and the Florida Class against HMA, HMC, KA, and KC.

311. Plaintiff Cohen and Florida Class Members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

312. HMA, HMC, KA, and KC engage in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

313. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

314. HMA's, HMC's, KA's, and KC's acts and practices, described herein, are unfair and deceptive in violation of the FDUTPA. HMA, HMC, KA, and KC engaged in unfair and deceptive trade practices by promoting the quality and functionality of the Class Vehicles while willfully failing to disclose and actively concealing the Defect. HMA, HMC, KA, and KC owed a duty to disclose all material facts concerning the Class Vehicles and the Defect because it possessed exclusive or superior knowledge, intentionally concealed material information from consumers, and/or made misrepresentations that were rendered misleading because they were contradicted by facts that were withheld.

315. HMA, HMC, KA, and KC committed such unfair and deceptive acts and practices with the intent that consumers, such as Plaintiff Cohen and Florida Class Members, would rely on Defendants' misrepresentations and omissions when deciding whether to purchase a Class Vehicle.

316. Plaintiff Cohen and Florida Class Members suffered ascertainable loss as a direct and proximate result of HMA's, HMC's, KA's, and KC's unfair and deceptive acts and practices. Had Plaintiff Cohen and Florida Class Members known that the Class Vehicles are defective, they would not have purchased or leased them, or would have paid significantly less for a Class Vehicle. Among other injuries, Plaintiff Cohen and Florida Class Members overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

317. Plaintiff Cohen and Florida Class Members are entitled to recover their

actual damages, under Fla. Stat. § 501.211(2) and reasonable attorneys' fees under Fla. Stat. § 501.2105(1).

318. Plaintiff Cohen also seeks an order enjoining HMA's, HMC's, KA's, and KC's unfair and deceptive acts and practices pursuant to Fla. Stat. § 501.211, and any other just and proper relief available under the FDUTPA.

**SIXTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY, FLA. STAT. § 672.314**
(Individually and on behalf of the Florida Class)
(As to all Defendants)

319. Plaintiff Cohen incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

320. Plaintiff Cohen brings this claim on behalf of himself and the Florida Class against HMA, HMC, KA, and KC.

321. At all relevant times hereto, HMA, HMC, KA, and KC were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. HMA, HMC, KA, and KC knew or should have known of the specific use for which the Class Vehicles were purchased.

322. HMA, HMC, KA, and KC provided Plaintiff Cohen and the Florida Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles pose a substantial safety hazard because the Defect renders them highly susceptible and predisposed to theft by experienced and amateur thieves, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

323. The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Defect.

324. HMA, HMC, KA, and KC impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by HMA, HMC, KA, and KC were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation.

325. Defendants market and advertise the sale of the Class Vehicles in various media outlets across the State of Florida, including to the Plaintiffs and the Class.

326. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Defect which renders them highly susceptible and predisposed to theft and makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

327. Plaintiff Cohen and the other Florida Class Members have had sufficient direct dealings with either HMA, HMC, KA, and KC or their agents (e.g., dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between HMA and HMC or KA and KC on one hand, and Plaintiff Cohen and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff Cohen and each of the other Class Members are intended third-party beneficiaries of contracts between HMA and HMC or KA and KC and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the

ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from KA and HMA is to immediately re-sell them to the end-users like Plaintiffs and the Class Members.

328. Additionally, privity is excused here because Plaintiff Cohen and each of the other Florida Class Members relied on statements made by HMA, HMC, KA, and KC themselves in choosing to purchase or lease a Class Vehicle.

329. HMA, HMC, KA, and KC advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet his or her needs; obtain information about the value of trade-in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

330. HMA, HMC, KA, and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

331. Additionally, the MMWA specifies that when a manufacturer offers a written

90

warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product…."). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

332. HMA's, HMC's, KA's, and KC's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of FLA. STAT. ANN. § 672.314.

333. As a direct and proximate result of HMA's, HMC's, KA's, and KC's breach of implied warranties of merchantability, Plaintiff Cohen and the other Florida Class Members are entitled to damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT ("MUDTPA"), MINN. STAT. §§ 325D.43, ET SEQ
(Individually and on behalf of the Minnesota Class)
(As to all Defendants)

334. Plaintiff Ragsdale incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

335. Plaintiff Ragsdale brings this claim on behalf of herself and the Minnesota Class against HMA, HMC, KA, and KC.

336. By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, HMA, HMC, KA, and KC violated Minn. Stat. § 325D.44, including the following provisions:

a. Representing that its goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5);

b. Representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44(1)(7);

c. Advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and

d. Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

337. HMA's, HMC's, KA's, and KC's deceptive practices included:

a. Misrepresenting the safety, reliability, and quality of the Class Vehicles;

b. Failing to comply with common law and statutory duties pertaining to duties to disclose material facts and safety defects found in the Class Vehicles; and

c. Failing to comply with FMVSS No. 114.

