# EXHIBIT 1

**Query**    **Reports** ▾    **Utilities** ▾    **Help**    **Log Out**

# U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:23-cv-00103-ELH

| | |
|---|---|
| Beneman v. Kia America, Inc. et al | Date Filed: 01/13/2023 |
| Assigned to: District Judge Ellen Lipton Hollander | Jury Demand: Plaintiff |
| Case in other court:  United States District Court, California Central, 8:22ml03052 | Nature of Suit: 195 Contract Product Liability |
| Cause: 28:1332 Diversity-Motor Vehicle Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Efua Beneman**             represented by    **Nicholas A Migliaccio**
Migliaccio & Rathod LLP
412 H Street N.E.
Suite 302
Washington, DC 20002
12024703520
Fax: 12028002730
Email: nmigliaccio@classlawdc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kia America, Inc.**

**Defendant**

**Hyundai Motor America**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/13/2023 | 1 | COMPLAINT against Hyundai Motor America, Kia America, Inc., filed by Efua Beneman. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Proposed for Hyundai Motor America, # 3 Summons Proposed for Kia America, Inc.)(Migliaccio, Nicholas) (Entered: 01/13/2023) |
| 01/17/2023 | | Case Assigned to District Judge Ellen Lipton Hollander. (kos, Deputy Clerk) (Entered: 01/17/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/17/2023 09:02:55 | | |
| **PACER Login:** | jb0014 | **Client Code:** | 71273-10008 |
| **Description:** | Docket Report | **Search Criteria:** | 8:23-cv-00103-ELH |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

|  |  |
|---|---|
| EFUA BENEMAN, on behalf of herself and all others similarly situated, | **Case No:** 8:23-cv-103 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KIA AMERICA, INC. and HYUNDAI MOTOR AMERICA, | |
| Defendants. | |

Plaintiff Efua Beneman ("Plaintiff"), by and through her attorneys, individually and behalf of all others similarly situated, brings this action against Kia America, Inc. ("Kia") and Hyundai Motor America ("Hyundai," and together with Kia, "Defendants"). Plaintiff alleges the following based on personal knowledge as to her own acts, based upon the investigation conducted by her counsel, and upon information and belief as to all other allegations:

<u>**SUMMARY OF THE ACTION**</u>

1.      Plaintiff brings this consumer class action lawsuit seeking damages and injunctive relief for Defendants' negligent, unfair, abusive, deceptive, and fraudulent business practices, specifically that Defendants designed, manufactured, marketed, and distributed millions of defective vehicles, and sold and leased them in Maryland and throughout the United States.

2.      Defendants knowingly omitted a critical anti-theft feature from Kia vehicles manufactured between 2011 and 2021 and Hyundai vehicles manufactured between 2015 and 2021, including, at least, the following models: Kia Sorento, Kia Telluride, Kia Stinger, Kia Sportage, Kia Soul, Kia Seltos, Kia Sedona, Kia Rio, Kia Optima, Kia Niro, Kia K900, Kia

Forte, Kia Cadenza, Hyundai Sonata, Hyundai Venue, Hyundai Kana, Hyundai Tucson, Hyundai

Santa Fe, Hyundai Santa Cruz, Hyundai Palisade and Hyundai Elantra (collectively, the "Class

Vehicles").

3.       Between 2011 and 2021, Defendants refused to incorporate a theft-deterrent

feature into the Class Vehicles even though they knew the feature could reduce the theft of those

vehicles by approximately 60% or more. The absence of this feature came to light in 2021, after

videos explaining how to exploit the missing feature to steal the Class Vehicles went viral on

social media. The Class Vehicles are now known by seasoned car thieves and amateurs alike as

the easiest of targets, as they can be stolen quickly and with minimal effort and equipment.

4.       Specifically, each of the Class Vehicles lack what is known as an "engine

immobilizer," as well as other anti-theft features that might compensate for the absence of an

engine immobilizer, and their rear windows are not connected to the alarm system (the "Security

Defect"). An engine immobilizer is an electronic security feature that prevents an engine from

being started without the manufacturer's authorized key. For decades, and across the globe, the

automotive industry has used this technology as an effective theft deterrent. It is the standard in

anti-theft technology and is used by nearly all cars sold in the United States.

5.       Knowledge of the Security Defect is widespread, thanks in part to a social media

trend that instructed would-be thieves how to exploit the Security Defect steal a Class Vehicle

using only a screwdriver and USB charging cable. As one sheriff explained, the Class Vehicles

are easy to steal because "[i]f you strip the ignition column, there's a piece that pops off and you

can stick a USB drive, a knife, or something like that. Well, think about how many people charge

their cell phones in their cars. The exact part they need to steal that car is featured in most people's cars."[1]

6.      As this information spread across social media in 2021 and 2022, thefts of the Class Vehicles skyrocketed across the country. Police departments in various cities reported enormous increases in the thefts of Class Vehicles, with some jurisdictions reporting year-over-year increases exceeding 500%.

7.      If a stolen Class Vehicle is recovered, repair costs are substantial. Repair costs for a window and the steering column—typically the minimum repairs required for a vehicle stolen via an exploit of the Security Defect—exceed $1,000, and repair costs for other damage inflicted in connection with the theft commonly exceeds $10,000. Defendants offer no assistance in covering the costs of these repairs and Class Vehicle owners must pay out of pocket to have their vehicles repaired. Even after repair, however, their vehicles are still afflicted with the Security Defect because Defendants have failed to provide any way for Class Vehicles to be outfitted with adequate security features.

8.      Defendants have long been aware of the Security Defect in the Class Vehicles. For example, in 2007, Hyundai petitioned the National Highway Traffic Safety Administration ("NHTSA") to add engine immobilizers to certain vehicles and provided evidence that the devices reduced vehicle theft by 60% or more. In 2009, Kia also petitioned the NHTSA for the same reason and provided the same evidence. Although Defendants know well the benefits offered by engine immobilizers, they ultimately declined to include the devices in the Class

---

[1]      Rose Schmidt, *St. Paul PD: Kia Thefts Up 1,300%, Hyundai Thefts Up 584% In 2022*, Fox9.com (Jul. 18, 2022), *available at* https://www.fox9.com/news/st-paul-pd-kia-thefts-up-1300-hyundai-thefts-up-584-in-2022 (*last visited* Jan. 11, 2023).

Vehicles, blatantly placing profit over the quality of their vehicles and the safety and security of their customers.

9. Defendants also knew or should have learned of the Security Defect from, *inter alia*, their experience and expertise as international automobile manufacturers. For decades, countries across the world have mandated that their domestic vehicles use engine immobilizers because of their power to reduce vehicle thefts. Defendants have uniformly complied with those mandates.

10. At the latest, Defendants would have learned of the Security Defect in 2021, in connection with the rash of thefts of the Class Vehicles.

11. Yet, notwithstanding their longstanding knowledge of the Security Defect, Defendants have uniformly refused to remedy it or repair without charge the Class Vehicles damaged as a consequence of the Security Defect. This constitutes breach of Defendants' warranties, as well as unfair, abusive, deceptive, and fraudulent business practices.

12. Defendants knowingly concealed this material defect and/or omitted it from their marketing and other communications with consumers. Defendants possessed exclusive knowledge about the importance of the absent engine immobilizers and intentionally concealed the foregoing from consumers, including Plaintiff and the members of the putative Class. Defendants also made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff that put the lie to those representations.

13. The ease with which the Class Vehicles can be stolen renders them materially unsafe and unreliable. A stolen vehicle cannot provide reliable transportation; nor is it a safe

vehicle. A vehicle that is easily stolen is not a vehicle that can be depended on to provide reliable transportation and also is not safe to own or occupy.

14.     Furthermore, the revelation of the Security Defect has greatly diminished the value of the Class Vehicles. A vehicle that possesses a standard and adequate anti-theft system is more valuable than one that does not.

