# EXHIBIT B

Dean Kawamoto, CSB # 232032
dkawamoto@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of Madison*

(additional counsel listed below)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF MADISON, | |
| Plaintiff, | No. 8:23-cv-555 |
| v. | COMPLAINT |
| HYUNDAI MOTOR AMERICA and KIA AMERICA, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………1

II.     JURISDICTION AND VENUE..................................................................5

III.    PARTIES.....................................................................................................6

        A.    Plaintiff..........................................................................................6

        B.    Defendants.....................................................................................6

IV.     THE KIA HYUNDAI THEFT WAVE .....................................................7

        A.    Without Immobilizers, Defendants' Vehicles Are Sitting
              Ducks..............................................................................................7

        B.    Car Thefts Imperil Public Safety .................................................10

        C.    Measures to Prevent Vehicle Theft Have Existed for
              Over a Century..............................................................................23

        D.    The Widespread Adoption of Modern Engine
              Immobilizers as an Even More Effective Vehicle Theft
              Deterrent.......................................................................................27

        E.    Defendants' Deviation from the Industry Standard ......................30

V.      CAUSES OF ACTION ............................................................................32

COUNT ONE — COMMON LAW PUBLIC NUISANCE ...............................32

COUNT TWO — NEGLIGENCE .....................................................................36

VI.     PRAYER FOR RELIEF..........................................................................41

VII.    JURY TRIAL DEMANDED ..................................................................41

i

# I.   <u>INTRODUCTION</u>

1.      There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal both protects property and protects the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers cannot be bothered to include standard anti-theft technology in their cars.

2.      The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most cars, the ignition key emits a radio signal that prompts a computer to disengage an immobilizer device and allows the car to move when the key is present. But recent Hyundai and Kia models are a glaring exception.

3.      Between 2011 and 2021, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Hyundai and Kia failed to keep up with the times. As a result, TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing common anti-theft technology have resulted in an epidemic of thefts. This vehicular crime wave has had a significant impact on law

enforcement operations, emergency services, and public safety, particularly in the City of Madison, where the police department is under considerable staffing stress.

4.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle immobilizers in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have decided to trade public safety for profits.

5.     The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *26%* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *96%* of vehicles from all other manufacturers.[1]

6.     Hyundai's and Kia's decision to put cost-savings and profits over public safety has had devastating consequences for the City of Madison and its

---

[1] "Hyundai and Kia theft losses," 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

residents, as it has in other cities. The failure of Defendants to install an industry-standard anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

7.     This epidemic started in Milwaukee before spreading nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.[2]

8.     The same trend is evident in Madison, where, for example, between 2021 and 2022, the police reported a 124% increase in theft of Kia vehicles. 92 Kias were stolen in Madison in 2022, compared to 41 stolen Kias in 2021 and 30 stolen Kias in 2020.

---

[2] James Gilboy, *News, Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, THEDRIVE.COM (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

Kia and Hyundai Thefts in Madison



—— Stolen Kias      —— Stolen Hyundais      —— Combined

9.     Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn results in injuries and death. It results in increased violence, as many car owners are unlikely to part with their vehicles willingly. It consumes scarce law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

10.     The skyrocketing rate of vehicle theft in Madison has drastically impacted city and police resources. Madison residents are subjected to the increasingly dangerous conditions on their city streets, as car thieves (many of them teenagers) taking advantage of Hyundai's and Kia's failures engage in reckless driving, endangering Madison residents and their property.

4

11.     Defendants' conduct has created a public nuisance that could have been avoided had they simply followed industry-wide standards and installed immobilizer devices, or an equivalent anti-theft device, in all their vehicles.

12.     To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including Madison, to divert funds and risk officer safety to combat the rising burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the Parties. The City of Madison is regarded as a citizen of the state of Wisconsin, for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

14.     This court has general personal jurisdiction over Defendants as they are incorporated and headquartered in the state of California.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are citizens of California, incorporated in this State with headquarters located in this district.

### III.   PARTIES

#### A.   Plaintiff

16.     Plaintiff, the City of Madison (the "City" or "Madison"), is a municipal corporation organized under the laws of the State of Wisconsin. The City is located in Dane County and has approximately 270,000 residents. The City's principal offices are located at 210 Martin Luther King Jr., Blvd., Madison, Wisconsin.

