# EXHIBIT 2

Dean Kawamoto, CSB # 232032
dkawamoto@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of Cincinnati*

(additional counsel listed below)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF CINCINNATI,<br><br>                   Plaintiff,<br><br>    v.<br><br>HYUNDAI MOTOR AMERICA and<br>KIA AMERICA, INC.,<br><br>                  Defendants. | No. 2:23-cv-01750<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I. INTRODUCTION……………………………………………………1

II. JURISDICTION AND VENUE ...................................................5

III. PARTIES .................................................................................6

    A. Plaintiff ..........................................................................6

    B. Defendants ......................................................................6

IV. THE KIA HYUNDAI THEFT WAVE ........................................7

    A. Without Immobilizers, Defendants' Vehicles Are Sitting Ducks..............................................................................7

    B. Car Thefts Imperil Public Safety ...................................11

    C. Measures to Prevent Vehicle Theft Have Existed for Over a Century............................................................22

    D. The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent ....................................................................27

    E. Defendants' Deviation from the Industry Standard .........................29

V. CAUSES OF ACTION ...........................................................31

COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE ................................................................................31

COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE ................................................................................36

COUNT THREE — NEGLIGENCE ................................................38

VI. PRAYER FOR RELIEF...........................................................42

VII. JURY TRIAL DEMANDED ..................................................43

# I.  **INTRODUCTION**

1.      There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal both protects property and protects the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers cannot be bothered to include standard anti-theft technology in their cars.

2.      The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most cars, the ignition key emits a radio signal that prompts a computer to disengage an immobilizer device and allows the car to move when the key is present. This safety feature, a vehicle immobilizer, is present in the vast majority of cars. But recent Hyundai and Kia models are a glaring exception.

3.      Between 2011 and 2021, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Defendants Hyundai Motor America and Kia America, Inc. (collectively "Defendants") failed to keep up with the times. As a result, TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing common anti-theft technology have resulted in an

epidemic of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly in the City of Cincinnati, where the police department is under considerable staffing stress.

4.      In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle immobilizers in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have decided to trade public safety for profits.

5.      The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *26%* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *96%* of vehicles from all other manufacturers.[1]

---

[1] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

6.      Hyundai's and Kia's decisions to put cost-savings and profits over public safety have had devastating consequences for the City of Cincinnati and its residents, as in other cities. The failure of Defendants to install an industry-standard anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

7.      This epidemic started in Milwaukee before spreading nationwide.[2] By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.

8.      The same trend is evident in Cincinnati, where, for example, Kia and Hyundai vehicles accounted for 72% of reported auto thefts or attempts in February of 2023, compared to only 8% in February of 2022.

---

[2] Brook Endale, *News*, *Police warn of rise in car thefts in Kia and, Hyundai models caused by possible design flaw?* THE CINCINNATI ENQUIRER (June 30, 2022, 6:42 PM), https://www.cincinnati.com/story/news/2022/06/28/police-report-rise-car-thefts-certain-car-brands/7762399001/.



## Auto Theft Spike
(attempted and completed)

* Data labels note percent of auto thefts that were KIA or Hyundai

9. Vehicle theft is not only a property crime affecting vehicle owners, it also presents a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn results in injuries and death. It results in increased violence, as many car owners are unlikely to part with their vehicles willingly. It consumes scarce law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

10. The skyrocketing rate of vehicle theft in Cincinnati has drastically affected city and police resources. Cincinnati residents are subjected to increasingly dangerous conditions on their city streets, as car thieves (many of them teenagers) taking advantage of Hyundai's and Kia's failures engage in reckless driving, endangering Cincinnati residents and their property.

11.     Defendants' conduct has created a public nuisance that could have been avoided, had they simply followed industry-wide standards and installed immobilizer devices in all their vehicles.

