# EXHIBIT 3

Dean Kawamoto, CSB # 232032
dkawamoto@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of Cleveland*

(additional counsel listed below)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF CLEVELAND, | |
| Plaintiff, | No. 2:23-cv-01713 |
| v. | |
| HYUNDAI MOTOR AMERICA and KIA AMERICA, INC., | COMPLAINT |
| Defendants. | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................1

II.     JURISDICTION AND VENUE.............................................................. 4

III.    PARTIES ............................................................................................... 5

        A.      Plaintiff.................................................................................. 5

        B.      Defendants ............................................................................. 6

IV.     THE KIA HYUNDAI THEFT WAVE .................................................. 6

        A.      Without Immobilizers, Defendants' Vehicles Are Sitting Ducks ....................... 6

        B.      Car Thefts Imperil Public Safety ....................................... 10

        C.      Measures to Prevent Vehicle Theft Have Existed for Over a Century ...................................... 22

        D.      The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent .................................. 26

        E.      Defendants' Deviation from the Industry Standard......................................... 28

V.      CAUSES OF ACTION......................................................................... 31

COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE ............................... 31

COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE............................. 35

COUNT THREE — NEGLIGENCE................................................................. 37

VI.     PRAYER FOR RELIEF ....................................................................... 42

VII.    JURY TRIAL DEMANDED ................................................................ 42

i

# I.   **INTRODUCTION**

1.     There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal both protects property and protects the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers cannot be bothered to include standard anti-theft technology in their cars.

2.     The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most cars, the ignition key emits a radio signal that prompts a computer to disengage an immobilizer device and allows the car to move when the key is present. But recent Hyundai and Kia models are a glaring exception.

3.     Between 2011 and 2021, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Defendants Hyundai Motor America and Kia America, Inc. (collectively, "Defendants") failed to keep up with the times. As a result, TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a USB cable. Hyundai and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing common anti-theft technology have resulted in an epidemic of thefts. This vehicular crime wave has had a significant impact on law

enforcement operations, emergency services, and public safety, particularly in the City of Cleveland, where the police department is under considerable staffing stress.

4.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle immobilizers in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have decided to trade public safety for profits.

5.     The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *26 percent* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *96 percent* of vehicles from all other manufacturers.[1]

---

[1] "Hyundai and Kia theft losses," 38 HLDI BULLETIN 28 (December 2021), available at: https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

6.     Hyundai's and Kia's decisions to put cost-savings and profits over public safety have had devastating consequences for the City of Cleveland and its residents, as in other cities. The failure of Defendants to install an industry-standard anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

7.     This epidemic started in Milwaukee before spreading nationwide.[2] By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.

8.     The same trend is evident in Cleveland, where, for example, there were 475 thefts of Hyundai and Kia vehicles in December 2022 alone.[3] For January 2023, data from the Cleveland Police Department reflect a 622.22% increase in Hyundai and Kia vehicle thefts, compared to January 2022.[4]

9.     Vehicle theft is not only a property crime affecting vehicle owners, but may also present a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn results in injuries and death. It results in

[2] "Police warn of rise in car thefts of two particular car brands. Is yours one of them?" The Cleveland Enquirer (June 28, 2022), available at: https://www.Cleveland.com/story/news/2022/06/28/police-report-rise-car-thefts-certain-car-brands/7762399001/.

[3] *See* Exh. A.

[4] *Id.*

3

increased violence, as many car owners are unlikely to part with their vehicles willingly. It consumes scarce law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

10.     The skyrocketing rate of vehicle theft in Cleveland has drastically affected city and police resources. Cleveland residents are subjected to increasingly dangerous conditions on their city streets, as car thieves (many of them teenagers) taking advantage of Hyundai's and Kia's failures engage in reckless driving, endangering Cleveland residents and their property.

11.     Defendants' conduct has created a public nuisance that could have been avoided, had they simply followed industry-wide standards and installed immobilizer devices in all their vehicles.

12.     To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including Cleveland, to divert funds and risk officer safety to combat the rising burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the Parties. The City of Cleveland is a home-rule municipal corporation and regarded as a citizen of the state of Ohio, for the purposes of

4

diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

14.     This court has general personal jurisdiction over Defendants as they are incorporated and headquartered in the state of California.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are citizens of California, incorporated in this State with headquarters located in this district.

