# EXHIBIT B

Dean Kawamoto, CSB # 232032
dkawamoto@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of Rochester*

(additional counsel listed below)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ROCHESTER,<br><br>                    Plaintiff,<br><br>    v.<br><br>HYUNDAI MOTOR AMERICA and<br>KIA AMERICA, INC.,<br><br>                    Defendants. | No. 8:23-cv-00736<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTION AND VENUE...........................................................5

III.    PARTIES ...............................................................................................5

        A.    Plaintiff ......................................................................................5

        B.    Defendants .................................................................................6

IV.     THE KIA HYUNDAI THEFT WAVE ...............................................6

        A.    Without Immobilizers, Defendants' Vehicles Are Sitting
              Ducks..........................................................................................6

        B.    Car Thefts Imperil Public Safety ...........................................10

        C.    Measures to Prevent Vehicle Theft Have Existed for
              Over a Century..........................................................................23

        D.    The Widespread Adoption of Modern Engine
              Immobilizers as an Even More Effective Vehicle Theft
              Deterrent....................................................................................28

        E.    Defendants' Deviation from the Industry Standard .........30

V.      CAUSES OF ACTION .......................................................................33

COUNT ONE — COMMON LAW PUBLIC NUISANCE ................................33

COUNT TWO — NEGLIGENCE......................................................................36

VI.     PRAYER FOR RELIEF......................................................................39

VII.    DEMAND FOR JURY TRIAL..........................................................40

# I.    INTRODUCTION

1.     There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers choose not to include standard anti-theft technology in their vehicles.

2.     The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most recent cars, the ignition key emits a radio signal that, when the key is present, prompts a computer to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.     Between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Hyundai and Kia failed to keep up with the times. As a result, TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing common anti-theft technology have resulted in an epidemic of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly in the City of Rochester, where the police department is under considerable staffing stress.

4.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology,

1

this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle immobilizers in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have decided to trade public safety for profits.

5.      The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *twenty-six percent* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *ninety-six percent* of vehicles from all other manufacturers.[1]

6.      Hyundai's and Kia's decision to put cost-savings and profits over public safety has had devastating consequences for the City of Rochester and its residents, as it has for other cities. The failure of Defendants to install an industry-standard anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

7.      This epidemic started in Milwaukee before spreading nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and

---

[1] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), available at: https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

1  Kia vehicles had increased by 2,500% since the previous year, with an average of

2  sixteen cars being stolen per day.[2]

3      8.    The same trend is evident in Rochester, where, for example, there was

4  an estimated 2,365% increase in thefts of Hyundai and Kia vehicles from January to

5  April 2023 compared to the same time period in 2022. Specifically, police data

6  shows that 789 Hyundai and Kia vehicles have been stolen in Rochester in the first

7  four months of 2023, with an average of seven cars being stolen per day.

8      9.    The ease of stealing the susceptible Hyundai and Kia vehicles has also

9  led to a spike in additional crimes in Rochester. Since January 2023, Rochester

10  police have recorded approximately seventy incidents of suspects breaking into

11  various local businesses. Twenty-six of these burglaries (or "smash-and-grabs")

12  involved a stolen Kia or Hyundai that was used either for transportation to and from

13  crime scenes or to smash through the doors or windows of businesses to gain entry

14  and steal various merchandise. Eleven other incidents involved unknown vehicles

15  that had noticeable window damage and/or matched the modus operandi of other

16  burglaries involving stolen Hyundai or Kia vehicles.

17      10.    Vehicle theft is not only a property crime affecting vehicle owners, but

18  it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand

19  with reckless driving, which in turn results in injuries and death. It results in

20  increased violence, as many car owners are unlikely to part with their vehicles

21  

22  [2] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, THEDRIVE.COM (Dec. 11, 2021, 11:15 AM),

23  https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

3

1   willingly. It consumes scarce law enforcement and emergency resources and

2   deprives the public of safe streets and sidewalks.

3       11.    In a recent letter issued to the National Highway Traffic Safety

4   Administration, eighteen Attorneys General, including New York Attorney General

5   Letitia James, raised concern over this very issue, noting the downstream

6   consequences that unsafe Hyundai and Kia vehicles have created for local

7   governments around the country:

8           The high rate of theft of Hyundai and Kia vehicles has
            demanded time and resources from public safety agencies,
9           diverting resources from other priorities. Thefts reported
            to law enforcement require documentation and
10          investigation, and crashes of stolen vehicles require
            emergency responder services. In addition to responding
11          to Hyundai and Kia vehicle thefts and related crashes or
            crimes, local agencies have also had to allocate scarce
12          resources to preventative measures.[3]

13      12.    The skyrocketing rate of vehicle theft in Rochester has drastically

14   impacted City resources, including its police resources. Rochester residents are

15   subjected to the increasingly dangerous conditions on their city streets, as car thieves

16   (many of them teenagers) take advantage of Hyundai's and Kia's failures and engage

17   in reckless driving, endangering City residents and their property.

