Query    Reports     Utilities     Help    What's New    Log Out

CONSENTPENDING

# U.S. District Court
# District of Maryland (Baltimore)
# CIVIL DOCKET FOR CASE #: 1:23-cv-01238-ADC

Mayor and City Council of Baltimore vs. Hyndai Motor America, Inc et al
Assigned to: Magistrate Judge A. David Copperthite
Demand: $1,000,000
Case in other court: U.S. District for Central California, 22-01548
Cause: 28:1332 Diversity-Property Damage/Product Liability

Date Filed: 05/11/2023
Jury Demand: Plaintiff
Nature of Suit: 240 Torts to Land
Jurisdiction: Diversity

**Plaintiff**

**Mayor and City Council of Baltimore**              represented by   **Martin Eugene Wolf**
Gordon, Wolf & Carney, Chtd.
100 W. Pennsylvania Avenue
Suite 100
Towson, MD 21204
410-825-2300
Fax: 410-825-0066
Email: mwolf@GWCfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Hyndai Motor America, Inc**

**Defendant**

**KIA America, Inc.**

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2023 | 1 | COMPLAINT *by Mayor and City Council of Baltimore against Hyundai Motor America and Kia America* against MAYOR AND CITY COUNCIL OF BALTIMORE ( Filing fee $ 402 receipt number AMDDC-10593046.), filed by MAYOR AND CITY COUNCIL OF BALTIMORE. (Attachments: # 1 Civil Cover Sheet)(Wolf, Martin) (Entered: 05/11/2023) |
| 05/11/2023 | | Case Assigned to Magistrate Judge A. David Copperthite. (kos, Deputy Clerk) (Entered: 05/11/2023) |
| 05/12/2023 | 2 | QC NOTICE: 1 Complaint, filed by Mayor and City Council of Baltimore was filed incorrectly. ***The following attachment is missing - Summons. To correct this problem, file Summons using the event Notice (Other) and linkSummons to 1 Complaint. (kb3s, Deputy Clerk) (Entered: 05/12/2023) |

| 05/12/2023 | 3 | NOTICE of Case Assignment. This case has been assigned to Magistrate Judge A. David Copperthite. Mayor and City Council of Baltimore or counsel for Mayor and City Council of Baltimore are required to review and comply with the Magistrate Judge Pilot Project Procedures which can be downloaded here. Pursuant to Standing Order 2019-07, which can be downloaded here, counsel has 14 days from the date of this notice to file their consent, or decline to consent to proceed before a U.S. Magistrate Judge which can be downloaded here. To file your consent, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Consent to Proceed Before a Magistrate Judge*. To file your declination, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Decline to Proceed Before a Magistrate Judge*. Failure to file a consent or declination will result in issuance of an Order to Show Cause. Please review the case management order that has been issued in this case. Magistrate Election Form due by 5/26/2023. (kb3s, Deputy Clerk) (Entered: 05/12/2023) |
| --- | --- | --- |
| 05/12/2023 | 4 | Case Management Order. Signed by Magistrate Judge A. David Copperthite on 5/12/2023. (kb3s, Deputy Clerk) (Entered: 05/12/2023) |
| 05/14/2023 | 5 | NOTICE by Mayor and City Council of Baltimore re 2 QC Notice - Miscellaneous, *SUMMONS - HYUNDAI MOTOR AMERICA, IINC* (Wolf, Martin) (Entered: 05/14/2023) |
| 05/14/2023 | 6 | NOTICE by Mayor and City Council of Baltimore re 1 Complaint, *SUMMONS-KIA AMERICA, INC.* (Wolf, Martin) (Entered: 05/14/2023) |
| 05/15/2023 | 7 | Summons Issued 21 days as to Hyndai Motor America, Inc, KIA America, Inc. (Attachments: # 1 Summons 2)(dass, Deputy Clerk) (Entered: 05/15/2023) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

MAYOR AND CITY COUNCIL OF BALTIMORE
City Hall
100 N. Holliday Street, Suite 109
Baltimore, Maryland 21202,

               Plaintiff,

    vs.

