# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF NEW YORK , <br><br> Plaintiff, <br><br> v. <br><br> HYUNDAI MOTOR AMERICA AND KIA AMERICA, INC., <br><br> Defendants. | Case No.  1:23-cv-4772 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     JURISDICTION AND VENUE ............................................................................ 5

III.    PARTIES ............................................................................................................... 6

        A.      Plaintiff .......................................................................................................... 6

        B.      Defendants ..................................................................................................... 6

IV.     THE KIA AND HYUNDAI THEFT WAVE ......................................................... 7

        A.      Without Immobilizers, Defendants' Vehicles Are Sitting Ducks ...................... 7

        B.      Car Thefts Imperil Public Safety ................................................................. 11

        C.      Car Thefts Drain Public Resources and Imperil Public Policy ........................ 17

        D.      Measures to Prevent Vehicle Theft Have Existed for Over a
                Century ........................................................................................................ 24

        E.      The Widespread Adoption of Modern Engine Immobilizers as an
                Even More Effective Vehicle Theft Deterrent .................................................. 28

        F.      Defendants' Deviation from the Industry Standard ......................................... 30

V.      CAUSES OF ACTION ......................................................................................... 32

COUNT ONE — COMMON LAW PUBLIC NUISANCE .................................................. 32

COUNT TWO — NEGLIGENCE .................................................................................... 34

VI.     PRAYER FOR RELIEF ....................................................................................... 37

VII.    DEMAND FOR JURY TRIAL ............................................................................. 38

Plaintiff the City of New York (the "City") by and through its attorney, Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, alleges upon personal knowledge as to itself and upon information and belief as to all other matters:

## I.   INTRODUCTION

1.   There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers choose not to include standard anti-theft technology in their cars.

2.   The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most recent cars, the ignition key emits a radio signal that, when the key is present, prompts a computer to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.   Between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Hyundai and Kia failed to keep up with the times. As a result, videos teaching the relative ease with which Hyundai and Kia vehicles can be stolen have gone viral. In many cases, thieves use tools no more advanced than a screwdriver—or these days, more typically, a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by foregoing common anti-theft technology have resulted in an epidemic of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, including in New York City, where there are significant competing priorities for New York City Police Department ("NYPD") resources.

4.      In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force to crack open the ignition column and a key-shaped object to start the car and drive off within seconds. Thanks to vehicle immobilizers, this is no longer the case for most cars. Between 2011 and 2022, Hyundai and Kia were nearly unique among automobile manufacturers in failing to install these devices in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have chosen to sacrifice public safety for profits.

5.      The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *26%* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *96%* of vehicles from all other manufacturers.[1]

6.      Hyundai's and Kia's decision to put cost-savings and profits over public safety has had serious, potentially catastrophic, consequences for New York City and its residents, as it has in other cities. Defendants' failure to install an industry-standard anti-theft immobilization device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

---

[1] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

7.     This epidemic started in Milwaukee before spreading nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.[2]

8.     The same trend is evident in New York City,[3] where the police department reports that approximately 287 Kias were stolen in 2022, compared to approximately 119 in 2021, a roughly 241% increase. There was a similar spike in thefts of Hyundais, with approximately 415 reported stolen in 2022, compared to 232 in 2021, a 178.9% increase. And the problem continues to escalate. In 2023, in comparison to past years, there has been a virtual explosion of thefts of Kias and Hyundais: an estimated 977 Hyundai and Kia vehicles were reported stolen in the first four months of 2023 alone. This represents a roughly 660% increase in thefts of Kia and Hyundai vehicles as compared to those same months in 2022, when there were only 148 such thefts.

9.     The spike in thefts for Kias and Hyundais in New York City is even more dramatic when compared to thefts in the city for other makes of cars: in the first four months of 2023 there were approximately 575 thefts of Hyundais reported, establishing Hyundai as the second most stolen car brand in New York City during that period, as compared to 2022, when it was the seventh most commonly stolen. Similarly, approximately 402 Kias were reported stolen between January and April 2023, positioning Kia as the fourth most stolen make of car in the city, compared to 2022, when it was eleventh.

---

[2] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, THEDRIVE.COM (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

[3] Peter Valdes-Dapena, *Hyundai and Kia theft trend has reached New York City*, CNN (Mar. 30, 2023, 3:06 PM), https://www.cnn.com/2023/03/30/business/hyundai-kia-thefts-new-york/index.html.

10.     It is especially telling that while thefts of Kias and Hyundais have grown exponentially in New York City in 2023, thefts of other makes have been decreasing. For comparison, from January through April 2023, thefts of Hondas—one of the most common makes of car in New York City, and the most frequently stolen—decreased by 6.2% over the number of thefts of Hondas in those same months in 2022. Similarly, thefts of Fords, Toyotas, BMWs, Nissans, and Mercedes in 2023 have all decreased from their numbers in 2022, many by significant amounts.[4]

