# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CITY OF PARMA, | ) | No. |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| HYUNDAI MOTOR AMERICA and KIA | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 4

III.    PARTIES ........................................................................................................... 4

        A.      Plaintiff ................................................................................................. 4

        B.      Defendants ............................................................................................ 5

IV.     THE KIA HYUNDAI THEFT WAVE ............................................................. 5

        A.      Without Immobilizers, Defendants' Vehicles Are Sitting Ducks ....................... 5

        B.      Car Thefts Imperil Public Safety ........................................................ 9

        C.      Measures to Prevent Vehicle Theft Have Existed for Over a
                Century ............................................................................................... 23

        D.      The Widespread Adoption of Modern Engine Immobilizers as an
                Even More Effective Vehicle Theft Deterrent .................................. 27

        E.      Defendants' Deviation from the Industry Standard .......................... 28

V.      CAUSES OF ACTION .................................................................................... 30

COUNT One — COMMON LAW ABSOLUTE PUBLIC NUISANCE ............................... 30

COUNT Two — COMMON LAW QUALIFIED PUBLIC NUISANCE .............................. 33

COUNT Three — NEGLIGENCE ...................................................................................... 35

VI.     PRAYER FOR RELIEF .................................................................................. 38

VII.    DEMAND FOR JURY TRIAL ....................................................................... 39

## I.    INTRODUCTION

1.    There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens to public safety when car manufacturers choose not to include standard anti-theft technology in their vehicles.

2.    The days of "hotwiring" cars with nothing more than a screwdriver are largely over: in most recent cars, the ignition key emits a radio signal that, when the key is present, prompts a computer to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.    Between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Hyundai and Kia failed to keep up with the times. As a result, TikTok and news videos demonstrate the relative ease with which Hyundai and Kia vehicles can be stolen. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by forgoing common anti-theft technology have resulted in an epidemic of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly in the City of Parma, where the police department is under considerable staffing stress.

4.    In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars. Hyundai and Kia are nearly unique among automobile manufacturers in failing to install vehicle immobilizers in most of their cars. This is not because the technology is somehow beyond them—

in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them. It is only in the United States that Hyundai and Kia have decided to trade public safety for profits.

5.     The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: only *26%* of 2015-model Hyundai and Kia vehicles in the U.S. had immobilizers, compared to *96%* of vehicles from all other manufacturers.[1]

6.     Hyundai's and Kia's decision to put cost-savings and profits over public safety has had devastating consequences for the City of Parma and its residents, as it has for other cities. The failure of Defendants to install an industry-standard anti-theft device, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

7.     This epidemic started in Milwaukee before spreading nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.[2]

8.     The City of Parma has experienced a similar surge in thefts of Hyundai and Kia vehicles. Between 2021 and 2022, the number of Kia vehicles stolen in the City of Parma increased by more than 414% and thefts of Hyundai vehicles increased by more than 416%. The rash of thefts has continued at a similar pace in 2023.

---

[1] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[2] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, THEDRIVE.COM (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

9.      Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft often goes hand in hand with high-speed pursuits and other forms of reckless driving, which in turn results in injuries and death. It results in increased violence, as many car owners are unlikely to part with their vehicles willingly. It consumes scarce law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

10.      In a recent letter issued to the National Highway Traffic Safety Administration, eighteen Attorneys General raised concern over this very issue, noting the downstream consequences that unsafe Hyundai and Kia vehicles have created for local governments around the country:

> The high rate of theft of Hyundai and Kia vehicles has demanded time and resources from public safety agencies, diverting resources from other priorities. Thefts reported to law enforcement require documentation and investigation, and crashes of stolen vehicles require emergency responder services. In addition to responding to Hyundai and Kia vehicle thefts and related crashes or crimes, local agencies have also had to allocate scarce resources to preventative measures.[3]

11.      The skyrocketing rate of vehicle theft in Parma has drastically impacted City resources, including its police resources. Parma residents are subjected to the increasingly dangerous conditions on their city streets, as car thieves (many of them teenagers) take advantage of Hyundai's and Kia's failures and engage in high-speed, reckless driving, endangering City residents and their property. Typically, young males working in groups also use these vehicles to rob, burglarize, and commit other crimes because the vehicles are stolen so easily.

---

[3] Letter from Attorneys General to Ann Carlson, Acting Administrator of the National Highway Traffic Safety Administration  4 (Apr. 20, 2023), https://oag.dc.gov/sites/default/files/2023-04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.pdf ("Letter from Attorneys General to NHTSA").

12.     Defendants' conduct has created a public nuisance that could have been avoided had they simply followed industry-wide standards and installed immobilizer devices, or an equivalent anti-theft device, in all their vehicles.

13.     To date, Hyundai and Kia refuse to accept responsibility, forcing municipalities across the country, including Parma, to divert funds and risk officer safety to combat the rising burden caused by increased Hyundai and Kia vehicle theft and reckless driving on city streets.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The City of Parma is a municipal corporation and regarded as a citizen of the state of Ohio, for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants are citizens of California, where they are headquartered and incorporated.