338. HMA's, HMC's, KA's, and KC's representations and omissions were material because they were likely to deceive reasonable consumers about the safety, reliability, and quality of the Class Vehicles.

339. HMA, HMC, KA, and KC intended to mislead Plaintiff and Minnesota Class Members and induce them to rely on their misrepresentations and omissions.

340. Plaintiff Ragsdale and Minnesota Class Members suffered ascertainable loss

as a direct and proximate result of HMA's, HMC's, KA's, and KC's unfair and deceptive acts and practices. Had Plaintiff Ragsdale and Minnesota Class Members known that the Class Vehicles are defective, they would not have purchased or leased them, or would have paid significantly less for a Class Vehicle. Among other injuries, Plaintiff Ragsdale and Minnesota Class Members overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

341. Plaintiff Ragsdale and Minnesota Class Members are entitled to recover their actual damages and reasonable attorneys' fees.

342. Plaintiff Ragsdale also seeks an order enjoining HMA's, HMC's, KA's, and KC's unfair and deceptive acts and practices and any other just and proper relief available under the MUDTPA.

### EIGHTH CAUSE OF ACTION

### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT ("MCFA"), MINN. STAT. § 325F.69, SUBD. 1 *ET SEQ.* AND MINN. STAT. §§ 8.31, *ET SEQ.*

(Individually and on behalf of the Minnesota Class)
(As to all Defendants)

343. Plaintiff Ragsdale incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

344. Plaintiff Ragsdale brings this claim on behalf of herself and the Minnesota Class against HMA, HMC, KA, and KC.

345. HMA, HMC, KA, and KC, Plaintiff, and members of the Minnesota Class are each a "person" as defined by Minn. Stat. § 325F.68(3).

346. The Class Vehicles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

347. HMA, HMC, KA, and KC engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

348. HMA, HMC, KA, and KC engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including:

  a. Misrepresenting the safety, reliability, and quality of the Class Vehicles;

  b. Failing to comply with common law and statutory duties pertaining to duties to disclose material facts and safety defects found in the Class Vehicles; and

  c. Failing to comply with FMVSS No. 114.

349. HMA's, HMC's, KA's, and KC's representations and omissions were material because they were likely to deceive reasonable consumers about the safety, reliability, and quality of the Class Vehicles.

350. HMA, HMC, KA, and KC intended to mislead Plaintiff and Minnesota Class Members and induce them to rely on its misrepresentations and omissions.

351. HMA's, HMC's, KA's, and KC's fraudulent, misleading, and deceptive practices affected the public interest, including thousands of Minnesotans that own a Class Vehicle.

352. As a direct and proximate result of HMA's, HMC's, KA's, and KC's fraudulent, misleading, and deceptive practices, Plaintiff and Minnesota Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

353. Plaintiff and Minnesota Class Members seek all monetary and nonmonetary

94

relief allowed by law, including damages; injunctive or other equitable relief; and attorneys' fees, disbursements, and costs.

**NINTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY, MINN. STAT. § 336.2-314**
(Individually and on behalf of the Minnesota Class)
(As to all Defendants)

354. Plaintiff Ragsdale incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

355. Plaintiff Ragsdale brings this claim on behalf of herself and the Minnesota Class against HMA, HMC, KA, and KC.

356. At all relevant times hereto, HMA, HMC, KA, and KC were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. HMA, HMC, KA, and KC knew or should have known of the specific use for which the Class Vehicles were purchased.

357. HMA, HMC, KA, and KC provided Plaintiff Ragsdale and the Minnesota Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles pose a substantial safety hazard because the Defect renders them highly susceptible and predisposed to theft by experienced and amateur thieves, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

358. The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Defect.

359. HMA, HMC, KA, and KC impliedly warranted that the Class Vehicles were

95

of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by HMA, HMC, KA, and KC were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation.

360. Defendants market and advertise the sale of the Class Vehicles in various media outlets across the State of Minnesota, including to the Plaintiffs and the Class.

361. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Defect which renders them highly susceptible and predisposed to theft and makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

362. Plaintiff Ragsdale and the other Minnesota Class Members have had sufficient direct dealings with either HMA, HMC, KA, and KC or their agents (e.g., dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between HMA and HMC or KA and KC on one hand, and Plaintiff Ragsdale and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff Ragsdale and each of the other Class Members are intended third-party beneficiaries of contracts between HMA and HMC or KA and KC and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. The sole and express purpose

that each authorized Kia and Hyundai dealer has when it acquires the vehicles from KA and HMA is to immediately re-sell them to the end-users like Plaintiffs and the Class Members.