15.     As a result of Defendants' deception, unsuspecting customers, including Plaintiff Beneman and the Class, purchased or leased Class Vehicles unaware that their cars would be targeted for theft and therefore are unsafe and unreliable. Furthermore, Plaintiff and the Class were not informed that their vehicles do not conform to Defendants' warranties and representations or to federal and industry standards. Nor did they understand that the value of their vehicles would drop when the Security Defect was revealed.

16.     Had Plaintiff and the Class members known about the Security Defect at the time of purchase, they either would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

17.     As a result of Defendants' negligent, unfair, abusive, deceptive, and fraudulent business practices, owners of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money, property, and/or value. As a result of the Security Defect and the monetary costs of repairing the damage stemming therefrom, Plaintiff and Class members have suffered injury in fact, incurred damages, and otherwise have been harmed by Defendants' conduct. Defendants' acts and omissions were conducted in a manner giving rise to substantial aggravating factors.

18.     Plaintiff brings common law claims, including warranty, product liability, fraudulent omission, and negligence claims, claims under the Magnuson-Moss Warranty Act, 15

U.S.C. §§ 2301, *et seq.*, and the Maryland Consumer Protection Act, ("MCPA"), Md. Code, Com. Law §§ 13-101, *et seq.*, against Defendants.

19.     On behalf of the Class Members she seeks to represent, Plaintiff seeks an award of damages in excess of $5,000,000, including the costs of installing engine immobilizers and/or other anti-theft features in the Class Vehicles and equitable relief, including an order requiring Defendants to adequately disclose and repair the Security Defect. Furthermore, Plaintiff seeks damages, injunctive and declaratory relief, restitution, disgorgement of profits, attorneys' fees and costs, punitive damages, and the repair of, replacement of, or refund of money paid to own or lease all Class Vehicles in Maryland.

## PARTIES

20.     Plaintiff Efua Beneman is a resident of Landover Hills, Maryland, who purchased a used 2018 Hyundai Elantra for approximately $19,000 in or around October 22, 2021, from EchoPark Automotive DC in Laurel, Maryland.

21.     Defendant Kia America, Inc., is a California corporation with a principal place of business in Irvine, California.

22.     Defendant Hyundai Motor America is also a California corporation with a principal place of business in Fountain Valley, California.

23.     Defendant Hyundai and Defendant Kia are subsidiaries of Hyundai Motor Company and Kia Corporation, respectively. Hyundai Motor Company is an affiliate of and the largest shareholder in Kia Corporation, owning 33.88% of the company.[2]

## JURISDICTION AND VENUE

---

[2]     *Shareholders*, Kia.com, *available at* https://worldwide.kia.com/int/company/ir/info/shareholders (*last visited* Jan. 11, 2023).

24.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state from Defendants, the number of proposed Class Members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs. See 28 U.S.C. § 1332(d)(2)(A).

25.     This Court has general and specific jurisdiction over the Defendants because Defendants have sufficient minimum contacts with Maryland and within the Southern Division of Maryland to establish Defendants' presence in Maryland, and certain material acts upon which this suit is based occurred within the Southern Division of Maryland. Defendants do substantial business in the State of Maryland and within this Judicial District, are registered to and are doing business within the State of Maryland, and otherwise maintain requisite minimum contacts with the State of Maryland. Specifically, Defendants distributed, sold, and leased Class Vehicles in Maryland, and many Class Vehicles are registered and operated in Maryland.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction within the Southern District of Maryland and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district, including: a thief stole Plaintiff's Class Vehicle by exploiting the Security Defect in Maryland, and damage to Plaintiff's Class Vehicle was repaired by a Hyundai franchised dealership in Prince George's County. Furthermore, Plaintiff's Class Vehicle is in Prince George's County, and Plaintiff resides in Prince George's County. Additionally, Defendants distribute Class Vehicles in this District, receive substantial compensation and profits from the sale and lease of Class Vehicles in this District, and have concealed and continue to conceal and make material omissions in this District.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

27.     An engine immobilizer is a form of electronic security technology, or anti-theft feature, nearly always included in vehicles manufactured during the past 20 years to deter auto thieves who do not have the necessary key or fob to start the engine of a vehicle.

28.     The Code of Federal Regulations defines an immobilizer as "a device that, when activated, is intended to prevent a motor vehicle from being powered by its own propulsion system."[3]   An engine immobilizer is an electronic security device incorporated into a motor vehicle's Engine Control Unit ("ECU") that prevents the engine from starting in the absence of the vehicle's authorized key. The key is either a unique, digitally-coded key or Smart Key fob containing a transponder chip that stores that vehicle's electronic security code.

29.     When a driver inserts a digitally-coded key into an ignition, or brings the Smart Key fob inside a vehicle, a transponder chip in the key or fob transmits an electronic security code to the vehicle's ECU. If the codes do not match, the ECU does not activate the vehicle's fuel system or ignition circuit. Thus, an engine immobilizer-equipped vehicle will start only if the correct key or Smart Key fob is used.

30.     Engine immobilizers were first integrated into mass market vehicles in the United States around 1990 and by 2000 approximately 60% of all vehicles used engine immobilizers.  By 2015, engine immobilizers were standard equipment on 96% of all United States vehicles from manufacturers other than Defendants, while only 26% of Defendants' vehicles included engine immobilizers.

31.     A 2016 study found that the use of engine immobilizers lowered the overall rate of car theft by about 40% between 1995 and 2008, and that the benefits in terms of prevented thefts

---

[3]      49 CFR § 543.4(b).

are at least three times higher than the costs of installing the devices.

32.     The widespread benefits of engine immobilizers have motivated numerous countries to mandate their inclusion in new automobiles. In 1998, Germany, the United Kingdom and Finland mandated that all new vehicles be equipped with immobilizers.  Immobilizers have been required in new vehicles in Australia since 2001 and in Canadian-made vehicles since 2007.

33.     Although immobilizers are not required in United States, the NHTSA has urged car manufacturers to equip their vehicles with them for decades. The NHTSA has explained that it "is unable to issue a theft prevention standard under the [Motor Vehicle Theft Law Enforcement Act, 49 U.S.C. 33101 *et seq.*] to require the installation of immobilizers because that Act limits the agency's standard setting authority to issuing standards that require [affixing numbers or symbols to vehicle parts as a theft deterrent]."[4]

### I.     Defendants Failed to Equip the Class Vehicles with Engine Immobilizers

34.     Defendants did not equip the Class Vehicles with engine immobilizers.

35.     Nor did Defendants equip the Class Vehicles with other anti-theft features that would prevent thieves from taking advantage of the fact that the Class Vehicles lack engine immobilizers and therefore can easily be stolen.

36.     For this reason, the Class Vehicles do not comply with Federal Motor Vehicle Safety Standard ("FMVSS") 114. FMVSS 114 "specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles."[5] FMVSS 114, S.5.1.1 requires:

> Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

---

[4]     Exemption From Vehicle Theft Prevention Standard, 81 FR 66833, 66836.
[5]     Federal Motor Vehicle Safety Standards; Theft Protection, 71 FR 17752-01.

(a) The normal activation of the vehicle's engine or motor; and
(b) Either steering, or forward self-mobility, of the vehicle, or both.[6]

37.     The Class Vehicles fail to conform to FMVSS 114 because the ignition systems do not prevent the normal activation of the vehicle, nor do they prevent steering or forward self-mobility when the key is removed. This defect makes the Class Vehicles incredibly easy to steal, even for unsophisticated thieves armed only with a screwdriver and knowledge gleaned from social media.