#### B.   Defendants

17.     Defendant **Hyundai Motor America** ("Hyundai"), is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

18.     Defendant **Kia America, Inc.** ("Kia"), is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles

through a network of over 700 dealers throughout the United States from its headquarters in California.

## IV.   THE KIA HYUNDAI THEFT WAVE

### A.   Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

19.   As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models ("Susceptible Vehicles") without engine immobilizers between 2011 and 2021: Hyundai Accent, Elantra, Kona, Palisade, Santa Cruz, Santa Fe, Sonata, Tucson, Veloster, and Venue; and the Kia Cadenza, Forte, K900, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As would-be car thieves learned of this susceptibility, the incidence of theft for susceptible models increased, relative to other models, from 2015 to 2020.[3]

---

[3] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; *and America's 10 Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.

7

20. However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal susceptible Kias and Hyundais.[4] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[5] As the videos detailed, a thief need only remove the plastic cowl under the steering column and use a USB cable to start these unsecure cars.

21. What followed was all-too predictable: thefts of Kias and Hyundais skyrocketed.[6] In the first half of 2021, the number of stolen Kias and Hyundais increased by more than 30 and 15 times, respectively, when compared to the same period in 2020 in Milwaukee.[7] This dramatic increase was unique to Kias and Hyundais, which represented 66% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[8] This trend then spread nationwide.

---

[4] Greg Rosalsky, *Planet Money*, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-

[5] Chris DiLella & Andrea Day, *Autos*, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[6] *Investigative*, *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, INSIDE EDITION (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[7] Sean Tucker, *General*, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, KELLEY BLUE BOOK (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[8] Matt Posky, *News Blog*, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* THE TRUTH ABOUT CARS (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971; Jeramey Jannene, *Two-Thirds of All*

8

22.     In the summer of 2022, thefts of Kia and Hyundai automobiles in Madison increased by 270%.[9] During that time period, Hyundais and Kias accounted for more than half of all auto thefts in Madison.[10] According to Madison's data, for the entirety of 2022, the percentage of auto theft attributable to Hyundai and Kia was twice the historical norm.



Kia and Hyundai as a Percentage of All Auto Theft in Madison

23.     The Madison Police department identified the cause of this swift increase in auto thefts—a manufacturing issue that makes certain Kia and Hyundai vehicles easy to steal.[11]

---

*Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021, 4:29 PM), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

[9] City of Madison, *Multiple Goals m\Met During 2022 Summer Strategic Plan,* (December 14, 2022, 3:40 PM), https://www.cityofmadison.com/news/multiple-goals-met-during-2022-summer-strategic-plan-0.

[10] https://www.channel3000.com/news/crime/madison-police-more-than-half-of-stolen-vehicle-cases-involve-kia-hyundai-models/article_9cb2e00c-b9ea-5777-a60c-a1fd8d99a837.html.

[11] City of Madison, Police Blotter, *Stolen Auto update – Hayes Rd. Area*, (June 20, 2022, 11:13 AM), https://www.cityofmadison.com/police/blog/?Id=26548.

24.     The susceptibility of Defendants' vehicles to theft enabled this spiraling epidemic. Defendants' choice to deviate from the industry standard of utilizing engine immobilizers, placing profits over people and safety, was both a proximate and but-for cause of this outbreak. As a Milwaukee police sergeant described the problem, Defendants' cars are simply too easy to steal.[12] This presents a risk not only for property damage, but to public safety, as thieves often engage in reckless driving, as well as other dangerous criminal conduct, including robbery and firearm thefts. Specifically, Kias and Hyundais have been targeted by thieves seeking weapons (and other valuables) that might have been left in patrons' vehicles.[13]

### B.     Car Thefts Imperil Public Safety

25.     Car thefts imperil public safety. By creating a rash of car thefts, Defendants are responsible for a substantial risk to the public safety.

26.     This is the conclusion drawn by the National Highway Traffic Safety Administration ("NHTSA"). Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle

---

[12] Rebecca Klopf, *MPD: Hyundai and Kia vehicles too easy to steal, leading to spike in car thefts,* TMJ 4 (Feb. 3, 2021, 4:40 PM), https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts.