12.     To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including Cincinnati, to divert funds and risk officer safety to combat the rising burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the Parties. The City of Cincinnati is a home-rule municipal corporation and regarded as a citizen of the state of Ohio, for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

14.     This court has general personal jurisdiction over Defendants as they are incorporated and headquartered in the state of California.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are citizens of California, incorporated in this State with headquarters located in this district.

### III.    PARTIES

#### A.    Plaintiff

16.    Plaintiff, the City of Cincinnati (the "City" or "Cincinnati") is a home-rule municipal corporation chartered under Article XVIII, Section 7 of the Ohio Constitution and acting pursuant to the Charter of the City of Cincinnati, through its City Solicitor. The City is located in Hamilton County, Ohio, and has approximately 310,000 residents. The City's principal offices are located at 801 Plum Street, Cincinnati, Ohio, 45202.

#### B.    Defendants

17.    Defendant **Hyundai Motor America** ("Hyundai"), is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

18.    Defendant **Kia America, Inc.** ("Kia"), is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia markets, leases, warrants, and

oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

## IV.    THE KIA HYUNDAI THEFT WAVE

### A.    Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

19.    As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing a vehicle immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and belief, Defendants designed, manufactured, distributed, and sold the following automobile models ("Susceptible Vehicles") without engine immobilizers between 2011 and 2021: Hyundai Accent, Elantra, Kona, Palisade, Santa Cruz, Santa Fe, Sonata, Tucson, Veloster, and Venue; and the Kia Cadenza, Forte, K900, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As would-be car thieves learned of this susceptibility, the incidence of theft for susceptible models increased, relative to other models, from 2015 to 2020.[3]

---

[3] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf;**Error! Hyperlink reference not valid.** *America's 10 Most Stolen Vehicles*, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; *and*

20. However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal susceptible Kias and Hyundais.[4] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[5] As the videos detailed, an individual need only remove the plastic cowl under the steering column and use a USB cable to start these cars.

21. What followed was all too predictable: thefts of Kias and Hyundais skyrocketed.[6] In the first half of 2021, the number of stolen Kias and Hyundais increased by more than 30 and 15 times when compared to the same period in 2020 in Milwaukee.[7] This dramatic increase was unique to Kia and Hyundais, which

---

*America's 10 Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.

[4] Greg Rosalsky, *Planet Money, Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

[5] Chris DiLella & Andrea Day, *Autos, TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[6] *Investigative, Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, INSIDE EDITION (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[7] Sean Tucker, *General, Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, KELLEY BLUE BOOK (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

represented 66% of all cars stolen in that period, compared to only 6% of stolen

cars in 2019.[8] This trend then spread nationwide.

22.     By July of 2022, the Cincinnati Police Department was seeing a

considerable increase in auto theft.[9] This increase was directly attributable to

Hyundai and Kia theft. According to the City's data on attempted and completed

auto theft, when comparing 2021 to 2022 there was a 416.6% increase in Kia and

Hyundai theft. During the same time period, there was a 3.6% *decrease* in auto

theft for all other manufacturers. This trend has persisted into 2023, and 72% of

attempted or completed auto thefts in Cincinnati involved a Kia or Hyundai. Up

until July of 2022, Kia and Hyundai consistently combined to account for less than

20 attempted or completed thefts per month. In July, that number spiked to 150,

and in February of 2023 that number approached 250, a more than 1,000% increase

over the historical norm.

---

[8] Matt Posky, *News Blog*, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* THE TRUTH ABOUT CARS (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971; Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021, 4:29 PM), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

[9] WVXU News, *Cincinnati 2022 Crime Statistics*, SCRIBD, https://www.scribd.com/document/624340564/Cincinnati-2022-Crime-Statistics.