### III.     PARTIES

#### A.     Plaintiff

16.     Plaintiff, the City of Cleveland (the "City" or "Cleveland") is a municipal corporation organized and chartered pursuant to Article XVIII, Section 7 of the Ohio Constitution. The City has all the powers of local self-government and all other powers possible for a city to have under the Constitution of the state of Ohio, and the laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Cleveland. The City is located in Cuyahoga County, Ohio, and has approximately 368,000 residents. The City's principal offices are located at City Hall, 601 Lakeside Ave E, Cleveland, Ohio, 44114.

## B.    Defendants

17.    Defendant **Hyundai Motor America** ("HMA" or "Hyundai"), is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. HMA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

18.    Defendant **Kia America, Inc.** ("KA" or "Kia"), is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. KA markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

## IV.    THE KIA HYUNDAI THEFT WAVE

### A.    Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

19.    As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon

6

information and belief, at all relevant times, Defendants designed, manufactured, distributed, and sold the following automobile models ("Susceptible Vehicles") without engine immobilizers between 2011 and 2021: Hyundai Accent, Elantra, Kona, Palisade, Santa Cruz, Santa Fe, Sonata, Tucson, Veloster, and Venue; and the Kia Cadenza, Forte, K900, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As would-be car thieves learned of this susceptibility, the incidence of theft for susceptible models increased, relative to other models, from 2015 to 2020.[5]

20.    However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal susceptible Kias and Hyundais.[6] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[7] As the videos detailed, an individual need only remove the plastic cowl under the steering column and use a USB cable to start these unsecure cars.

---

[5] https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf;
https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf;
https://www.nicb.org/sites/files/2017-11/2017-Hot-Wheels-Report.pdf;
https://www.nicb.org/sites/files/2017-11/2018-Hot-Wheels-Report.pdf; and
https://www.nicb.org/sites/files/2017-11/2019-Hot-Wheels-Report.pdf.

[6] https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

[7] https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

21.     What followed was all-too predictable: thefts of Kias and Hyundais skyrocketed.[8] In the first half of 2021, the number of stolen Kias and Hyundais increased by more than 30 and 15 times when compared to the same period in 2020 in Milwaukee.[9] This dramatic increase was unique to Kias and Hyundais, which represented 66% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[10] [11]

22.     This trend then spread nationwide. By July 2022, the Cleveland Police Department were seeing a considerable increase in Hyundai and Kia vehicle theft.[12]

---

[8] https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[9] https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[10] https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971.

[11] https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

[12] Exh. A.

8





23.     Between October and December, more than 1,200 Hyundai and Kia vehicles were stolen in Cleveland.[13] For December alone, Hyundais and Kias accounted for approximately 65% of total vehicle theft in the City.



24.     The susceptibility of Defendants' vehicles to theft enabled this spiraling epidemic. Defendants' choice to deviate from the industry standard of

---

[13] *Id.*

9

utilizing engine immobilizers, placing profits over safety, was both a proximate and but-for cause of this outbreak. As a police sergeant described the problem, Defendants' cars are simply too easy to steal.[14] This presents a risk not only for property damage, but to public safety, as thieves often engage in reckless driving, as well as other dangerous criminal conduct, including robbery and firearm thefts, as Kias and Hyundais have been targeted by thieves seeking weapons (and other valuables) that might have been left in patrons' vehicles.[15] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland Security was stolen in broad daylight.[16] Inside the Hyundai was a rifle, ammunition, and body armor.[17]

### B.    Car Thefts Imperil Public Safety

25.    Car thefts imperil public safety. By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

26.    This is the conclusion drawn by the National Highway Traffic Safety Administration ("NHTSA"). Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety Standard 114 to reduce the instances of car theft, because "stolen cars

---

[14] https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts.
[15] https://www.jsonline.com/story/opinion/2021/05/21/driven-by-good-will-anonymous-donor-pays-off-milwaukee-womans-stolen-car-debt/5130896001/.
[16] https://www.wisconsinrightnow.com/homeland-security-hyundai/.
[17] *Id.*

constitute a major hazard to life and limb on the highways."[18] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[19] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[20]

27.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

28.     Reckless driving threatens the comfortable enjoyment of life, health, and safety of the public within Cleveland. This is particularly true with the current crime wave. Distinct from many instances of car theft, where the object is converting the stolen vehicle, the viral "Kia challenge" typically involves joyriding

---

[18] *See* 33 Fed. Reg. 6,471 (April 27, 1968).
[19] *Id.*
[20] *Id.*

and then abandoning the stolen vehicles. Far from surreptitiously delivering a car to a chop shop under cover of night, the social media phenomenon, made possible by Defendants' unsecure vehicles, led to youth posting videos of reckless driving during busy hours of the day, abandoning the vehicles after collisions.