18

19

20

21   [3] Letter from Attorneys General to Ann Carlson, Acting Administrator of the
     National Highway Traffic Safety Administration  4 (Apr. 20, 2023),
22   https://oag.dc.gov/sites/default/files/2023-
     04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.p
23   df (Hereinafter "Letter from Attorneys General Letter to NHTSA").

4

13.   Defendants' conduct has created a public nuisance that could have been avoided had they simply followed industry-wide standards and installed immobilizer devices, or an equivalent anti-theft device, in all their vehicles.

14.   To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including Rochester, to divert funds and risk officer safety to combat the rising burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.   JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The City of Rochester is regarded as a citizen of the state of New York for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

16.   This court has general personal jurisdiction over Defendants as they are incorporated and headquartered in the state of California.

17.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are citizens of California, incorporated in this State with headquarters located in this district.

## III.   PARTIES

### A.   Plaintiff

18.   Plaintiff, the City of Rochester (the "City" or "Rochester") is a municipal corporation organized under the laws of the State of New York. The City

5

is located in Monroe County, New York, and has approximately 210,000 residents. The City's principal offices are located at City Hall, 30 Church Street, Rochester, New York, 14614.

### B.    Defendants

19.    Defendant **Hyundai Motor America** ("Hyundai") is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

20.    Defendant **Kia America, Inc.** ("Kia") is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

### IV.    THE KIA HYUNDAI THEFT WAVE

### A.    Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

21.    As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and

belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models ("Susceptible Vehicles") without engine immobilizers between 2011 and 2022: Hyundai Accent, Elantra, Kona, Palisade, Santa Cruz, Santa Fe, Sonata, Tucson, Veloster, and Venue; and the Kia Cadenza, Forte, K900, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other models, from 2015 to 2020.[4]

22.    However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible Vehicles.[5] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[6] As the videos detailed, a thief need only remove the plastic cowl under the steering column and use a USB cable to start these unsecure cars.

---

[4] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; *and America's 10 Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.
[5] Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.
[6] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia,*

7

23.     What followed was all too predictable: thefts of Kias and Hyundais skyrocketed.[7] In the first half of 2021, the number of stolen Kias and Hyundais in Milwaukee increased by more than thirty and fifteen times, respectively, when compared to the same period in 2020.[8] This dramatic increase was unique to Kias and Hyundais, which represented sixty-six percent of all cars stolen in that period, compared to only six percent of stolen cars in 2019.[9] This trend then spread nationwide.

24.     So far in 2023, total vehicle thefts have risen to 274.67% of 2022's rate of vehicle theft over the same date range. This rise is directly attributable to elevated Hyundai and Kia thefts. The Rochester Police Department reports that of the

---

*Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[7] *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, INSIDE EDITION (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[8] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, KELLEY BLUE BOOK (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[9] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* THE TRUTH ABOUT CARS (Sept. 20, 2022 2:36 PM),https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971; Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021, 4:29 PM), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

1   approximately 1,063 cars stolen so far in 2023, nearly 75% are Hyundai and Kia

2   vehicles.[10]

3          25.    The susceptibility of Defendants' vehicles to theft enabled this spiraling

4   epidemic. Defendants' choice to deviate from the industry standard of utilizing

5   engine immobilizers, placing profits over people and safety, was both a proximate

6   and but-for cause of this outbreak. As a police sergeant described the problem,

7   Defendants' cars are simply too easy to steal.[11] This presents a risk not only for

8   property damage, but to public safety, as thieves often engage in reckless driving, as

9   well as other dangerous criminal conduct, including robbery, burglary, and firearm

10   thefts. Specifically, Kias and Hyundais have been targeted by thieves seeking

11   weapons (and other valuables) that might have been left in patrons' vehicles.[12]

12          26.    At least nineteen stolen Hyundai and Kia vehicles have been used to

13   smash into commercial Rochester businesses in the last four months, with the thieves

14   stealing, among other things, jewelry, cash, e-cigarettes, cigars, and liquor. During

15   a March 25, 2023 incident at a Dick's Sporting Goods store, suspects drove a stolen

16
17   [10] Kayla Canne, *Lawsuit against Kia, Hyundai to be filed by Rochester*, Rochester
       Democrat & Chronicle (Apr. 24, 2023, 2:58 PM),
18     https://www.democratandchronicle.com/story/news/2023/04/24/lawsuit-against-
       kia-and-hyundai-to-be-filed-by-rochester-ny/70146820007/.
19   [11] Rebecca Klopf, *MPD: Hyundai and Kia vehicles too easy to steal, leading to
       spike in car thefts,* TMJ 4 (Feb. 3, 2021, 4:40 PM),
20     https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-
       to-steal-leading-to-spike-in-car-thefts.
21   [12] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland
       Security was stolen in broad daylight. *See* Jim Piwowarczyk, *Department of
22     Homeland Security Hyundai Stolen in Milwaukee, Contained Rifle & Body Armor*,
       WISCONSIN RIGHT NOW (Apr. 17, 2022),
23     https://www.wisconsinrightnow.com/homeland-security-hyundai/.