HYUNDAI MOTOR AMERICA, INC.           Civil Action: _____
10550Talbert Avenue
Fountain Valley, California 92708-6031,      JURY TRIAL

        <u>Serve on</u>:
        Resident Agent
        CSC-Lawyers Incorporating Service Co.
        7 St. Paul Street, Suite 820
        Baltimore, MD 21202

and

KIA AMERICA, INC.,
111 Peters Canyon Road
Irvine, California 92606-1790,

        <u>Serve on</u>:
        Resident Agent
        The Corporation Trust, Inc.
        2405 York Road, Suite 201
        Lutherville Timonium, MD 21093-2264

        Defendants.
_____

**COMPLAINT**

TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................4

III.    PARTIES..............................................................................................................4

IV.     THE HYUNDAI/KIA THEFT WAVE................................................................5

        A. Hyundai and Kia Vehicles are Easy Targets................................................5

        B. Car Thefts Imperil Public Safety.................................................................7

        C. Measures to Prevent Vehicle Theft Have Existed for Over a Century ..................................10

        D. The Widespread Adoption of Modern Engine Immobilizers as an
           Even More Effective Vehicle Theft Deterrent .........................................12

        E. Defendants' Deviation from the Industry Standard ..................................14

V.      CAUSE OF ACTION: PUBLIC NUISANCE ..........................................15

VI.     PRAYER FOR RELIEF.....................................................................................17

VII.    JURY TRIAL DEMANDED..............................................................................17

## I.     INTRODUCTION

1.      There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal both protects property and protects the public by keeping dangerous drivers in stolen vehicles off the roads. This case is an example what happens to public safety when car manufacturers fail to include standard anti-theft technology in their cars.

2.      The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most cars, the ignition key emits a radio signal that prompts a computer to disengage an immobilizer device and allows the car to move when the key is present. But recent Hyundai and Kia models are a glaring exception.

3.      Between 2011 and 2021, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Hyundai Motor America, Inc. ("Hyundai") and Kia America, Inc. ("Kia") failed to keep up with industry standards. As a result, TikTok and news videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a USB cable. Hyundai and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing an industry standard anti-theft technology has resulted in a substantial increase in thefts of their vehicles. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly in the City of Baltimore.

4.      In the 1960s and 1970s, all that was needed for a successful vehicle theft was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle

immobilizers in most of their cars. This is not because the technology is somehow beyond

them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate

vehicle immobilizers, because regulations there expressly require them. Hyundai and Kia also

install vehicle immobilizers in their higher-end models in the United States.  For most Hyundai

and Kia models sold in the United States, however, Hyundai and Kia have decided to trade public

safety for profits.

     5.     The disparity between the rate of immobilizers in Hyundai and Kia vehicles

compared to all other manufacturers is staggering—in 2015, only *26 percent* of Hyundai and Kia

vehicles in the U.S. had immobilizers, compared to 96 percent in vehicles from all other

manufacturers.[1]

     6.     Hyundai and Kia's decision to put cost savings and profits over public safety has

had significant consequences for Baltimore and its residents, as it has in other cities. The failure

of Defendants to install a common-sense anti-theft technology, notwithstanding decades of

academic literature and research supporting the deterrent effects of such technology, has caused a

substantial spike in Hyundai and Kia vehicle theft and related crime sprees, reckless driving, and

public harm.

     7.     This problem started in Milwaukee before spreading nationwide.[2] By June 2021,

the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had

increased by 2,500% since the previous year, with an average of sixteen cars being stolen per

day. The same trend is evident in Baltimore, where, for example, thefts of Hyundai and Kia

---

[1] Hyundai and Kia theft losses," 38 HLDI BULLETIN 28 (December 2021), available at:
https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-
081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf

[2] Thieves key on hack that leaves Hyundai, Kia cars vulnerable," The Seattle Times (Sept. 21, 2022), available at:
https://www.seattletimes.com/business/thieves-key-on-hack-that-leaves-hyundai-kia-cars-vulnerable/

vehicles in 2022 (807) more than doubled the total for 2021 (391).[3] Thus far in 2023, thefts of Hyundai and Kia (577 total thru May 3, 2023) are on pace to far exceed (if not double) the total for 2022 (807).[4]