11.     Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn results in injuries and death. It results in increased violence because not only may some vehicles be taken by force, but owners who notice their cars are being stolen may attempt to physically engage with the perpetrator to prevent the theft, or may attempt to recover their stolen vehicles while they are still being driven by the perpetrators. Automotive theft also consumes law enforcement and emergency resources that might otherwise be deployed elsewhere, and deprives the public of safe streets and sidewalks. In a recent letter issued to the National Highway Traffic Safety Administration, eighteen Attorneys General, including New York Attorney General Letitia James, raised concern over this very issue, noting the downstream consequences that unsafe Hyundai and Kia vehicles have created for local governments around the country:

> The high rate of theft of Hyundai and Kia vehicles has demanded time and resources from public safety agencies, diverting resources from other priorities. Thefts reported to law enforcement require documentation and investigation, and crashes of stolen vehicles require emergency responder services. In addition to responding to Hyundai and Kia vehicle thefts and related crashes or crimes, local

---

[4] In New York City, thefts of Ford vehicles are down 37.8%; thefts of Toyotas, 31.7%; Nissans, 24.9%; Mercedes, 26.9%; and BMWs, 15.6%.

agencies have also had to allocate scarce resources to preventative measures.[5]

12.     The skyrocketing number of Kia and Hyundai vehicle thefts in New York City has drastically impacted NYPD and other City resources. Residents of New York City are subjected to increasingly dangerous conditions on their city streets, as car thieves (many of them teenagers) taking advantage of Hyundai's and Kia's failures engage in reckless driving, endangering New York City residents and their property.

13.     Defendants' conduct has created a public nuisance that could have been mitigated or avoided had they followed industry-wide standards and installed immobilizer devices, or an equivalent anti-theft device, in all their vehicles.

14.     To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including the City, to divert funds and risk officer safety to combat the growing burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.      JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the Parties. The City is regarded as a citizen of the state of New York for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

16.     This court has specific personal jurisdiction over Defendants, as they conduct substantial business in New York through the sale of vehicles that they distribute in New York,

---

[5] Letter from Attorneys General to Ann Carlson, Acting Administrator of the National Highway Traffic Safety Administration 4 (Apr. 20, 2023), https://oag.dc.gov/sites/default/files/2023-04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.pdf ("Letter from Attorneys General Letter to NHTSA").

purposefully availing themselves of the privilege of conducting business in this State, and the claims arise out of or relate to Defendants' contacts with New York. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because it is a district where a substantial part of the events giving rise to the claims took place and where the public nuisance exists.

### III.     PARTIES

#### A.     Plaintiff

18.     Plaintiff, the City of New York, is a municipal corporation organized under the laws of the State of New York. It comprises five counties in the state of New York and has approximately 8.5 million residents.

#### B.     Defendants

19.     Defendant **Hyundai Motor America** ("Hyundai") is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

20.     Defendant **Kia America, Inc.** ("Kia"), is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

## IV.    THE KIA AND HYUNDAI THEFT WAVE

### A.    Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

21.    As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models ("Susceptible Vehicles") without engine immobilizers at various times between 2011 and 2022: Hyundai Accent, Elantra, Elantra GT, Elantra Coupe, Elantra Touring, Genesis Coupe, Kona, Palisade, Santa Fe, Santa Fe XL, Santa Fe Sport, Sonata, Tucson, Veloster, Venue, and Veracruz; and the Kia Forte, K5, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As word of this susceptibility spread, thefts of Susceptible Vehicles increased relative to other models.[6]

22.    However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible Vehicles.[7] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in

---

[6] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; *and America's 10 Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.
[7] Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

reckless driving after stealing Kias and Hyundais.[8] As the videos detailed, a thief need only remove the plastic cowl under the steering column and use a USB cable to start these unsecure cars.

23.     What followed was all too predictable: thefts of Kias and Hyundais skyrocketed.[9] In the first half of 2021, the number of stolen Kias and Hyundais increased by more than 30 and 15 times, respectively, when compared to the same period in 2020 in Milwaukee.[10] This dramatic increase was unique to Kias and Hyundais, which represented two-thirds of the 5,144 vehicles stolen in Milwaukee between January 1, 2021 and July 11, 2021.[11] For all of 2019, Hyundai and Kia vehicles made up only 6% of the 3,495 vehicles stolen in Milwaukee.[12] This trend then spread nationwide.

24.     The susceptibility of Defendants' vehicles to theft has enabled this spiraling epidemic. Defendants' choice to deviate from the industry standard of utilizing engine immobilizers, placing profits over people and safety, was both a proximate and but-for cause of

---

[8] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[9] *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, INSIDE EDITION (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[10] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, KELLEY BLUE BOOK (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[11] Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021, 4:29 PM), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

[12] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* THE TRUTH ABOUT CARS (Sept. 20, 2022 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971.

this outbreak. As one police sergeant described the problem, Defendants' cars are simply too easy to steal.[13]