15.     This Court has specific personal jurisdiction over Defendants, as they conduct substantial business in Ohio through the sale of vehicles that they distribute in Ohio, purposefully availing themselves of the privilege of conducting business in this State, and the claims arise out of or relate to Defendants' contacts with Ohio. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because it is a district where a substantial part of the events giving rise to the claims took place and where the public nuisance exists.

## III.     PARTIES

### A.     Plaintiff

17.     Plaintiff, the City of Parma (the "City" or "Parma") is a municipal corporation organized pursuant to Article XVIII of the Ohio Constitution. The City has all the powers of

local self-government and all other powers possible for a city to have under the Constitution of the state of Ohio, and the laws of the state of Ohio. The City is located in Cuyahoga County, Ohio, and has approximately 80,000 residents. The City's principal offices are located at City Hall, 6611 Ridge Road, Parma, Ohio.

### B. Defendants

18.     Defendant **Hyundai Motor America** ("Hyundai") is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

19.     Defendant **Kia America, Inc.** ("Kia") is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

### IV.     THE KIA HYUNDAI THEFT WAVE

### A.     Without Immobilizers, Defendants' Vehicles Are Sitting Ducks

20.     As described further below, Kia and Hyundai have chosen to flout the industry standard of utilizing an engine immobilizer in many of their vehicles, which made those vehicles more susceptible to theft. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models ("Susceptible Vehicles") without engine immobilizers between 2011 and 2022: Hyundai Accent,

Elantra, Elantra GT, Elantra Coupe, Elantra Touring, Genesis Coupe, Kona, Palisade, Santa Fe,

Santa Fe XL, Santa Fe Sport, Sonata, Tucson, Veloster, Venue, and Veracruz; and the Kia Forte,

K5, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. As would-be car thieves learned of

this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other

models, from 2015 to 2020.[4]

21.     However, this progression became an explosion in late 2020, when a group of

teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible

Vehicles.[5] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in

reckless driving after stealing Kias and Hyundais.[6] As the videos detailed, a thief need only remove

the plastic cowl under the steering column and use a USB cable to start these unsecure cars.

22.     What followed was all too predictable: thefts of Kias and Hyundais skyrocketed.[7]

In the first half of 2021, the number of stolen Kias and Hyundais in Milwaukee increased by more

---

[4] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1,
2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot
Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017),
https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *America's 10 Most
Stolen Vehicles*, NICB (Sept. 18, 2018),
https://www.nicb.org/news/news-releases/2017-hot-wheels-report; *America's 10 Most Stolen
Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-
01/2018%20Hot%20Wheels%20Report.pdf; *America's 10 Most Stolen Vehicles*, NICB (Oct. 13,
2020), https://www.nicb.org/HotWheels2019; *and America's 10 Most Stolen Vehicles*, NICB
(Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-
report-americas-top-ten-most-stolen-vehicles.
[5] Greg Rosalsky, *Planet Money*, *Someone stole my truck. I got a crash course on
the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM),
https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-
crash-course-on-the-wild-black-market-for-stolen-.
[6] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia,
Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM),
https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-
cars.html.
[7] *Videos Show Teens How to Steal Certain Kias and Hyundais With
Only a USB Cable, Police Warn Amid Rising Thefts*, INSIDE EDITION (Aug. 10,

than thirty and fifteen times, respectively, when compared to the same period in 2020.[8] This dramatic increase was unique to Kias and Hyundais, which represented 66% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[9] This trend then spread nationwide.

23.    By 2022, the Parma Police Department were seeing a considerable increase in Hyundai and Kia vehicle theft.



---

2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

[8] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, KELLEY BLUE BOOK (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[9] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia,* THE TRUTH ABOUT CARS (Sept. 20, 2022 2:36 PM),https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971; Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021, 4:29 PM), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/.

24.     The combined number of Hyundai and Kia vehicle thefts in 2022 more than quintupled the number of thefts of those same vehicles in 2021. As thefts of these vehicles increased, so too did the number of times officers had to pursue Hyundai and Kia vehicles, which suggests these vehicles were being used to commit other crimes or otherwise endangered the public (e.g., being driven recklessly).



25.     In the first six months of 2023, 24 Hyundai and Kia vehicles were stolen—more than the total Hyundai and Kia vehicle thefts for all of 2020 and, also, for all of 2021, *combined*.

26.     Parma law enforcement officers also pursued ten Hyundai and Kia vehicles through the first six months of 2023, which matches the total number of pursuits for those same vehicles for all of 2022.

27.      The surge in thefts has caused Parma law enforcement officers to spend more and more of their time responding to stolen Hyundai and Kia vehicles. In 2022, officers were on scene responding to stolen Hyundai and Kia vehicles for more than 20,000 minutes. This near ten-fold increase since 2020 has placed a tremendous strain on Parma's Uniform Patrol Division, whose

time has been diverted from other important duties, not to mention the time other divisions spend investigating and prosecuting these crimes.