363. Additionally, privity is excused here because Plaintiff Ragsdale and each of the other Minnesota Class Members relied on statements made by HMA, HMC, KA, and KC themselves in choosing to purchase or lease a Class Vehicle.

364. HMA, HMC, KA, and KC advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet their needs; obtain information about the value of trade-in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

365. HMA, HMC, KA, and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

366. Additionally, the MMWA specifies that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a)

("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product…."). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

367. HMA's, HMC's, KA's, and KC's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of MINN. STAT. § 336.2-314.

368. As a direct and proximate result of HMA's, HMC's, KA's, and KC's breach of implied warranties of merchantability, Plaintiff Ragsdale and the other Minnesota Class Members are entitled to damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212

369. Plaintiff Taylor incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

370. Plaintiff Taylor brings this claim on behalf of himself and the Georgia Class against HMA, HMC, KA, and KC.

371. HMA, HMC, KA, and KC are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), "sellers" of motor vehicles under § 11-2-103(1)(d), and "lessors" of motor vehicles under § 11-2A-103(1)(p).

372. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

373. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

374. At all relevant times hereto, HMA, HMC, KA, and KC were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. HMA, HMC, KA, and KC knew or should have known of the specific use for which the Class Vehicles were purchased.

375. HMA, HMC, KA, and KC provided Plaintiff Taylor and the Georgia Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles pose a substantial safety hazard because the Defect renders them highly susceptible and predisposed to theft by experienced and amateur thieves, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

376. The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Defect.

377. HMA, HMC, KA, and KC impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by HMA, HMC, KA, and KC were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation.

378. Defendants market and advertise the sale of the Class Vehicles in various

media outlets across the State of Georgia, including to the Plaintiffs and the Class.

379.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Defect which renders them highly susceptible and predisposed to theft and makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

380.   Plaintiff Taylor and the other Georgia Class Members have had sufficient direct dealings with either HMA, HMC, KA, and KC or their agents (e.g., dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between HMA and HMC or KA and KC on one hand, and Plaintiff Taylor and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff Taylor and each of the other Class Members are intended third-party beneficiaries of contracts between HMA and HMC or KA and KC and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from KA and HMA is to immediately re-sell them to the end-users like Plaintiffs and the Class Members.

381.   Additionally, privity is excused here because Plaintiff Taylor and each of the other Georgia Class Members relied on statements made by HMA, HMC, KA, and KC themselves in choosing to purchase or lease a Class Vehicle.

382.   HMA, HMC, KA, and KC advertise their authorized dealer network on their

respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation. Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet his or her needs; obtain information about the value of trade-in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

383. HMA, HMC, KA, and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

384. Additionally, the MMWA specifies that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product...."). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

385. HMA's, HMC's, KA's, and KC's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for

such use in violation of Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

386. As a direct and proximate result of HMA's, HMC's, KA's, and KC's breach of implied warranties of merchantability, Plaintiff Taylor and the other Georgia Class Members are entitled to damages in an amount to be determined at trial.

## IX.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that this Court:

a.     Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

b.     Declare that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

c.     Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair and/or recall the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

d.     Award Plaintiffs and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

e.     Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.     Award pre- and post-judgment interest at the maximum legal rate;

g.    Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

h.    Grant all such other relief as is just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated:    September 9, 2022    By:  _/s/ Jennifer A. Lenze_
                         Jennifer A. Lenze, CA Bar # 246858
                         LENZE LAWYERS, PLC.
                         999 Corporate Drive, Suite 100
                         Ladera Ranch, CA 92694
                         Telephone: (310) 322-8800
                         Facsimile: (310) 322-8811
                         jlenze@lenzelawyers.com

                         Elizabeth A. Fegan
                         (*pro hac vice* forthcoming)
                         FEGAN SCOTT LLC
                         150 S. Wacker Dr., 24th Floor
                         Chicago, IL 60606
                         Phone: 312.741.1019
                         Fax: 312.264.0100
                         beth@feganscott.com

                         Jonathan D. Lindenfeld
                         (*pro hac vice* forthcoming)
                         FEGAN SCOTT LLC
                         140 Broadway, 46th Floor
                         New York, NY 10005
                         Phone: 332.216.2101
                         Fax: 312.264.0100
                         jonathan@feganscott.com

                         J. Barton Goplerud
                         (*pro hac vice* forthcoming)
                         SHINDLER, ANDERSON, GOPLERUD
                         & WEESE PC
                         5015 Grand Ridge Drive, Suite 100
                         West Des Moines, IA 50265

Telephone: (515) 223-4567
E-mail: goplerud@sagwlaw.com

*Attorneys for Plaintiffs and
Proposed Class Counsel*

CLASS ACTION COMPLAINT