## II.     The Security Defect Made the Class Vehicles Prime Targets for Thieves

38.     Through 2021 and 2022, social media posts spread word of how easy it was to steal a Class Vehicle by exploiting the Security Defect. On the social media site TikTok, individuals known as the 'Kia Boyz" uploaded a video explaining how to exploit the Security Defect and steal Class Vehicles. The video also challenged viewers to break into Class Vehicles and use the just-demonstrated technique to steal the vehicles. Commonly referred to as the "Kia Challenge," viewers were encouraged to take videos proving that they completed the challenge and upload them to TikTok.

39.     Would-be thieves need only a screwdriver and a common USB charging cable to exploit the Security Defect and steal a Class Vehicle. Once inside the vehicle, the thief must strip off the steering column cover with a screwdriver—a simple task that takes approximately 10 seconds—to reveal the ignition switch wire assembly and cylinder. Using a USB charging cable, which are commonly left in vehicles as many people charge their phones while they drive, the thief can turn the stripped ignition switch and start the vehicle without its key.

40.     Increased awareness of the Security Defect through social media contributed to an enormous surge in Class Vehicle thefts throughout the United States:

---

[6]     49 CFR § 571.114.

a.  In Los Angeles, Hyundai and Kia vehicles accounted for 20% of all 2022 vehicle thefts in the city, a sharp increase from 13% the year prior.[7]

b.  In St. Petersburg, Florida, during the month of July 2022 approximately 41% of all stolen cars were Class Vehicles.[8]

c.  Milwaukee, Wisconsin, reported that in 2021 more than two-thirds of vehicles stolen in Milwaukee were made by Kia and Hyundai and more than half of the thieves caught were children. The city had more vehicle thefts than Chicago.[9]

d.  In July of 2022, the city of Chicago, Illinois, reported a 767% increase in Hyundai and Kia vehicle thefts.[10]

e.  St. Paul, Minnesota saw Kia thefts increase by 1,300% and Hyundai thefts by nearly 600% in 2022.[11]

41.     After the Kia Challenge brought public attention to the Security Defect, Defendants announced that they would include an immobilizer for all 2022 and later model year vehicles.

---

[7]     Chris Rosales, *LAPD Issues Alert as Kia and Hyundai Thefts Keep Spiking*, The Drive (Aug. 29, 2022), *available at* https://www.thedrive.com/news/lapd-issues-alert-as-kia-and-hyundai-thefts-keep-spiking (*last visited* Jan. 11, 2023).

[8]     Jordan Highsmith, *Police: 40% Of Recent Car Thefts In St. Pete Have Been Kia, Hyundai Models*, WTSP.com (Jul. 27, 2022), *available at* https://www.wtsp.com/article/news/crime/st-pete-stolen-cars-kia-hyundai/67-07998798-197e-4355-9bca-8861b65a3c57#:~:text=Of%20those%20cars%2C%2023%20of,the%20vehicles%20and%20steal%20them.%22 (*last visited* Jan. 11, 2023).

[9]     Jeramy Jannene, *Kia, Hyundai Thefts Now National Problem*, UrbanMilwaukee.com (Aug. 17, 2022), *available at* https://urbanmilwaukee.com/2022/08/17/kia-hyundai-thefts-now-national-problem/ (*last visited* Jan. 11, 2023).

[10]     Audrey Conclin, *TikTok Car Theft Challenge: Chicago Area Sees 767% increase in Hyundai, Kia Thefts*, NY Post (Aug. 29, 2022), *available at* https://nypost.com/2022/08/25/chicago-area-sees-increase-inhyundai-kia-thefts-due-to-tiktok/ (*last visited* Jan. 11, 2023).

[11]     Rose Schmidt, *Kia Thefts: Minneapolis Woman's Car Targeted 3 Times In 6 Months*, Fox9.com (Jul. 21, 2022), *available at* https://www.fox9.com/news/minneapolis-woman-had-kias-targeted-three-times-in-six-months (*last visited* Jan. 11, 2023).

However, Defendants have taken no action to remedy the Security Defect in the Class Vehicles. Defendants clearly recognize the severity of the problem presented by the Security Defect but maintain that it is not their responsibility to remedy the harm that has already happened or prevent owners or lessors of the Class Vehicles from suffering future harm arising from the Security Defect.

42.     Although Defendants have announced that all 2022 models of their vehicles will be equipped with engine immobilizers, police maintain that these models remain vulnerable to theft because the 2022 models do not feature any style changes.[12] A thief would not necessarily be able to differentiate between a Class Vehicle and a newer model until after the thief has already broken into the car, stripped the steering column, and attempted to manipulate the ignition assembly.

43.     The presence of the Security Defect in the Class Vehicles has severely diminished the value of the vehicles. A vehicle that lacks anti-theft features and requires little effort to steal is far less desirable than a like vehicle with an immobilizer. Additionally, the Security Defect has caused Class Vehicle owners to suffer direct damages. If a stolen vehicle is recovered and is not totalled, the repair costs are substantial. On average, the cost to repair damage caused in the theft ranges from $1,000 to in excess of $10,000.

### III.     Defendants Had Superior and Exclusive Knowledge of the Security Defect

44.     Before the release of the first Class Vehicles and throughout the period in which Defendants were distributing, selling, and leasing the Class Vehicles, Defendants knew or should have known that the Class Vehicles suffered from the Security Defect and presented an unreasonable risk of theft, and therefore were unsafe and presented an unreasonable and significant

---

[12] Rob Stumpf, *How Thieves Are Stealing Hyundais and Kias With Just a USB Cable*, TheDrive (Aug. 2, 2022), *available at* https://www.thedrive.com/news/how-thieves-are-stealing-hyundais-and-kias-with-just-a-usb-cable (*last visited* Jan. 11, 2023).

risk of personal injury and/or property damage to consumers and the public.

45.     Defendants' knowledge of these facts is established by: (i) their statements to the NHTSA in connection with petitions to include immobilizers in models released prior to 2010; (ii) their own design and manufacturing practices in regard to the vehicles it sells in foreign markets; (iii) through clear and consistent trends of rising thefts of the Class Vehicles across the nation; (iv) increased demand for replacement parts as well as increases in repairs or repair requests arising from Security Defect-related theft; and (v) increased demand for "loan" vehicles to temporarily replace missing or out of service Class Vehicles.

46.     Defendants knew of the theft-reduction benefits conferred by engine immobilizers before the first Class Vehicles were manufactured. In 2007, Hyundai petitioned the NHTSA to add an immobilizer to its Azera line of vehicles in order to receive an exemption from certain manufacturing requirements. In connection with its petition, it provided theft rate data showing that immobilizers like the ones it intended to use had reduced thefts of other manufacturers' models by between 58% and 80%.[13] Similarly, an agent petitioned on Kia's behalf to add an immobilizer to Kia's Amanti line in 2009. It also provided the NHTSA with data showing that immobilizers reduced thefts of other manufacturers' models by between 58% and 80%.[14]

47.     Despite being well aware of the theft deterrent effects of engine immobilizers, Defendants refused to include them as standard features in their vehicles. Nor did they advise their customers of the additional risk they were undertaking, despite knowing that the lack of engine immobilizers caused the Class Vehicles to suffer from a greater risk of theft than comparable vehicles with engine immobilizers.

---

[13]     Federal Register, Vol. 72, No. 138, page 39662, July 19, 2007.
[14]     Federal Register, Vol. 75, No. 6, page 1448, January 11, 2010.

48.     Additionally, Defendants manufacture, sell, and lease their vehicles in countries where immobilizers are mandated and thus have been aware of immobilizer technology and have been implementing this technology for at least 24 years. Nevertheless, Defendants elected to manufacture, sell, and lease the Class Vehicles in the United States without immobilizers even though immobilizers are standard in the industry and required to comply with FMVSS 114.

49.     During 2021 and 2022, law enforcement agencies throughout the country documented a substantial increase in thefts of the Class Vehicles. Numerous articles were published detailing this trend and Defendants were contacted for comment time and again. Defendants undoubtedly were or should have been aware of this rash of thefts and the reason therefore—the Security Defect—since late 2021 or earlier.