[13] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland Security was stolen in broad daylight. *See* Jim Piwowarczyk, *Department of Homeland Security Hyundai Stolen in Milwaukee, Contained Rifle & Body Armor*, WISCONSIN RIGHT NOW (Apr. 17, 2022), https://www.wisconsinrightnow.com/homeland-security-hyundai/.

10

Safety Standard 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[14] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[15] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[16]

27.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

28.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others within Madison. This is particularly true with the current crime wave. In contrast to many instances of car theft, where the object is converting the

---

[14] *See* 33 Fed. Reg. 6,471 (Apr. 27, 1968).
[15] *Id.*
[16] *Id.*

stolen vehicle and stolen cars are delivered to a chop shop, usually under the cover of night, the viral recent wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and abandoning the stolen vehicles after collisions, during busy hours of the day. According to the City's arrest data, the average age of people arrested for stealing a Kia or Hyundai was under 20-years-old, and 54.5% of those arrested were juveniles, as young as 11-years-old.

29.    Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[17]

---

[17] *See e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; @monloww__, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; *and* @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

30.     In Madison, this phenomenon has already led to extreme incidents. On June 20, 2022, four juveniles, with ages ranging from 12-to-14-years-old, were arrested for the theft of a Kia.[18] The Kia was involved in a rollover crash with an unoccupied parked car.[19]

 

31.     While there were no serious injuries reported in the June 20, 2022 incident, stolen Kias and Hyundais have been involved in devastating accidents. In Buffalo, New York, on October 2022, a 16-year-old individual driving a stolen Kia Sportage crashed the vehicle at the intersection of Routes 33 and 198.[20] All five passengers were ejected from the vehicle, three of whom were pronounced dead at the scene.[21] Another passenger later died at the hospital, and the remaining passenger and driver sustained serious injuries. The four passengers who died were

---

[18] City of Madison, Police Incident Reports, *Incident Report for Case # 2022-239938,* (June 20, 2022, 7:54 PM, https://www.cityofmadison.com/police/newsroom/incidentreports/incident.cfm?id=29925.
[19] *Id.*
[20] Aidan Joly & Evan Anstey, *Regional News*, *Four teens killed in rollover crash in Buffalo, two injured*, ROCHESTERFIRST.COM (Oct. 25, 2022, 12:26 PM), https://www.rochesterfirst.com/crime/police/four-teens-killed-in-crash-at-33-and-198/.
[21] *Id.*

13

all between the ages of 14 and 19.[22] The 16-year-old driver faces four counts of second-degree manslaughter, among other charges.[23]



32.   The public safety threat associated with juveniles recklessly driving these stolen Kia and Hyundai vehicles continues to plague Madison. According to the City's data, 54.5% of those arrested for stealing a Kia or Hyundai in 2022 were juveniles.

---

[22] Graeme Massie, *US Crime News*, *Car crash that killed four teens is linked to 'Kia Challenge' TikTok craze, Buffalo police say*, THE INDEPENDENT (Oct. 25, 2022, 9: 38 PM), https://www.independent.co.uk/news/world/americas/crime/buffalo-teen-crash-tiktok-kia-challenge-b2210473.html.

[23] Maki Becker, *Teen in stolen Kia crash that killed 4 must wear ankle monitor, report to probation*, THE BUFFALO NEWS (Dec. 11, 2022), https://buffalonews.com/news/local/crime-and-courts/teen-in-stolen-kia-crash-that-killed-4-must-wear-ankle-monitor-report-to-probation/article_030d8c44-56e8-11ed-a8c0-b77671ebf054.html.

33.     Last week, in a suburb south of Madison, five Hyundais and Kias were stolen in a single day, all "by exploiting the known Hyundai/Kia security vulnerability."[24]

34.     Some Kia owners have been the victim of auto theft multiple times, leading to insurance companies canceling policies.[25] These thefts have occurred even when the owner utilized a wheel lock.[26]



35.     Another example of this all-too-common tragedy occurred in Milwaukee in June 2021, when a sixteen-year-old was killed after he stole a Kia Sportage and collided with another car.[27] His two twelve-year-old accomplices

---

[24] https://www.fitchburgwi.gov/CivicAlerts.aspx?AID=1956

[25] Caroline Reinwald, *Thieves Stole Their Kias Multiple Times, Now Their Insurance Companies Are Dropping Them*, WISN (Jan. 4, 2023), https://www.wisn.com/article/thieves-stole-their-kias-multiple-times-now-their-insurance-companies-are-dropping-them/42401238# .