**Count of Auto Thefts (Top 5 Manufacturers)**
January 1, 2020 - February 28, 2023

1255% increase
(Apr 22 = 11, Jul 22 = 149)

CHEVROLET    FORD    HONDA    HYUNDAI    KIA

23.     The susceptibility of Defendants' vehicles to theft enabled this spiraling epidemic. Defendants' choice to deviate from the industry standard of utilizing engine immobilizers, placing profits over safety, was both a proximate and but-for cause of this outbreak. As a police sergeant described the problem, Defendants' cars are simply too easy to steal.[10] This presents a risk not only for property damage, but to public safety, as thieves often engage in reckless driving, as well as other dangerous criminal conduct, including robbery and firearm thefts, as Kias and Hyundais have been targeted by thieves seeking weapons (and other

---

[10] Rebecca Klopf, *MPD: Hyundai and Kia vehicles too easy to steal, leading to spike in car thefts,* TMJ 4 (Feb. 3, 2021, 4:40 PM), https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts.

valuables) that might have been left in patrons' vehicles.[11] In 2022, six firearms were reported stolen in an auto theft involving a Hyundai or Kia, compared to two such thefts in the prior two years combined.



## B.    Car Thefts Imperil Public Safety

24.    Car thefts imperil public safety. By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

---

[11] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland Security was stolen in broad daylight. *See* Jim Piwowarczyk, *Department of Homeland Security Hyundai Stolen in Milwaukee, Contained Rifle & Body Armor*, WISCONSIN RIGHT NOW (Apr. 17, 2022), https://www.wisconsinrightnow.com/homeland-security-hyundai/.

25.     This is the conclusion drawn by the National Highway Traffic Safety Administration ("NHTSA"). Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety Standard 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[12] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[13] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[14]

26.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

---

[12] *See* 33 Fed. Reg. 6,471, (Apr. 27, 1968).
[13] *Id.*
[14] *Id.*

27.     Reckless driving threatens the comfortable enjoyment of life, health, and safety of the public within Cincinnati. This is particularly true with the current crime wave. Distinct from many instances of car theft, where the object is converting the stolen vehicle, the viral "Kia challenge" typically involves joy riding and then abandoning the stolen vehicles. Far from surreptitiously delivering a car to a chop shop under cover of night, the social media phenomenon, made possible by Defendants' unsecure vehicles, led to youth posting videos of reckless driving during busy hours of the day, abandoning the vehicles after collisions.

28.     In 2020, stolen Hyundai and Kias were involved in 15 crashes. In 2021, 13 such crashes occurred. In the first half of 2022, there were four such crashes, before a meteoric jump to 21 crashes involving stolen Kia and Hyundais in the second half of 2022. Already, there have been 12 crashes involving stolen Kia and Hyundais in 2023, nearly as many as in all of 2021.



29.     Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[15]

30.     In Cincinnati, this phenomenon has already led to extreme and tragic accidents. On July 8, 2022, at approximately 6:20 p.m., a stolen 2014 Kia Rio was being operated in Queensgate by a 13-year-old.[16] The youth was attempting to turn onto Kenner Street from Dalton Avenue, when he lost control of the vehicle and crashed into metal poles and a transformer box.[17]  A 12-year-old passenger was seriously injured in the accident.

---

[15] *See e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; @monloww__, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738;  ;  @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; *and* @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

[16] Luke Jones, *Teen who crashed in car with 13-year-old driver: "We was running from the police,"* LOCAL 12 (July 12, 2022, 7:27 PM), https://local12.com/news/local/teens-joyride-police-chase-pursuit-crash-west-end-stolen-car-kennedy-heights-injury-cincinnati-local-12-wkrc-tristate-ohio-kentucky-indiana-crime-news.

[17] WKRC, *Police, 13-year-old driver crashes seriously injuring 12-year-old passenger*, LOCAL 12 (July 11, 2022, 9:24 AM), https://local12.com/news/local/police-13-year-old-driver-crashes-seriously-injuring-12-year-old-passenger-cincinnati-ohio-dalton-avenue-crash-control-kia-rio-hospital-investigation-speed.