29.     Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[21]

30.     In Cleveland, this phenomenon has already led to extreme and disastrous accidents. In November 2022, police officers responded to a burglary alarm at Summit Armory, a gun store, in North Cleveland. When officers arrived, they found an abandoned Kia vehicle, previously reported stolen from Cleveland, had crashed into the gun store.[22]

---

[21] *See e.g.*, https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; https://www.tiktok.com/@monloww__/video/715301222806773738; https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; https://www.instagram.com/p/CSwsnhfAktd/; https://www.instagram.com/p/CTqCaYTANaC/; and https://www.instagram.com/p/CVRCcU5AkwT/.

[22] https://www.wkyc.com/article/news/local/summit-county/vehicle-stolen-cleveland-found-bath-police-department/95-7f112515-2605-434d-8bb4-dfe4dc5d9344.



31.     The following month, a home in Cleveland sustained significant damage after a stolen Hyundai Elantra crashed into the side of the house.[23] A 25-year-old woman and her infant were inside the home during the crash and, fortunately, neither was injured.



---

[23] https://www.wkyc.com/article/news/local/cleveland/car-slams-into-cleveland-home-pictures/95-1198fbd5-86a0-499b-a32a-fafe1437c292.

32.     In mid-January 2023, four teenagers in a stolen Hyundai Elantra attempted to elude police before crashing into a utility pole in the Parma neighborhood of Cleveland.[24] Three of the individuals apprehended were between the ages of 17 and 19. Officers also observed a Kia SUV that had been reported stolen, but the driver of the car was able to get away. Prior to the police chase, officers observed a group of individuals in the stolen Kia trying to steal another vehicle in an apartment complex.[25]

33.     In the last week of January, alone, there were at least three other stolen car police pursuits in the Greater Cleveland area, two of which ended in crashes.[26] One of the crashes involved a stolen Kia that drove across four lanes of traffic, clipping a charter bus carrying members of the Baldwin Wallace University swim team, and crashing into a retaining wall.[27]

34.     Also in late January, a man in Cleveland reported that his Hyundai was stolen. While driving his other car, a Kia Rio, the man spotted his stolen Hyundai at a Burger King drive thru. When he attempted to block the Hyundai, two teenagers in the stolen car rammed the man's Kia against the Burger King

---

[24] https://www.wkyc.com/article/news/local/cuyahoga-county/teenagers-crash-stolen-hyundai-cleveland/95-7ab0ff03-3d0e-475e-a26b-7521e3103aa8.
[25] *Id.*
[26] https://www.news5cleveland.com/news/local-news/dash-cam-video-shows-wrong-way-crash-on-i-480-third-stolen-car-pursuit-in-a-week.
[27] https://fox8.com/news/baldwin-wallace-swim-team-bus-hit-by-stolen-vehicle-police/.

restaurant.[28] Police reported that the incident was part of a three-day crime spree involving two shootings within an hour of each other, which the driver of the stolen Hyundai helped carry out.[29]



35.     Another example of this all-too-common tragedy occurred in Milwaukee in June 2021, when a sixteen-year-old was killed after he stole a Kia Sportage and collided with another car.[30] His two twelve-year-old accomplices were also seriously injured, as were three passengers in the car that he struck. The images and dashcam footage[31] of this tragedy show how the epidemic of vehicle theft imperils the public.

---

[28] https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[29] *Id.*

[30] https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

[31] https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

36.     Yet another tragic example occurred in Buffalo in October 2022, when a 16-year-old driving a stolen Kia caused a high-speed rollover crash that killed four teenage passengers.[32]



37.     The act of car theft creates a substantial risk of physical harm, in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man reported that a Hyundai Sonata struck his car mirror and did not stop. When the man followed the Hyundai, the driver and passenger of the Hyundai got out with guns and began shooting at him.[33] Police found nine bullet casings in the

---

[32] "Teenage driver charged in crash of stolen car that killed 4," Seattle Times (Nov. 22, 2022), available at: https://www.seattletimes.com/business/teenage-driver-charged-in-crash-of-stolen-car-that-killed-4/.