9

1  Hyundai through the store entrance and attempted, unsuccessfully, to access the

2  store's gun cases.

3      27.   Although many of the stolen Hyundai and Kia vehicles in Rochester

4  have eventually been recovered by police officers, some owners report having to

5  wait months for repairs to be made to their cars.[13]

6              **B.   Car Thefts Imperil Public Safety**

7      28.   Car thefts imperil public safety. By creating a rash of car thefts,

8  Defendants are responsible for a substantial risk to public safety.

9      29.   This is the conclusion drawn by the National Highway Traffic Safety

10  Administration ("NHTSA"). Operating under what was formerly known as the

11  National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety

12  Standard 114 to reduce the instances of car theft, because "stolen cars constitute a

13  major hazard to life and limb on the highways."[14] NHTSA concluded that the

14  "evidence shows that cars operated by unauthorized persons are far more likely to

15  cause unreasonable risk of accident, personal injury, and death than those which are

16  driven by authorized individuals."[15] The NHTSA Administrator concluded that "a

17  reduction in the incidence of auto theft would make a substantial contribution to

18  motor vehicle safety," by reducing both injuries and deaths to would-be car thieves,

19  _____

20  [13] Sheyanne Walker, *Wave of Kia thefts causing parts shortage, some car owners waiting months for repairs*, ABC News 4 (Apr. 24, 2023, 9:39 AM),

21  https://abcnews4.com/news/nation-world/some-kia-hyundai-owners-waiting-months-for-repairs-on-vehicles-that-were-stolen-thieves-significant-damage-lost-money-deductible-high-demand-lack-of-parts.

22  [14] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (April 27, 1968).

23  [15] *Id.*

10

and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[16]

30.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

31.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others within Rochester. Distinct from many instances of car theft, where the object is converting the stolen vehicle, the viral recent wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and then abandoning the stolen vehicles—often after collisions—during busy hours of the day.

32.     Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[17] Many of these juveniles range in age between twelve and

---

[16] *Id.*

[17] *See, e.g.*, Mixtape Trappers (@mixtapetrappers_), Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; Mon Lõww (@monloww__), TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021),

1    fourteen years old, meaning they are not even eligible to have a driving permit or

2    license and have no experience behind the wheel of a car.

3          33.    In Rochester, this phenomenon has already led to extreme and reckless

4    incidents. On April 18, 2023, police investigated a stolen Kia SUV that was driven

5    "recklessly at high speeds" over sidewalks and lawns at Franklin High School, with

6    over 600 students, in Rochester.[18]

7          34.    Cell phone footage of the event shows the chaotic scene, as the Kia

8    "barrels through the courtyard, zigging and zagging, sending kids screaming and

9    running away in fear."[19] Chief of Communications for the Rochester City School

10    District, Marisol Ramos-Lopez, described the event with one word: "Terror."[20]

11

12

13

14

15

16

17

18    _____

      https://www.instagram.com/p/CSwsnhfAktd/; 414 Hypehouse (@414hypehouse),
19    Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; *and*
      414 Hypehouse (@414hypehouse), Instagram (Oct. 20, 2021),
20    https://www.instagram.com/p/CVRCcU5AkwT/.
      [18] James Battaglia, *Stolen Kia driven on Franklin High School courtyard,*
21    *Rochester police investigating*, RochesterFirst.com (Apr. 20, 2023, 11:11 AM),
      https://www.rochesterfirst.com/rochester/suv-driven-on-franklin-high-school-
22    courtyard-rochester-police-investigating/.
      [19] *Id.*
23    [20] *Id.*

                                              12

1
2
3
4
5
6
7
8
9
10



11        35.    More recently, on April 25, 2023, a fourteen-year-old was arrested after

12   stealing a Kia in Rochester. Police officers in the nearby town of Gates, New York

13   responded to the scene after witnessing the Kia "doing donuts in the road" before

14   pulling into a driveway.[21] When officers pulled into the same driveway, the Kia

15   "backed over a neighbor's lawn, jumped a curb and hit a Gates police car on Chili

16   Avenue."[22] A police chase ensued, where the stolen Kia "drove through a wooden

17   fence" before officers "found it flipped over in the intersection."[23] Gates and

18   Rochester police officers, as well as New York State Police, took two suspects,

19

20   _____

21   [21] Evan Bourtis and Bonnie Marrocco, *A 14-year-old is charged with driving the stolen Kia involved in Tuesday's police chase*, News10 NBC (Apr. 25, 2023, 9:12 AM), https://www.whec.com/top-news/gates-police-investigate-after-chase-ended-with-crash-in-rochester/.