8.      Vehicle theft poses a serious threat to public safety– it goes hand in hand with reckless driving, which in turn causes injuries and death. It also results in increased violence, as car owners may attempt to stop someone attempting to steal their vehicle. It consumes scarce law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

9.      The dramatically increased rate of Hyundai and Kia theft in Baltimore has required city and police resources that would not have been needed but for Hyundai and Kia's deliberate failures. Car thieves—many of them teenagers—take advantage of these failures and engage in reckless driving, creating substantial safety risks to themselves and Baltimore residents and their property.

10.     Defendants' conduct has created a public nuisance that could have been avoided had they simply followed industry-wide standards and installed immobilizer devices in all their vehicles.

11.     Once vehicle theft of Hyundai and Kia models skyrocketed, further expanding the public nuisance, Defendants could have easily abated the public nuisance by issuing a recall and/or spending approximately $500 per vehicle to install immobilizer devices.[5] Instead, Defendants again put profits over public safety by passing on the burden of installing immobilizer devices to the very same customers they put at risk.[6] Because Hyundai and Kia refuse to accept responsibility,

---

[3] Compilation of police department data published by USA Facts. https://usafacts.org/data-projects/car-thefts

[4] Baltimore City Police ("BCP") auto theft incident reports.  Hyundai and Kia constitute 41% of all stolen vehicles (1,396) in the City thru May 3, 2023.

[5] https://www.autoevolution.com/news/hyundai-tries-to-appease-disgruntled-owners-with-170-security-kit-to-stave-https://www.autoevolution.com/news/hyundai-tries-to-appease-disgruntled-owners-with-170-security-kit-to-stave-

[6] *Id.*

municipalities across the country, including Baltimore City, have been forced to divert funds and risk officer safety to combat the rising burden caused by the increases in Hyundai and Kia vehicle thefts and the resulting reckless driving on city streets.

## II.      JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the Parties.

13.     The Mayor and City Council of Baltimore ("Baltimore") is a municipal corporation and regarded as a citizen of the State of Maryland for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

14.     This Court has personal jurisdiction over Defendants, as they conduct substantial business in Maryland, purposefully availing themselves of the privilege to conduct business in this State through the sale of vehicles that they distributed in this State, and the claims arise out of or relate to the Defendants' contacts with Maryland. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. __, 141 S. Ct. 1017, 1028 (2021).

15.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because it is a district where a substantial part of the events giving rise to the claims took place and where the public nuisance exists.

## III.      PARTIES

### A.      Plaintiff

16.     Plaintiff, the Mayor and City Council of Baltimore, is a municipal corporation organized and operating under the Baltimore City Charter and the laws of the State of Maryland.

### B.      Defendants

17.     Defendant Hyundai is a manufacturer and distributor of new motor vehicles under

4

the Hyundai brand and is incorporated and headquartered in the state of California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

18.    Defendant Kia is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Kia markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

## IV.            THE HYUNDAI/KIA THEFT WAVE

### A.    Hyundai and Kia Vehicles Are Easy Targets

19.    As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in  many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, distributed, and sold the following automobile models ("Susceptible Vehicles") without engine immobilizers: Hyundai Elantra, Hyundai Kona, Hyundai Palisade, Hyundai Santa Cruz, Hyundai Santa Fe, Hyundai Sonata, Hyundai Tucson, Hyundai Venue, Kia Cadenza, Kia Forte, Kia K900, Kia Niro, Kia Optima, Kia Rio, Kia Sedona, Kia Seltos, Kia Sorrento, Kia Soul, Kia Sportage, Kia Stinger, and Kia Telluride. As would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased notably in parts of the country, relative to other models, from 2015 to 2020.[7]

---

[7] https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; https://www.nicb.org/sites/files/2017-11/2016-Hot Wheels-Report.pdf; https://www.nicb.org/sites/files/2017-11/2017-Hot-Wheels-Report.pdf https://www.nicb.org/sites/files/2017-11/2018-Hot-Wheels-Report.pdf https://www.nicb.org/sites/files/2017-11/2019-

20.     However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal susceptible Kias and Hyundais. That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[8] As the videos detailed, a thief need only remove the plastic cowl under the steering column and use a USB cable to start these unsecured cars.