25.     In a recent press conference, New York City Mayor Eric Adams, NYPD Commissioner Keechant Sewell, and Philip Banks, Deputy Mayor for Public Safety, highlighted the significant harm to public safety in New York City caused by the vulnerability of the Susceptible Vehicles to theft due to the absence of anti-theft measures—a vulnerability that is being exacerbated by the viral social media challenge spreading word of its existence—and the many NYPD resources that are being directed to address this issue.[14] A review of data reflecting reported auto thefts in 2022 in New York City confirms the serious and escalating threat that the Mayor, Police Commissioner, and Deputy Mayor described: thefts of 2011–2021 Kias and 2015–2021 Hyundais rose rapidly in New York City between September and December 2022, particularly in the Bronx and northern Manhattan. Prior to September 2022, there were an average of twelve 2015–2021 Hyundais reported stolen in the city per month, compared to approximately 105 such vehicles reported stolen in December 2022—an 875% increase. Similarly, prior to October 2022, there were an average of ten 2011–2021 Kias reported stolen in the city per month, compared to approximately 99 such vehicles reported stolen in December 2022—a 990% increase.[15]

---

[13] Rebecca Klopf, *MPD: Hyundai and Kia vehicles too easy to steal, leading to spike in car thefts,* TMJ 4 (Feb. 3, 2021, 4:40 PM), https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts.

[14] NYC Mayor's Office, *Mayor Eric Adams Makes Public Safety Announcement with NYPD Commissioner Sewell*, YouTube (Mar. 30, 2023), https://www.youtube.com/watch?v=Ns03Y3O3ogA.

[15] Kia and Hyundai have recently acknowledged that vehicle immobilizers were not installed in some of their models released in 2022. As a result, it is likely that the significant increase in the number of thefts of Kias and Hyundais is even greater than is reflected in the above data. The City is in the process of updating its data to include reported thefts of 2022 Kia and Hyundai models.

26.     The theft of 2011–2021 Kias and 2015–2021 Hyundais have continued to skyrocket in New York City. From January to April 2023, approximately 369 such Kias and 402 such Hyundais were reported stolen, compared to approximately 42 Kias and 54 Hyundais reported stolen during those same months in 2022. Thefts of 2011–2021 Kias and 2015–2021 Hyundais now represent 19.3% of all reported car thefts this year in New York City, despite the fact that these cars represent only 2.88% of all cars registered in New York City. The increase in thefts of these vulnerable vehicles has been significant. For comparison, in 2022, even including the spike of thefts seen in December 2022, thefts of these Kias and Hyundais represented only 3.67% of all reported car thefts in the city.

27.     Indeed, as seen in the City's most recent CompStat report—a periodic public NYPD report on the rates of certain major categories of crime—thefts of vulnerable Kias and Hyundais have contributed to a double digit increase in Grand Larceny Auto ("GLA") rates in New York City in 2023. In comparison, almost all of the other major crime categories have declined this year compared to their 2022 numbers: reported GLA's have increased 16.5% in New York City through May 14, 2023, compared to an 11% drop in reported murders, a 5.1% decline in reported rapes, a 2.4% decrease in reported robberies, an 8% drop in reported burglaries, and a 1.3% decline in reported grand larcenies.[16] In addition, the NYPD's Crime Control Strategies Division reports that there have been 271 arrests for thefts of Hyundai and Kia vehicles since the uptick in thefts of Kias and Hyundais began in September 2022.

---

[16] NYPD Citywide Compstat, Volume 30, Number 19 (through May 14, 2023), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nyc.gov/assets/nypd/downloads/pdf/crime_statistics/cs-en-us-city.pdf; *See also*, *March sees drop in murders, but 'static' overall crime*, Spectrum News (April 6, 2023), https://www.ny1.com/nyc/all-boroughs/news/2023/04/06/nypd-crime-statistics-march-2023.

### B.   Car Thefts Imperil Public Safety

28.     Car thefts imperil public safety. By creating and/or facilitating or otherwise contributing to a rash of car thefts, Defendants are responsible for a substantial risk to the public safety.

29.     This is the conclusion drawn by the National Highway Traffic Safety Administration ("NHTSA"). Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety Standard 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[17] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[18] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[19]

30.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' decision to forego the installation of immobilizer devices has led to a clear rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to operators of stolen vehicles and any lawful drivers or pedestrians who are unfortunate enough to cross their paths.

---

[17] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968).
[18] *Id.*
[19] *Id.*

31.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of New York City residents. This is particularly true with the current crime wave of Hyundai and Kia thefts, which often involve joy riding, where stolen cars are used recklessly for a short period of time before being discarded.

32.     The perpetrators of the recent wave of Hyundai and Kia thefts are often teenagers who post videos of themselves driving recklessly before abandoning the stolen vehicles—sometimes after collisions—during busy hours of the day. Social media platforms are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[20] The fact that many of the perpetrators are juveniles and therefore inexperienced drivers—in many cases, too young to have a driver's license or permit—adds to the danger.

36.     The public safety threat associated with juveniles and young adults recklessly driving these stolen Kia and Hyundai vehicles continues to plague cities nationwide, including New York City. From September 1, 2022 to April 20, 2023, of the 271 arrests made in connection with GLAs involving Kias and Hyundais, more than half of those arrested (54.2%) were between 12 and 17 years old, and more than three quarters (87.5%) were under the age of 25. Other statistics similarly indicate that the percentage of juveniles and young adults committing these car thefts is increasing. In 2021, 17.8% of those arrested for grand larceny of a vehicle were under the age of

---

[20] *See e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link;@monloww__, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; *and* @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

eighteen. In 2022, with the uptick in Kia and Hyundai thefts beginning in September, that number increased to 22%. And, in the first four months of 2023, that number has increased to 29.7%.