28.    In the first four months of 2023, Parma officers have already spent more time responding to reports of stolen Hyundai and Kia vehicles than they did in all of 2020.

29.    The susceptibility of Defendants' vehicles to theft enabled this spiraling epidemic. Defendants' choice to deviate from the industry standard of utilizing engine immobilizers, placing profits over people and safety, was both a proximate and but-for cause of this outbreak. As a Milwaukee police sergeant described the problem, Defendants' cars are simply too easy to steal.[10] This presents a risk not only for property damage, but to public safety, as thieves often engage in reckless driving, as well as other dangerous criminal conduct, including robbery and firearm thefts. Specifically, Kias and Hyundais have been targeted by thieves seeking weapons (and other valuables) that might have been left in these vehicles.[11]

### B.    Car Thefts Imperil Public Safety

30.    Car thefts imperil public safety. By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

31.    This is the conclusion drawn by the National Highway Traffic Safety Administration ("NHTSA"). Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety Standard 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the

---

[10] Rebecca Klopf, *MPD: Hyundai and Kia vehicles too easy to steal, leading to spike in car thefts,* TMJ 4 (Feb. 3, 2021, 4:40 PM), https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts.

[11] In one instance, a 2017 Hyundai Sonata owned by the Department of Homeland Security was stolen in broad daylight. *See* Jim Piwowarczyk, *Department of Homeland Security Hyundai Stolen in Milwaukee, Contained Rifle & Body Armor*, WISCONSIN RIGHT NOW (Apr. 17, 2022), https://www.wisconsinrightnow.com/homeland-security-hyundai/.

highways."[12] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[13] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[14]

32.     Sadly, the reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts, and the concomitant threats to public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicle and any lawful users of the public thoroughfare who are unfortunate enough to cross paths.

33.     Reckless driving impacts the comfortable enjoyment of life, health, and safety of others within Parma. This is particularly true with the current crime wave. Distinct from many instances of car theft, where the object is converting the stolen vehicle, the recent viral wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and then abandoning the stolen vehicles—often after collisions—during busy hours of the day.

34.     Social media platforms like TikTok and Instagram are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real danger from this

---

[12] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (April 27, 1968).
[13] *Id.*
[14] *Id.*

phenomenon, including youth joyriding through school zones or even through crowds of students, and drivers hitting other cars and then running from the scene.[15]

36.     This phenomenon has already led to extreme driving through Parma with disastrous consequences.

36.     For example, a 14-year-old driving a stolen Kia Optima led Parma Officers on a high-speed pursuit in the early morning hours of October 2, 2022. The vehicle eventually crashed into an apartment building, causing damage to its foundation, and disabling the vehicle.

37.     On November 6, 2022, Parma officers were forced to pursue a stolen Kia Forte traveling over 100 miles per hour, including in a 25 miles per hour zone. The stolen Kia almost struck another vehicle and crashed through a construction cone before officers were able to stop the vehicle. The three juveniles inside the stolen Kia were taken into custody.

---

[15] *See e.g.*, @mixtapetrappers_, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link;@monloww__, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; *and* @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

38.     In December 2022, a 17-year-old male in a stolen Hyundai Elantra led Parma police on a high-speed pursuit. The driver of the stolen Hyundai ran multiple stop signs and reached speeds of 80–90 miles per hour before crashing into a home just outside Parma city limits.[16] A 25-year-old woman and her infant were inside the home during the crash and, fortunately, neither was injured. The driver of the stolen vehicle sustained head injuries and was transported to the hospital. The Hyundai vehicle was towed back to Parma.



39.     The previous month, police officers in the township of Bath, Ohio responded to a burglary alarm at Summit Armory, a gun store. When officers arrived, they found an abandoned Kia vehicle, previously reported stolen from Cleveland, had crashed into the gun store.[17]

---

[16] WKYC Staff, *Photos: Car slams into Cleveland home following stolen vehicle pursuit*, WKYC STUDIOS (Dec. 13, 2022, 7:08 PM), https://www.wkyc.com/article/news/local/cleveland/car-slams-into-cleveland-home-pictures/95-1198fbd5-86a0-499b-a32a-fafe1437c292.

[17] Anna Meyer, *Stolen Kia from Cleveland crashes into Summit Armory in Bath Township*, WKYC Studios (Nov. 3, 2022, 6:41 PM), https://www.wkyc.com/article/news/local/summit-county/vehicle-stolen-cleveland-found-bath-police-department/95-7f112515-2605-434d-8bb4-dfe4dc5d9344.