50.     Defendants also were or should have been aware of the Security Defect due to the uptick in demand for replacement parts needed to repair damage caused by theft exploiting the Security Defect—*e.g.*, replacement steering column panels, rear window glass, and ignition parts. Such replacement parts are in short supply and in many cases are backordered; as a result repairs may be more expensive and/or severely delayed, as was the case with Plaintiff Beneman. Defendants were also privy to repair records and repair request data that made or should have made Defendants aware that the Class Vehicles were prone to theft via the Security Defect.

51.     Similarly, Defendants were or should have been aware of the Security Defect due to the uptick in requests for temporary replacement "loaner" vehicles from Class Vehicle owners whose cars were stolen or awaiting repairs. As discussed below, when Plaintiff Beneman requested a loan vehicle, Defendant Hyundai denied her request, citing a shortage of vehicles available to loan.

52.     Finally, Defendants' own statements reflect their knowledge of the importance of

engine immobilizers. An article posted to Defendant Hyundai's website in mid-2021 touts, unironically, the importance of the immobilizers it does install:

> With the mass adoption of automobiles, cars have become important personal assets; Protecting my car from crimes like theft has become important. The car key was an important tool for this - it was necessary to get into the car and to start it. Engraved into a unique pattern, the key acted like a password for a security system. But these keys had problems; It was easy to duplicate. To overcome this problem, technicians gave each key a unique pattern by carving the inside, not the surface. Then, in 1994, the immobilizer technology appeared, offering a more fundamental solution. A key with immobilizer technology looks just like a regular key, but an encrypted chip called a 'transponder' is inserted into the handle of the key. The vehicle's electronic control unit (ECU) authenticated the information on this chip and allowed the engine to start. In other words, you could open the car door with an identical key, but driving the car was not possible. Immobilizer technology is still an important security device in automobiles.
>
> . . .
>
> Car keys are constantly evolving not only in terms of security but also in terms of user convenience. . . .
>
> In addition, most smart keys have buttons rather than the turnkey starter. In the past, the immobilizer was operated through a chip in the key handle, but the immobilizer of the smart key operates through an antenna, so if there is a smart key in the car, the car can recognize it and start the car.[15]

53.     The sharp uptick in Class Vehicle thefts that has occurred across the country is a clear consequence of: (i) Defendants' failure to include engine immobilizers or other comparable anti-theft features in the Class Vehicles; (ii) Defendants' failure to timely disclose the Security Defect to Class Vehicle owners; and (iii) Defendants' failure to take action to fix the Security Defect and ensure that the Class Vehicles conform to industry and federal standards.

---

[15]     *The Future of Car Keys*, Hyundai Motor Group (Jun. 6, 2021), *available at* https://www.hyundaimotorgroup.com/story/CONT0000000000001667 (*last visited* Jan. 11, 2023).

54.     Because they knew of the Security Defect, Defendants had a duty to disclose the Security Defect and not to conceal it from consumers. Defendants' failure to disclose and/or active concealment of the Security Defect placed Plaintiff and the public at an unreasonable and unnecessary risk of personal injury and/or property damage.

55.     Despite having ample knowledge of the Security Defect and having admitted that the Class Vehicles are vulnerable to theft, Defendants have not acted to remedy the defect, for example, by installing immobilizers or comparable anti-theft features in the Class Vehicles, nor have they issued a recall for the Class Vehicles.

56.     When Defendants or their agents repair a Class Vehicle that has been damaged as the result of a theft caused by the Security Defect, they fail to properly attribute such damage to the Security Defect, and merely replace the damaged parts without installing engine immobilizers or otherwise remedying the Security Defect, which does not prevent the recurrence of the issue. And the owners of the impacted Class Vehicles must pay for these repairs.

**IV.     Plaintiff Beneman's Class Vehicle Was Stolen Via the Security Defect**

57.     Plaintiff Efua Beneman's 2018 Hyundai Elantra was broken into and stolen on October 31, 2022, from where it was parked on the street in front of her home. Ms. Beneman parked and locked her vehicle at approximately 11:45pm; around 1:00am she noticed that it was not where she had parked it. She immediately called the police but wasn't able to speak to an officer about her car until around 4:00am. The next morning, she notified her automobile insurer of the theft and filed a claim.

58.     Four days after the theft, her car was found abandoned in a local park. She was able to have her car towed to Sheehy Hyundai of Waldorf, one of Defendants' authorized dealers, to repair the damage caused by the theft.

59.     According to her insurance records, her car required repairs to the steering column, including the column cover panel, ignition assembly, and key and cylinder set, as well as the rear door window glass. These repairs necessitated labor and diagnostic work including calibrations and pre-repair scans.

60.     The total cost for this work was $2316.78, with parts totaling $1286.78 and labor totaling $1030. After her insurer's contribution, Ms. Beneman paid approximately $500 out-of-pocket. Notably, this repair does not include the installation of an engine immobilizer or other anti-theft feature that would remedy the Security Defect.

61.     Ms. Beneman carried a USB charging cable in her vehicle, and it was inside her car at the time it was stolen. Her insurance adjuster and dealership agreed that the USB cable was likely used to steal her vehicle based on the damage to the steering column and ignition assembly—a tell-tale sign that the thief exploited the Security Defect to steal her car.

62.     Sheehy Hyundai completed repairs on Ms. Beneman's vehicle and made it available for pickup on January 11, 2023—almost two and a half months after the theft. The delay was due to a shortage of replacement parts. Her insurer provided a rental car for the first thirty days after the theft, but Sheehy Hyundai would not loan her a vehicle or otherwise provide her a temporary replacement after she lost the use of that rental. When Ms. Beneman contacted Defendant Hyundai to request a loan vehicle they informed her that they had none available.

63.     Ms. Beneman did not have access to a vehicle of her own between early December 2022 and January 11, 2023. She could not afford to rent a vehicle during this period, so she had to rely on rideshare services like Uber to meet her transportation needs. Ms. Beneman continued to pay her automobile loan and car insurance—payments exceeding $800 per month—while her Elantra was in Defendants' possession awaiting repair. Ms. Beneman worries that her insurance

costs may increase due to the theft.

64.     When Ms. Beneman purchased her Hyundai, she believed, based on Defendants'
marketing and advertising, that the 2018 Hyundai Elantra was a safe and reliable vehicle. She did
not know that her vehicle lacked an engine immobilizer, as Defendants never disclosed the
Security Defect to her. Had Ms. Beneman known about the Security Defect, and specifically that
the 2018 Hyundai Elantra lacked an engine immobilizer, she would not have purchased it, or she
would have paid significantly less for it.

### TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL

65.     Defendants maintained exclusive control over information concerning the
immobilizer used in the Class Vehicles, and such information was unavailable to buyers and
lessees of Class Vehicles, including Plaintiff and the Class members.

66.     Defendants were under a continuous duty to Plaintiff and Class members to disclose
the true nature, quality, and character of its Class Vehicles.

67.     Plaintiff and Class members relied on Defendants to disclose the Security Defect
because the absence of an immobilizer, and the import of that absence, could not reasonably be
discovered through reasonable efforts by Plaintiff and the Class members.

68.     Nevertheless, throughout the time period relevant to this action, Defendants failed
to disclose and concealed critical information relating to the Security Defect, and to the true nature,
quality, and character of the Class Vehicles, as described herein. Defendants knew of the Security
Defect for years but concealed it and/or failed to alert purchasers or lessees. At any point in time,
Defendants could have communicated this material information to Plaintiff and the Class members
through individual correspondence, media releases, or other means. They did not do so.

69.     As a result of Defendants' failure to disclose and/or concealment of the Security

Defect, neither Plaintiff nor the Class members could have discovered the Security Defect, even upon reasonable exercise of diligence.