[26] *Id.*

[27] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN (June 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

were also seriously injured, as were three passengers in the car that he struck. The

images and dashcam footage[28] of this tragedy show how the epidemic of vehicle

theft imperils the public.



36.     In electing profits over safety and in deviating from industry norms by

not including engine immobilizers as a standard safety feature, Defendants created

and maintained a public nuisance.

37.     A substantial risk to public safety also arises in the event that the

would-be thief is confronted in the act. In January 2023, a Cleveland man followed

a Hyundai Sonata that struck his car mirror and did not stop. The driver and

[28] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*,
WISN (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-
crash-moments-after-police-cancel-pursuit/37955614.

passenger of the Hyundai got out with guns and began shooting at him.[29] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[30] About one hour later, reports indicate that the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[31]

38.    This risk was also tragically demonstrated in Wauwatosa, Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed.[32]

39.    Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into another car and a 54-year-old pedestrian.[33]  Both cars careened into a nearby building, which collapsed

---

[29] Cory Shaffer, *Courts and Justice*, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, CLEVELAND.COM, (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[30] *Id.*

[31] *Id.*

[32] Michael Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021, 10:06 PM), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.

[33] Dan Belson, *Crime, Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, THE BALTIMORE SUN (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html.

on top of the vehicles and the pedestrian.[34] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[35]



40.     Stolen cars are often used in other crimes. In Madison, an 18-year-old was found with a fatal gunshot wound inside a stolen Kia on July 22, 2022.[36]



---

[34] *Id.*

[35] *Id.*

[36] City of Madison, Police Incident Reports, *Incident Report for Case # 2022-291413,* (July 22, 2022, 11:20 AM, https://www.cityofmadison.com/police/newsroom/incidentreports/incident.cfm?id=29981; Barry Adams, *18-Year-Old Found Shot, Dies In Stolen Vehicle On North Side As Police Probe Nearby Shooting* Wisconsin State Journal (July 22, 2022), https://madison.com/news/local/crime-and-courts/18-year-old-found-shot-dies-in-stolen-vehicle-on-north-side-as-police-probe/article_46179542-8758-57f5-9305-b7f0471a7e1e.html.

41.     Madison has experienced an especially high rate of Hyundai and Kia vehicle thefts and has been forced to respond, incurring significant costs, including expending extra police time and resources taking reports and collecting evidence, providing emergency and medical services, and processing, prosecuting, and rehabilitating offenders. These are costs incurred above and beyond the normal policing costs, attributable to the public nuisance created and maintained by Defendants.

42.     For instance, in 2021, Madison police officers spent 848.75 hours responding to stolen Hyundais and Kias. In 2022, Madison police officers spent 1,256.32 hours—a nearly 50% increase, which does not include follow-up detective work or time spent prosecuting cases. The amount of time spent responding to rampant thefts puts additional stress on the City of Madison's limited resources. However, despite these efforts, without action from Defendants, the City has been unable, on its own, to abate this nuisance.

43.     As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities, thereby increasing the potential number of uninsured motorists on the road.[37]

---

[37] Peter Valdes-Dapena, *CNN Business*, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html.

44.     To date, Defendants' responses have shown a continued prioritization of profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only offering wheel locks for municipalities to distribute.[38] Unfortunately, the wheel locks are not effective; residents who use them have still had their cars stolen, and even, in some instances, connected to shootings.[39]

45.     More recently, Hyundai has begun rolling out a "software update" rather than installing immobilizers.[40] Kia has planned a similar software update, yet this software-only approach is too little, too late, and many of the Susceptible Vehicles will not even be included in the update.[41]

46.     Upon information and belief, rather than install an immobilizer, the software update will double the length of the theft alarm sound and add a new logic check to the vehicles' on-board computers. This update is a late half-measure at best and will be useless in many common scenarios such as parking and waiting to

---

[38] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, MILWAUKEE JOURNAL SENTINEL (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[39] Ashley Sears, *Crime and Public Safety*, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX6NOW.COM (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice.