31.     On August 28, 2021, a 14-year-old driving a stolen Hyundai Elantra crashed when exiting I-71 at Ridge Road, in Cincinnati.[18] The stolen car crashed into a pole, hitting a tree before coming to a rest on its side. The 14-year-old driver was partially ejected from the vehicle and pronounced dead at the scene, and a 13-year-old passenger suffered injuries.

32.     Around this same time, a local woman in Cincinnati discovered that her 2019 Kia Forte was stolen outside of her apartment building—the car was subsequently wrecked and abandoned.[19] Contents inside the car, including the car seat for her small child, were gone.

33.     On February 8, 2023, a police chase involving a stolen Hyundai ended in a crash in College Hill, damaging a six-foot-tall brick pillar and fence.[20]



---

[18] Kaitlin Lewis, *News*, *Hamilton County Sheriff: one dead in Saturday morning crash involving two juveniles*, THE CINCINNATI ENQUIRER (Aug. 28, 2021, 4:23 PM), https://www.cincinnati.com/story/news/2021/08/28/hamilton-county-sheriff-one-dead-car-crash-involving-two-juveniles/5637645001/.

[19] Local 12, *'Kia Boys' stolen car trend hits one local woman who wonders if she'll ever get hers back*, YouTube (Aug. 24, 2022), https://www.youtube.com/watch?v=LsBNZPCtJWk.

[20] Jennifer Edwards Baker, *Police chase ends in crash that closes W. North Bend Road*, FOX 19 (Feb. 8, 2023, 5:07 AM), https://www.fox19.com/2023/02/08/police-chase-ends-crash-that-closes-w-north-bend-road/.

34.     Another example of this all-too-common tragedy occurred in Milwaukee in June 2021, when a sixteen-year-old was killed after he stole a Kia Sportage and collided with another car.[21] His two twelve-year-old accomplices were also seriously injured, as were three passengers in the car that he struck. The images and dashcam footage[22] of this tragedy show how the epidemic of vehicle theft imperils the public.

35.     Yet another tragic example occurred in Buffalo in October 2022, when a 16-year-old driving a stolen Kia caused a high-speed rollover crash that killed four teenage passengers.[23]



---

[21] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN (June 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

[22] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*, WISN (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

[23] Carolyn Thompson, *Teenage driver charged in crash of stolen car that killed 4*, THE SEATTLE TIMES (Nov. 22, 2022, 8:32 PM), https://www.seattletimes.com/business/teenage-driver-charged-in-crash-of-stolen-car-that-killed-4/.

36.     A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man reported that a Hyundai Sonata struck his car mirror and did not stop. When the man followed the Hyundai, the driver and passenger of the Hyundai got out with guns and began shooting at him.[24] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[25]

37.     This risk was also tragically demonstrated in Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed at the scene.[26]

38.     Further, the act of car theft creates a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into a car and a 54-year-old pedestrian.[27] Both cars careened into a nearby building, which collapsed on top of the vehicles

---

[24] Cory Shaffer, *Courts and Justice*, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, CLEVELAND.COM, (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.
[25] *Id.*
[26] Michael Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021, 10:06 PM), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.
[27] Dan Belson, *Crime, Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, THE BALTIMORE SUN (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html.

and the pedestrian.[28] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[29]



39.     Cincinnati has seen an especially high rate of Hyundai and Kia vehicle thefts, has incurred costs associated with these thefts, and has been unable to abate the nuisance in the absence of action by Defendants. Cincinnati has been forced to respond to this surge of stolen susceptible Kia and Hyundai vehicles, expending extra time and resources taking reports and collecting evidence; providing emergency and medical services; processing, prosecuting, and rehabilitating offenders; and educating the public about this nuisance. The amount of time spent responding to rampant thefts puts additional stress on the City of Cincinnati's limited resources.