[33] https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

street and bullet holes in the front window of a nearby home and in a car parked on the street.[34]

38.     This risk to bystanders was also tragically demonstrated in October 2021 in Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed at the scene.[35]

39.     Further, the act of car theft creates a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into a car and a 54-year-old pedestrian.[36] Both cars careened into a nearby building, which collapsed on top of the vehicles



[34] https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.
[35] https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.
[36] https://www.msn.com/en-us/news/crime/footage-shows-fatal-crash-into-baltimore-building-collapse-following-police-pursuit-of-stolen-car/ar-AA189TDg.

and the pedestrian.[37] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[38]

40. Cleveland has seen an especially high rate of Hyundai and Kia vehicle thefts, has incurred costs associated with these thefts, and has been unable to abate the nuisance in the absence of action by Defendants.

41. As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities including Cleveland, thereby increasing the potential number of uninsured motorists on the road.[39]

42. The amount of time spent responding to rampant thefts puts additional stress on the City of Cleveland's resources. For January and February 2023, the median time officers spent from the call time to clear time of a single reported vehicle theft is 139 minutes, or nearly two and a half hours.[40] At the current rate of calls received related to vehicle theft in 2023, the Cleveland Police Department is on track to surpass the more than 2,814 vehicle theft calls it received in 2022.

---

[37] *Id.*

[38] *Id.*

[39] https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html.

[40] *See* Exh. B.

**GTMV Calls (Median) Time From Call to Officer Clear Time**

*Only GTV Calls with a Call time, Arrive Time and Clear Time, Regardless of Disposition*

1/1/2022 - 2/23/2023 **By Month**

Lower Number = Amount of Calls

Upper Number = Minutes from Call to Clear Time

| | 2022 | | | | | | | | | | | | | 2023 | | | Total |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total | 1 | 2 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Early 1man | 137 | 115 | 126 | 122 | 118 | 127 | 133 | 144 | 127 | 128 | 134 | 145 | 132 | 146 | 140 | 142 | 134 |
| | 94 | 82 | 103 | 72 | 81 | 90 | 95 | 102 | 139 | 163 | 181 | 223 | 1425 | 200 | 125 | 325 | 1750 |
| Early 2man | 107 | 91 | 270 | 484 | 138 | 141 | 156 | 201 | 126 | 147 | 100 | 131 | 136 | 167 | 68 | 105 | 136 |
| | 11 | 11 | 4 | 2 | 13 | 9 | 16 | 4 | 15 | 20 | 16 | 24 | 145 | 16 | 7 | 23 | 168 |
| Late 1man | 140 | 143 | 139 | 142 | 113 | 118 | 145 | 146 | 129 | 142 | 130 | 129 | 134 | 145 | 129 | 142 | 135 |
| | 77 | 44 | 85 | 53 | 63 | 58 | 73 | 77 | 87 | 116 | 133 | 125 | 991 | 148 | 69 | 217 | 1208 |
| Late 2man | 88 | 94 | 124 | 152 | 142 | 115 | 145 | 296 | 94 | 130 | 125 | 115 | 124 | 83 | 119 | 119 | 124 |
| | 17 | 9 | 7 | 7 | 15 | 11 | 13 | 10 | 7 | 23 | 16 | 21 | 156 | 15 | 7 | 22 | 178 |
| Not Patrol | 125 | 86 | 63 | 165 | 160 | 186 | 156 | 157 | 96 | 130 | 120 | 134 | 125 | 126 | 101 | 119 | 121 |
| | 11 | 10 | 7 | 6 | 6 | 5 | 2 | 3 | 9 | 10 | 15 | 13 | 97 | 16 | 15 | 31 | 128 |
| Total | 135 | 117 | 132 | 141 | 123 | 125 | 142 | 147 | 124 | 133 | 130 | 135 | 132 | 145 | 127 | 139 | 133 |
| | 210 | 156 | 206 | 140 | 178 | 173 | 199 | 196 | 257 | 332 | 361 | 406 | 2814 | 395 | 223 | 618 | 3432 |

43.     To date, Defendants' responses have shown a continued prioritization of profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only offering wheel locks for municipalities to distribute.[41] Unfortunately, the wheel locks are not effective; residents who use them have still had their cars stolen, and in some instances, connected to shootings.[42]

44.     More recently, Hyundai has begun rolling out a "software update" rather than installing immobilizers.[43] Kia has planned a similar software update,

---

[41] https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[42] https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice.