22   [22] *Id.*

23   [23] *Id.*

13

including the fourteen-year-old driver, into custody. The police search for the third

suspect involved remains ongoing as of the filing of this Complaint.[24]



36.    As alleged above, the ease of stealing the Susceptible Vehicles has also

led to an increase of burglaries and other secondary offenses in Rochester, especially

"smash-and-grabs" involved a stolen Kia or Hyundai that was used either for

transportation to and from the scene of the crime or to smash through the doors of

certain businesses to steal merchandise.

37.    In neighboring areas of upstate New York, the surge in stolen Hyundai

and Kia thefts has also led to devastating and fatal accidents. In October 2022, a

sixteen-year-old individual driving a stolen Kia Sportage crashed the vehicle near

the intersection of Routes 33 and 198 in Buffalo.[25]

---

[24] *Id.*

[25] Aidan Joly & Evan Anstey, *Four teens killed in rollover crash in Buffalo, two injured*, ROCHESTERFIRST.COM (Oct. 25, 2022, 12:26 PM), https://www.rochesterfirst.com/crime/police/four-teens-killed-in-crash-at-33-and-198/.



38.     All five passengers were ejected from the vehicle, three of whom were pronounced dead at the scene.[26] Another passenger later died at the hospital, and the remaining passenger and driver sustained serious injuries. The four passengers who died were all between the ages of fourteen and nineteen.[27] The sixteen-year-old driver faces four counts of second-degree manslaughter, among other charges.[28]

39.     Another example of this all-too-common tragedy occurred in Milwaukee in June 2021, when a sixteen-year-old was killed after he stole a Kia

_____

[26] *Id.*
[27] Graeme Massie, *Car crash that killed four teens is linked to 'Kia Challenge' TikTok craze, Buffalo police say*, THE INDEPENDENT (Oct. 25, 2022, 9:38 PM), https://www.independent.co.uk/news/world/americas/crime/buffalo-teen-crash-tiktok-kia-challenge-b2210473.html.
[28] Maki Becker, *Teen in stolen Kia crash that killed 4 must wear ankle monitor, report to probation*, THE BUFFALO NEWS (Dec. 11, 2022), https://buffalonews.com/news/local/crime-and-courts/teen-in-stolen-kia-crash-that-killed-4-must-wear-ankle-monitor-report-to-probation/article_030d8c44-56e8-11ed-a8c0-b77671ebf054.html.

15

Sportage and collided with another car.[29] His two twelve-year-old accomplices were also seriously injured, as were three passengers in the car that he struck. The images and dashcam footage of this tragedy show how the epidemic of vehicle theft imperils the public.[30]

40.    Police officers responding to vehicle thefts and other crimes stemming from those same thefts also face serious safety threats. This was illustrated recently, on December 29, 2022, when a Rochester police officer responded to a reported theft at a gas station convenience store as the suspect was attempting to flee.[31] When the officer approached the suspect's car, the suspect attempted to drive away and the officer, who became trapped between the door and frame of the car, "was dragged across the parking lot."[32] Both the suspect and officer were hospitalized for separate injuries following the incident.[33] Police later confirmed that the vehicle involved was a stolen Hyundai Sonata.[34]

---

[29] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN 12 (Jun. 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

[30] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*, WISN 12 (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

[31] Hailie Higgins, *Watch: RPD officer dragged by car after convenience store theft*, Rochester First (Jan. 10, 2023, 12:40 PM), https://www.rochesterfirst.com/crime/police/watch-rpd-officer-dragged-by-car-after-convenience-store-theft/.

[32] *Id.*

[33] *Id.*

[34] Jennifer Lewke, *RPD releases video showing officer being dragged by car in December*, News10 NBC (Jan. 10, 2023, 2:22 PM), https://www.whec.com/top-news/rpd-parolee-accused-of-dragging-officer-with-car-stole-two-packs-of-beer-and-had-six-outstanding-warrants/.

16

41.     A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai got out with guns and began shooting at him.[35] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[36] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[37]

42.     This risk was also tragically demonstrated in Wauwatosa, Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed at the scene.[38]

43.     Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into another car and a fifty-four-year-old pedestrian.[39] Both cars careened into a nearby building, which collapsed on top of

---

[35] Cory Shaffer, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, CLEVELAND.COM, (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[36] *Id.*

[37] *Id.*

[38] Michael Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021, 10:06 PM), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.

[39] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, THE BALTIMORE SUN (Mar 3, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html.

17

the vehicles and the pedestrian.[40] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[41]

44.     In electing profits over safety and in deviating from industry norms by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.