21.     What followed was all too predictable: thefts of Kias and Hyundais skyrocketed.[9] In the first half of 2021, the number of stolen Kias and Hyundais increased by more than thirty and fifteen times when compared to the same period in 2020 in Milwaukee.[10] This dramatic increase was unique to Kia and Hyundai, which represented 66% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[11][12] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland Security was stolen in broad daylight.[13] Inside the Hyundai was a rifle, ammunition, and body armor.

22.     This trend then spread nationwide. Baltimore had 391 Hyundai/Kia thefts in 2021; 807 in 2022. This surge continues to the present.  In the first 4 months of 2023,  577  Hyundai/Kia vehicles have already been stolen in Baltimore.[14]  Maryland State Police believe the surge can be

---

Hot-Wheels-Report.pdf https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-

[8] https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html

[9] https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html

[10] https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/

[11] https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971

[12] https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/ https://www.wisconsinrightnow.com/homeland-security-hyundai/

[13] *Id.*

[14] *See* n. 4 *supra*.

attributed to "Kia Boys" videos on Tik Tok.[15]

23.     The susceptibility of Defendants' vehicles to theft enabled this increase. Defendants' choice to deviate from the industry standard of utilizing engine immobilizers, placing profits over safety, was both a proximate and but-for cause. This presents a risk not only for property damage, but to public safety, as car thieves often engage in reckless driving, as well as other dangerous criminal conduct, in stolen vehicles.

## B.     Car Thefts Imperil Public Safety

24.     Car thefts imperil public safety. By creating cars that are too easy to steal, and are therefore frequently stolen, Defendants are responsible for a substantial risk to the public safety.

25.     As noted above, this is the conclusion drawn by the NHTSA.  FMVSS 114 was promulgated to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways." *See* 33 Fed. Reg. 6,471, (Apr. 27, 1968). NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id.* The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year. *Id.*

26.     The reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to

---

[15] The Baltimore Banner, *Gone in 30 seconds: Tik Tok challenge leading to thefts of Kia, Hyundai cars hits Maryland,* April 10, 2023 (updated April 11, 2023).

a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

27.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others within Seattle. This is particularly true with the current crime wave.  Distinct from many instances of car theft, where the object is converting the stolen vehicle, the viral Kia challenge typically involves joy riding and then abandoning the stolen vehicles. Far from surreptitiously delivering a car to a chop shop under cover of night, the social media phenomenon, made possible by Defendants' unsecure vehicles, led to youth posting videos of reckless driving during busy hours of the day, and abandoning the vehicles after collisions.

28.     Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.

29.     One example occurred in Milwaukee in June 2021, when a sixteen-year-old was killed after he stole a Kia Sportage and collided with another car.[16] His two twelve-year-old accomplices were also seriously injured, as were three passengers in the car that he struck.[17]

30.     In Minneapolis, a 14-year-old boy sustained life-threatening injuries after crashing a stolen Kia in December 2022.[18]

31.     Baltimore City has not evaded these tragedies, either.  On February 8, 2023, a stolen Hyundai Sonata ran a red light, hit another vehicle, causing both cars to strike a rowhome, which

---

[16] https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640

[17] https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614

[18] https://www.fox9.com/news/police-14-year-old-driver-seriously-hurt-after-crash-in-stolen-kia.

collapsed.[19]  A pedestrian was killed in the horrifying accident, which was caught on video.

32.     Further, the act of car theft creates a substantial risk of physical harm, in the event the would-be thief is confronted in the act. This was tragically demonstrated in October 2021 in Wisconsin, when a woman was killed after confronting four youths who were attempting to steal a Hyundai.

33.     By electing profits over safety, or, at best, cutting corners and shifting costs to the City and the public, and by deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

34.     As detailed above, Baltimore has experienced a high rate of Hyundai and Kia vehicle thefts, has incurred costs associated with these thefts, and has been unable to abate the nuisance in the absence of action by Defendants.