37.     The phenomenon of young people stealing susceptible Kias and Hyundais and driving recklessly has resulted in potentially catastrophic accidents in and around New York City. For example, in April of this year, four young men from the Bronx allegedly driving recklessly in a stolen Kia Forte crashed into a house in Greenwich, CT at high speed, causing significant damage to the vehicle and the home. The young men are now facing multiple charges.[21] In another recent example, in January 2023 a 17-year-old allegedly stole a Kia in Harlem and smashed it into a tree in the Bronx, before being arrested.[22]

38.     In upstate New York, the phenomenon has already led to extreme and devastating accidents. In October 2022, a 16-year-old individual allegedly driving a stolen Kia Sportage crashed the vehicle near the intersection of Routes 33 and 198 in Buffalo.[23] All five passengers were ejected from the vehicle, three of whom were pronounced dead at the scene.[24] Another passenger later died at the hospital, and the remaining passenger and driver sustained serious

---

[21] *Police: Car thieves from the Bronx crash into Greenwich home; 4 arrested*, NEWS 12 BROOKLYN (April 29, 2023 2:13 PM), https://brooklyn.news12.com/police-car-thieves-from-the-bronx-crash-into-greenwich-home-4-arrested.

[22] *Police Fight TikTok's Viral Kia Challenge – With Low-Tech solution to High Tech Glitch*, NBCNEWYORK.COM (January 10, 2023 6:37 AM), https://www.nbcnewyork.com/news/local/police-fight-tiktoks-viral-kia-challenge-with-low-tech-solution-to-high-tech-glitch/4040814/.

[23] Aidan Joly & Evan Anstey, *Four teens killed in rollover crash in Buffalo, two injured*, ROCHESTERFIRST.COM (Oct. 25, 2022, 12:26 PM), https://www.rochesterfirst.com/crime/police/four-teens-killed-in-crash-at-33-and-198/.

[24] *Id.*

injuries. The four passengers who died were all between the ages of 14 and 19.[25] The 16-year-old

driver faces four counts of second-degree manslaughter, among other charges.[26]



39.     Another example of this all-too-common tragedy occurred in Milwaukee in June

2021, when a 16-year-old was killed after he allegedly stole a Kia Sportage and collided with

another car.[27] His two 12-year-old alleged accomplices were also seriously injured, as were three

---

[25] Graeme Massie, *Car crash that killed four teens is linked to 'Kia Challenge' TikTok craze, Buffalo police say*, THE INDEPENDENT (Oct. 25, 2022, 9: 38 PM), https://www.independent.co.uk/news/world/americas/crime/buffalo-teen-crash-tiktok-kia-challenge-b2210473.html.

[26] Maki Becker, *Teen in stolen Kia crash that killed 4 must wear ankle monitor, report to probation*, THE BUFFALO NEWS (Dec. 11, 2022), https://buffalonews.com/news/local/crime-and-courts/teen-in-stolen-kia-crash-that-killed-4-must-wear-ankle-monitor-report-to-probation/article_030d8c44-56e8-11ed-a8c0-b77671ebf054.html.

[27] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN (June 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

passengers in the car that he struck. The images and dashcam footage[28] of this tragedy show how the epidemic of vehicle theft imperils the public.



40.     In electing profits over safety and deviating from industry norms by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

41.     The risk to public safety is not limited to the vehicle theft and subsequent reckless driving of that vehicle; thieves often engage in other dangerous criminal conduct using stolen vehicles, putting the community, and police officers, at great risk. For example, in New York City in December 2022, a stolen Hyundai was used in connection with a serious firearms offense, resulting in a death. In that case, while NYPD officers were attempting to conduct a stop of a stolen Hyundai Elantra, the car attempted to flee, causing property damage to other vehicles on public

---

[28] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*, WISN (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

streets. Later, one of the occupants of the vehicle twice exchanged gunfire with the police, was struck by multiple bullets, and later died in hospital.[29]

42.     Vehicle thefts may also create a substantial risk to public safety under circumstances where the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai allegedly got out with guns and began shooting at him.[30] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[31] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[32]

43.     This risk was also tragically demonstrated in Wauwatosa, Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed at the scene.[33]

44.     Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in

---

[29] *NYPD officers shoot man after stolen car chase, gunfight in Bronx near Yankee Stadium*, NY DAILY NEWS (December 4, 2022 5:59 PM), https://www.nydailynews.com/new-york/nyc-crime/ny-cops-shoot-man-after-chase-bronx-20221204-gtn77c36fnas3crdgxxvzmfllu-story.html; *Man dies after shootout with NYPD in Bronx that included cop involved in previous deadly 2021 gunfight*, NY DAILY NEWS (December 11, 2022, 6:07 PM), https://www.nydailynews.com/new-york/nyc-crime/ny-bronx-man-dies-police-shooting-20221211-a64dvow6uvhodclce5tp5kqi6i-story.html.

[30] Cory Shaffer, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, CLEVELAND.COM (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[31] *Id.*

[32] *Id.*

[33] Michael Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021, 10:06 PM), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.