40.      In early January 2023, thieves in Parma stole four Kia vehicles and one Hyundai

vehicle "and attempted to steal seven others" in a single weekend.[18]

41.      In mid-January 2023, four teenagers in a stolen Hyundai Elantra attempted to elude

police before crashing into a utility pole in Parma.[19] Three of the individuals apprehended were

between the ages of 17 and 19. Officers also observed a Kia SUV that had been reported stolen,

but the driver of the car was able to get away. Prior to the police chase, officers observed a group

of individuals in the stolen Kia trying to steal another vehicle in an apartment complex.[20]

---

[18] Julia Bingel, *Parma police search for suspects who stole 5 cars, attempted to snatch 7 more*,
Cleveland19.com (Jan. 4, 2023, 5:12 AM), https://www.cleveland19.com/2023/01/04/busy-
weekend-stolen-cars-parma/.

[19] Anna Meyer & Bri Buckley, *4 teenagers taken into custody after crashing stolen Hyundai into
pole in Cleveland*, WKYC STUDIOS (Jan. 18, 2023, 11:22 PM),
https://www.wkyc.com/article/news/local/cuyahoga-county/teenagers-crash-stolen-hyundai-
cleveland/95-7ab0ff03-3d0e-475e-a26b-7521e3103aa8.

[20] *Id.*

42.     In the last week of January 2023 alone, there were at least three other stolen car police pursuits in the Greater Cleveland area, two of which ended in crashes.[21] One of the crashes involved a stolen Kia that drove across four lanes of traffic, clipping a charter bus carrying members of the Baldwin Wallace University swim team, and crashing into a retaining wall.[22]

43.     Also in late January 2023, a man in Cleveland reported that his Hyundai was stolen. While driving his other car, a Kia Rio, the man spotted his stolen Hyundai at a Burger King drive thru. When he attempted to block the Hyundai, two teenagers in the stolen car rammed the man's Kia against the Burger King restaurant.[23] Police reported that the incident was part of a three-day crime spree involving two shootings within an hour of each other, which the driver of the stolen Hyundai helped carry out.[24]

---

[21] Bryn Caswell, *Dash-cam video shows wrong-way crash on I-480; third stolen car pursuit in a week*, News 5 Cleveland (Feb. 1, 2023, 4:17 PM), https://www.news5cleveland.com/news/local-news/dash-cam-video-shows-wrong-way-crash-on-i-480-third-stolen-car-pursuit-in-a-week.

[22] Laura Morrison, *Baldwin Wallace swim team bus hit by stolen vehicle: Police*, FOX 8 (Jan. 30, 2023, 9:22 AM), https://fox8.com/news/baldwin-wallace-swim-team-bus-hit-by-stolen-vehicle-police/.

[23] Cory Shaffer, *Teens lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, Cleveland.com (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[24] *Id.*

14



44.     Within two weeks of June of 2023, Parma police responded to at least four incidents involving high-speed pursuits of stolen Hyundai and Kia vehicles. For one incident, the suspect vehicles reached speeds of 100 miles per hour in a school zone during busy morning hours when children were more likely to be present. In another incident, a stolen Kia and Hyundai drove towards an officer at high speed, nearly striking the officer's cruiser.

45.     Another example of this all-too-common tragedy occurred in Milwaukee in June 2021, when a 16-year-old was killed after he stole a Kia Sportage and collided with another car.[25] His two 12-year-old accomplices were also seriously injured, as were three passengers in the car that he struck. The images and dashcam footage[26] of this tragedy show how the epidemic of vehicle theft imperils the public.

---

[25] *Teen driving stolen car killed in head-on crash, 5 others injured*, WISN 12 (Jun. 16, 2021, 5:32 PM), https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640.

[26] Caroline Reinwald, *Dashcam video shows fatal crash moments after police cancel pursuit*, WISN 12 (Oct. 13, 2021, 11:00 PM), https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614.

46.     In upstate New York, this phenomenon has already led to extreme and devastating accidents. In October 2022, a 16-year-old individual driving a stolen Kia Sportage crashed the vehicle near the intersection of Routes 33 and 198 in Buffalo.[27] All five passengers were ejected from the vehicle, three of whom were pronounced dead at the scene.[28] Another passenger later died at the hospital, and the remaining passenger and driver sustained serious injuries. The four passengers who died were all between the ages of 14 and 19.[29] The 16-year-old driver faces four counts of second-degree manslaughter, among other charges.[30]



---

[27] Aidan Joly & Evan Anstey, *Regional News*, *Four teens killed in rollover crash in Buffalo, two injured*, ROCHESTERFIRST.COM (Oct. 25, 2022, 12:26 PM), https://www.rochesterfirst.com/crime/police/four-teens-killed-in-crash-at-33-and-198/.
[28] *Id.*
[29] Graeme Massie, *Car crash that killed four teens is linked to 'Kia Challenge' TikTok craze, Buffalo police say*, THE INDEPENDENT (Oct. 25, 2022, 9: 38 PM), https://www.independent.co.uk/news/world/americas/crime/buffalo-teen-crash-tiktok-kia-challenge-b2210473.html.
[30] Maki Becker, *Teen in stolen Kia crash that killed 4 must wear ankle monitor, report to probation*, THE BUFFALO NEWS (Dec. 11, 2022), https://buffalonews.com/news/local/crime-and-courts/teen-in-stolen-kia-crash-that-killed-4-must-wear-ankle-monitor-report-to-probation/article_030d8c44-56e8-11ed-a8c0-b77671ebf054.html.