70.    Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiff and the Class members have against Defendants as a result of Defendants' misrepresentations and omissions, by virtue of the fraudulent concealment doctrine.

71.    Additionally, all applicable statutes of limitation have been tolled based on the discovery rule, and Defendants are estopped from relying on any statutes of limitation or repose that might otherwise apply to the claims asserted by Plaintiff herein in defense of this action.

## CLASS ALLEGATIONS

72.    Plaintiff brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of the individuals in the below-defined classes (collectively, the "Class"):

**Nationwide Class:**

During the fullest period allowed by law, all persons residing in the United States who purchased or leased a Class Vehicle (the "Nationwide Class").

**Maryland Subclass:**

During the fullest period allowed by law, all persons residing in the State of Maryland who purchased or leased a Class Vehicle (the "Maryland Subclass").

73.    Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

74.    Plaintiff seeks only damages and equitable relief on behalf of herself and the putative Classes. Plaintiff disclaims any intent or right to seek any recovery in this action for

personal injuries or emotional distress suffered by Plaintiff and/or putative Class members.

75.     Plaintiff reserves the right to modify the class definitions, if necessary, to include additional of Defendants' automobiles possessing the Security Defect.

76.     **Numerosity**: Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown, it likely consists of thousands of people geographically dispersed throughout the United States. The number of Class members can be determined by sales information and other records in Defendants' possession. Moreover, joinder of all potential Class members is not practicable given their numbers and geographic diversity. Class members are readily identifiable from information and records in the possession of Defendants and their authorized distributors and retailers.

77.     **Commonality**: Common questions of law and fact exist as to all Class members. These questions predominate over questions that may affect only individual Class members because Defendants acted on grounds generally applicable to all Class members. Such common legal or factual questions include, *inter alia*:

     a.   Whether Defendants designed, advertised, sold and placed Class Vehicles into the stream of commerce;

     b.   Whether the Class Vehicles were sold with the Security Defect;

     c.   Whether the Security Defect in the Class Vehicles created a foreseeable risk of harm to Plaintiff and the Class;

     d.   Whether Defendants breached implied warranties made to Plaintiff and the Class members;

     e.   Whether Defendants knew about the Security Defect and, if so, how long they knew about it;

     f.   Whether Defendants concealed the Security Defect;

     g.   Whether Defendants conduct violates consumer protection statutes, warranty laws, and other laws asserted herein;

     h.   Whether the Class members have suffered damages as a result of the conduct alleged herein and, if so, the measure of such damages, including diminution of value and deprivation of the benefits of the bargain; and

     i.   Whether the Class members are entitled to injunctive relief.

78.    **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of Class members. She has no interests antagonistic to those of Class members. Plaintiff retained attorneys experienced in the prosecution of class actions, including consumer and product and automotive defect class actions, and Plaintiff intends to prosecute this action vigorously.

79.    **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Class members will remain at an unreasonable and serious safety risk as a result of the Security Defect. Plaintiff has standing to make this claim because she would purchase or lease another Class Vehicle provided that the Security Defect is fixed in that vehicle. Defendants acted and refused to act on grounds that apply generally to the Class members, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Nationwide Class and Maryland Subclass as a whole.

80.    **Predominance and Superiority**: Plaintiff and Class members all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Absent a class

action, Class members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

81.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

82.     Defendants acted or refused to act on grounds generally applicable to the Nationwide Class and Maryland Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes appropriate.

## COUNT I

### Breach of the Implied Warranties
### (On Behalf of Plaintiff and the Maryland Subclass)

83.     Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

84.     Defendants are merchants and were at all relevant times involved in the manufacturing, distributing, warranting, selling, and/or leasing of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

85.     Defendants entered into agreements with various retailers and suppliers, including their own dealerships, to market, sell, and lease the Class Vehicles.

86.     Defendants impliedly warranted that the Class Vehicles, which they designed and manufactured and sold or leased to Plaintiff and members of the Maryland Subclass, were merchantable, fit and safe for their ordinary use, not otherwise injurious to consumers, and would

come with adequate safety warnings.

87.    These warranties were assigned to Plaintiff and members of the Maryland Subclass upon their purchase or lease of their respective Class Vehicles.

88.    Defendants breached their implied warranties in the sale or lease of the Class Vehicles to Plaintiff and members of the Maryland Subclass in that the vehicles were not fit for their ordinary purpose and not merchantable.

89.    Specifically, by failing to disclose that the Class Vehicles did not have engine immobilizers, Defendants implied that the Class Vehicles were relatively safe from theft, or at least as safe as other similar passenger vehicles and not extremely prone to theft. Defendants implied that the Class Vehicles were safe and reliable and were worth as much as similar vehicles that possessed engine immobilizers.

90.    Because the Class Vehicles lack engine immobilizers and other anti-theft features, the vehicles purchased or leased and used by Plaintiff and Maryland Subclass members are unsafe, threaten injury to their occupants, fail to conform to prevailing standards of quality, did not have the quality that a buyer would expect, were not of the same quality as those generally acceptable in the trade, are not fit for the ordinary purpose for which such goods are used, and are otherwise not merchantable and/or fit.

91.    Plaintiff put Defendants on notice of their breaches of implied warranty. Specifically, Plaintiff complained to one of Defendants' authorized dealers at the time that her vehicle was stolen, and to Defendant Hyundai's corporate offices via a phone call in which she sought to obtain a loan vehicle. Despite these complaints, Defendants did nothing to remedy the Security Defect in her Elantra or to reimburse Ms. Beneman for her repair costs.

92.    Additionally, Defendants were provided notice of these issues through complaints

filed against them, including the instant Complaint, by customer communications before and within a reasonable period of time after the allegations of the vehicle defects became public, and articles published on the internet reporting a clear and consistent upward trend in thefts of the Class Vehicles across the nation. Thus, notice should be deemed unnecessary in light of the Defendants' failure and refusal to take corrective action despite the notice.

93.     Plaintiff and the other Maryland Subclass members were harmed by Defendants' breaches of their implied warranties. The failure of the Class Vehicles to be merchantable and fit for their purpose was a substantial factor in causing Plaintiff's and the other Maryland Subclass members' harm.

94.     Had Plaintiff and the Maryland Subclass members known that the Class Vehicles lacked engine immobilizers and other anti-theft features, making them incredibly easy to steal, and were unsafe, unreliable, and worth less than their sales price, they either would not have purchased their vehicles or would have paid significantly less for them. As a result of Defendants' breach of the implied warranties of fitness and merchantability, Plaintiff and the other Maryland Subclass members have suffered economic damages, including consequential and incidental damages.

95.     As a direct and proximate result of Defendants' breaches of the implied warranties of merchantability and fitness for a particular purpose, Plaintiff and members of the Maryland Subclass suffered damages in excess of $5,000,000.00.

96.     As a direct and proximate result of the foregoing, Plaintiff and Maryland Subclass members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## <u>COUNT II</u>

**Breach of Express Warranty**
**(On Behalf of Plaintiff and the Maryland Subclass)**

97.     Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

98.     For each Class Vehicle sold or leased, Defendants issued an express written warranty covering the vehicle. The express warranty represented that the Class Vehicles were of high quality, properly designed, conformed with applicable federal standards, and, at a minimum, would work properly, and would be reliable and safe.

99.     Defendants breached their express warranties by, among other things, selling or leasing to Plaintiff and the other Maryland Subclass members the Class Vehicles, which are not free of material defects. The Class Vehicles are unsafe, unreliable, and worth less than if they contained standard and adequate anti-theft features because they are far easier to steal than comparable vehicles that contain standard and adequate anti-theft features.

100.    The Class Vehicles are not of the quality promised in the written warranty, are improperly designed, do not conform with applicable standards, and are not reliable or safe.