[40] *News*, *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

[41] *Id.*

pick up a child from after-school activities. Unless the doors were recently unlocked using a key fob, the Engine Control Unit will not turn on. This software-based approach is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability, not to mention public safety.

47.    The rollout of the software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that Madison has incurred and continues to incur. The update's efficacy has not been tested in the real world,[42] and no one knows how many consumers will even opt in to get it. But there are facial defects with this approach. Upon information and belief, this update will not cover all Susceptible Vehicles—even newer models. For vehicles not covered by the update, Defendants are offering nothing more than wheel locks, or rebates for already purchased wheel locks.

---

[42] Already, Susceptible Vehicles have been stolen after receiving the update. *See* Michelle Nicks, *Cleveland woman devastated after new anti-theft device on her Hyundai fails to stop thieves from causing damage*, CLEVELAND19.COM (March 17, 2023, 8:07 PM), https://www.cleveland19.com/2023/03/18/cleveland-woman-devastated-after-new-anti-theft-device-her-hyundai-fails-stop-thieves-causing-damage/; Additional anecdotes suggest that the update is not reliable. *See* Jsmith4523, Reddit (Feb. 22, 2023, 4:52 PM), https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_elantra_se_was_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name=iossmf; MaximumLongjumping31, Reddit (Mar. 3, 2023, 5:12 AM), https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrade_my_terrible_experience/.

48.     What's more, the work-around substantially reduces the usability of the vehicles. This software's logic could be triggered by letting a passenger out of a car to run an errand and then starting the car again. In addition, Susceptible Vehicle owners have already experienced issues with after-market remote start systems, rendering the vehicles functionally inoperable. As one owner recently posted:

> "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[43]

49.     Prior to this software update, Hyundai callously turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[44] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money off of a crime wave it caused.

---

[43] Fungiinterezt, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new.

[44] Taryn Phaneuf, *Insurance, Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, NERD WALLET (Jan. 26, 2023), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

50.    By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

### C.    Measures to Prevent Vehicle Theft Have Existed for Over a Century

51.    Since the dawn of gasoline-powered automobiles at the turn of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[45]

52.    Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[46]

53.    Evans and Birkenbeuel's immobilizer/alarm system consisted of a 3x3 switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions

---

[45] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[46] *Id.* at ¶¶ 14–20.

23

that until released would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.



**Sketches for Evans' & Birkenbeuel's "Automobile Theft Preventer"**

54.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

55.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

56.     In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle

24

and traffic safety standards.[47] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: NHTSA, f/k/a/ the National Traffic Safety Bureau.

57.     Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[48] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. *Scope*. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles
>
> S2. *Purpose*. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less. . . .
>
> S5.1 *Theft Protection*.
> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
> (a)     The normal activation of the vehicle's engine or motor; and
> (b)     Either steering, or forward self-mobility, of the vehicle, or both.

---

[47] P.L. 89–563, 80 Stat. 718.
[48] 49 C.F.R. § 571.114.

. . .

> S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

58.     The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[49]

59.     As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[50] Accordingly, NHTSA recognized that "a reduction of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[51] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to

---

[49] 33 Fed. Reg. 6471 (April 27, 1968).
[50] *Id.*
[51] *Id.*

require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[52]

60.    An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[53] The proposed software update does not appear to satisfy this requirement—as it is not linked to an attempt to start the vehicle without the correct key—and the absence of *any* system not only violates this standard, it created the public nuisance of rampant car theft in Madison.

### D.    The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

61.    In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[54] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring."

---

[52] 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* 33 Fed. Reg. 6,471 (Apr. 27, 1968).

[53] NHTSA Interpretation GF005229-2 (Sept. 24, 2004).

[54] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 CRIME SCIENCE 17, 1, 3 (2020).



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014[55]**

62.     To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[56] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[57]

---

[55] *Id.* at 2.
[56] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).
[57] *Id.*

63.     In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

64.     Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[58]

65.     The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[59] Similar mandates soon followed in Australia, New Zealand, and Canada.