---

[28] *Id.*
[29] *Id.*

40.     As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities including Cincinnati, thereby increasing the potential number of uninsured motorists on the road.[30]

41.     To date, Defendants' responses have shown a continued prioritization of profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only offering wheel locks for municipalities to distribute.[31] Unfortunately, the wheel locks are not effective; residents who use them have still had their cars stolen, and in some instances, connected to shootings.[32]

42.     More recently, Hyundai has begun rolling out a "software update" rather than installing immobilizers.[33] Kia has planned a similar software update,

---

[30] Peter Valdes-Dapena, *CNN Business*, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Kendall Hyde, *Some insurance companies look to stop insuring select Kia, Hyundai models*, FOX 19 (Feb. 14, 2023, 2:52 PM), https://www.fox19.com/story/news/2021/02/14/some-insurance-companies-look-stop-insuring-select-kia-hyundai-models/.

[31] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, MILWAUKEE JOURNAL SENTINEL (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[32] Ashley Sears, *Crime and Public Safety*, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX6NOW.COM (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice.

[33] *News*, *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

yet this software-only approach is too little, too late, and many susceptible vehicles will not even be included in the update.[34]

43.     Upon information and belief, rather than install an immobilizer, the software update will double the length of the theft alarm sound and add a new logic check to the vehicles' on-board computers. This update is a late half-measure at best and will be useless in many common scenarios such as parking and waiting for a passenger to run an errand or picking up a child from after-school activities. Unless the doors were recently unlocked using a key fob, the Engine Control Unit will not turn on. This software-based approach is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability, not to mention public safety.

44.     The rollout of the software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that Cincinnati has incurred and continues to incur. The update's efficacy has not been tested in the real world,[35] and no one knows how many consumers will even opt in

---

[34] *Id.*

[35] Already, Susceptible Vehicles have been stolen after receiving the update. *See* Jsmith4523, Reddit (Feb. 22, 2023, 4:52 PM), https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_elantra_se_was_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name=iossmf. Additional anecdotes suggest that the update is not reliable. *See* MaximumLongjumping31, Reddit (Mar. 3, 2023, 5:12 AM),

to get it. But there are facial defects with this approach. Upon information and belief, this update will not cover all Susceptible Vehicles—even newer models. For vehicles not covered by the update, Defendants are offering nothing more than wheel locks, or rebates for already purchased wheel locks.

45.     What's more, the work-around substantially reduces the usability of the vehicles. This logic could be triggered by letting a passenger out of a car to run an errand and then starting the car again. In addition, susceptible vehicle owners have already experienced issues with after-market remote start systems, rendering the vehicles functionally inoperable. As one owner recently posted:

> "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[36]

46.     Prior to this software update, Hyundai callously turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[37] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the

---

https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrade_my_terrible_experience/.

[36] Fungiinterezt, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new.

[37] Taryn Phaneuf, *Insurance*, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, NERD WALLET (Jan. 26, 2023), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

cars were sold, Defendants could have implemented a mandatory recall.  Instead, Hyundai chose to make money off a crime wave it caused.

47.     By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

### C.     Measures to Prevent Vehicle Theft Have Existed for Over a Century

48.     Since the dawn of gasoline-powered automobiles at the turn of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[38]

49.     Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[39]

---

[38] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[39] *Id.* at ¶¶ 14–20.

50.     Evans and Birkenbeuel's immobilizer/alarm system consisted of a 3x3 switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"**

51.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*,

which made the interstate transportation of stolen vehicles a federal crime. The law

passed, in part, to respond to the growing number of automobile thefts around the

country, especially in midwestern cities.

52.    As time passed and technology advanced, the United States pursued

further efforts to promulgate vehicle safety standards.

53.    In 1966, Congress passed the National Traffic and Motor Vehicle

Safety Act (the "Safety Act"), with the aim of administering new motor vehicle

and traffic safety standards.[40] Administration of the Safety Act was overseen by the

newly created Department of Transportation through its sub-agency: NHTSA, f/k/a

the National Traffic Safety Bureau.