[43] https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

yet this software-only approach is too little, too late, and many susceptible vehicles will not even be included in the update.[44]

45. Upon information and belief, rather than install an immobilizer, the software update will double the length of the theft alarm sound and add a new logic check to the vehicles' on-board computers. This update is a late half-measure at best and will be useless in many common scenarios such as parking and waiting for a passenger to run an errand or picking up a child from after-school activities. Unless the doors were recently unlocked using a key fob, the Engine Control Unit will not turn on. This software-based approach is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability, not to mention public safety.

46. The rollout of the software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that Cleveland has incurred and continues to incur. The update's efficacy has not been tested in the real world,[45] and no one knows how many consumers will even opt in

---

[44] *Id.*

[45] Already, Susceptible Vehicles have been stolen after receiving the update. *See* https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_elantra_se_wa s_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name=iossmf. Additional anecdotes suggest that the update is not reliable. *See* https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrade_my_terribl e_experience/.

to get it. But there are facial defects with this approach. Upon information and belief, this update will not cover all Susceptible Vehicles—even newer models. For vehicles not covered by the update, Defendants are offering nothing more than wheel locks, or rebates for already purchased wheel locks.

47.     What's more, the work-around substantially reduces the usability of the vehicles. This logic could be triggered by letting a passenger out of a car to run an errand and then starting the car again. In addition, susceptible vehicle owners have already experienced issues with after-market remote start systems, rendering the vehicles functionally inoperable. As one owner recently posted:

> "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[46]

48.     Prior to this software update, Hyundai callously turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[47] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money off a crime wave it caused.

---

[46] https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new.

49. By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

## C. Measures to Prevent Vehicle Theft Have Existed for Over a Century

50. Since the dawn of gasoline-powered automobiles at the turn of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[48]

51. Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[49]

52. Evans and Birkenbeuel's immobilizer/alarm system consisted of a 3x3 switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions

---

[48] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[49] *Id.* at ¶¶ 14–20.

that, until released, would divert electricity to the horn instead of the ignition

should an unauthorized user attempt to start the vehicle.



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"**

53.     The timing of the first immobilizer patent coincided with Congress's

enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*,

which made the interstate transportation of stolen vehicles a federal crime. The law

passed, in part, to respond to the growing number of automobile thefts around the

country, especially in midwestern cities.

23

54. As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

55. In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[50] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: NHTSA, f/k/a the National Traffic Safety Bureau.

56. Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[51] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. *Scope*. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles
>
> S2. *Purpose*. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less. . . .
>
> S5.1 *Theft Protection*.

---

[50] P.L. 89–563, 80 Stat. 718.
[51] 49 C.F.R. § 571.114.

S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

(a)     The normal activation of the vehicle's engine or motor; and

(b)     Either steering, or forward self-mobility, of the vehicle, or both.

. . .

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

57.     The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[52]

58.     As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[53] Accordingly, NHTSA recognized that "a reduction of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and

---

[52] 33 Fed. Reg. 83, 6471 (April 27, 1968).
[53] *Id.*

25

injured by stolen cars each year."[54] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[55]

59.     An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[56] The proposed software update does not appear to satisfy this requirement—as it is not linked to an attempt to start the vehicle without the correct key—and the absence of *any* system not only violates this standard, it created the public nuisance of rampant car theft in Cleveland.

### D.     The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

60.     In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[57] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring."

---

[54] *Id.*

[55] https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *also see* 33 Fed. Reg. 6,471, (Apr. 27, 1968).

[56] NHTSA Interpretation GF005229-2 (Sept. 24, 2004).

[57] Anthony Dixon & Graham Farrell, Age-period-cohort effects in half a century of motor vehicle theft in the United States, 9 CRIME SCIENCE 17, 1, 3 (2020).