45.     Rochester has experienced an especially high rate of Hyundai and Kia vehicle thefts and has been forced to respond, incurring significant costs, including expending extra police time and resources taking reports and collecting evidence; providing emergency and medical services; processing, assisting with prosecution, and rehabilitating offenders; and educating the public about this threat to public safety.

46.     In the first four months of 2023 alone, the City has made sixty arrests associated with Hyundai and Kia vehicles—about half of which involved juvenile

---

[40] *Id.*
[41] *Id.*

suspects. Countywide, sixty-five juveniles have been charged for crimes related to these vehicle thefts, and six are still in custody at the Children's Detention Center.

47.     As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities, thereby increasing the potential number of uninsured motorists on the road.[42]

48.     To date, Defendants' responses have shown a continued prioritization of profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only offering wheel locks for municipalities to distribute.[43] Unfortunately, the wheel locks are not effective; Susceptible Vehicles with wheel locks in use have still been stolen and, in some instances, used in connection with other crimes, including shootings.[44]

_____

[42] Peter Valdes-Dapena, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Robert Higgs, *Progressive, State Farm halt new car insurance policies for high theft models of Kia and Hyundai*, CLEVELAND.COM (Jan. 31, 2023, 1:06 PM), https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html.

[43] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, MILWAUKEE JOURNAL SENTINEL (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[44] Ashley Sears, *Milwaukee woman's Kia stolen twice,  had steering wheel lock*, FOX6NOW.COM (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX13 SEATTLE (Jan. 25, 2023), https://www.q13fox.com/news/b-i-swear-b-im-gonna-

49.    More recently, Hyundai has begun rolling out a "software update" rather than installing immobilizers.[45] Kia has planned a similar software update, yet this software-only approach is too little, too late, and many of the Susceptible Vehicles will not even be included in the update.[46]

50.    As highlighted in the multistate letter sent on behalf of eighteen Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[47]

51.    For vehicles not covered by the update, Defendants are offering nothing more than wheel locks, or rebates for already purchased wheel locks.[48] As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to the individual vehicle owners."[49]

52.    Additionally, the Attorneys General have identified two other primary issues with the software update. First, "not all eligible vehicles can receive the

---

crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; *and Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS MINNESOTA (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/

[45] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

[46] *See* Zac Palmer, *Hyundai launches software update to fix some of 4 million vehicles at risk of theft*, Yahoo! (Feb. 14, 2023), https://autos.yahoo.com/hyundai-launches-software-fix-4-155800221.html.

[47] Letter from Attorneys General to NHTSA at 6.

[48] *See* Palmer, *supra* note 48..

[49] Letter from Attorneys General to NHTSA at 6.

20

updates immediately"—at least two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[50] Meanwhile, these vehicles "will remain on the road, vulnerable to theft and posing a threat to public safety."[51] Second, the Defendants' "voluntary service campaign" does not prompt certain "regulatory requirements and oversight and instead places additional burdens on individual vehicle owners."[52]

53.     Upon information and belief, rather than install an actual immobilizer, the software update will merely double the length of the theft alarm sound and add a new logic check to the vehicles' on-board computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This update is a late half-measure at best and will be useless in many common scenarios. One such common example is a situation where a driver parks and waits to pick up a passenger, such as picking up a child from after-school activities, which often involves turning on the ignition without first unlocking the car from the outside with a key fob (because the driver is waiting in the car). Unless the doors were recently unlocked using a key fob, the Engine Control Unit will not turn on, essentially "locking out" an authorized driver. This software-based approach

---

[50] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

[51] Letter from Attorneys General to NHTSA at 7.

[52] Letter from Attorneys General to NHTSA at 7.

is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability, not to mention public safety.

54.     The rollout of the software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that Rochester has incurred and continues to incur. The update's efficacy has not been proven in the real world, and in fact Susceptible Vehicles have already been stolen after receiving the update.[53] No one knows how many consumers will even opt to get the update.[54] And, as mentioned above, there are facial defects with this approach, including that approximately two million of the Susceptible Vehicles cannot "receive the updates immediately."[55]

55.     What's more, the work-around substantially reduces the usability of the vehicles. This logic could be triggered by letting a passenger out of a car to run an

---

[53] Already, Susceptible Vehicles have been stolen after receiving the update. *See* Michelle Nicks, *Cleveland woman devastated after new anti-theft device on her Hyundai fails to stop thieves from causing damage*, CLEVELAND19.COM (March 17, 2023, 8:07 PM), https://www.cleveland19.com/2023/03/18/cleveland-woman-devastated-after-new-anti-theft-device-her-hyundai-fails-stop-thieves-causing-damage/. Additional anecdotes suggest that the update is not reliable. *See* Jsmith4523, Reddit (Feb. 22, 2023, 4:52 PM), https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_el antra_se_was_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name =iossmf; MaximumLongjumping31, Reddit (Mar. 3, 2023, 5:12 AM), https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrad e_my_terrible_experience/.
[54] *See* Letter from Attorneys General to NHTSA at 7 (noting that "voluntary service campaigns like the ones announced by Hyundai and Kia are distinct from recalls and offer insufficient assurances that vehicles with the starting-system flaw will be corrected or taken off the road in a timely manner").
[55] *Id.* at 6.

errand and then starting the car again. In addition, owners of the Susceptible Vehicles have already experienced issues with after-market remote start systems, rendering the vehicles functionally inoperable. As one owner recently posted:

> "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[56]

56.     Prior to this software update, Hyundai callously turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[57] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money off of a crime wave it caused.