35.     Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall to correct this omission. To date, Defendants have refused to implement a recall for the Susceptible Vehicles.

36.     As of April 18, 2023, 18 Attorneys General across the country, including Maryland's attorney General Anthony Brown, have signed on to a letter requesting the National Highway Transportation Safety Administration to issue a mandatory nationwide recall of all "unsafe" Hyundai and Kia vehicles manufactured between 2011 and 2022.[20]  Both Kia and

---

[19] The Baltimore Banner, *Stolen Car fatally strikes pedestrian before crashing into Baltimore building that collapsed over the wreckage,* March 2, 2023.

[20] https://www.wbaltv.com/article/kia-hyundai-car-theft-recall-attorney-general/43662471
https://www.usatoday.com/story/money/cars/2023/04/20/kia-hyundai-anti-theft-recall-attorney-general/11705550002/

Hyundai issued statements continuing to oppose *any* recall as "unnecessary."[21]

37.    Hyundai has callously turned this problem of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[22]

**C.    Measures to Prevent Vehicle Theft Have Existed for Over a Century**

38.    Since the dawn of gasoline-powered automobiles at the turn of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development.

39.    In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[23]

40.    Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[24]

41.    Evans and Birkenbeuel's immobilizer/alarm system consisted of a 3x3 switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

42.    The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate

---

[21] *Id.*

[22] https://www.nerdwallet.com/article/insurance/kia-hyundai-theft (mentions the free steering wheel locks; $170 glass-break sensor security kits).

[23] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).

[24] Id. at ¶¶ 14–20.

transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

43.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

44.     In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[25] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: the National Highway Traffic Safety Administration (the "NHTSA"), f/k/a/ the National Traffic Safety Bureau.

45.     Pursuant to its statutory authority under the Safety Act, the NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. *Scope*. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles.
>
> S2. *Purpose*. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.
>
> . . .
>
> S5.1 Theft Protection.
>
> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

---

[25] P.L. 89–563, 80 Stat. 718.

(a) The normal activation of the vehicle's engine or motor; and

(b) Either steering, or forward self-mobility, of the vehicle, or both.

. . .

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

49 C.F.R. § 571.114.

46.     The main motivation for creating FMVSS 114 was the NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[26] As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[27] Accordingly, the NHTSA recognized that "a reduction of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[28]

###     D.     The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

47.     In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[29] The common method for stealing a car involved bypassing the motor's ignition switch,

---

[26] 33 Fed. Reg. 83, 6471 (April 27, 1968).

[27] *Id.*

[28] *Id.*

[29] Anthony Dixon & Graham Farrell, Age-period-cohort effects in half a century of motor vehicle theft in the United States, 9 CRIME SCIENCE 17, 1, 3 (2020).

otherwise known as "hotwiring."

48.     To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[30] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[31]

49.     In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

50.     Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal." [32]

51.     The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[33][42] Similar mandates soon followed in Australia, New Zealand, and Canada.

52.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[34]

---

[30] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

[31] *Id.*

[32] *Id*.

[33] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1, (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[34] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

E.       **Defendants' Deviation from the Industry Standard**

53.     At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by a majority of car manufacturers in America, with the exception of Hyundai and Kia.

54.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[35] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[45] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[36]

55.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[37]

56.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance

---

[35] "Hyundai and Kia theft losses", 38 HLDI BULLETIN 28 (December 2021), available at: https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf

[36] *Id.*

[37] *Id.*

with applicable laws there.[38]

57.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the

American market. In March 2007, Hyundai requested an exemption from particular NHTSA

vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an

antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford

[immobilizer] devices" in reducing vehicle theft.[3949] Yet, until the last year or so, Hyundai and

Kia only offered immobilizers in their premium, more expensive, model lines. This decision only

compounds the harm. Those without resources to afford such models are more likely to live in

areas with higher crimes rates and are likely less able to pay for alternative transportation or for

the cost of repairing a recovered vehicle.