Baltimore crashed into another car and a 54-year-old pedestrian.[34] Both cars careened into a nearby building, which collapsed on top of the vehicles and the pedestrian.[35] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[36]



### C.    Car Thefts Drain Public Resources and Imperil Public Policy

45.    New York City has experienced an especially high rate of Hyundai and Kia vehicle thefts and the City has been forced to respond, incurring significant costs, including expending extra police time and resources taking reports and collecting evidence; providing emergency and medical services; processing, prosecuting, and rehabilitating offenders; developing, maintaining, and tracking data on the rising trend of Hyundai and Kia thefts; and educating the public about this threat to public safety. Specifically, the NYPD's Auto Crime Unit, and officers assigned to local

---

[34] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, THE BALTIMORE SUN (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html.
[35] *Id.*
[36] *Id.*

precincts are expending valuable time and resources to respond to and investigate the thefts, including putting their own safety at risk in pursuit of reckless and dangerous drivers, while at the same time, the NYPD's Crime Prevention and Community Outreach Divisions have been forced to launch a public awareness campaign in an effort to alert the public and thereby prevent these thefts.[37] Moreover, the NYPD has also undertaken campaigns to purchase and distribute steering wheel locks to the owners of vulnerable models of Kia and Hyundai vehicles in an effort to prevent thefts, and to distribute tracking devices—Apple AirTags and Android Tile trackers—that would allow iPhone and Android mobile phone users to track their vehicles when they are stolen, and potentially facilitate or expedite recovery of the stolen vehicles by the NYPD.[38] These public outreach and distribution campaigns, and any related costs incurred in carrying them out, above and beyond normal policing costs, are attributable to the public nuisance created and maintained by Defendants.

---

[37] NYC Mayor's Office, *Mayor Eric Adams Makes Public Safety Announcement with NYPD Commissioner Sewell*, YouTube (Mar. 30, 2023), https://www.youtube.com/watch?v=Ns03Y3O3ogA.

[38] Lauren Leffer, *NYPD to Hand Out 500 Free Air Tags as Car Thefts Rise,* YAHOO! NEWS, May 1, 2023, https://news.yahoo.com/nypd-hand-500-free-airtags-171200700.html?guccounter=1; *see also*, NYPD Community Affairs (@NYPDCommAffairs) post, TWITTER, May 18, 2023, https://twitter.com/NYPDCommAffairs/status/1659259516041535495?s=20.



15 hours ago

## Attention Kia/Hyundai Owners!!

The NYPD Crime Prevention Division will be distributing a limited number of Apple Airtags  and Tile Trackers free of charge, to owners of Kia and Hyundai vehicles who meet the criteria above.

The event is this Saturday, May 20, 2023
Location: 2855 Ulmer Street, Queens, NY 11357
Time of event: 11:00am - 1:00pm (while supplies last)

For more information, contact your local precinct Crime Prevention Officer.

46.     As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities, thereby increasing the potential number of uninsured motorists on the road—themselves a threat to public safety—and undermining important public policy goals, with potentially significant public safety *and* public health consequences.[39] In a March 20, 2023 letter to Kia and Hyundai, New York Attorney General Letitia James, along with 21 other Attorneys General and one Director of Consumer Protection also highlighted potential legal consequences for vehicle owners in their states:

> Beyond dealing with the risk of having their vehicle stolen, Hyundai and Kia owners are now facing the threat of being unable to insure their vehicles. Major insurance companies are now refusing to insure the Hyundai and Kia models most susceptible to theft. In states where insurance is required to own and operate a vehicle, the inability to obtain car insurance can mean that certain Hyundai and Kia owners can no longer legally drive their car.[40]

47.     Defendants' responses to the crises that they have created show that they continue to prioritize profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only suggesting that owners of Susceptible Vehicles use wheel locks.[41] Unfortunately, the wheel locks are not entirely effective; Susceptible

---

[39] Peter Valdes-Dapena, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Joe Hernandez, *Dealers still sell Hyundais and Kias vulnerable to theft, but insurance is hard to get,* NPR (May 4, 2023, 5:00 AM), https://www.npr.org/2023/05/04/1173048646/hyundai-kia-car-theft-tiktok-insurance-dealerships (discussing how "a dozen" insurance companies denied coverage for the new owner of 2020 Kia Forte).

[40] Letter from Attorneys General to John Yoon of Kia and Jason Erb of Hyundai 3 (March 20, 2023), https://cbs6albany.com/hyundai-kia-pushed-to-do-more-to-help-customers-with-cars-targeted-by-thieves-vehicle-thefts-rise-engine-immobilizers-state-attorney-general-california-new-york-illinois-pennsylvania-wisconsin-arizona-colorado-connecticut-delaware-maryland.

[41] Defendants have offered to distribute wheel locks to certain municipalities, but New York City was not one of them. *See* Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, MILWAUKEE JOURNAL

Vehicles with wheel locks in use have still been stolen, and in some instances, used in connection with other crimes, including shootings.[42]

48.    More recently, Hyundai and Kia have begun rolling out a "software update" rather than installing immobilizers.[43] As highlighted in the multistate letter sent on behalf of eighteen Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[44]

49.    The rollout of Defendants' software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that the City has incurred and continues to incur. Moreover, the update's efficacy has not been proven in the real world—and in fact Susceptible Vehicles have already been stolen after receiving the update.[45] For vehicles not

---

SENTINEL (July 19, 2021, 10:16 AM),
https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[42] Ashley Sears, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX6NOW.COM (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX13 SEATTLE (Jan. 25, 2023), https://www.q13fox.com/news/b-i-swear-b-im-gonna-crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; *and Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS MINNESOTA (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/.