47.     In electing profits over safety and in deviating from industry norms by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

48.     A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai got out with guns and began shooting at him.[31] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[32] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[33]

49.     This risk to bystanders was also tragically demonstrated in October 2021 in Wisconsin, when a woman who attempted to prevent the theft of a Hyundai was killed at the scene.[34]

50.     Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into another car and a 54-year-old pedestrian.[35]   Both cars careened into a

---

[31] Cory Shaffer, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, CLEVELAND.COM, (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[32] *Id.*

[33] *Id.*

[34] Michael Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021, 10:06 PM), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.

[35] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, THE BALTIMORE SUN (Mar 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html

nearby building, which collapsed on top of the vehicles and the pedestrian.[36] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[37]



51.    Parma has experienced an especially high rate of Hyundai and Kia vehicle thefts and high-speed pursuits that have forced the City to respond, incurring significant costs, including expending extra police time and resources taking reports and collecting evidence; providing emergency and medical services; processing, assisting with prosecution, and rehabilitating offenders; and educating the public about this threat to public safety.

52.    As a result of the skyrocketing rate of theft of Hyundai and Kia vehicles nationwide, at least two major insurance companies are refusing to write policies for certain Hyundai and Kia models in major cities including Parma, thereby increasing the potential number of uninsured motorists on the road.[38]

---

[36] *Id.*
[37] *Id.*
[38] Peter Valdes-Dapena, *CNN Business*, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM),

53.     To date, Defendants' responses have shown a continued prioritization of profits over safety. Both companies have refused to implement a recall to install engine immobilizers in the Susceptible Vehicles, initially only offering wheel locks for municipalities to distribute.[39] Unfortunately, the wheel locks are not effective; Susceptible Vehicles with wheel locks in use have still been stolen and, in some instances, used in connection with other crimes, including shootings.[40]

54.     More recently, Hyundai has begun rolling out a "software update" rather than installing immobilizers.[41] Kia has planned a similar software update, yet this software-only approach is too little, too late, and many of the Susceptible Vehicles will not even be included in the update.[42]

---

https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Robert Higgs, *Progressive, State Farm halt new car insurance policies for high theft models of Kia and Hyundai*, CLEVELAND.COM (Jan. 31, 2023, 1:06 PM), https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html; *see also* Joe Hernandez, *Dealers still sell Hyundais and Kias vulnerable to theft, but insurance is hard to get*, NPR (May 4, 2023, 5:00 AM), https://www.npr.org/2023/05/04/1173048646/hyundai-kia-car-theft-tiktok-insurance-dealerships (discussing how "a dozen" insurance companies denied coverage for the new owner of 2020 Kia Forte).

[39] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, MILWAUKEE JOURNAL SENTINEL (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

[40] Ashley Sears, *Milwaukee woman's Kia stolen twice,  had steering wheel lock*, FOX6NOW.COM (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX13 SEATTLE (Jan. 25, 2023), https://www.q13fox.com/news/b-i-swear-b-im-gonna-crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; *and Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS MINNESOTA (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/

[41] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft

[42] *Id.*

55.     As highlighted in the multistate letter sent on behalf of eighteen Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[43]

56.     For vehicles not covered by the update, Defendants are offering nothing more than wheel locks, or rebates for already purchased wheel locks.[44] As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to the individual vehicle owners."[45]

57.     Additionally, the Attorneys General have identified two other primary issues with the software update. First, "not all eligible vehicles can receive the updates immediately"—at least two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[46] Meanwhile, these vehicles "will remain on the road, vulnerable to theft and posing a threat to public safety."[47] Second, the Defendants' "voluntary service campaign" does not prompt certain "regulatory requirements and oversight and instead places additional burdens on individual vehicle owners."[48]

58.     Upon information and belief, rather than install an actual immobilizer, the software update merely doubles the length of the theft alarm sound and adds a new logic check to the

---

[43] Letter from Attorneys General to NHTSA at 6.

[44] *See* Palmer, *supra* note 38.

[45] Letter from Attorneys General to NHTSA at 6.

[46] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

[47] Letter from Attorneys General to NHTSA at 7.

[48] *Id.*

vehicles' on-board computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This software-based approach is a late half-measure at best and already significant flaws have been uncovered.[49] There have been numerous reports of Kia and Hyundai vehicles being stolen after receiving the software update, and Kia and Hyundai have identified scenarios where the software logic fails.[50] While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability, not to mention public safety.