101.    Plaintiff put Defendants on notice of their breaches of express warranty. Specifically, Plaintiff complained to one of Defendants' authorized dealers soon after her stolen vehicle was recovered and dropped off for repairs, and to Defendant Hyundai's corporate offices via a phone call in which she sought to obtain a loan vehicle. Despite these complaints, Defendants did nothing to remedy the Security Defect or to reimburse Ms. Beneman for her repair and other costs.

102.    Additionally, Defendants were provided notice of these issues through complaints filed against them, including the instant complaint, by customer communications before and within a reasonable period of time after the allegations of the Class Vehicle defects became public, and articles published on the internet reporting a clear and consistent upward trend in thefts of the Class

Vehicles across the nation. Thus, notice should be deemed unnecessary in light of the Defendants' failure and refusal to take corrective action despite the notice.

103.    Plaintiff and Maryland Subclass members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

104.    Defendants failed to repair the Class Vehicles as required by the written warranty.

105.    Plaintiff and the other Maryland Subclass members were harmed. Defendants' breach of its express warranties proximately caused the Maryland Subclass to suffer damages in excess of $5,000,000.00.

106.    The failure of the Class Vehicles to conform to Defendants express warranties was a substantial factor in causing Plaintiff's and the other Maryland Subclass members' harm.

107.    As a direct and proximate result of the foregoing, Plaintiff and Maryland Subclass members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT III

### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. §§ 2301 et seq.
### (On behalf of the Nationwide Class)

108.    Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

109.    Congress enacted the Magnuson-Moss Warranty Act ("MMWA"), to address the widespread misuse of express warranties and to protect consumers from deceptive warranty practices. Additionally, a warrantor who fails to comply with an obligation under a written or

corresponding implied warranty can be liable under the MMWA.

110.    In connection with the purchase or lease of each Class Vehicle, Defendants issued an express written warranty that covered the vehicle and which warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

111.    Defendants breached their express warranties by selling or leasing defective vehicles that were by design and construction defective and unsafe, thereby subjecting the occupants of the Class Vehicles to loss and injury and to risks of loss and injury.

112.    The MMWA defines "consumer product" as "any tangible personal property which is distributed for commerce and used for personal, family, or household purposes." 15 USCS § 2301(1).

113.    The defective Class Vehicles are "consumer products" under the MMWA.

114.    The MMWA defines "consumer" as "a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract)." *Id.* § 2301(3).

115.    Plaintiff and the Class members are "consumers" within the meaning of the MMWA.

116.    The MMWA defines "supplier" as "any person engaged in the business of making a consumer product directly or indirectly available to consumers." *Id.* § (4).

117.    The MMWA defines "warrantor" as "any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty." *Id.* §

(5).

118.     Each of the Defendants is a "supplier" and "warrantor" within the meaning of the MMWA.

119.     The MMWA defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time . . . which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product." *Id.* § (6).

120.     In connection with the sale and/or lease of the Class Vehicles, Defendants supplied Plaintiff and members of the Class with "written warranties" as defined within the MMWA.

121.     The MMWA defines "implied warranty" as "an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer product." *Id.* § (7).

122.     Defendants sales or leases of the Class Vehicles to Plaintiff and Class members were made subject to the implied warranties of merchantability and fitness, both of which are "implied warranties" within the meaning of the MMWA.

123.     Pursuant to 15 U.S.C. § 2310(d)(1), "[a] consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief . . . in an appropriate district court of the United States . . . ."

124.     Pursuant to 15 U.S.C. §§ 2310(d)(3)(A)(B) & (C), Plaintiff's claim exceeds $25, the amount in controversy is greater than $50,000, exclusive of interests and costs, computed on

the basis of all claims to be determined in this suit.

125.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure. Further, affording Defendants an opportunity to cure their breach of warranty would be unnecessary and futile.

126.    Privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers and agents. Specifically, Plaintiff and the Class members are intended third-party beneficiaries of the written and implied warranties.

127.    The dealers and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided for the Class Vehicles. The warranty agreements were designed for and intended to benefit consumers.

128.    In addition, privity is not required because the Class Vehicles are unsafe and hazardous instrumentalities due to, without limitation, the lack of engine immobilizers.

129.    Defendants impliedly warranted that the Class Vehicles were fit for the ordinary purpose of passenger motor vehicles and were merchantable and conformed to a reasonable buyer's expectations.

130.    Defendants breached and continues to breach these implied warranties and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1) because, without limitation, the Class Vehicles share common design defects, including that they lack engine immobilizers.

131.    These defects render the Class Vehicles deficient, in that they are incredibly easy

to steal. For this reason, the Class Vehicles are not a safe or reliable means of transportation.

132.    The victim of vehicle theft is typically left stranded, without transportation, and sometimes thrust into unsafe scenarios. Additionally, widespread knowledge of the Security Defect ensures that the Class Vehicles are at greater risk of carjacking, placing the occupants at greater risk of injury or death while driving.

133.    Defendants provided Plaintiff and the other Class members written warranties in connection with the purchase or lease of their vehicles.

134.    Defendants made written affirmations of fact that the Class Vehicles would be free from defects that would prevent ordinary use.

135.    Defendants placed labeling and other written affirmations making performance-related representations related to the Class Vehicles, including expressly warranting that they were high quality, properly designed, conformed with applicable federal standards, and, at a minimum, would work properly and be safe and reliable.

136.    Defendants breached and continues to breach their express warranties for the Class Vehicles by, among other things, selling or leasing the Class Vehicles while they contain material defects.

137.    Any efforts to limit these express and implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, as is any effort to disclaim or otherwise limit liability for the Class Vehicles.

138.    Any limitations on these express and implied warranties are procedurally and substantively unconscionable. Further, there was an unequal and unfair bargaining power between Defendants, on the one hand, and Plaintiff and the other Class members, on the other.

139.    Defendants purposefully misrepresented and/or concealed the true qualities and

risks of the Class Vehicles.

140.    Defendants knew that no engine immobilizers were installed on the Class Vehicles, among other design defects, and they failed to disclose this material fact, thereby misrepresenting the vehicles' safety, ease of theft, and value to consumers, including Plaintiff and the Class members.

141.    Defendants failed to disclose the Security Defect to Plaintiff and the other Class members even though Defendants were aware that the Class Vehicles lacked engine immobilizers, which are standard in the industry, as well as other anti-theft features.

142.    Defendants are aware of that the Security Defect is a major problem and have promised to alter their 2022 and later vehicles to eliminate the defect moving forward, but have steadfastly refused to remedy the Security Defect in the Class Vehicles.

143.    At the time of the sale or lease of each Class Vehicle, the Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.

144.    Plaintiff used her Class Vehicle in a manner consistent with its intended use and performed every duty required of her under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law.

145.    Under the circumstances, the remedies available under any information settlement procedure would be inadequate, and any requirement that Plaintiff resort to an informal dispute resolution procedure and afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

146.    Plaintiff, individually and on behalf of the other Class members, seeks all damages

permitted by law, including diminution of value of their vehicles, in an amount to be proven at trial.

147.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees) determined by the Court to have been reasonably been incurred by Plaintiff and the Class members in connection with the commencement and prosecution of this action.

148.    Plaintiff and the Class members are also entitled to equitable relief pursuant to 15 U.S.C. § 2310(d)(1), including an order that Defendants are required to fix the Security Defect in the Class Vehicles.

## COUNT IV

### Negligent Failure to Warn
### (On Behalf of Plaintiff and the Maryland Subclass)

149.    Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

150.    Defendants owed Plaintiff and Maryland Subclass members a duty of care and had a duty to warn of any risks associated with the Class Vehicles. Defendants knew or should have known of the true risks posed by the Security Defect, but failed to warn Plaintiff and the Maryland Subclass members of those risks.