66.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995–2008."[60]

---

[58] *Id.*

[59] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1, (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[60] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

### E.    Defendants' Deviation from the Industry Standard

67.    At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

68.    Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[61] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[62] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[63]

69.    Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[64]

---

[61] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.
[62] *Id.*
[63] *Id.*
[64] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

70.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[65]

71.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. In March 2007, Hyundai requested an exemption from particular NHTSA vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford [immobilizer] devices" in reducing vehicle theft.[66] Yet, until the last year or so, Hyundai and Kia only offered immobilizers in their premium, more expensive, model lines. This decision only compounds the harms on low-income communities.[67] Those without resources to afford such models are more likely to live in areas with higher crime

---

[65] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Press Release*, *Over 50 years of progress: the history of Hyundai* HYUNDAI.NEWS (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[66] 72 Fed. Reg. 39,662 (July 19, 2007); *see also* 75 Fed. Reg. 1,447 (Jan. 11, 2010) (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendants' representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[67] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

31

rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered vehicle.

72.     In September 2022, the HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, combined, had a theft claim rate of 1.21.[68]

73.     Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2021, in contrast to the approximately 96% of all other car manufacturers that did install an immobilizer, has led to a reasonably foreseeable car theft epidemic that is plaguing Madison.

## V.     CAUSES OF ACTION

### COUNT ONE — PUBLIC NUISANCE

74.     The City of Madison incorporates each preceding paragraph as though fully set forth herein.

75.     Pursuant to Wis. Stat. § 823.01, the City brings this action to recover damages and abate the public nuisance described above, as to both Defendants.

---

[68] *Id.* An insured vehicle year is equal to one vehicle insured for one year.

76.     Under Wisconsin law, a public nuisance is an unreasonable interference with a right common to the general public. A public nuisance includes a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community, or which interferes with the public health, the public safety, the public peace, the public comfort, or the public convenience. If the public is injured in its civil or property rights or privileges or in respect to public health to any degree, that is sufficient to constitute a public nuisance.

77.     Defendants—through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft—have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public. In addition, each Defendant knows, or has reason to know, that its conduct has a significant effect upon public rights and endangers the safety of the general public in the City of Madison.

78.     Madison and its residents have a common right to be free from such conduct that interferes with the peaceful use of public streets, sidewalks, commerce, travel, and the quality of daily life.

79.     Defendants have endangered and harmed the public, undermined law enforcement efforts to deter vehicle theft, and otherwise diverted scarce law enforcement resources.

80.     Defendants' conduct has directly caused a severe disruption of the public welfare, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

81.     Further, Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares.

82.     Defendants' conduct has affected and continues to affect a substantial number of people within Madison's community and is likely to continue causing significant harm.

83.     The nuisance created by Defendants' conduct is abatable.

84.     At all relevant times, Defendants, have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of other violent crimes in the State of Wisconsin and the City of Madison.

85.     At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation

of immobilizers in their own vehicles has considerably deterrent effects on the rate of car theft.

86.     Defendants knew or had reason to know that their conduct has caused an increase in vehicle theft that has had, and will continue to have, a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in Madison.

87.     Defendants' conduct has affected and continues to affect a substantial number of people within Madison's community and is likely to continue causing significant harm.

88.     At a minimum, Defendants knew or had reason to know that this interference with public safety was substantially certain to result from their conduct.

89.     By intentionally foregoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Madison.

90.     In the alternative, the conduct underlying the public nuisance alleged herein was negligent. Hyundai and Kia could have avoided all this by installing engine immobilizers at the time of manufacture for as little as $200 per device. Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct, and Defendants' conduct was a factual and proximate

cause, of the injuries, harm, and economic losses that the City has suffered and will continue to suffer.

91.    As a result of Defendants' conduct, Madison has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services. Madison will continue to incur such damages until the nuisance is abated. These damages are particular to the City and are different in kind and degree to the harms suffered by Wisconsin residents at large.

92.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Madison alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

93.    Madison requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for damages suffered as a result of the public nuisance; and injunctive relief.