54.    Pursuant to its statutory authority under the Safety Act, NHTSA

promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among

these standards, FMVSS 114[41] requires minimum theft-protection standards for

nearly all passenger vehicles in the United States:

> S1. *Scope*. This standard specifies vehicle performance
> requirements intended to reduce the incident of crashes
> resulting from theft and accidental rollaway of motor
> vehicles
>
> S2. *Purpose*. The purpose of this standard is to decrease
> the likelihood that a vehicle is stolen, or accidentally set in
> motion.

---

[40] P.L. 89–563, 80 Stat. 718.
[41] 49 C.F.R. § 571.114.

S3. *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.
. . .

S5.1 *Theft Protection*.
S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
(a)    The normal activation of the vehicle's engine or motor; and
(b)    Either steering, or forward self-mobility, of the vehicle, or both.

. . .

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

55.    The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[42]

56.    As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[43] Accordingly, NHTSA recognized that "a reduction

---

[42] 33 Fed. Reg. 6,471 (April 27, 1968).
[43] *Id.*

of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[44] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[45]

57.     An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[46] The proposed software update does not appear to satisfy this requirement—as it is not linked to an attempt to start the vehicle without the correct key—and the absence of *any* system not only violates this standard, it created the public nuisance of rampant car theft in Cincinnati.

---

[44] *Id.*

[45] 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* 33 Fed. Reg. 6,471 (Apr. 27, 1968).

[46] NHTSA Interpretation GF005229-2 (Sept. 24, 2004).

### D.    The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

58.    In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[47] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring."



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**[48]

59.    To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[49] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer

---

[47] Anthony Dixon & Graham Farrell, Age-period-cohort effects in half a century of motor vehicle theft in the United States, 9 CRIME SCIENCE 17, 1, 3 (2020).

[48] *Id.* at 2.

[49] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[50]

60.   In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

61.   Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[51]

62.   The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[52] Similar mandates soon followed in Australia, New Zealand, and Canada.

63.   As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers

---

[50] *Id.*

[51] *Id.*

[52] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1, (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

"lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[53]

### E.      Defendants' Deviation from the Industry Standard

64.      At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

65.      Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[54] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[55] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[56]

66.      Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only

---

[53] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

[54] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[55] *Id.*

[56] *Id.*

26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[57]

67.    The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[58]

68.    Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. In March 2007, Hyundai requested an exemption from particular NHTSA vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford [immobilizer] devices" in reducing vehicle theft.[59] Yet, until the last year or so, Hyundai and Kia only offered immobilizers in their premium, more expensive, model lines. This decision only compounds the harms on low-income communities.[60] Those without

---

[57] *Id.*

[58] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Press Release*, *Over 50 years of progress: the history of Hyundai* HYUNDAI.NEWS (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[59] 72 Fed. Reg. 39,661–39,662 (July 19, 2007); *see also* 75 Fed. Reg. 1,447 (Jan. 11, 2010) (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendants' representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[60] Tom Krisher, *Tech*, *There's a hack that makes stealing Hyundai and Kia cars easier—and thieves are taking note*, FORTUNE (Sept. 22, 2022, 10:44 AM), https://fortune.com/2022/09/22/hyundai-kia-cars-stealing-hack-thieves/ (HLDI Senior VP Matt

resources to afford such models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered vehicle.

69.     Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2021, in contrast to all other car manufacturers having installed immobilizers in 96% of their vehicles, has led to a reasonably foreseeable car theft epidemic that is plaguing Cincinnati.

## V.     CAUSES OF ACTION

### COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE

70.     The City incorporates each preceding paragraph as though set forth fully herein.

71.     A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

72.     Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the safety, welfare, peace, comfort, and sense of security of the City and its residents. *See* Restatement (Second) of Torts § 821B.