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**[58]

61.   To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[59] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[60]

62.   In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

---

[58] *Id.* at 2.
[59] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).
[60] *Id.*

63. Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[61]

64. The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[62] Similar mandates soon followed in Australia, New Zealand, and Canada.

65. As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[63]

### E. Defendants' Deviation from the Industry Standard

66. At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

67. Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive

---

[61] *Id.*

[62] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1, (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[63] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

28

immobilizing antitheft devices were introduced."[64] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[65] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[66]

68.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[67]

69.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[68]

---

[64] "Hyundai and Kia theft losses", 38 HLDI BULLETIN 28 (December 2021), available at: https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. "Over 50 years of progress: the history of Hyundai" Press Release, 04.06.2019, available at https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

70.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. In March 2007, Hyundai requested an exemption from particular NHTSA vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford [immobilizer] devices" in reducing vehicle theft.[69] Yet, until the last year or so, Hyundai and Kia only offered immobilizers in their premium, more expensive, model lines. This decision only compounds the harms on low-income communities.[70] Those without resources to afford such models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered vehicle.

71.     Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2021, in contrast to all other car manufacturers having installed immobilizers in 96% of their vehicles, has led to a reasonably foreseeable car theft epidemic that is plaguing Cleveland.

---

[69] 72 Fed. Reg. 138, 39,662 (July 19, 2007); *see also* 75 Fed. Reg. 1,447 (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[70] https://fortune.com/2022/09/22/hyundai-kia-cars-stealing-hack-thieves/ (HLDI Senior VP Matt Moore notes that "Many of the vulnerable Hyundais and Kias are often bought by lower-income people" because those cars "are relatively inexpensive vehicles when purchased new[.]").

## V.    CAUSES OF ACTION

## COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE

72.    The City incorporates each preceding paragraph as though set forth fully herein.

73.    A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

74.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the safety, welfare, peace, comfort, and sense of security of the City and its residents. *See* Restatement (Second) of Torts § 821B.

75.    Defendants have created and maintained a public nuisance by manufacturing and distributing automobiles that are dangerously susceptible to theft, thus interfering with the public safety, health, and welfare in Cleveland. Cleveland and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

76.    Defendants' conduct has directly caused a severe disruption of public order and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

77.     Further, Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares. Defendants' conduct has created an unlawful obstruction or impediment to the flow of municipal transit vehicles and public traffic.

78.     The public nuisance is an *absolute* public nuisance because Defendants' nuisance creating conduct was intentional and violated FMVSS 114, which established specific legal requirements for the protection of others.

79.     FMVSS 114 requires automobiles to have a starting system which, whenever the key is removed from the starting system prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system."

80.     As alleged above, nearly all cars in the United States satisfy FMVSS 114 through the installation of an engine immobilizer. Defendants' failure to include an engine immobilizer, or a substitute system capable of satisfying FMVSS 114, violates that law.

81.     Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the public welfare, safety, peace, comfort, and convenience of Cleveland and Cleveland's residents.

82. Defendants had initial control over the manufacturing of the Susceptible Vehicles and their shipping of automobiles to Cleveland. Defendants continued to maintain control over the conduct through the ability, and failure, to implement a recall to remediate the susceptibility.

83. It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Cleveland.

84. Based on Defendants' intentional and unreasonable actions and their special position in understanding the decades of literature supporting the deterrent effects of engine immobilizers, without Defendants' actions, vehicle theft in Cleveland would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

85. The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to Cleveland and Cleveland's community. The harm inflicted outweighs any offsetting benefit.

86. As a direct and proximate result of Defendants' conduct, Cleveland has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

87.    As a direct and proximate result of Defendants' tortious conduct, Cleveland has suffered and will continue to suffer stigma damage and damage to its proprietary interests, including reduced tax revenues attributable to property value declines caused by increases in property crime rates and stigma damage.

88.    The nuisance created by Defendants' conduct is abatable.

89.    Defendants' conduct has affected and continues to affect Cleveland's community, and Cleveland will continue to incur economic losses until the nuisance is abated.

90.    Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that the interference with public safety caused by easier vehicle theft was substantially certain to result from their conduct. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%.

91.    Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Cleveland.

92.    By intentionally foregoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Cleveland.

93.     Hyundai and Kia could have avoided all this by installing engine immobilizers at the time of manufacture for as little as $200 per device.