57.     By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

### C.     Measures to Prevent Vehicle Theft Have Existed for Over a Century

58.     Since the dawn of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles

---

[56] Fungiinterezt, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_softw are_update_to/?sort=new.

[57] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, NERD WALLET (Jan. 26, 2023), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

23

1    from being stolen. Thus, efforts to prevent theft or unauthorized access to
2    automobiles have tracked vehicle development. In 1919, St. George Evans and E. B.
3    Birkenbeuel invented the first formation of an electric immobilizer/vehicle security
4    system.[58]

5        59.    Labeled the "Automobile-Theft Preventer" the purpose of Evans and
6    Birkenbeuel's invention was relatively straightforward: "to provide a means for
7    automatically signaling an attempt to move an automobile by unauthorized persons;
8    and to provide a means for locking the electric circuit open, in which case it will be
9    impossible to move the car by its own power."[59]

10       60.    Evans and Birkenbeuel's immobilizer/alarm system consisted of a
11   three-by-three switch panel that connected to the car's battery, horn, and ignition.
12   Upon exiting his vehicle, a driver could turn a few switches on the panel to different
13   positions that, until released, would divert electricity to the horn instead of the
14   ignition should an unauthorized user attempt to start the vehicle.

15

16

17

18

19

20

21

22

23   _____

[58] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[59] *Id.* at ¶¶ 14–20.

24



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"**

61.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

62.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

63.     In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and

25

1   traffic safety standards.[60] Administration of the Safety Act was overseen by the

2   newly created Department of Transportation through its sub-agency: NHTSA, f/k/a/

3   the National Traffic Safety Bureau.

4          64.   Pursuant to its statutory authority under the Safety Act, NHTSA

5   promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among

6   these standards, FMVSS 114[61] requires minimum theft-protection standards for

7   nearly all passenger vehicles in the United States:

8          S1. *Scope*. This standard specifies vehicle performance
           requirements intended to reduce the incident of crashes
9          resulting from theft and accidental rollaway of motor
           vehicles
10

11         S2. *Purpose*. The purpose of this standard is to decrease
           the likelihood that a vehicle is stolen, or accidentally set in
12         motion.

13
           S3. *Application*. This standard applies to all passenger
14         cars, and to trucks and multipurpose passenger vehicles
           with GVWR of 4,536 kilograms (10,000 pounds) or less.
15         . . .

16
           S5.1 *Theft Protection*.
17         S5.1.1 Each vehicle must have a starting system which,
           whenever the key is removed from the starting system
18         prevents:
           (a)   The normal activation of the vehicle's engine or
19         motor; and
           (b)   Either steering, or forward self-mobility, of the
20         vehicle, or both.

21   _____

22   [60] National Traffic and Motor Vehicle Safety Act of 1966, Pub. L. 89–563, 80 Stat.
        718.

23   [61] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. §
        571.114.

1

2
. . .

3
> S5.2.2 Except as specified in S5.2.4, the vehicle must be
> designed such that the transmission or gear selection
> control cannot move from the "park" position, unless the
> key is in the starting system.

4

5

6
65.   The main motivation for creating FMVSS 114 was NHTSA's

7
recognition "that stolen cars constitute a major hazard to life and limb on the

highways. The evidence shows that stolen cars are far more likely to cause

8
unreasonable risk of accident, personal injury, and death than those which are driven

9
by authorized individuals."[62]

10
66.   As early as 1966, studies showed "there were an estimated 94,000

11
stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in

12
injury to one or more people."[63] Accordingly, NHTSA recognized that "a reduction

13
of the incident of auto theft would make a substantial contribution to motor vehicle

14
safety" and "protect the many innocent members of the public who are killed and

15
injured by stolen cars each year."[64] To address this safety risk, which is largely tied

16
to "car thieves who could bypass the ignition lock . . . the agency decided to require

17
a device, which would prevent either self-mobility or steering even if the ignition

18
lock were bypassed."[65]

19

20

21
[62] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33
Fed. Reg. 6,471 (April 27, 1968).