58.     Based on the above, Defendants' decision not to install the simple and highly

effective immobilizer in the Susceptible Vehicles between 2011 and 2021, in contrast to the

approximately 96% of all other car manufacturers that did install an immobilizer, has led to a

significant and reasonably foreseeable increase of Hyundai and Kia car theft in Baltimore.

## V.     CAUSE OF ACTION: PUBLIC NUISANCE

59.     Baltimore hereby re-alleges and incorporates by reference each and every

allegation contained above as though the same were set forth herein in full.

60.     Baltimore, as governmental authority, enjoys *parens patriae* standing to assert

public nuisance claims.  This cause of action is brought pursuant to Baltimore's *parens patriae*

---

[38] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. "Over 50 years of progress: the history of Hyundai" Press Release, 04.06.2019, available at https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[39] 72 Fed. Reg. 138, 39,662 (July 19, 2007); *see also* 75 Fed. Reg. 1,447 (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendants' representation that the immobilizer installation for that specific model should substantially reduce theft rates).

interest in protecting the health and well-being, physical and economic, of a substantial segment of the Baltimore population.

61.     Defendants created a condition that is harmful to human health, indecent and offensive to the senses, and obstructing the free use of property and resources, so as to interfere with the comfortable enjoyment of such property and resources.

62.     Defendants' actions and omissions have caused an unreasonable and substantial interference and risk to citizens who own or operate certain Hyundai and Kia vehicles throughout Baltimore. This interference and risk are ongoing and continuing.

63.     Defendants created a condition that affected a substantial number of people at the same time – specifically, Defendants has created a significant risk of auto theft and bodily injury including death that affects tens of thousands of Baltimore residents.

64.     An ordinary person would be reasonably annoyed and disturbed by Defendants' actions as described throughout this Complaint, including manufacturing, selling, leasing and otherwise providing to the general public vehicles without immobilizers contrary to industry standards.

65.     The social utility and/or benefit (if any) derived from Defendants' deficient vehicles do not outweigh the gravity of the harm inflicted on Baltimore and its residents.

66.     Baltimore has not consented to Defendants' conduct.

67.     Baltimore and its residents who own or operate Defendants' deficient vehicles have suffered and continue to suffer harm different from the type of harm suffered by the general public.  Among other reasons discussed throughout the Complaint, Baltimore is a governmental authority that has incurred costs and losses of a kind and degree different from members of the general public.

68.    Defendants' conduct was a substantial factor in causing Baltimore's harm.

69.    Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## VI.    PRAYER FOR RELIEF

70.    Entering an Order that the conduct alleged herein constitutes a public nuisance under Maryland common law;

71.    Entering an Order that Defendants are jointly and severally liable;

72.    Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

73.    Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

74.    Awarding equitable relief to fund automobile theft prevention;

75.    Awarding actual and compensatory damages;

76.    Awarding reasonable attorneys' fees and costs of suit;

77.    Awarding pre-judgment and post-judgment interest; and

78.    Such other and further relief as the Court deems just and proper under the circumstances.

## VII.    JURY TRIAL DEMANDED

79.    Baltimore hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 11th day of May 2023.

**BALTIMORE CITY DEPARTMENT OF LAW**

By: /s/Sara Gross
Ebony M. Thompson
Acting Solicitor (Bar No. 18968)
Sara Gross
Chief Solicitor (Bar No. 27704)
Baltimore City Department of Law
City Hall
100 North Holliday Street, Suite 109
Baltimore, Maryland 21202
(410) 396-3947 (office)
(410) 574-1025 (fax)
Ebony.Thompson@baltimorecity.gov
Sara.Gross@baltimorecity.gov

**GORDON, WOLF & CARNEY, CHTD.**

By: /s/Richard S. Gordon
Richard S. Gordon (Bar No. 06882)
Martin E. Wolf (Bar No. 09425)
100 W. Pennsylvania Avenue, Suite 100
Towson, Maryland 21204
(410) 825-2300 (office)
(410) 825-0066 (fax)
rgordon @GWCfirm.com
mwolf@GWCfirm.com

*Attorneys for Mayor and City Council of Baltimore*