[43] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

[44] Letter from Attorneys General to NHTSA at 6.

[45] Already, Susceptible Vehicles have been stolen after receiving the update. *See* Michelle Nicks, *Cleveland woman devastated after new anti-theft device on her Hyundai fails to stop thieves from causing damage*, CLEVELAND19.COM (March 17, 2023, 8:07 PM), https://www.cleveland19.com/2023/03/18/cleveland-woman-devastated-after-new-anti-theft-device-her-hyundai-fails-stop-thieves-causing-damage/. *See also* Devin Bartolotta, *First case of Kia stolen after security software upgrade reported in New Orleans*, WWLTV (May 15, 2023, 10:16 PM), https://www.wwltv.com/article/news/crime/first-case-kia-stolen-after-security-

covered by the update, Defendants are offering nothing more than a $300 rebate "for the purchase of various anti-theft devices."[46]

50.     In addition, upon information and belief, the software update can significantly inconvenience the drivers of the Susceptible Vehicles, making them less likely to seek it out. Rather than install an actual immobilizer, the software update doubles the length of the theft alarm sound the car emits and adds a new logic check to the vehicles' on-board computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This update will interfere with the usability of the Susceptible Vehicles in many everyday situations.

51.     As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to the individual vehicle owners."[47]

52.     Additionally, the Attorneys General have identified two other primary issues with the software update. First, "not all eligible vehicles can receive the updates immediately"—at least

---

software-upgrade-reported-new-orleans-sweeps-crime-local-news/289-c789eed8-bc46-4e0a-83fb-7489563300ce (discussing the theft of a 2020 Kia Optima approximately 15 hours after the same vehicle received the software update from a Kia dealership); *and* Dave D'Marko, *Hyundai and Kia owners report thefts despite software upgrade*, Fox 4 Kansas City (May 17, 2023, 9:54 PM), https://fox4kc.com/news/hyundai-kia-owners-report-thefts-despite-software-upgrade/. Additional anecdotes suggest that the update is not reliable. *See* Jsmith4523, Reddit (Feb. 22, 2023, 4:52 PM), https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_elantra_se_was_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name=iossmf; MaximumLongjumping31, Reddit (Mar. 3, 2023, 5:12 AM), https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrade_my_terrible_experience/.
[46] *Kia Motor America and Kia America Resolve Consumer Litigation in Response to Vehicle Thefts*, Kia Media (May 18, 2023), https://www.kiamedia.com/us/en/media/pressreleases/20679/hyundai-motor-america-and-kia-america-resolve-consumer-litigation-in-response-to-vehicle-thefts.
[47] Letter from Attorneys General to NHTSA at 6.

two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[48]

Meanwhile, these vehicles "will remain on the road, vulnerable to theft and posing a threat to

public safety."[49] Second, Defendants' "voluntary service campaign" does not prompt certain

"regulatory requirements and oversight and instead places additional burdens on individual vehicle

owners."[50]

53.      In addition, owners of the Susceptible Vehicles have already experienced issues

where the software update, which requires the car to be unlocked using the fob before starting,

failing which the alarm will sound, conflicts with after-market remote start systems that they had

installed, rendering the vehicles functionally inoperable. As one owner recently posted:

> I have the update. I also have an after-market remote start. The
> remote start will set off my car alarm. You can turn the alarm off,
> but it will beep periodically and the headlights flash until you turn
> the vehicle off.[51]

54.      Prior to this software update, Hyundai callously turned this crisis of its own making

into a source of revenue, selling security kits for $170, plus the cost of installation.[52] Defendants

could have—and should have—initially included a fob-integrated engine immobilizer as a

standard feature in their cars, consistent with the accepted industry standard. Even after the cars

---

[48] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

[49] Letter from Attorneys General to NHTSA at 7.

[50] *Id.*

[51] Fungiinterezt, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new.

[52] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, NERD WALLET (Jan. 26, 2023), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

were sold, Defendants could have implemented a complete recall to implement the fix. Instead, Hyundai chose to make money off of a crime wave it caused. By electing profits over safety and deviating from the industry standard by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

### D.   Measures to Prevent Vehicle Theft Have Existed for Over a Century

55.   Since the dawn of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[53]

56.   Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[54]

57.   Evans and Birkenbeuel's immobilizer/alarm system consisted of a 3x3 switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions that until released would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

---

[53] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[54] *Id.* at ¶¶ 14–20.



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"**

58.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

59.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

60.    In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[55] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: NHTSA, f/k/a/ the National Traffic Safety Bureau.