59.     The rollout of the software update has just begun, far too late to prevent the nuisance that the Susceptible Vehicles created and the expenses that Parma has incurred and continues to incur. The update's efficacy has not been proven in the real world, and in fact Susceptible Vehicles have already been stolen after receiving the update.[51] No one knows how many consumers will

---

[49] *See* Michelle Nicks, Cleveland woman devastated after new anti-theft device on her Hyundai fails to stop thieves from causing damage, CLEVELAND19.COM (March 17, 2023, 8:07 PM), https://www.cleveland19.com/2023/03/18/cleveland-woman-devastated-after-new-anti-theft-device-her-hyundai-fails-stop-thieves-causing-damage/. *See also* Devin Bartolotta, *First case of Kia stolen after security software upgrade reported in New Orleans*, WWLTV (May 15, 2023, 10:16 PM), https://www.wwltv.com/article/news/crime/first-case-kia-stolen-after-security-software-upgrade-reported-new-orleans-sweeps-crime-local-news/289-c789eed8-bc46-4e0a-83fb-7489563300ce (discussing the theft of a 2020 Kia Optima approximately 15 hours after the same vehicle received the software update from a Kia dealership). Additional anecdotes suggest that the update is not reliable. *See* Jsmith4523, Reddit (Feb. 22, 2023, 4:52 PM), https://www.reddit.com/r/Hyundai/comments/119jlts/well_it_happened_my_17_elantra_se_was_stolen_and/?utm_source=share&utm_medium=ios_app&utm_name=iossmf; MaximumLongjumping31, Reddit (Mar. 3, 2023, 5:12 AM), https://www.reddit.com/r/Hyundai/comments/11h0frt/alarm_tsb_computer_upgrade_my_terrible_experience/.

[50] Carly Shaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Automotive News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes (discussing a February 2023 service bulletin issued from Kia to its dealers regarding a software compatibility issue for Kia vehicles equipped with remote start accessories; another bulletin issued from Kia in late-May 2023 acknowledged that "the problem has not been remedied").

[51] *See* Letter from Attorneys General to NHTSA at 7 (noting that "voluntary service campaigns like the ones announced by Hyundai and Kia are distinct from recalls and offer insufficient

even opt to get the update. And, as mentioned above, there are facial defects with this approach, including that approximately two million of the Susceptible Vehicles cannot "receive the updates immediately."[52]

60.     In the three months since the software update began rolling out, data gathered from the Associated Press "shows that the number of Hyundai and Kia thefts is still growing despite the companies' efforts to fix the glitch, which makes 8.3 million vehicles relatively easy targets for thieves."[53]

61.     What's more, the work-around substantially reduces the usability of the vehicles. This logic could be triggered by letting a passenger out of a car to run an errand and then starting the car again. In addition, owners of the Susceptible Vehicles have already experienced issues with after-market remote start systems, rendering the vehicles functionally inoperable. As one owner recently posted:

> "I have the update. I also have an after market remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[54]

62.     Prior to this software update, Hyundai callously turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[55] Defendants

---

assurances that vehicles with the starting-system flaw will be corrected or taken off the road in a timely manner").

[52] *Id.* at 6.

[53] Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, Associated Press (May 9, 2023), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

[54] Fungiinterezt, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/?sort=new.

[55] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, NERD WALLET (Jan. 26, 2023), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money off of a crime wave it caused.

63.     By electing profits over safety and deviating from industry-standard norms by not including engine immobilizers as a standard safety feature, Defendants created and maintained a public nuisance.

### C.     Measures to Prevent Vehicle Theft Have Existed for Over a Century

64.     Since the dawn of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and E. B. Birkenbeuel invented the first formation of an electric immobilizer/vehicle security system.[56]

65.     Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[57]

66.     Evans and Birkenbeuel's immobilizer/alarm system consisted of a three-by-three switch panel that connected to the car's battery, horn, and ignition. Upon exiting his vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

---

[56] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[57] *Id.* at ¶¶ 14–20.



**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"**

67.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

68.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards.

69.     In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[58]

---

[58] National Traffic and Motor Vehicle Safety Act of 1966, Pub. L. 89–563, 80 Stat. 718.

Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: NHTSA, f/k/a/ the National Traffic Safety Bureau.

70.    Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[59] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1.  *Scope*.  This  standard  specifies  vehicle  performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles
>
> S2.  *Purpose*. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. *Application*. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.
> . . .
>
> S5.1 *Theft Protection*.
> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
> (a)    The normal activation of the vehicle's engine or motor; and
> (b)    Either steering, or forward self-mobility, of the vehicle, or both.
>
> . . .
>
> S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

71.    The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that

---

[59] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. § 571.114.

stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[60]

72.    As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[61] Accordingly, NHTSA recognized that "a reduction of the incident of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[62] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[63]

73.    An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[64] The proposed software update does not appear to satisfy this requirement—as it is not linked to an attempt to start the vehicle without the correct key—and the absence of *any* system not only violates this standard, it created the public nuisance of rampant car theft in Parma.

---

[60] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars,33 Fed. Reg. 83, 6471 (April 27, 1968).

[61] *Id.*

[62] *Id.*

[63] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968).