151.    Defendants' negligent breaches of duty caused Plaintiff and Maryland Subclass members to suffer economic damages and injuries in that their Class Vehicles are less reliable, less safe, and less valuable than they would be if the Class Vehicles contained adequate anti-theft features.

152.    Plaintiff and Maryland Subclass members would not have purchased, chosen, and/or paid for all or part of the vehicles had they known of the true risks arising from the Security

Defect.

153.     Plaintiff and Maryland Subclass members have suffered damages in an amount to be determined at trial.

## COUNT V

### Negligence
### (On Behalf of Plaintiff and the Maryland Subclass)

154.     Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

155.     Defendants designed, manufactured, distributed, tested, sold, leased, and/or supplied the Class Vehicles.

156.     Defendants held themselves out as capable of reasonably and prudently developing, manufacturing, marketing, supplying, testing, distributing, supplying, selling, and leasing the Class Vehicles and therefore had the duty to possess and exercise the knowledge of an expert on such products.

157.     Defendants knew or should have known that the Class Vehicles contained the Security Defect because Defendants manufactured and designed them without engine immobilizers or other prophylactic anti-theft features.

158.     Defendants knew or should have known that the Class Vehicles are incredibly easy to steal and fail to satisfy industry and federal standards.

159.     As designers, manufacturers, processors, packagers, distributors, marketers, sellers, lessors, and suppliers of the Class Vehicles, Defendants had a duty to exercise due care and the ordinary, reasonable and technical skill and competence that is required of designers, manufacturers, processors, packagers, distributors, marketers, sellers, lessors, suppliers, and others in a similar situation, including, without limitation, (i) the duty to test its vehicles; (ii) the duty to

acquire and maintain the knowledge of an expert; (iii) the duty to design, manufacture, process, distribute, market, sell, and/or supply its vehicles free from defects and/or latent defects; (iv) the duty to adequately warn consumers of defects and/or hazards in the Class Vehicles, which duty continued even after the sale of said vehicles; and (v) the duty to market, advertise, sell and supply vehicles with adequate information and warning about the unacceptable risk of theft their design failures create.

160.    Defendants failed to use due care under the circumstances and thereby breached their duties as set forth above and were careless and negligent in the performance of their duties to Plaintiff and the other Maryland Subclass members.

161.    Plaintiff used these Class Vehicles in a manner ordinarily anticipated by Defendants.

162.    Defendants were negligent as alleged herein.

163.    Plaintiff and the Maryland Subclass members were harmed thereby.

164.    Defendants' negligence was a substantial factor in causing Plaintiff and the Maryland Subclass members' harm.

## COUNT VI

### Strict Liability – Design Defect
### (On Behalf of Plaintiff and the Maryland Subclass)

165.    Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

166.    Defendants designed, manufactured, and/or supplied the Class Vehicles within the ordinary course of their business.

167.    Plaintiff and the other Maryland Subclass members purchased or leased the Class Vehicles.

168.    The absence of engine immobilizers in the Class Vehicles constitutes a design defect, as does the absence of other prophylactic security measures. As a result, the Class Vehicles are incredibly easy to steal, far more so than other vehicles, and are therefore unsafe and unreliable and constitute a safety hazard and are worth less than if they had engine immobilizers and other anti-theft measures, which they should.

169.    Defendants knew or should have known of the dangerous and defective nature of the Class Vehicles at the time of their design, manufacture, sale, lease, testing, transportation, distribution, supply, and use.

170.    Defendants failed to take safety precautions to prevent Plaintiff's and the other Maryland Subclass members' harm and failed to warn and/or instruct Plaintiff and other Maryland Subclass members of the defective and unreasonably dangerous nature of their vehicles.

171.    Defendants' defective and unreasonably dangerous vehicles directly and proximately caused economic injuries to Plaintiff and the other Maryland Subclass members.

172.    Plaintiff and the other Maryland Subclass members drive the vehicles and then park them and leave them unattended, which is a manner of use reasonably anticipated by Defendants.

173.    As a result of the Security Defect, the Class Vehicles are unreasonably dangerous and defective when put to their anticipated use.

174.    The Class Vehicles did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

175.    Plaintiff and the other Maryland Subclass members were harmed by Defendants' defective design.

176.    The Class Vehicles' failure to perform safely was a substantial factor in causing Plaintiff and the other Maryland Subclass members' harm.

177.    Plaintiff and the other Maryland Subclass members' harm is not limited to only the difference in value between a Class Vehicle and a similar vehicle without the Security Defect. Other damages include, but are not limited to, repairs to damaged vehicles, the replacement cost of stolen vehicles, the purchase price of security devices to prevent theft, and the increase in insurance premiums Plaintiff, and the other Maryland Subclass members have or may have to pay due to the design defect.

## COUNT VII

**Violation of the Maryland Consumer Protection Act ("MCPA")**
**Md. Code Ann., Commercial Law § 13-101, et seq.**
**(On Behalf of Plaintiff and the Maryland Subclass)**

178.    Plaintiff and the Maryland Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

179.    Plaintiff brings this claim individually and on behalf of the Maryland Subclass.

180.    Plaintiff and Maryland Subclass members who purchased or leased Class Vehicles are "consumers" under the MCPA.

181.    The Class Vehicles are consumer goods within the meaning of the MCPA and provided services within the MCPA's meaning of the term consumer services.

182.    The MCPA prohibits the use of any "unfair, abusive, or deceptive trade practice" in the sale or lease of any consumer goods or services.

183.    Defendants violated the MCPA by, *inter alia*, engaging in the following unfair, abusive, and deceptive acts or practices:

   a.   Failing to state material facts that deceived and had the tendency to deceive, *see* Md. Code Ann., Commercial Law § 13-301(3); and

   b.   Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent

that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease, *see id.* §§ 13-301(9)(i), (iii).

184.    Defendants violated the MCPA by concealing, suppressing, and/or omitting material facts regarding the Class Vehicles, including, but not limited to, (i) the fact that the Class Vehicles lack appropriate anti-theft features—specifically, engine immobilizers—and are therefore defective, (ii) that as a result of such defect, the Class Vehicles are distinctly susceptible to theft in that a thief can steal a Class Vehicle with minimal knowledge and using readily available tools, and (iii) that the victim of such a theft is not only inconvenienced and potentially endangered, but is also required to pay a high cost to repair the damage stemming from the theft. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase, or how much to pay for, the Class Vehicles.

185.    Defendants concealed, suppressed, and/or omitted these material facts in conducting trade and commerce with the intent that Plaintiff and the members of the Maryland Subclass would rely on the absence of these facts in the purchase or lease of their Class Vehicles.

186.    To this day, Defendants continue to violate the MCPA by actively refusing to install engine immobilizers or other comparable anti-theft features in the Class Vehicles, which is an abusive business practice.

187.    Defendants intended that Plaintiff and the members of the Maryland Subclass would rely on their concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

188.    Defendants' practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

a. At the time of sale or lease, Defendants knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose the Security Defect to Plaintiff and Class Members and that the Class Vehicles were unsafe and unreliable as a consequence of being extraordinarily susceptible to theft.

b. Thereafter, Defendants failed to disclose the Security Defect to Plaintiff and the members of the Maryland Subclass, either through warnings or recall notices, and/or actively concealed from them that the Class Vehicles lacked standard anti-theft features, namely engine immobilizers, and as a result were unsafe and unreliable as a consequence of being extraordinarily susceptible to theft, even though Defendants were aware of the Security Defect: (i) prior to the release of the first Class Vehicle, as evidenced by their statements to the NHTSA in 2007 and 2009; (ii) at the time of manufacture, when they failed to incorporate engine immobilizers or other comparable anti-theft devices that they incorporated into their vehicles in many foreign markets; (iii) at some point between 2010 and 2021, as Defendants observed increased demand for Class Vehicle parts and loan vehicles, as well as increases in repairs or repair requests, due to thefts exploiting the Security Defect; and (iv) around early 2022, from public reporting on clear and consistent upward trends in thefts of the Class Vehicles across the nation.

c. Based on these and other sources, Defendants knew with certainty that the lack of engine immobilizers in the Class Vehicles posed a serious risk of theft and therefore that the Class Vehicles would be unsafe, unreliable, and less valuable than if they possessed standard and adequate anti-theft features.

d.   Despite Defendants' prior knowledge of the defect, Defendants forced Plaintiff and members of the Maryland Subclass to expend money on diagnostics and ineffectual repairs and part replacements that could not remedy the Security Defect.

e.   Defendants, in administering their limited warranty, engaged in materially misleading deceptive acts and practices by ignoring the Security Defect and placing blame for the theft solely on the vehicle owner or lessor and/or the thief, so as to place the consequences of the Security Defect outside of warranty coverage.