## COUNT TWO — NEGLIGENCE

94.    The City of Madison incorporates each preceding paragraph as though set forth fully herein.

95.     At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably easy to steal.

96.     Defendants owed Madison a duty to not expose the City to an unreasonable risk of harm.

97.     At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

98.     Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Madison's injuries and thus created a dangerous and unreasonable risk of injury to Madison. Defendants were therefore in the best position to protect Madison against the foreseeable rise in the theft of Hyundai and Kia vehicles.

99.     At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause Madison's injuries, as FMVSS 114 requires automobiles to have a

starting system which, whenever the key is removed from the starting system prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system." As alleged *supra*, most carmakers in the United States satisfy FMVSS through the use of an engine immobilizer.

100.   As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

101.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Madison.

102.   Defendants knew and/or should have known that it was foreseeable that Madison would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

103.   Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

104.   Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Madison suffered, and will continue to suffer.

105.   Defendants acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

106.   Madison's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

107.   As a proximate result of Defendants' wrongful acts and omissions, Madison has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in Madison's community.

108.   Defendants engaged in conduct, as described above, that constituted reckless disregard of Madison's rights, being fully aware of the probable

dangerous consequences of the conduct and deliberately failing to avoid those consequences.

109.   Defendants' conduct constituting reckless disregard of Madison's rights, was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard of Madison's rights and adopted or approved that conduct after it occurred.

110.   Madison has incurred, and will continue to incur, expenditures over and above its ordinary public services.

111.   The tortious conduct of each Defendant was a substantial factor in producing harm to Madison.

112.   Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Madison's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

113.   Madison is without fault, and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

## VI.   PRAYER FOR RELIEF

114.   Entering an Order that the conduct alleged herein constitutes a public nuisance under Wisconsin law;

115.   Entering an Order that Defendants are jointly and severally liable;

116.   Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

117.   Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

118.   Awarding equitable relief to fund automobile theft prevention;

119.   Awarding actual and compensatory damages;

120.   Awarding punitive damages;

121.   Awarding reasonable attorneys' fees and costs of suit;

122.   Awarding pre-judgment and post-judgment interest; and

123.   Such other and further relief as the Court deems just and proper under the circumstances.

## VII.   JURY TRIAL DEMANDED

124.   Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 27th day of March, 2023.

CITY OF MADISON
By Counsel

Michael Haas (*pro hac vice forthcoming*)
City Attorney

By */s/ Michael Haas*
    Michael Haas
    210 Martin Luther King Jr. Blvd
    Room 401
    Madison, WI 53703
    Telephone: (608) 266-6598
    Fax: (608) 267-8715
    mhaas@cityofmadison.gov

    Trial Counsel for City of Madison

KELLER ROHRBACK L.L.P.

By */s/ Dean Kawamoto*
    Dean Kawamoto, CSB #232032
    Gretchen Freeman Cappio (*pro hac vice forthcoming*)
    Derek W. Loeser (*pro hac vice forthcoming*)
    Ryan McDevitt (*pro hac vice forthcoming*)
    Alison Gaffney (*pro hac vice forthcoming*)
    Garrett Heilman (*pro hac vice forthcoming*)
    Zachary Gussin (*pro hac vice forthcoming*)
    Kylie Fisher (*pro hac vice forthcoming*)
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    Telephone: (206) 623-1900
    Fax: (206) 623-3385
    dkawamoto@kellerrohrback.com
    gcappio@kellerrohrback.com
    dloeser@kellerrohrback.com
    rmcdevitt@kellerrohrback.com
    agaffney@kellerrohrback.com

42

gheilman@kellerrohrback.com
zgussin@kellerrohrback.com
kfisher@kellerrohrback.com

MWH LAW GROUP L.L.P.


By /s/ Emery K. Harlan
    Emery K. Harlan (*pro hac vice forthcoming*)
    Warren E. Buliox (*pro hac vice forthcoming*)
    735 North Water Street, Suite 610
    Milwaukee, WI, 53202
    Telephone: (414) 436-0353
    Fax: (414) 436-0354
    emery.harlan@mwhlawgroup.com
    warren.buliox@mwhlawgroup.com

*Counsel for Plaintiff City of Madison*