---

Moore notes that "Many of the vulnerable Hyundais and Kias are often bought by lower-income people" because those cars "are relatively inexpensive vehicles when purchased new[.]").

73.     Defendants have created and maintained a public nuisance by manufacturing and distributing automobiles that are dangerously susceptible to theft, thus interfering with the public safety, health, and welfare in Cincinnati. Cincinnati and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

74.     Defendants' conduct has directly caused a severe disruption of public order and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

75.     Further, Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares. Defendants' conduct has created an unlawful obstruction or impediment to the flow of municipal transit vehicles and public traffic.

76.     The public nuisance is an *absolute* public nuisance because Defendants' nuisance creating conduct was intentional and violated FMVSS 114, which established specific legal requirements for the protection of the public.

77.     FMVSS 114 requires automobiles to have a starting system which, whenever the key is removed from the starting system prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such

that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system."

78.    As alleged above, nearly all cars in the United States satisfy FMVSS 114 through the installation of an engine immobilizer. Defendants' failure to include an engine immobilizer, or a substitute system capable of satisfying FMVSS 114, violates that law.

79.    Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the public welfare, safety, peace, comfort, and convenience of Cincinnati and Cincinnati's residents.

80.    Defendants had initial control over the manufacturing of the Susceptible Vehicles and their shipping of automobiles to Cincinnati. Defendants continued to maintain control over the conduct through the ability, and failure, to implement a recall to remediate the susceptibility.

81.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Cincinnati.

82.    Based on Defendants' intentional and unreasonable actions and their special position in understanding the decades of literature supporting the deterrent effects of engine immobilizers, without Defendants' actions, vehicle theft in Cincinnati would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

83.     The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to Cincinnati and Cincinnati's community. The harm inflicted outweighs any offsetting benefit.

84.     As a direct and proximate result of Defendants' conduct, Cincinnati has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, youth rehabilitative services, and other services.

85.     As a direct and proximate result of Defendants' tortious conduct, Cincinnati has suffered and will continue to suffer stigma damage and damage to its proprietary interests, including reduced tax revenues attributable to property value declines caused by increases in property crime rates and stigma damage.

86.     The nuisance created by Defendants' conduct is abatable.

87.     Defendants' conduct has affected and continues to affect Cincinnati's community, and Cincinnati will continue to incur economic losses until the nuisance is abated.

88.     Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that the interference with public safety caused by easier vehicle theft was substantially certain to result from

their conduct. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%.

89.     By intentionally foregoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Cincinnati.

90.     Hyundai and Kia could have avoided all this by installing engine immobilizers at the time of manufacture for as little as $200 per device.

91.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

92.     Cincinnati has incurred expenditures for special programs over and above its ordinary public services.

93.     Cincinnati has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by Cincinnati.

94.     Cincinnati requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and

injunctive relief. Cincinnati does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

### COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE

95.    The City of Cincinnati incorporates each preceding paragraph as though fully set forth herein.

96.    Defendants have created and maintained a public nuisance by manufacturing and distributing automobiles that are dangerously susceptible to theft, thus interfering with the public health, welfare, and safety in Cincinnati. Cincinnati and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

97.    The public nuisance is a *qualified* public nuisance because Defendants negligently engaged in conduct or omissions which endanger or injury the property, health, safety, or comfort of the public in Cincinnati.

98.    Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, sale, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe and equipped with industry-standard anti-theft measures.

99.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

100.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Cincinnati's injuries and thus created a dangerous and unreasonable risk of injury to Cincinnati.

101.    As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, sale, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

102.    As a proximate result of Defendants' wrongful acts and omissions, Cincinnati has incurred economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services. The City does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT THREE — NEGLIGENCE

103.   The City of Cincinnati incorporates each preceding paragraph as though set forth fully herein.

104.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, sale, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably capable of being engine-activated and operated without a key in the starting system.