94.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

95.     Cleveland has incurred expenditures for special programs over and above its ordinary public services.

96.     Cleveland has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by Cleveland.

97.     Cleveland requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. Cleveland does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE

98.     The City of Cleveland incorporates each preceding paragraph as though fully set forth herein.

99.     Defendants have created and maintained a public nuisance by manufacturing and distributing automobiles that are dangerously susceptible to theft, thus interfering with the public health, welfare, and safety in Cleveland. Cleveland and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

100.    The public nuisance is a *qualified* public nuisance because Defendants negligently engaged in conduct or omissions which endanger or injure the health, safety, or comfort of the public in Cleveland.

101.    Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, sale, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe and equipped with industry-standard anti-theft measures.

102.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

103.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an

engine immobilizer in the Susceptible Vehicles could cause Cleveland's injuries and thus created a dangerous and unreasonable risk of injury to Cleveland.

104.   As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, sale, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

105.   Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Cleveland.

106.   As a proximate result of Defendants' wrongful acts and omissions, Cleveland has incurred economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services. The City does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT THREE — NEGLIGENCE

107.   The City of Cleveland incorporates each preceding paragraph as though set forth fully herein.

108.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, sale, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably capable of being engine-activated and operated without a key in the starting system.

109.   Defendants owed Cleveland a duty to not expose the City to an unreasonable risk of harm.

110.   Defendants' duties were preexisting.

111.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

112.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Cleveland's injuries and thus created a dangerous and unreasonable risk of injury to Cleveland.

113.   As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same

circumstances in the design, research, development, manufacture, testing, sale, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

114.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Cleveland.

115.    Defendants knew and/or should have known that it was foreseeable that Cleveland would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

116.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

117.    Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the economic losses that Cleveland has suffered, and will continue to suffer.

118.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

119.    Cleveland's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

120.    As a proximate result of Defendants' wrongful acts and omissions, Cleveland has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to address the consequences of Defendants' conduct in Cleveland's community.

121.    Defendants engaged in conduct, as described above, that constituted reckless disregard of Cleveland's rights, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

122.    Defendants' conduct, constituting reckless disregard of Cleveland's rights, was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard of Cleveland's rights and adopted or approved that conduct after it occurred.; and/or

123.    Defendants' conduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local

government's existence. Cleveland alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect occur.

124. Cleveland has incurred expenditures for special programs over and above its ordinary public services.

125. Cleveland has suffered an indivisible injury as a result of the tortious conduct of Defendants.

126. The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

127. Defendants made conscious decisions not to warn or inform the unsuspecting public, including Cleveland's community or Cleveland. Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Cleveland's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

128. Cleveland is without fault, and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacture and distribution of their vehicles.

129. Cleveland asserts this Cause of Action as a common law tort claim for negligence and not as a "product liability claim" as defined in R.C. § 2307.71. Plaintiff does not seek damages for death, physical injury to person, emotional

distress, or physical damage to property, as defined under the Ohio Product

Liability Act.

## VI.    PRAYER FOR RELIEF

130.    Entering an Order that the conduct alleged herein constitutes a public

nuisance under Ohio law;

131.    Entering an Order that Defendants are jointly and severally liable;

132.    Entering an Order requiring Defendants to abate the public nuisance

described herein and to deter and/or prevent the resumption of such nuisance;

133.    Enjoining Defendants from engaging in further actions causing or

contributing to the public nuisance as described herein;

134.    Awarding equitable relief to fund automobile theft prevention;

135.    Awarding actual and compensatory damages;

136.    Awarding reasonable attorneys' fees and costs of suit;

137.    Awarding pre-judgment and post-judgment interest; and

138.    Such other and further relief as the Court deems just and proper under

the circumstances.

## VII.   JURY TRIAL DEMANDED

139.    Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 7th day of March, 2023.

CITY OF CLEVELAND
By Counsel

Mark D. Griffin (*pro hac vice forthcoming*)
Chief Legal Officer

By */s/ Elena N. Boop*
    Elena Boop (*pro hac vice forthcoming*)
    Chief Trial Counsel
    J.R. Russell (*pro hac vice forthcoming*)
    Chief Assistant Director of Law
    601 Lakeside Ave., Room 106
    Cleveland, Ohio 44114
    Telephone: (216) 664-2800
    Fax: (216) 664-2663
    eboop@clevelandohio.gov
    jrussell2@clevelandohio.gov

    Trial Counsel for City of Cleveland

KELLER ROHRBACK L.L.P.