22
[63] *Id.*

[64] *Id.*

23
[65] Federal Motor Vehicle Safety Standards; Theft Protection,71 Fed. Reg. 17,753
(Apr. 7, 2006) (to be codified at 49 C.F.R. pt. 571); *see also* Motor Vehicle Safety

27

67.     An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[66] The proposed software update does not appear to satisfy this requirement—as it is not linked to an attempt to start the vehicle without the correct key—and the absence of *any* system not only violates this standard, it created the public nuisance of rampant car theft in Rochester.

### D.      The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

68.     In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[67] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The below graph illustrates the dramatic rise in car thefts during this time period.[68]

---

Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968).

[66] Jacqueline Glassman, *NHTSA Interpretation GF005229-2*, NHTSA.gov (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Prot ection.

[67] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 CRIME SCIENCE 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[68] *Id.* at 2.

69.    To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[69] Unlike



Evans and Birkenbeuel's invention nearly seventy-five years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[70]

70.    In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

71.    Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[71]

72.    The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be

---

[69] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).
[70] *Id.*
[71] *Id.*

29

equipped with an electronic engine immobilizer.[72] Similar mandates soon followed in Australia, New Zealand, and Canada.

73.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[73]

### E.     Defendants' Deviation from the Industry Standard

74.     At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

75.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[74] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[75] A 2013 HLDI study "found that thieves were sometimes targeting the older

---

[72] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[73] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

[74] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[75] *Id.*

model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[76]

76.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[77]

77.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[78]

78.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. In March 2007, Hyundai requested an exemption from particular NHTSA vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford [immobilizer] devices" in reducing vehicle theft.[79] Yet, until the last year or so, Hyundai and Kia only

---

[76] *Id.*

[77] *Id.*

[78] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Over 50 years of progress: the history of Hyundai*, HYUNDAI NEWS (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[79] Petition for Exemption From the Vehicle Theft Prevention Standard;

offered immobilizers in a few, more expensive, models. This decision only compounds the harms on low-income communities.[80] Those without resources to afford such models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered vehicle.

79.    In September 2022, the HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, *combined*, had a theft claim rate of 1.21.[81]

80.    Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2022, in contrast to the approximately ninety-six percent of all other car manufacturers that

---

Hyundai-Kia America Technical Center, 72 Fed. Reg. 39,661 (July 19, 2007); *see also Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundia-Kia America Technical Center,* 75 Fed. Reg. 1,447 (Jan. 11, 2010) (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[80] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

[81] *Id.* An insured vehicle year is equal to one vehicle insured for one year.

did install an immobilizer, has led to a reasonably foreseeable car theft epidemic that is plaguing Rochester.

## V.    CAUSES OF ACTION

### COUNT ONE — COMMON LAW PUBLIC NUISANCE

81.    The City incorporates each preceding paragraph as though fully set forth herein.

82.    Defendants, through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft, have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public.

83.    A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc., 362 N.E.2d 968, 971* (1977) (internal citations omitted).

84.    Defendants' conduct has interfered, and continues to interfere, with the use by the public of public streets and sidewalks in Rochester, and has endangered the safety, health, and comfort of the general public in the City.

85.    In addition, Defendants' conduct has undermined law enforcement efforts to deter vehicle theft and has otherwise diverted scarce law enforcement resources.

86.    At all relevant times, Defendants have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of violent crimes in the State of New York and the City. Specifically, Defendants' conduct has aided tens of burglaries or "smash and grabs" involving stolen Hyundai or Kia vehicles that are increasingly being used to ram into the doors of local Rochester businesses and aid the theft of various goods and merchandise.

87.    At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as forty percent. Defendants also knew or had reason to know that the installation of immobilizers in their own vehicles has considerable deterrent effects on the rate of car theft.

88.    Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in the City.

89.    Defendants, through their business practices, contribute to a significant increase in vehicle theft, reckless driving, and the use of their vehicles in the commission of other crimes in Rochester, thus endangering the safety and health of considerable numbers of Rochester residents, depriving Rochester residents of the peaceful use of the public streets and sidewalks, undermining law enforcement

efforts, increasing law enforcement costs and diverting law enforcement resources, and interfering with commerce, travel, and the quality of daily life in Rochester.

90.     Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in Rochester.

91.     As a result of Defendants' conduct, the City has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, and other services. The City will continue to incur economic losses until the nuisance is abated. These damages are particular to the City and are different in kind to the harms suffered by New York residents at large.

92.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

93.     Rochester has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the public nuisance created by Defendants' actions.

94.     Rochester requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of, compensation for the economic losses suffered as a result of the nuisance, and injunctive relief.

## COUNT TWO — NEGLIGENCE

95.     The City of Rochester incorporates each preceding paragraph as though set forth fully herein.

96.     At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so easy to steal.

97.     Defendants owed and continue to owe the City a duty not to expose the City to an unreasonable risk of harm.

98.     Defendants' duties were preexisting.

99.     At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

100.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Rochester's injuries and thus created a dangerous and unreasonable risk of injury to Rochester. Defendants were therefore in the best position to protect the City against the foreseeable rise in the theft of Susceptible Vehicles.