61.    Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[56] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1.   *Scope*. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles
>
> S2.   *Purpose*. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3.   *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.
> . . .
>
> S5.1 *Theft Protection*.
> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
> (a)    The normal activation of the vehicle's engine or motor; and
> (b)    Either steering, or forward self-mobility, of the vehicle, or both.
>
> . . .
>
> S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

---

[55] National Traffic and Motor Vehicle Safety Act of 1966, Pub. L. 89–563, 80 Stat. 718.
[56] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. § 571.114.

62.     The main motivation for enacting FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[57]

63.     As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[58] Accordingly, NHTSA recognized that "a reduction of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[59] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[60]

64.     Although FMVSS 114 does not expressly require the installation of an engine immobilizer, it is apparent that an immobilizer is the most effective way to satisfy this requirement and has become the industry standard, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[61] Kia and Hyundai, instead of including an engine immobilizer in all of their vehicle models, rely

---

[57] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (April 27, 1968).

[58] *Id.*

[59] *Id.*

[60] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006) (to be codified at 49 C.F.R. pt. 571); *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968).

[61] Jacqueline Glassman, *NHTSA Interpretation GF005229-2*, NHTSA.gov (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

on other factory-installed anti-theft features: requiring a key to start the vehicle, gear-shift locks, and steering wheel locks. These features are ineffective at addressing the risk of theft because they do not immobilize the vehicle when an attempt is made to bypass the ignition system or to start the vehicle without *the correct* key. The same is true for Hyundai's proposed anti-theft software update. The failure to include an engine immobilizing system created and/or contributed to the public nuisance of rampant car theft in New York City.

### E.   The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

65.   In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[62] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The below graph illustrates the dramatic rise in car thefts during this time period.[63]



---

[62] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 CRIME SCIENCE 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[63] *Id.* at 2.

66.     To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[64] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[65]

67.     In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

68.     Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[66]

69.     The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[67] Similar mandates soon followed in Australia, New Zealand, and Canada.

70.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[68]

---

[64] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

[65] Id.

[66] Id.

[67] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[68] Jan C. van Ours & Ben Vollaard, The Engine Immobiliser: A Non-Starter for Car Thieves, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

F.      **Defendants' Deviation from the Industry Standard**

71.     At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

72.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing anti-theft devices were introduced."[69] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[70] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[71]

73.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[72]

74.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing

---

[69] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.
[70] *Id.*
[71] *Id.*
[72] *Id.*

immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[73]

75.     Moreover, Defendants are equally familiar with the benefits of installing immobilizers in the American market. As far back as March 2007, Hyundai touted the anti-theft device installed in its 2008 Hyundai Azera line as "at least as effective as th[e] GM and Ford [immobilizer] devices" when explaining its ability to reduce vehicle theft.[74] Yet, despite knowing the unquestionable benefits of engine immobilizers, Hyundai and Kia intentionally chose to forego the standard use of such devices in many of their cars. Instead, they relied on less effective measures such as steering wheel and gear shift locks, particularly in their lower end models. This decision callously compounded the risk and the harms of auto theft experienced by low-income communities,[75] as those least able to afford to purchase the high-end Kia or Hyundai models equipped with immobilizers are more likely to live in areas with higher crime rates—making them doubly vulnerable to auto theft—and are less likely to be able to pay for alternative transportation when their car is stolen, or for the cost of repairing the vehicle if and when it is recovered.

---

[73] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Over 50 years of progress: the history of Hyundai* HYUNDAI.NEWS (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[74] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center,72 Fed. Reg. 39,661 (July 19, 2007); *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, 75 Fed. Reg. 1,447 (Jan. 11, 2010) (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendants' representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[75] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

76.     In September 2022, the HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, *combined*, had a theft claim rate of 1.21.[76]

77.     Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2022, in contrast to the approximately 96% of all other car manufacturers that did install an immobilizer, has led to a reasonably foreseeable car theft epidemic that is plaguing the City.

### V.     CAUSES OF ACTION

### COUNT ONE — COMMON LAW PUBLIC NUISANCE

78.     The City of New York incorporates each preceding paragraph as though fully set forth herein.

79.     Defendants—through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft—have created, contributed to, and maintained a public nuisance that substantially interferes with rights common to the general public.

80.     A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.*, 362 N.E.2d 968, 971 (1977) (internal citations omitted).

---

[76] *Id.* An insured vehicle year is equal to one vehicle insured for one year.

81.     Defendants' conduct has interfered, and continues to interfere, with the use by the public of public streets and sidewalks in New York City, and has endangered the safety, health, and comfort of the general public in the city.

82.     In addition, Defendants' conduct has undermined law enforcement efforts to deter vehicle theft and otherwise diverted valuable law enforcement resources.

83.     At all relevant times, Defendants have been the manufacturers, marketers, and/or distributors of the Susceptible Vehicles being stolen at record rates that are, at times, being used in the commission of violent crimes in New York City and New York State.

84.     At all times relevant to this litigation, Defendants knew or had reason to know of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically the increased risk of vehicle theft and public harm. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as 40%. Defendants also knew or had reason to know that the installation of immobilizers in their own vehicles has considerable deterrent effects on the rate of car theft.

85.     Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the safety, welfare, peace, comfort, and convenience of the general public in New York City.