[64] Jacqueline Glassman, *NHTSA Interpretation GF005229-2* (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

### D.      The Widespread Adoption of Modern Engine Immobilizers as an Even More Effective Vehicle Theft Deterrent

74.      In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[65] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The below graph illustrates the dramatic rise in car thefts during this time period.[66]



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**

75.      To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[67] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[68]

---

[65] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 CRIME SCIENCE 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.
[66] *Id.* at 2.
[67] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).
[68] *Id.*

76.     In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle.

77.     Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[69]

78.     The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[70] Similar mandates soon followed in Australia, New Zealand, and Canada.

79.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[71]

### E.     Defendants' Deviation from the Industry Standard

80.     At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America, with the exception of Hyundai and Kia.

81.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[72] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft

---

[69] *Id.*

[70] Commission Directive No. 95/96/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[71] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).

[72] *Hyundai and Kia theft losses*, 38 HLDI BULLETIN 28 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[73] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[74]

82.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[75]

83.     The staggeringly low percentage of Hyundai and Kia vehicles with immobilizers is especially concerning given that, during this same time period, Defendants were installing immobilizers in 100% of their models for sale in European and Canadian markets, in compliance with applicable laws there.[76]

84.     Nor are Defendants unfamiliar with the benefits of installing immobilizers in the American market. In March 2007, Hyundai requested an exemption from particular NHTSA vehicle theft prevention standards for its 2008 Hyundai Azera line "based on the installation of an antitheft device" for the vehicle line that would be "at least as effective as th[e] GM and Ford [immobilizer] devices" in reducing vehicle theft.[77] Yet, until the last year or so, Hyundai and Kia

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Press Release*, *Over 50 years of progress: the history of Hyundai* HYUNDAI.NEWS (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[77] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, 72 Fed. Reg. 39,662 (July 19, 2007); *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, 75 Fed. Reg. 1,447

only offered immobilizers in a few, more expensive, models. This decision only compounds the harms on low-income communities.[78] Those without resources to afford such models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered vehicle.

85.     In September 2022, the HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, *combined*, had a theft claim rate of 1.21.[79]

86.     Based on the above, Defendants' decision not to install the simple and highly effective immobilizer in the Susceptible Vehicles between 2011 and 2022, in contrast to the approximately 96% of all other car manufacturers that did install an immobilizer, has led to a reasonably foreseeable car theft epidemic that is plaguing Parma.

## V.     CAUSES OF ACTION

### COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE

87.     The City incorporates each preceding paragraph as though fully set forth herein.

88.     A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

---

(Jan. 11, 2010) (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[78] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people" because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

[79] *Id.* An insured vehicle year is equal to one vehicle insured for one year.

89.     Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the safety, welfare, peace, comfort, and sense of security of the City and its residents. *See* Restatement (Second) of Torts § 821B.

90.     Defendants, through their designing, manufacturing, and distributing of automobiles that are dangerously susceptible to theft, have created, contributed to, and maintained a public nuisance.

91.     Defendants' conduct has directly caused a severe disruption of public order and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

92.     The public nuisance is an *absolute* public nuisance because Defendants' nuisance creating conduct was intentional.

93.     Defendants know that their conduct has caused an increase in vehicle theft that has had and will continue to have a detrimental effect on the public welfare, safety, peace, comfort, and convenience of Parma and Parma's residents.

94.     Defendants had initial control over the manufacturing of the Susceptible Vehicles and their shipping of automobiles to Parma. Defendants continued to maintain control over the conduct through the ability, and failure, to implement a recall to remediate the susceptibility.

95.     It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Parma.

96.     Based on Defendants' intentional and unreasonable actions and their special position in understanding the decades of literature supporting the deterrent effects of engine immobilizers, without Defendants' actions, vehicle theft in Parma would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

97.     The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to Parma and Parma's community. The harm inflicted outweighs any offsetting benefit.

98.     As a direct and proximate result of Defendants' conduct, Parma has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

99.     As a direct and proximate result of Defendants' tortious conduct, Parma has suffered and will continue to suffer stigma damage and damage to its proprietary interests, including reduced tax revenues attributable to property value declines caused by increases in property crime rates and stigma damage.

100.    The nuisance created by Defendants' conduct is abatable.

101.    Defendants' conduct has affected and continues to affect Parma's community, and Parma will continue to incur economic losses until the nuisance is abated.

102.    Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that the interference with public safety caused by easier vehicle theft was substantially certain to result from their conduct. Defendants knew or had reason to know that the installation of engine immobilizers successfully decreased the rate of car theft by as much as forty percent.

103.    By intentionally foregoing the installation of engine immobilizers in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Parma.

104.     Hyundai and Kia could have avoided all this by installing engine immobilizers at the time of manufacture for as little as $200 per device.

105.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

106.     Parma has incurred expenditures for special programs over and above its ordinary public services.

107.     Parma has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by Parma.

108.     Parma requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. Parma does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE

109.     The City of Parma incorporates each preceding paragraph as though fully set forth herein.

110.     Defendants have created and maintained a public nuisance by manufacturing and distributing automobiles that are dangerously susceptible to theft, thus interfering with the public health, welfare, and safety in Parma. Parma and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

111.    The public nuisance is a *qualified* public nuisance because Defendants negligently engaged in conduct or omissions which endanger or injure the health, safety, or comfort of the public in Parma.