189.   Furthermore, Defendants engaged in materially misleading and deceptive acts by continuing to sell and lease the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendants' knowledge that the vehicles were not safe or reliable, as Defendants intended, represented, and warranted, and that the Security Defect would cause purchasers to incur significant out-of-pocket costs and expenses.

190.   Defendants' acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendants have, through knowing, intentional, material omissions, concealed the true defective nature of the Class Vehicles.

191.   Defendants' acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

192.   As a direct and proximate result of these unfair acts or practices, Plaintiff and the members of the Maryland Subclass have been damaged because: (i) they purchased Class Vehicles they otherwise would not have; (ii) paid more for Class Vehicles than they otherwise would have;

(iii) paid for diagnoses, repairs, and replacements, towing, and/or rental cars; (iv) and are left with Class Vehicles of diminished value and utility because of the Security Defect. Meanwhile, Defendants have sold more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching themselves.

193.   Plaintiff and the members of the Maryland Subclass seek restitution of the substantial sums of money they expended to repair damage arising from the Security Defect in their Class Vehicles.

194.   Plaintiff and the members of the Maryland Subclass also seek appropriate equitable relief, including an order requiring Defendants to adequately disclose and remediate the Security Defect and an order enjoining Defendants from omitting engine immobilizers or other comparable anti-theft features from its vehicles in the future.

## COUNT VIII

### Unjust Enrichment/Restitution
### (On behalf of the Nationwide Class /
### Asserted in the Alternative on behalf of the Maryland Subclass)

195.   Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

196.   Defendants have been unjustly enriched as a result of the conduct described in this Complaint.

197.   Defendants received a benefit from Plaintiff and the members of the Class in the form of payment for the Class Vehicles.

198.   Retention of these benefits by Defendants would be unjust and inequitable because Defendants received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

199.    The benefits (or at least some portion the benefits) that Defendants received were not legitimately earned and came at the expense of Plaintiff and the other members of the Class.

200.    Defendants know that the Class Vehicles are unsafe and unreliable, but nonetheless sold them without warning.

201.    Defendants' conduct is unjust, inequitable, and wrongful, but they systematically engage in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits.

202.    There is no justification for Defendants' continued silence as customers purchased the Class Vehicles affected by the dangerous Security Defect.

203.    It is therefore against equity and good conscience to permit Defendants to retain the proceeds from their sales and leases of the defective Class Vehicles.

204.    Plaintiff and the Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

## COUNT IX

**Fraudulent Omission or Concealment
(On behalf of the Nationwide Class /
Asserted in the Alternative on behalf of the Maryland Subclass)**

205.    Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.    At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, selling, and leasing the Class Vehicles.

207.    Defendants, directly and through their representatives or agents, delivered Class Vehicles to their authorized dealerships and other distribution channels.

208.    Defendants willfully, falsely, and knowingly omitted various material facts

regarding the quality, reliability, and safety of the Class Vehicles.

209.    Rather than disclose the Security Defect to Plaintiff and other prospective purchasers and lessors of Class Vehicles, Defendants concealed the Security Defect.

210.    Defendants omitted and concealed this material information to drive up sales, maximize profits, and maintain market power, as consumers would not purchase or lease Class Vehicles, or would pay substantially less for them, had they known the truth.

211.    Plaintiff and Class members could not reasonably have discovered the Security Defect prior to it manifesting in their Class Vehicles.

212.    Defendants were in exclusive possession of information concerning the Security Defect's existence, which would have been material to reasonable consumers, and thus were obligated to disclose the Security Defect to Plaintiff and Class members, at the point of sale or lease or otherwise.

213.    Defendants also had a duty to disclose because they made many general affirmative representations about the quality, reliability, and safety of the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, reliability, and safety.

214.    Even when faced with complaints regarding the Security Defect, Defendants often refused to acknowledge the issue. As a result, Class members were misled as to the true condition of the Class Vehicles, once at the time of purchase and, often, again when the theft was brought to Defendants' attention. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased, are material concerns to

a consumer.

215.    Although Defendants had a duty to disclose the Security Defect to consumers, they failed to do so.

216.    Plaintiff and Class members sustained injury at the time they purchased or leased Class Vehicles that suffer from the Security Defect, which Defendants failed to disclose and actively concealed from them. Had Plaintiff and the Class known about the Security Defect at the time of purchase or lease, they would have paid substantially less for their Class Vehicles or would not have purchased or leased them and avoided the significant out-of-pocket costs they have or will incur to repair or replace Class Vehicles due to the Security Defect.

217.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being, and in part to enrich themselves at the expense of consumers. Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration or competitor devices. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT X

**Equitable Injunctive and Declaratory Relief**
**(On behalf of the Nationwide Class /**
**Asserted in the Alternative on behalf of the Maryland Subclass)**

218.    Plaintiff repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

219.    Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

220.   Plaintiff seeks a ruling that:

a.   The Class Vehicles are defective in that they lack standard anti-theft features and as a result are unsafe, and unreliable because they are highly susceptible to theft;

b.   Any limitation of consumer rights in Defendants' warranty is void as unconscionable;

c.   Defendants must notify owners and lessors of the Class Vehicles of the Security Defect; and

d.   Defendants will reassess all prior warranty claims and pay the full cost of repairs and damages relating to the Security Defect, including insurance deductibles paid by owners in connection therewith.

### PRAYER FOR RELIEF

WHEREFORE**,** Plaintiff prays for judgement against Defendants as follows:

a.   For an order certifying the proposed classes and appointing Plaintiff and Plaintiff's counsel to represent the classes;

b.   Entering judgment in favor of Plaintiff and the Class against Defendants;

c.   A declaration that: (i) Defendants violated the statutes that form the basis for Plaintiff's statutory claims; (ii) Defendants were unjustly enriched by their conduct as described herein; and (iii) Defendants breached their warranties as set forth herein;

d.   For an order awarding Plaintiff and Class members actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

e.   For an order awarding Plaintiff and the Class members restitution, disgorgement and/or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper, including the repair of all Class Vehicles, replacement or repurchase of all Class Vehicles, and/or the refund of money paid to own or lease all Class Vehicles;

f.   For an order or orders requiring Defendants to adequately disclose and remediate the Security Defect and enjoining Defendants from incorporating the Security Defect into its vehicles in the future;

g.   For an order awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

h.   For an order awarding Plaintiff and Class members reasonable attorney fees and costs of suit, including expert witness fees; and

i.   For an order awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

The Plaintiff and each Class hereby demand trial by a struck jury of all issues triable by right.

DATED: January 13, 2023                    Respectfully submitted,

Nicholas A. Migliaccio
(Maryland Federal Bar No. 29077)
Jason S. Rathod
(Maryland Federal Bar No. 18424)
Bryan G. Faubus
(*pro hac vice* anticipated)
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel:     (202) 470-3520
Email:  nmigliaccio@classlawdc.com
           jrathod@classlawdc.com
           bfaubus@classlawdc.com

Attorneys for the Plaintiff and Class