105.   Defendants owed Cincinnati a duty to not expose the City to an unreasonable risk of harm.

106.   Defendants' duties were preexisting.

107.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

108.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Cincinnati's injuries and thus created a dangerous and unreasonable risk of injury to Cincinnati.

109.    As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, sale, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

110.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Cincinnati.

111.    Defendants knew and/or should have known that it was foreseeable that Cincinnati would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacture and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

112.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

113.    Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the economic losses that Cincinnati has suffered, and will continue to suffer.

114.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

115.   Cincinnati's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

116.   As a proximate result of Defendants' wrongful acts and omissions, Cincinnati has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to address the consequences of Defendants' conduct in Cincinnati's community.

117.   Defendants engaged in conduct, as described above, that constituted reckless disregard of Cincinnati's rights, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

118.   Defendants' conduct constituting reckless disregard of Cincinnati's rights, was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard of Cincinnati's rights and adopted or approved that conduct after it occurred.

119.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Cincinnati alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

120.    Cincinnati has incurred expenditures for special programs over and above its ordinary public services.

121.    Cincinnati has suffered an indivisible injury as a result of the tortious conduct of Defendants.

122.    The tortious conduct of each Defendant was a substantial factor in producing harm to Cincinnati.

123.    Defendants made conscious decisions not to warn or inform the unsuspecting public, including Cincinnati's community or Cincinnati. Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Cincinnati's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

124.    Cincinnati is without fault and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacture and distribution of their vehicles.

125.     Cincinnati asserts this Cause of Action as a common law tort claim for negligence and not as a "product liability claim" as defined in R.C. § 2307.71. Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## VI.     PRAYER FOR RELIEF

126.     Entering an Order that the conduct alleged herein constitutes a public nuisance under Ohio law;

127.     Entering an Order that Defendants are jointly and severally liable;

128.     Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

129.     Enjoining Defendants from engaging in further actions causing, maintaining, or contributing to the public nuisance as described herein;

130.     Awarding equitable relief to fund automobile theft prevention;

131.     Awarding actual and compensatory damages;

132.     Awarding reasonable attorneys' fees and costs of suit;

133.     Awarding pre-judgment and post-judgment interest;

134.     Entering an order for remedial relief on the City's claims against Defendants; and

135.     Such other and further relief as the Court deems just and proper under the circumstances.

# VII. JURY TRIAL DEMANDED

136.   Plaintiff hereby demands a trial by jury.


RESPECTFULLY SUBMITTED this 8th day of March, 2023.


CITY OF CINCINNATI
By Counsel

Emily Smart Woerner (*pro hac vice forthcoming*)
City Solicitor

By */s/ Mark Manning*
Mark Manning (*pro hac vice forthcoming)*
Chief Counsel
Jon Vogt (*pro hac vice forthcoming)*
Assistant City Solicitor
801 Plum Street, Room 214
Cincinnati, Ohio 45202
Phone: (513) 352-4576
mark.manning@cincinnati-oh.gov
jon.vogt@cincinnati-oh.gov

Trial Counsel for City of Cincinnati

KELLER ROHRBACK L.L.P.

By */s/ Dean Kawamoto*
Dean Kawamoto, CSB #232032
Gretchen Freeman Cappio (*pro hac vice forthcoming*)
Derek W. Loeser (*pro hac vice forthcoming*)
Ryan McDevitt (*pro hac vice forthcoming*)
Alison S. Gaffney (*pro hac vice forthcoming*)
Zachary Gussin (*pro hac vice forthcoming*)
Kylie N. Fisher (*pro hac vice forthcoming*)

1201 Third Avenue, Suite 3200
Seattle, WA 98101
dkawamoto@kellerrohrback.com
gcappio@kellerrohrback.com
dloeser@kellerrohrback.com
rmcdevitt@kellerrohrback.com
agaffney@kellerrohrback.com
zgussin@kellerrohrback.com
kfisher@kellerrohrback.com

*Counsel for Plaintiff City of Cincinnati*