By */s/ Dean Kawamoto*
    Dean Kawamoto, CSB #232032
    Gretchen Freeman Cappio (*pro hac vice forthcoming*)
    Derek W. Loeser (*pro hac vice forthcoming*)
    Ryan McDevitt (*pro hac vice forthcoming*)
    Alison S. Gaffney (*pro hac vice forthcoming*)
    Felicia J. Craick (*pro hac vice forthcoming*)
    Zachary Gussin (*pro hac vice forthcoming*)
    Kylie N. Fisher (*pro hac vice forthcoming*)
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    Telephone: (206) 623-1900
    Fax: (206) 623-3384
    dkawamoto@kellerrohrback.com
    gcappio@kellerrohrback.com
    dloeser@kellerrohrback.com
    rmcdevitt@kellerrohrback.com
    agaffney@kellerrohrback.com
    zgussin@kellerrohrback.com
    kfisher@kellerrohrback.com
*Counsel for Plaintiff City of Cleveland*

# EXHIBIT A

Case 2:20-MD-13037020cument 169-3 07/04/23 Page 90 52 #:47

## Stolen Vehicles Citywide City of Cleveland

*1/1/2022 To 1/30/2023*



### Stolen Kia & Hyundai Cars 2022 By Month



### Stolen Kia & Hyundai Cars



# EXHIBIT B

## GTMV Calls (Median) Time
## From Call to Officer Clear Time

**Only GTV Calls with a Call time, Arrive Time and Clear Time, Regardless of Disposition**

**1/1/2022 - 2/23/2023**

## By Month

| | | | | | | | 2022 | | | | | | | | 2023 | | | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total | 1 | 2 | Total | |
| Early 1man | 137 | 115 | 126 | 122 | 118 | 127 | 133 | 144 | 127 | 128 | 134 | 145 | 132 | 146 | 140 | 142 | 134 |
| | 94 | 82 | 103 | 72 | 81 | 90 | 95 | 102 | 139 | 163 | 181 | 223 | 1425 | 200 | 125 | 325 | 1750 |
| Early 2man | 107 | 91 | 270 | 484 | 138 | 141 | 156 | 201 | 126 | 147 | 100 | 131 | 136 | 167 | 68 | 105 | 136 |
| | 11 | 11 | 4 | 2 | 13 | 9 | 16 | 4 | 15 | 20 | 16 | 24 | 145 | 16 | 7 | 23 | 168 |
| Late 1man | 140 | 143 | 139 | 142 | 113 | 118 | 145 | 146 | 129 | 142 | 130 | 129 | 134 | 145 | 129 | 142 | 135 |
| | 77 | 44 | 85 | 53 | 63 | 58 | 73 | 77 | 87 | 116 | 133 | 125 | 991 | 148 | 69 | 217 | 1208 |
| Late 2man | 88 | 94 | 124 | 152 | 142 | 115 | 145 | 296 | 94 | 130 | 125 | 115 | 124 | 83 | 119 | 119 | 124 |
| | 17 | 9 | 7 | 7 | 15 | 11 | 13 | 10 | 7 | 23 | 16 | 21 | 156 | 15 | 7 | 22 | 178 |
| Not Patrol | 125 | 86 | 63 | 165 | 160 | 186 | 156 | 157 | 96 | 130 | 120 | 134 | 125 | 126 | 101 | 119 | 121 |
| | 11 | 10 | 7 | 6 | 6 | 5 | 2 | 3 | 9 | 10 | 15 | 13 | 97 | 16 | 15 | 31 | 128 |
| Total | 135 | 117 | 132 | 141 | 123 | 125 | 142 | 147 | 124 | 133 | 130 | 135 | 132 | 145 | 127 | 139 | 133 |
| | 210 | 156 | 206 | 140 | 178 | 173 | 199 | 196 | 257 | 332 | 361 | 406 | 2814 | 395 | 223 | 618 | 3432 |

Lower Number = Amount of Calls

Upper Number = Minutes from Call to Clear Time