101.    At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles

1    could cause the City's injuries, as FMVSS 114 requires automobiles to have a

2    starting system which, whenever the key is removed from the starting system,

3    prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for

4    vehicles to be designed "such that the transmission or gear selection control cannot

5    move from the 'park' position, unless the key is in the starting system." As alleged

6    *supra*, most carmakers in the United States satisfy FMVSS 114 through the use of

7    an engine immobilizer.

8        102.   As such, Defendants, by action and inaction, breached their duty and

9    failed to exercise reasonable care, and failed to act as a reasonably prudent person

10   and/or company would act under the same circumstances in the design, research,

11   development, manufacture, testing, and distribution of their vehicles, in that

12   Defendants manufactured and produced vehicles that fell below minimum, industry-

13   standard security measures.

14       103.   Defendants are in control of the design, research, manufacture, testing,

15   and distribution of the vehicles they distributed to authorized dealerships in

16   Rochester.

17       104.   Defendants knew and/or should have known that it was foreseeable that

18   Rochester would suffer injuries as a result of Defendants' failure to exercise

19   reasonable care in the manufacturing of Defendants' vehicles, particularly given

20   Defendants' recognition as early as 2007 that engine immobilizers were an effective

21   deterrent in preventing vehicle theft.

22       105.   Defendants were negligent in failing to monitor and guard against third-

23   party misconduct and enabled such misconduct.

37

106.   Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Rochester suffered, and will continue to suffer.

107.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

108.   Rochester's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

109.   As a proximate result of Defendants' wrongful acts and omissions, Rochester has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in Rochester's community.

110.   Defendants engaged in conduct, as described above, that constituted reckless disregard for the safety and health of the City's residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

111.   Defendants' conduct constituting reckless and conscious disregard of public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of

Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

112. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Rochester alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

113. Rochester has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the negligence caused by Defendants' actions.

114. The tortious conduct of each Defendant was a substantial factor in producing harm to Rochester.

115. Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Rochester's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

116. Rochester is without fault and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

## VI.   PRAYER FOR RELIEF

117. Entering an Order that the conduct alleged herein constitutes a public nuisance under New York law;

118. Entering an Order that Defendants are jointly and severally liable;

39

119.   Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

120.   Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

121.   Awarding equitable relief to fund automobile theft prevention;

122.   Awarding actual and compensatory damages;

123.   Awarding punitive damages;

124.   Awarding reasonable attorneys' fees and costs of suit;

125.   Awarding pre-judgment and post-judgment interest; and

126.   Awarding such other and further relief as the Court deems just and proper under the circumstances.

## VII.   DEMAND FOR JURY TRIAL

127.   Rochester hereby demands a trial by jury.

40

1  RESPECTFULLY SUBMITTED this 28th day of April, 2023.

2  CITY OF ROCHESTER                    KELLER ROHRBACK L.L.P.

3

4  By /s/ Linda S. Kingsley            By /s/ Dean Kawamoto
       Linda S. Kingsley (*pro hac vice*       Dean Kawamoto, CSB #232032
5      *forthcoming*)                          Gretchen Freeman Cappio (*pro
       Corporation Counsel                     hac vice forthcoming*)
6      Patrick Beath (*pro hac vice*           Derek W. Loeser (*pro hac vice*
7      *forthcoming*)                          *forthcoming*)
       Deputy Corporation Counsel              Ryan McDevitt (*pro hac vice*
8                                              *forthcoming*)
       30 Church Street #400A                  Alison Gaffney (*pro hac vice*
9      Rochester, NY, 14614                    *forthcoming*)
       Telephone: (585) 428-6986              Garrett Heilman (*pro hac vice*
10     Fax: (585) 428-6950                     *forthcoming*)
       Linda.Kingsley@CityofRochester.gov      Zachary Gussin (*pro hac vice*
11     Patrick.Beath@CityofRochester.gov       *forthcoming*)
12                                             Kylie Fisher (*pro hac vice*
       *Trial Counsel for City of Rochester*   *forthcoming*)
13
14                                             1201 Third Avenue, Suite 3200
                                               Seattle, WA 98101-3052
15                                             Telephone: (206) 623-1900
                                               Fax: (206) 623-3384
16                                             dkawamoto@kellerrohrback.com
                                               gcappio@kellerrohrback.com
17                                             dloeser@kellerrohrback.com
                                               rmcdevitt@kellerrohrback.com
18                                             agaffney@kellerrohrback.com
                                               gheilman@kellerrohrback.com
19                                             zgussin@kellerrohrback.com
20                                             kfisher@kellerrohrback.com

21                                             *Counsel for Plaintiff City of
                                               Rochester*
22

23

                              41