86.     Defendants, through their business practices, contribute to a significant increase in vehicle theft, reckless driving, and the use of stolen vehicles in the commission of other crimes in New York City, thus endangering the safety and health of considerable numbers of New York City residents, depriving New York City residents of the peaceful use of the public streets and sidewalks, undermining City law enforcement efforts, increasing law enforcement costs and

diverting law enforcement resources, and interfering with commerce, travel, and the quality of daily life in New York City.

87.     Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in New York City.

88.     As a result of Defendants' conduct, the City has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, and other services. The City will continue to incur economic losses until the nuisance is abated. These damages are particular to the City and are different in kind to the harms suffered by New York residents at large.

89.     Defendants' decision to forego installing engine immobilizers in Susceptible Vehicles has predictable and harmful consequences, the cost of which should not be borne by the City and the public fisc.

90.     The City has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the public nuisance created by Defendants' actions.

91.     The City requests an order providing for abatement of the public nuisance that Defendants have created or contributed to, compensation for the economic losses suffered as a result of the nuisance, and injunctive relief.

### COUNT TWO — NEGLIGENCE

92.     The City of New York incorporates each preceding paragraph as though set forth fully herein.

93.     At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so easy to steal.

94.     Defendants owed and continue to owe the City a duty not to expose the City to an unreasonable risk of harm. Defendants' duties were preexisting.

95.     At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

96.     Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause the City's injuries and thus created a dangerous and unreasonable risk of injury to the City. Defendants were therefore in the best position to protect the City against the foreseeable rise in the theft of Susceptible Vehicles.

97.     At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause the City's injuries, as FMVSS 114 requires automobiles to have a starting system which, whenever the key is removed from the starting system, prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system." As alleged, *supra*, although Kia's and Hyundai's Susceptible Vehicles are purportedly equipped with certain anti-theft devices, using an engine immobilizer device is the accepted industry standard, which is why most carmakers in the United States install them to satisfy FMVSS 114.

98.     Thus, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and

distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

99.     Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in New York City.

100.    Defendants knew and/or should have known that it was foreseeable that the City would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

101.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

102.    Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that the City suffered, and will continue to suffer.

103.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

104.    The City's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

105.    As a proximate result of Defendants' wrongful acts and omissions, The City has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in New York City.

106.    Defendants engaged in conduct, as described above, that constituted reckless disregard for the safety and health of New York City residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

107.    Defendants' conduct constituting reckless and conscious disregard of public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

108.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

109.    The City has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the negligence caused by Defendants' actions.

110.    The tortious conduct of each Defendant was a substantial factor in producing harm to the City.

111.    Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of the City's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

112.    The City is without fault and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

## VI.    PRAYER FOR RELIEF

Wherefore, the City requests that the Court grant judgment, as follows:

37

113.    Entering an Order that the conduct alleged herein constitutes a public nuisance under New York law;

114.    Entering an Order that the Defendants' conduct was negligent;

115.    Entering an Order that Defendants are jointly and severally liable;

116.    Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

117.    Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

118.    Awarding equitable relief to fund automobile theft prevention;

119.    Awarding actual and compensatory damages;

120.    Awarding punitive damages;

121.    Awarding reasonable attorneys' fees and costs of suit;

122.    Awarding pre-judgment and post-judgment interest; and

123.    Awarding such other and further relief as the Court deems just and proper under the circumstances.

## VII.   DEMAND FOR JURY TRIAL

124.    Plaintiff hereby demands a trial by jury.

DATED:   New York, New York
        June 6, 2023

**HON. SYLVIA O. HINDS-RADIX**          **KELLER ROHRBACK L.L.P.**
Corporation Counsel of the              1140 Sixth Avenue, 9th Floor
City of New York                        New York, NY 10036
100 Church Street, Rm 20-87             Tel: (646) 380-6690
New York, NY 10007                      Fax: (646) 380-6692
Tel: (212) 356-2276                     *Attorneys for Plaintiff the City of New York*
 *Attorneys for Plaintiff the City of New York*


By /s/ _____              By /s/ *David S. Preminger*          ___
Melanie C.T. Ash                        David S. Preminger
Elizabeth Slater                        dpreminger@kellerrohrback.com
Assistant Corporation Counsels
mash@law.nyc.gov                        Derek W. Loeser
eslater@law.nyc.gov                     Gretchen Freeman Cappio, pro hac application
                                        to be filed
                                        Dean Kawamoto, pro hac application to be filed
                                        Ryan McDevitt, pro hac application to be filed
                                        Alison Gaffney, pro hac application to be filed
                                        Garrett Heilman, pro hac application to be filed
                                        Zachary Gussin, pro hac application to be filed
                                        Kylie Fisher, pro hac application to be filed
                                        Keller Rohrback L.L.P.
                                        1201 Third Avenue, Suite 3200
                                        Seattle, WA 98101
                                        Tel.:  (206) 623-1900
                                        Fax:  (206) 623-3385
                                        dloeser@kellerrohrback.com
                                        gcappio@kellerrohrback.com
                                        dkawamoto@kellerrohrback.com
                                        rmcdevitt@kellerrohrback.com
                                        agaffney@kellerrohrback.com
                                        gheilman@kellerrohrback.com
                                        zgussin@kellerrohrback.com
                                        kfisher@kellerrohrback.com