112.    Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe and equipped with industry-standard anti-theft measures.

113.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

114.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Parma's injuries and thus created a dangerous and unreasonable risk of injury to Parma.

115.    As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

116.    As a proximate result of Defendants' wrongful acts and omissions, Parma has incurred economic damages, including significant expenditures for police, emergency, health,

prosecutions, corrections, youth rehabilitative services, and other services. The City does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

## COUNT THREE — NEGLIGENCE

117.   The City of Parma incorporates each preceding paragraph as though set forth fully herein.

118.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so easy to steal.

119.   Defendants owed and continue to owe the City a duty not to expose the City to an unreasonable risk of harm.

120.   Defendants' duties were preexisting.

121.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

122.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Susceptible Vehicles could cause Parma's injuries and thus created a dangerous and unreasonable risk of injury to Parma. Defendants were therefore in the best position to protect the City against the foreseeable rise in the theft of Susceptible Vehicles.

123.   At all times relevant to this litigation, Defendants knew or had reason to know that the omission of an engine immobilizer in the Susceptible Vehicles could cause the City's injuries,

as FMVSS 114 requires automobiles to have a starting system which, whenever the key is removed from the starting system, prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system." As alleged *supra*, most carmakers in the United States satisfy FMVSS 114 through the use of an engine immobilizer.

124.    As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

125.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Parma.

126.    Defendants knew and/or should have known that it was foreseeable that Parma would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

127.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

128.    Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Parma suffered and will continue to suffer.

129.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

130.    Parma's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

131.    As a proximate result of Defendants' wrongful acts and omissions, Parma has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads within the City of Parma.

132.    Defendants engaged in conduct, as described above, that constituted reckless disregard of the safety and health of the City's residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

133.    Defendants' conduct constituting reckless and conscious disregard for public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

134.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Parma alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

135.    Parma has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the negligence caused by Defendants' actions.

136.    The tortious conduct of each Defendant was a substantial factor in producing harm to Parma.

137.     Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Parma's rights, including the right to public safety, therefore warrants an award of aggravated or punitive damages.

138.     Parma is without fault and injuries to the City and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

139.     Parma asserts this Cause of Action as a common law tort claim for negligence and not as a "product liability claim" as defined in R.C. § 2307.71. The City does not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

## VI.     PRAYER FOR RELIEF

140.     Entering an Order that the conduct alleged herein constitutes a public nuisance under Ohio law;

141.     Entering an Order that Defendants are jointly and severally liable;

142.     Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

143.     Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

144.     Awarding equitable relief to fund automobile theft prevention;

145.     Awarding actual and compensatory damages;

146.     Awarding punitive damages;

147.     Awarding reasonable attorneys' fees and costs of suit;

148.     Awarding pre-judgment and post-judgment interest;

149.     Entering an order for remedial relief on the City's claims against Defendants; and

150.    Awarding such other and further relief as the Court deems just and proper under the circumstances.

## VII.    DEMAND FOR JURY TRIAL

151.    Parma hereby demands a trial by jury.


RESPECTFULLY SUBMITTED this 13th day of July, 2023.

CITY OF PARMA                                                     KELLER ROHRBACK L.L.P.


By *s/   Timothy Dobeck*                          By *s/ Gretchen Freeman Cappio*
Timothy Dobeck, OH Bar No. 0034699                Gretchen Freeman Cappio (*pro hac vice*
Law Director                                      *forthcoming*)
Jennifer Meyer, OH Bar No. 0077853                Derek W. Loeser (*pro hac vice*
Principal Attorney                                *forthcoming*)
                                                  Dean Kawamoto (*pro hac vice forthcoming*)
7335 Ridge Road (second floor)                    Ryan McDevitt (*pro hac vice forthcoming*)
Parma, OH 44129                                   Alison Gaffney (*pro hac vice forthcoming*)
Telephone: (440) 885-8132                         Garrett Heilman (*pro hac vice forthcoming*)
Fax: (440) 885-8008                               Zachary Gussin (*pro hac vice forthcoming*)
tdobeck@cityofparma-oh.gov                        Kylie Fisher (*pro hac vice forthcoming*)
jmeyer@cityofparma-oh.gov
                                                  1201 Third Avenue, Suite 3200
*Counsel for City of Parma*                       Seattle, WA 98101-3052
                                                  Telephone: (206) 623-1900
                                                  Fax: (206) 623-3384
                                                  gcappio@kellerrohrback.com
                                                  dloeser@kellerrohrback.com
                                                  dkawamoto@kellerrohrback.com
                                                  rmcdevitt@kellerrohrback.com
                                                  agaffney@kellerrohrback.com
                                                  gheilman@kellerrohrback.com
                                                  zgussin@kellerrohrback.com
                                                  kfisher@kellerrohrback.com

                                                  *Counsel for Plaintiff City of Parma*